IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| CHEYTAC USA, LLC. | § | |
| | § | Civil Action No: |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | **JURY TRIAL DEMANDED** |
| NEXTGEN TACTICAL, LLC, | § | |
| DENNIS OMANOFF, | § | |
| individually, and | § | |
| JOHN TAYLOR, | § | |
| individually, | § | |
| | § | |
| Defendants. | | |

## PLAINTIFFS COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, CHEYTAC USA, LLC, ("CheyTac"), by and through undersigned

attorneys, hereby files this Original Petition, complaining of the actions of NEXTGEN

TACTICAL, LLC, a Florida Limited Liability Company ("NextGen"), Dennis Omanoff, an

individual ("Omanoff"), and John Taylor, an individual ("Taylor") (collectively,

"Defendants"), together with its Application for Temporary Injunction and Permanent

Injunction:

### I.      PRELIMINARY STATEMENT

1.      CheyTac is a pioneer and acknowledged leader in the development and

design of its patented balance control flight projectiles (bullets) and high caliber

tactical rifles ("CheyTac Products") which enable these projectiles to travel

further and with greater accuracy than competitors. CheyTac Products are widely

recognized high-technology products used by military and law enforcement

agencies around the world.  CheyTac has multiple engineering locations and sells

products in over 10 countries worldwide, including a 35,000 sq./ft. facility in Charleston, South Carolina. (*See* Declaration of Joseph Warren ("Warren") at ¶¶ 4-11, Exhibit 1.)

2.      CheyTac employees 5 full time employees and over 10 consultants and sells its products online through its website www.cheytac.com  CheyTac's estimated annual revenue is between $700,000 and $1,000,000.

3.      NextGen is Florida limited liability company started in April 2017 by Omanoff with its principal place of business located in Cocoa Beach, Florida.  All the members of the NextGen are former high-level employees including the former Chief Executive Officer of CheyTac. (Warren Decl. at ¶¶ 33, 36; *See* Exhibit 20.)

4.      Several of CheyTac's most award-winning and proprietary products, "M200 and M300 Intervention" rifles ("M200") and .375 CT and .408CT ("CheyTac Products") are the foundation to this lawsuit.  The M200 Intervention rifles include an interchangeable .375 and .408 caliber barrel that has garnered international recognition and has been ranked the #1 Sniper Rifle in the world by the Military Channel.  The M200 incorporates a proprietary lands and groove barrel design and receiver connection which minimize drag forces on the munitions by placing a specific spin rate on the munitions.  The proprietary spin rate and patent method enable CheyTac's projectiles to travel up to 2.6 miles. (Warren Decl. at ¶ 9; *See* Exhibit 24.)

5.      CheyTac's has acquired through assignment U.S. Patent No. 6,629,669 titled "Controlled Spin Projectile" to protect these methods of imparting optimal spin on CheyTac ammunition. (Warren Decl. at ¶ 32; *See* Exhibits 19 and 28.)

6.      CheyTac labels its .375 and .408 munitions as ".375CT" and ".408CT" on its website and packaging.

7.      CheyTac's .375CT and .408CT munitions have created a commercial impression amongst sophisticated purchasers who expect the term "CT" to be trademarked and originate from CheyTac. (Warren Decl. at ¶¶ 6, 8-10.)

8.      The terms "CT" is an abbreviation for "CHEYTAC" and the two terms have identical connotation.

9.      Several trade secrets incorporated into the M200, and .375CT and .408CT caliber munitions give CheyTac a competitive advantage.

10.     On information and belief, Defendant Omanoff, acting as a Co-Trustee of the Omanoff Family Trust ("Omanoff Trust") with Elaine Omanoff, owned 6,000,000 shares of in CheyTac (approximately 1/3 of all CheyTac shares) as of September 28, 2015. (Warren Decl. at ¶ 15; *See* Exhibit 8.)

11.     On September 28, 2015, Omanoff was appointed Chief Executive Officer of CheyTac and executed a Proprietary Rights Agreement ("PRA") with CheyTac.

12.     Omanoff's PRA contained both non-competition and non-solicitation clauses. (Warren Decl. at ¶ 16; *See* Exhibit 9.)

13.     On September 28,2016 CheyTac executed a Membership Repurchase Agreement for 6,000,000 shares with DMB Technology LLC. (*See* Exhibit 13.)

14.     On February 11, 2016, DMB Technology LLC shares were repurchased pursuant to the Membership Repurchase Agreement.

15.     On February 12, 2016, 3,000,000 shares were issued to Omanoff and Omanoff Family Trust and Praecisa Tenuras LLC.

16.     Upon information and belief, CheyTac's reputation and goodwill suffered throughout 2016 under Omanoff's leadership prompting CheyTac's Board of Managers to demand Omanoff's immediate resignation.

17.     Upon information and belief, in exchange for Omanoff's immediate resignation, CheyTac executed with Omanoff a "Membership Interest Purchase Agreement and Settlement Agreement" ("Omanoff Membership Agreement") to purchase all 9,000,000 shares held by Omanoff and Omanoff Family. (*See* Exhibits 14 and 30.)

18.     The Omanoff Membership Agreement included a non-disparagement clause. (Warren Decl. at ¶ 27; *See* Exhibit 14.)

19.     On information and belief, John Taylor served as Chief Technical Advisor at CheyTac and shareholder since CheyTac's inception in 2011 (*See* Exhibit 8.)

20.     On October 20, 2015, Taylor executed a PRA containing both non-competition and non-solicitation clauses with CheyTac. (Warren Decl. at ¶ 17; *See* Exhibit 10.)

21.     On January 1, 2017, Taylor resigned as Chief Technical Advisor at CheyTac.

22.     CheyTac executed with Taylor a "Membership Interest Purchase Agreement and Settlement Agreement" ("Taylor Membership Agreement") to purchase all 600,000 shares held by Taylor (*See* Exhibit. 30.)

23.     In March 2017, Omanoff created a NextGen Products Flyer ("Flyer") depicting a new brand of rifles and ammunition that directly compete with CheyTac Products. (Warren Decl. at ¶¶ 38-40; *See* Exhibit 21.)

4

24.     On information and belief, Omanoff sent copies of the NextGen Flyer to customers of CheyTac (Warren Decl. at ¶ 39; *See* Exhibits 21-22.)

25.     In April 2017, NextGen was registered as Florida Limited Liability Company with its principal place of business in Cocoa Beach, Florida.  Omanoff is listed as the Managing Member of NextGen (Warren Decl. at ¶ 33; *See* Exhibit 20.)

26.     CheyTac seeks a permanent injunction to stop NextGen's continued use and sale of CheyTac's patented technology and trade secrets and to prevent the otherwise inevitable disclosure to NextGen of CheyTac's highly confidential, proprietary and trade secret and intellectual property through CheyTac's former employees.

27.      CheyTac also seeks a temporary injunction to prevent any destruction or alteration of documents and other evidence, prevent further infringement of CheyTac's patents and trademarks, and prevent further hiring of CheyTac's employees or former employees, and order NextGen to refrain for a reasonable period from marketing, selling, or distributing any product in the high caliber rifle and ammunition industry, and any products that competes with CheyTac or falsely designates its goods as CheyTac Products. CheyTac further seeks a constructive trust as set out below.

## II.     PROCEDURAL BACKGROUND

### A.     The Parties

28.     Plaintiff CHEYTAC USA, LLC is a limited liability company organized under the laws of Georgia, with its principal place of business at 225 St. Phillips Street, Charleston, South Carolina 29403. (Warren Decl. at ¶ 3; *See* Exhibit 2.)

29.     Defendant NEXTGEN TACTICAL, LLC is a limited liability company formed under the laws of the State of Florida, with its principal places of business at 801 S. Atlantic Avenue, Cocoa Beach, FL 32931 (Warren Decl. at ¶ 33; *See* Exhibit 20.)

30.     Defendant Dennis Omanoff is an individual who, upon information and belief, resides in Cocoa Beach, FL.  Upon information and belief, Dennis Omanoff is a citizen of Florida and is the Managing Member of NEXTGEN TACTICAL LLC. (*See* Exhibit 20.)

31.     Defendant John Taylor is an individual who, upon information and belief, has his residence in Colorado Springs, CO.  John Taylor is a citizen of Colorado and is a technical advisor of NEXTGEN TACTICAL, LLC.

**B.     Jurisdiction and Venue**

32.     This is a civil action seeking monetary and injunctive relief for patent infringement under 35 U.S. U.S.C. § 271, 281-285, misappropriation of trade secrets under 18 U.S.C. § 1836, trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), unfair competition, false designation of origin, and trademark dilution under Section 43(a) and (c) of the Lanham Act, 15 U.S.C. §§ 1125(a) and (c), trade dress infringement the Lanham Act, 15 U.S.C. § 1127, and for substantial and related claims of breach of contract, breach of loyalty, unjust enrichment, and unfair and deceptive trade practices under the statutory and common laws of the State of Florida, all arising from the Defendants unauthorized misappropriation of trade secrets and unauthorized use of the CheyTac's patent and trademarks in connection with the manufacture, distribution, marketing, advertising, promotion, offering for sale, and/or sale of NextGen's high caliber rifles

6

and ammunition. The matter in controversy, exclusive of interest and costs, exceeds the sum or value of seventy-five thousand dollars ($75,000) and arises under the laws of the United States.

33.    This Court has personal jurisdiction over NextGen because it is registered in Florida and maintains a principal place of business in Florida. NextGen conducts and solicits business with parties located in Florida, and the causation of tortious injury in the state by acts or omission outside the state.

34.    On information and belief, this Court has personal jurisdiction over Omanoff because he is a resident of Florida, is employed by a Florida registered company, the transaction of business in state, the contracting to market, distribute and sell goods in the state, the derivation of revenue from goods consumed in the state, and the causation of tortious injury in the state by acts or omission outside the state.

35.    The Court has personal jurisdiction over Taylor because he has performed contracts in Florida, and upon information and belief, regularly conducts business in the state, and committed tortious acts in the state by acts or omission outside of the state.

36.    The Court has subject matter jurisdiction pursuant to § 39 of the Federal Trademark Act, 15 U.S.C. § 1121 and the Judicial Code, 28 U.S.C. §§ 1331, 1332(a) and (c), and 1338(a) and (b) of the federal law claims. This Court has supplemental jurisdiction over CheyTac's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy.

37.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or §§ 1400(a) and (b).

### III.     FACTUAL BACKGROUND

**A.     The Technology in the Context of the Dispute**

38.     CheyTac began manufacturing high caliber rifles and ammunition in 2011 and has since become one of the world's technology leader in ballistics and high caliber rifles. CheyTac products are sold to law enforcement and military agencies worldwide which rely on its proprietary and patented technology in protecting vital national interests and maintaining peace and stability (Warren Decl. at ¶ 11.)

39.     To maintain its position as an industry leader, CheyTac expends substantial time, resources and expense developing confidential business information, trade secrets, and intellectual property. CheyTac business depends on the protection of its trade secrets and intellectual property around the world to accurately acquire and engage targets at greater ranges using its patented "balanced flight" technology (Warren Decl. at ¶¶ 6-8, Exhibits 28-32.)

40.     For years' ballistic designers have attempted to create a projectile which travels over 2 miles accurately without experiencing significant drag forces. CheyTac Products have solved these challenges by combining a proprietary rifle barrel lands and grooves with its "balanced flight" munitions which allow its bullets to travel up to 2.6 miles (Warren Decl. at ¶ 32; *See* Exhibit 19.)

41.     CheyTac has substantially improved its ballistic and high caliber rifle barrel designs from its basic design by creating the M200 and m300 Intervention rifles ("M200") and .375CT and .408CT munitions.   CheyTac has invested

thousands of dollars and man-hours to improve its products (Warren Decl. at ¶¶ 6, 8.)

42.     Only recently, and after substantial investment by CheyTac has it been able to achieve global recognition as one of the top firearms and munitions manufacturers in the world (Warren Decl. at ¶¶ 6-10.)

43.     The M200 and .375CT and .408 CT open new business opportunities for CheyTac because of its unique and proprietary designs and patterns. Consequently, damage to CheyTac's M200 and .375CT and .408CT not only hurts the market for high performance ballistics, it also harms CheyTac prospects and the broad opportunities opened to it.  The wrongful conduct of the Defendants has harmed and continues to harm CheyTac's revenue and opportunities.

44.     The balance flight ballistic technology and rifle barrel design of the M200 and .375CT and, 408CT have become CheyTac's most popular products and cornerstone to CheyTac's research and investment.

**B.     CheyTac's Trade Secrets**

45.     CheyTac's business success is highly dependent upon extensive research and development activity. CheyTac's design specifications, architecture, technical and engineering data, laboratory testing, and benchmark testing give CheyTac market and performance advantages, and are not generally known by CheyTac's competitors. The precise nature of and identity of new products and features under development and the various creative and practical approaches taken to implement certain types of product development are not generally disclosed to CheyTac's best customer, much less its competitors (*See* Exhibits 9-10.)

46.     Omanoff as former Chief Executive Officer at CheyTac and Taylor as former Chief Technical Advisor had access to the proprietary ballistics and rifle barrel designs, customer lists, email, expense and travel reports, desktop and laptop computers, suppliers, hand-held smart devices, and office files and records. On information and belief, Omanoff and Taylor misappropriated CheyTac's proprietary and trade secret information when they founded NextGen to directly compete against Cheytac. Such information would be valuable to NextGen and would enable NextGen to rapidly produce competing products that cause consumer confusion as source and quality of the products. Access to CheyTac's ballistic and rifle barrel specifications, technical and engineering data, and customer lists would make it easier for NextGen to design similar products with the same appearance and designs as CheyTac Products. This would give NextGen improper but equal footing with third-party customers and market channels.

47.     CheyTac has advanced its ballistic and rifle barrel technology with several features that provide substantial competitive advantage to CheyTac. CheyTac's conceptual and practical implementation strategies and means and methodologies to implement these strategies are highly sensitive and protected trade secrets. Any competitor would have to spend a substantial amount of time and money to reverse engineer and replicate the advantages provided by the trade secrets in CheyTac Products.

48.     CheyTac's business is supported by confidential and proprietary commercial information and trade secrets gained through investing years of hard work and hundreds of thousands of dollars. The confidential and proprietary

information and trade secrets that afford CheyTac an advantage over its

competitors consists, at least in part, of the following:

    a.  Future design plans and roadmaps for ballistic and rifle barrel design features and attributes including additional system implementing the same;

    b.  Unpublished ballistic and rifle system design and performance specifications;

    c.  Identities of CheyTac's customer and their needs and interests, as well information about their respective key decision makers;

    d.  Information on CheyTac's licensing structure and terms and pricing;

    e.  CheyTac's compensation plans including salary and incentive plans and related information;

    f.  Marketing plans for new releases and related products;

    g.  CheyTac's phone lists and email addresses and other contact information;

    h.  Confidential alliances and partnerships and the terms and conditions

    i.  Information regarding the position, performance history, skill-set, and identity of CheyTac's engineers, gunsmiths, managers, marketing personnel and consultants, including the organizational structure.

49.    CheyTac takes numerous precautions to maintain the confidentiality of its confidential information, trade secrets, and intellectual property. All employees must sign confidentiality and proprietary Rights Agreements and Invention Assignment Agreements. Physical access to CheyTac's facilities is limited

to those authorized through a key card or code system.  CheyTac employees escort visitors while on the premises and limit access to just those portions relevant to the business purpose of the visitor, and any information shared is on a need-to-know basis. The entry and exit of the facility is monitored with security cameras. A multi-leveled security password-linked database and document access system allow access to documents and information on a need-to-know basis.

50.     As a condition of his employment, Omanoff certified that he read, understood, and would comply with the policies contained within the CheyTac's "Principles for Growing Value" (*See* Exhibits 11 and 27.)

51.     On information and belief, Taylor certified that he read, understood, and would comply with the policies contained within CheyTac's "Principle for Growing Value" (*See* Exhibit 27.)

**C.     Plaintiff's Intellectual Property Rights**

52.     On October 7, 2003, U.S. Pat. No. 6,629,669 ("'669") entitled "Control Spin Projectile" was duly and legally issued by the United States Patent and Trademark Office to inventor Warren S. Jensen (Warren Decl. at ¶ 32; Exhibit 19.)

53.     The '669 Patent and claims relates to the methods and applications of controlling bullet spin rates (*See* Exhibit 19.)

54.     The '669 Patent is currently in full force and effect.

55.     All right, title and interest in the '669 Patent have been assigned to CheyTac, who is the sole owner of the '669 Patent. (*See* Exhibit 28.)

56.     On April 29, 2003, CheyTac registered the word mark "CHEYTAC" with the United States Patent and Trademark Office ("USPTO") on the Principal

Register( U.S. Registration No. 2,711,809), for use in connection with " ammunition" (the "CheyTac Word Mark").  A renewal was filed on May 24, 2013. Under Section 7(b) of the Federal Lanham Act, 15 U.S.C. §1057(b), the CheyTac Word Mark constitutes *prima facie* evidence of the validity of the Word Mark, of CheyTac's ownership of same, and of CheyTac's exclusive right to use the Word Mark CHEYTAC in commerce on or in connection with the goods specified in the Certificate of Registration. In addition, on May 24, 2013, the Registration became incontestable under 15 U.S.C. §1065. Subject to certain statutory limitations, the Registration now constitutes conclusive evidence of the validity of the CheyTac word mark, of CheyTac's ownership of same, and of CheyTac's exclusive right to use the Word Mark in commerce on or in connection with the goods within international class 013 as described in the Certificate of Registration. (*See* Exhibit 17.)

57.     On April 2, 2013, CheyTac registered the word mark "SEIZE THE DISTANCE" with the United States Patent and Trademark Office ("USPTO")on the Principal register, (U.S. Registration No. 4,312,281), for use in connection with "ALL TYPES OF FAIREARMS AND AMMUNITION INCLUDING LONG RANGE SNIPER RIFLES AND PATENTED AMMUNITION" (the "Distance Word Mark") (*See* Exhibit 16.)

58.     On Febrauary 20, 2017, CheyTac filed a trademark application for the word mark "CHEYTAC USA" with the United States Patent and Trademark Office ("USPTO") on the Principal Register, Serial No. 87342181, for use in connection with "Firearms; and ammunition for firearm" (the "CheyTac USA Word Mark Application") (Exhibit 18.)

59.     The CheyTac Word Mark, Distance Word Mark, and CheyTac USA Word

Mark Application are collectively referred herein as "CheyTac Marks."

60.     CheyTac has acquired trade dress rights in the design and appearance of

the M300 Intervention rifle and mountable bipod.

61.     CheyTac has acquired common law in the marks ".408CT" and ".375CT."

**D.     The Misconduct**

62.     Omanoff was CheyTac's Chief Executive Officer, a member of the Board

of Managers, and a shareholder from September 2015 until his voluntary

resignation in November 2016. On condition of his appointment to CEO, Omanoff

executed a Proprietary Rights Agreement ("PRA") with CheyTac on September 28,

2015, which contained both non-compete and non-solicitation clauses (*See* Exhibit

9.)

63.     On information and belief, Taylor was CheyTac's Chief Technical Advisor

from its inception in July 2011 until his resignation in January 2017. Taylor

executed a PRA with CheyTac on September 20, 2015, which contained non-

compete and non-solicitation clauses (*See* Exhibit 9.)

64.     Omanoff and Taylor's PRA contains the same non-competition clause

(clause 7) which provides (in pertinent part):

> *"During my association with the Company and for a period of two (2)*
>
> *years following there termination of said association for any reason*
>
> *whatsoever, voluntarily or involuntarily, I shall not engage directly*
>
> *or indirectly, either personally or as an employee, associate,*
>
> *shareholder, partner, manager, salesperson, agent or in any other*

*individual or representative capacity whatsoever, or by means of any*

*corporate or legal advice, in any person, corporation, or other entity*

*that sells products or services within any Company market area,*

*which as of the date hereof is international, as of the date of*

*termination that are similar to the products and/or services sold by*

*the Company at any time during the last two years prior to the*

*termination of my association with the Company; provided,*

*however, that the term "Competing Business" shall not include any*

*of the activities of employee/consultant/Member or his/its*

*Affiliates that are excluded from the definition of "Business" as set*

*forth in* <u>*Exhibit A*</u> *hereto." (See* Exhibits 9-10.)

65.    Omanoff and Taylor's PRA contains the same non-solicitation clause

(clause 8) which provides (in pertinent part):

*"Additionally, during my association with the Company and for a*

*period of two (2) years following the termination of said association*

*for any reason whatsoever, voluntarily or involuntarily, I shall not,*

*directly or indirectly, attempt to dislodge, divert, prejudice or*

*interfere with current or future employees or current or future*

*customers of the Company. In connection with the foregoing, during*

*my association with the Company and for the above-referenced two-*

*year (2) year period:*

*(a).* <u>***Employees***</u>*. I shall not, directly or indirectly, solicit, hire, or*

*engage or attempt to hire or engage any individual who is an*

15

> employee or a consultant of the Company whether for or on my
> behalf for any entity in which I shall have a direct or indirect
> interest (or any subsidiary or affiliate of any such entity).
>
> (b). *Customers*. I shall not, directly or indirectly, solicit or contact
> any person or entity which is a present or former client, or potential
> client of the Business, for the purpose of introducing, offering, or
> selling to such person or entity any service that compete with the
> service offered or sold by the Company…" (*See* Exhibits 9-10.)

66.     Omanoff's and Taylor's PRAs include provisions to prevent the
unauthorized disclosure of trade secrets. Clause 2 of the PRA provides (in
pertinent part):

> "*Assignment of Rights*. All Proprietary Information and all patents,
> patent rights, copyright, trade secret rights, trademark rights and
> other rights (including, but not limited to, intellectual property
> rights) anywhere in the world in connection therewith is and shall be
> the Company sole property. I hereby assign to the Company any and
> all rights, title and interest I may currently have or acquire in such
> Proprietary Information. At all times, both during my association
> with the Company and after its termination, I will keep in
> confidence and trust and will not use or disclose and Proprietary
> Information or anything relating to it with the prior written consent
> of a Company officer, except as may be necessary in the ordinary
> course of performing my duties to the Company." (*See* Exhibits 9-

10.)

67.     Omanoff and Taylor owed a duty of loyalty to CheyTac to act in good faith and with due regard for the interests of CheyTac both during and after employment.

68.     On information and belief, while Chief Executive Officer at CheyTac, Omanoff implemented his own nefarious strategy for NextGen. His plan was contrary to the stated plans and best interests of CheyTac. Omanoff's plans were to benefit himself, to the detriment of CheyTac.

69.     On information and belief, to make his plan successful, Omanoff had to inhibit CheyTac's profitability and growth, and tarnish CheyTac's reputation.  This he did. After Omanoff joined CheyTac, revenue steadily declined while Omanoff would receive interest on his salary if CheyTac was unable to immediately pay. On information and belief, a substantial reason for the revenue decline was Omanoff's agenda for personal gain, his intentional disregard for the interests of CheyTac, and his disregard for his duties and obligations to CheyTac.

70.     While Omanoff was Chief Executive Officer of CheyTac, several proprietary measures were taken to secure its proprietary ballistic and rifle barrel technology including: acquiring U.S. Patent No. 6,629,669 through the conveyance of a Patent Assignment from DBM Technologies, LLC; acquiring Trademark Registration No. 2,711,809 through the conveyance of a Trademark Assignment from Tactical High Energy Impact Systems, LLC.

71.     Omanoff was the Chief Executive Officer and Taylor was the Chief Technical advisor when both M200 and M300 Intervention and .375CT .408CT were

17

designed and manufactured.  Omanoff and Taylor had unfettered access to all plans, specifications, and designs of CheyTac Products as a result of their position at CheyTac (Warren Decl. at ¶¶ 29-32; *See* Exhibits 17 and 19.)

72.     On information and belief, CheyTac first discussed with Omanoff terminating his position as Chief Executive Officer in the summer of 2016.

73.     On information and belief, it was during this time that Omanoff first contacted Taylor about his plans to create NextGen.

74.     Omanoff's contravention of CheyTac's Board of Managers decisions, his insubordination, and his failure to perform in good faith substantially harmed CheyTac reputation and goodwill. By mutual Agreement, Omanoff left CheyTac on November 1, 2016 and sold all remaining Omanoff and Omanoff Trust shares to CheyTac (*See* Exhibit 14.)

75.     On November 1, 2016, Omanoff executed a Membership Interest Purchase Agreement and Settlement Agreement which contained a non-disparagement clause (Warren Decl. at ¶ 25.)

76.     After his departure from CheyTac, Omanoff recruited the following key CheyTac personnel to join him at NextGen Georgia and who would eventually join him at NextGen:

     a.   John Taylor – left CheyTac in January 2017;

     b.   Brock Gardner – stopped consulting with CheyTac in January 2017.

        (Warren Decl. at ¶ 36.)

77.     Taylor was a valuable member of CheyTac and was specifically targeted to lead all CheyTac's research and development after Omanoff left.  With

CheyTac, Taylor was an excellent performer who contributed substantially to the technical trade secrets and intellectual property. CheyTac entrusted Taylor to work in good faith and in CheyTac's interest with the confidential information, trade secrets and intellectual property. Taylor's contribution was instrumental to the design and manufacture of all CheyTac Products, and protection of its intellectual property information and belief, Omanoff has induced Taylor to violate his PRA by bringing with him CheyTac's trade secrets and intellectual property.

78.     Taylors misappropriations of CheyTac trade secrets and infringement of its intellectual property has facilitated NextGen in almost immediately bringing high caliber rifles and ammunition ("Infringing Goods") to market. At least one of CheyTac's customer has asked CheyTac how NextGen could offer a product competitive with CheyTac so quickly.

79.     Upon information and belief, NextGen and the individual defendants have used CheyTac's designs, customer lists, source code, specification, customer contact information, market forecasts.

80.     Upon information and belief, Omanoff created a product flyer ("NextGen Flyer") in early 2017 which offers the Infringing Goods within the same industry and market channels as CheyTac products (Warren Decl. at ¶ 40.)

81.     Upon information and belief, on April 17, 2017 Omanoff registered NextGen Tactical, LLC ("NextGen"), with the Florida Division of Corporations, to directly compete against CheyTac (Warren Decl. at ¶ 33.)

82.     Upon information and belief, NextGen launched its website

www.nextgentactical.net in April 2017 market, advertises, and sell the Infringing Goods (Warren Decl. at ¶ 41.)

83.   As former high-level executives of CheyTac, Omanoff and Taylor hold substantial knowledge of CheyTac's confidential information, trade secrets and intellectual property, which they are currently disclosing and utilizing in the production and sale of the Infringing Goods (*See* Exhibits 21 and 23-26.)

84.   Upon information and belief, in the April of 2017 Omanoff has directly solicited CheyTac customers and attached the NextGen Flyer.

85.   On information and belief, in April 2017 Omanoff and Taylor have disparaged CheyTac and CheyTac executives while directly soliciting CheyTac customers in violation of Omanoff and Taylor's Purchase Agreements.

86.   NextGen's website offers for sale a "NEXTGEN .375" rifle.  Upon information and belief, the "NEXTGEN .375" has a confusingly similar appearance and design as CheyTac's M300 Intervention rifle.

87.   The "NEXTGEN .375" rifle includes CheyTac Marks engraved on the body of the rifle and leg of the bipod.

88.   NextGen's own statements and product information provided on their website make it clear they are directly competing against CheyTac Products.  With Omanoff, Taylor, and Gardner on the payroll, NextGen now has direct access to CheyTac's confidential and proprietary information, trade secrets, and intellectual property which give CheyTac its competitive advantage.

89.    If CheyTac's trade secrets and intellectual property are used, disclosed, or transferred, the value to CheyTac of it trade secrets and intellectual property,

particularly in the M200, and.375CT, and .408CT will be significantly damaged and may be destroyed.  NextGen and the individual defendants, on the other hand, will unjustly benefit from their misappropriation of CheyTac trade secrets and intellectual property.

## COUNT ONE
## PATENT INFRINGMENT
## <u>35 U.S.C. § 271</u>

90.    As a cause of action and grounds for relief, Plaintiff ChayTac alleges that Defendants have engaged and are currently engaged in acts of patent infringement in violation of under 35 U.S.C. § 271 (a) and (b) and incorporate by reference prior Paragraphs 1 through 89 of the Complaint, inclusive, as if fully set forth herein.

91.    Upon information and belief, NextGen has infringed and continues to infringe, has actively knowingly induced and continues to actively and knowingly induce infringement of one or more claims of the '669 Patent, including at least claim 1 of the '669 Patent in this District and elsewhere under 35 U.S.C. § 271 (a) and (b) (Warren Decl. at ¶ 49.)

92.    Claim 1 of the '669 Patent states as follows:

*"A projectile comprising:*

*a body including a bearing surface and an ogive continuous to and extending forward from the bearing surface;*

*a plurality of grooves and a plurality of lands formed on the bearing surface of the projectile in an alternating pattern for imparting a predetermined spin damping moment to the projectile in flight; and*

> *a ratio of a total surface the projectile to a total surface area of the*
> *physical feature in the range of to 3.00:1 to 4.00:1."*

93.     Upon information and belief, NextGen's ".375ct" and ".408ct" ammunition meet all the limitations of at least claim 1 of the '669 Patent either literally or under the doctrine of equivalents and thus infringe at least claim 1 (Warren Decl. at ¶ 50.)

94.     NextGen's acts of infringement have been without permission, consent, authorization or license of CheyTac.

95.     Upon information and belief, at least as of the time it received notice of this complaint, NextGen's inducement of infringement has been with full knowledge of the '669 Patent and with the intention of actively inducing direct infringement by others in the United States.

96.     Upon information and belief, NextGen will continue to infringe the '669 Patent unless and until it is enjoined by this Court.

97.     NextGen has cause and will continue to cause CheyTac injury and damage by infringing the '669 Patent.  CheyTac will suffer further irreparable injury unless and until NextGen is enjoined from infringing the '669 Patent.

## COUNT TWO
## TRADE SECRET MISAPPROPRIATION
## 18 U.S.C. § 1836(b), Defend Trade Secrets Act

98.     As a cause of action and grounds for relief, Plaintiff CheyTac alleges that Defendants have engaged and are currently engaged in acts of trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. §1836(b) and common law and incorporates by reference prior Paragraphs 1 through 97 of the

Complaint, inclusive, as if fully set forth herein.

99.    As part of its cause of action against the individual Defendants Omanoff and Taylor, Plaintiff alleges on information and belief that Defendants Omanoff and Taylor substantially and personally participated and participate in the trade secret misappropriation complained of herein. Plaintiff alleges on information and belief that Defendants Omanoff and Taylor used and uses Defendant NEXTGEN, LLC, to deliberately carry out the acts of trade secret misappropriation complained of here (Warren Decl. at ¶ 48.)

100.    The confidential and proprietary information and intellectual property CheyTac entrusted to Omanoff and Taylor constitute trade secrets because they are information which CheyTac derives independent economic value from being generally known to, and not be readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use; and they are the subject of efforts that are reasonable under the circumstance to maintain their secrecy.

101.    Due to Omanoff and Taylors employment relationships with CheyTac, they had access to and direct knowledge of CheyTac's trade secrets including customer lists, market research, customer contracts, intellectual property, bills of material, product design, schematics, source code, components lists, testing procedures, market forecast, competitor analyses, of all CheyTac Products.

102.    The confidential trade secret information is related to CheyTac's products use in, or intended for use in interstate commerce or foreign commerce.

103.    Omanoff and Taylor were prohibited from misappropriating CheyTac trade

secrets under the Defend Trade Secrets Act, 18 U.S.C. §1836(b).

104.   Upon information and belief, Omanoff and Taylor breached their duties to CheyTac by disclosing CheyTac's trade secrets and by using CheyTac trade secrets to directly compete against CheyTac (Warren Decl. at ¶ 48.)

105.   Upon information and belief, NextGen, Omanoff, and Taylor's misappropriation has been willful and malicious.

106.   As a direct and proximate result of NextGen, Omanoff, and Taylor's misappropriation of CheyTac trade secrets, CheyTac has been irreparably injured and has sustained significant damage in an amount to be determined at trial. CheyTac is threatened with losing current customers, goodwill, and revenue.

107.   Plaintiff believes that unless enjoined by this Court, Defendants will continue to misappropriate CheyTac trade secrets, thereby deceiving the public and causing the Plaintiff immediate and irreparable injury for which there is no adequate remedy at law.

## COUNT THREE
## TRADE DRESS INFRINGEMENT UNDER THE LANHAM ACT
## 15 U.S.C. §1125(a)(1)(A) and (B)

108.   As cause of action and ground for relief, Plaintiff CheyTac alleges that Defendants have engaged in trade dress infringement by representing to consumers that their products have a source, nature, and quality that they do not have and incorporates by reference Paragraphs 1 through 107 of the Complaint, inclusive, as if fully set forth herein.

109.   As a cause of action and grounds for relief, Plaintiff CheyTac alleges that Defendants Dennis Omanoff and John Taylor have engaged and are engaged in acts

of trade dress infringement under Sections 43(a)(1)(A) and (B) of the federal Lanham Act, 15 U.S.C. §1125(a)(1)(A) and (B).

110.   As described above, CheyTac owns all rights, title and interest in and to the CheyTac's M300 Intervention's appearance, design, and trade dress rights.

111.   CheyTac's use of its trade dress rights in commerce, have been substantially exclusive, continuous, and long-standing and represents the extensive goodwill built by CheyTac Products.

112.   CheyTac's trade dress rights in the appearance and design of the M300 Intervention is primarily non-functional.

113.   CheyTac' trade dress has acquired secondary meaning in that consumers have come to recognize the well-known appearance and design of the M300 Intervention, and associate that appearance and design with a single source. Further, the Defendants' willful and intentional copying of the CheyTac's trade dress provides *prima facie* evidence of distinctiveness.

114.   On information and belief, Defendants have created trade dress in the appearance and design of the M300 Intervention.  Upon information and belief, the "NEXTGEN .375" the M300 Interventions appearance and design was created to intentionally confuse and intentionally deceive consumers as to the source of their high caliber rifles and ammunition in violation of CheyTac's trade dress rights (Warren Decl. at ¶¶ 38-46; Exhibits 21 and 23-26.)

115.   By copying the appearance and design of the M300 Intervention, Defendants have falsely designated the origin of their Infringing Goods and falsely or misleadingly represented the source, origin, nature, and quality of goods,

thereby violating Plaintiffs' trade dress rights under Section 43(a) of the federal Lanham Act. The Defendants' continued sales of the "NEXTGEN .375" and other Infringing Products will continue to cause confusion, mistake or deception among consumers as to the source or origin of Defendants' products, and/or as to the source or origin of CheyTac' products (Warren Decl. at ¶¶ 38-46; Exhibits 21 and 23-26.)

116.    As a direct and proximate result of Defendants' actions, CheyTac has sustained and are likely to continue to sustain monetary damages and irreparable injury to its business, reputation and goodwill.

117.    CheyTac has no adequate remedy at law.

118.    By reason of the foregoing, Defendants are liable to CheyTac for trade dress infringement under Sections 43(a)(1)(A) and (B) of the federal Lanham Act, 15 U.S.C. §1125(a)(1)(A) and (B), and CheyTac is entitled to Defendants' profits, CheyTac's damages, the costs of the action, plus reasonable attorneys' fees by reason of the willfulness of Defendants' conduct, which willfulness renders this an exceptional case within the meaning of Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

119.    Plaintiffs are entitled to treble damages and increased profits, plus attorneys' fees, by reason of the willfulness of Defendants' conduct, which willfulness renders this an exceptional case within the meaning of Section 35(a) of the Lanham Act, 15 U.S.C. 1117(a).

120.    Plaintiffs are entitled under Section 36 of the Lanham Act, 15 U.S.C. §1118 to a court order providing that all Defendants' Infringing Products bearing

CheyTac' trade dress, along with all means of making such Infringing Products, be delivered up and destroyed.

## COUNT FOUR
### UNFAIR COMPETITION AND FALSE DEISGNATION OF ORIGIN UNDER THE LANHAM ACT 15 U.S.C. §1125(a)(1)(A) and (B)

121.    As a cause of action and ground for relief, Plaintiff CheyTac alleges that Defendants have and are engaged in unfair competition under 15 U.S.C. §1125(a)(1)(A) and (B) and incorporates by reference Paragraphs 1 through 120 of the Complaint, inclusive, as if fully set forth herein.

122.    As part of the action against the individual Defendants Omanoff and Taylor, Plaintiff alleges on information and belief that Defendants Omanoff and Taylor substantially and personally participated and participate in the unfair competition complained of herein and used and continue to use Defendant NextGen to deliberately carry out acts of unfair competition complained herein (Warren Decl. at ¶ 48.)

123.    Defendants are aware and have actual knowledge of CheyTac Products and CheyTac Marks.  Defendants intentionally copied and offered in interstate commerce high caliber rifles and ammunition that are confusingly similar as CheyTac Products and CheyTac Marks.  Defendant's infringing goods were designed to have the same distinctive overall appearance and look as CheyTac Products and are confusingly similar in total image, appearance, and overall aesthetic look. As a result, the public is, and likely to be, confused as to the source or origin (Warren Decl. at ¶¶ 38-46; *See* Exhibits 3, 21 and 23-26.)

124.    On information and belief, the Defendants have used in commerce and continue to use in commerce, the CheyTac Marks to unfairly benefit from Plaintiff's success by selling the same products bearing the same word marks and falsely designating the origin of NextGen products in this jurisdiction (Warren Decl. at ¶¶ 38-46; Exhibits 21 and 23-26.)

125.    Defendants has used CheyTac marks on its infringing goods with the express intent to pass off Defendant's inferior Infringing Goods as those of CheyTac's to cause confusion and mistake, and to deceive and mislead the purchasing public into believing that Defendant's Infringing Products are authorized, sponsored, affiliated with or associated with CheyTac, and to trade on CheyTac's reputation for high-quality and to improperly appropriate themselves CheyTac Products and Marks.

126.    Upon information and belief, Defendant's conduct as alleged herein is willful and is intended to and is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Defendant with Plaintiff.

127.    Defendant's conduct as alleged herein constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and (c).

128.    Defendant's conduct as alleged herein is causing immediate and irreparable harm and injury to Plaintiff, and to its goodwill and reputation, and will continue to both damage Plaintiff and confuse the public unless enjoined by this court. Plaintiff has no adequate remedy at law.

## COUNT SIX
## BREACH OF CONTRACT
## <u>Florida Common Law</u>

129.    As a cause of action and ground for relief, Plaintiff CheyTac alleges that

the individual Defendants Omanoff and Taylor, have breached both their PRA and

Member Purchase Agreements respectively and incorporates by reference

Paragraphs 1 through 128 of the Complaint, inclusive, as if fully set forth herein.

130.    By reason of the foregoing, Defendant Omanoff has willfully breached,

either during or after his employment with CheyTac, his obligations, and

agreements arising out of non-solicitation, non-compete clause of his Proprietary

Rights Agreement and the non-disparagement clause of his Membership Interest

Purchase Agreement and Settlement Agreement with CheyTac (*See* Exhibits 9 and

14.)

131.    By reason of the foregoing, Defendant Taylor has willfully breached,

either during or after their employment with CheyTac, his obligations, and

agreements arising out of the non-compete clause of his Proprietary Rights

Agreement and the non-disparagement clause of his Membership Interest Purchase

Agreement and Settlement Agreement with CheyTac (*See* Exhibit 10.)


## COUNT SEVEN
## DECEPTIVE AND UNFAIR TRADE PRACTICES
## <u>Fla. Stat. § 501.201 et seq.</u>

132.    As a cause of action and ground for relief, Plaintiff CheyTac alleges that

Defendants have and are engaged in deceptive and unfair trade practice under

Fla. Stat. § 501.201 et seq. and incorporates by reference Paragraphs 1 through 131 of the Complaint, inclusive, as if fully set forth herein.

133.    As described above, Defendants have engaged in unfair trade practices by representing to consumers that their products have a source, nature, and quality that they do not have (Warren Decl. at ¶¶ 38-46; Exhibits 21 and 23-26.)

134.    Defendants have engaged in false and misleading representations and omissions of material fact to consumers and have engaged in deceptive conduct.

135.    Defendants' false and misleading representations and deceptive conduct are material in that the same have caused and are likely to cause prospective consumers of the Plaintiff's products to be deceived as to the identity of the person to whom rights belong and as to the level of quality of the product.

136.    Defendants have disparaged the goods and services and business reputation of Plaintiff through false and misleading representations of material fact.

137.    By reasons of belief, the Defendants provided knowingly false and misleading representations of fact and conduct in violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq.

138.    As a direct and proximate result of said misleading and deceptive conduct, the Plaintiff, as well as consumers, have sustained and are likely to continue to sustain damages.

139.    Defendants Omanoff and Taylor are personally liable for the afore-described deceptive unfair trade practices because he personally directed, controlled, and participated in the unfair activity.

140.    Plaintiff has no adequate remedy at law.

141.    Pursuant to Florida's Deceptive and Unfair Trade Practices Act §§ 501.207 – 501.2075, the Plaintiff is entitled to enjoin Defendants' unlawful conduct as well as obtain compensatory damages, punitive damages, and attorney's fees.

## COUNT EIGHT
## TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
## Florida Common Law

142.    As a cause of action and ground for relief, Plaintiff CheyTac alleges that Defendants have and are engaged in tortious interference with business relationships and incorporates by reference Paragraphs 1 through 141 of the Complaint, inclusive, as if fully set forth herein.

143.    Defendants Omanoff and Taylor had access to CheyTac customer lists and were aware of existing relationships and used those customer lists to solicit business and interfere with CheyTac's established business relationships.

144.    Defendants Omanoff and Taylor had actual knowledge of CheyTac business relationships and willfully interfered mailing the NextGen Flyer.

145.    On information and belief Defendants have actively, willfully, intentionally, and improperly encouraged or induced Taylor, whom they solicited, recruited, and hired, to breach his contractual obligations to CheyTac (*See* Warren Decl. at ¶ 36.)

## COUNT NINE
## BREACH OF DUTY OF LOYALTY
## Florida Common Law

146.      As a cause of action and ground for relief, Plaintiff CheyTac alleges that Defendants Omanoff and Taylor have breached their common-law duty of loyalty owed to CheyTac and incorporates by reference Paragraphs 1 through 145 of the Complaint, inclusive, as if fully set forth herein

147.      By reason of the foregoing, Omanoff and Taylor as former executives of CheyTac and who personally executed individual PRS's willfully breached their common-law duty of loyalty by misappropriating CheyTac trade secrets and competing directly against CheyTac.

148.      CheyTac has suffered damages in an amount within the jurisdictional limits of the Court and will, unless enjoined by this Court continue to suffer damages proximately cause by Omanoff and Taylors breach of their duty to CheyTac.

149. The conduct of Omanoff and Taylor was and continues to be intentional, malicious, willful, and deliberate, giving rise to CheyTac's right to recover exemplary damages.

## COUNT TEN
## UNJUST ENRICHMENT
## FLA. STAT. § 501.201 et seq.

150.      CheyTac repeats and re-alleges each and every allegation of paragraphs 1 through 149 as though fully set forth herein.

151.     Defendants were aware of the CheyTac Products, trade secrets, and intellectual property and acted in willful disregard by creating NextGen and manufacturing Infringing Products which directly compete against CheyTac (Warren Decl. at ¶ 48.)

152.     Plaintiffs have been denied financial compensation from the proceeds of the Defendants' counterfeit and infringing rifles and ammunition, which have benefited from the Plaintiffs' intellectual property, trade secret, and other rights. The circumstances are such that equity and good conscience require the Defendants to make restitution in an amount to be proven at trial.

## CONSTRUCTIVE TRUST

153.     CheyTac repeats and re-alleges each and every allegation of paragraphs 1 through 152 as though fully set forth herein.

154.     CheyTac requests that this Court impose a constructive trust against the Defendants from their illicit profits from the use of CheyTac's confidential information, trade secrets, and intellectual property.

## DAMAGES

155.     CheyTac repeats and re-alleges each and every allegation of paragraphs 1 through 154 as though fully set forth herein. CheyTac affirmatively pleaded and seeks monetary relief that in the aggregate exceeds $75,000.

## Jury Demand

156.     CheyTac hereby demands pursuant to Federal Rule of Civil Procedure 38(b) a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that judgment be entered against the Defendants, jointly and severally, and that such judgment including:

1. The Court issue injunctive relief restraining and enjoining Defendants and each of them and their agents, servants, employees, attorneys, officer and those person in active concert or participation with them, including any parties with whom NextGen, Omanoff, or Taylor have shared or disclosed any of the confidential and proprietary trade secrets and intellectual property from doing any of the following:

    A. Altering, deleting, or destroying any documents, electronic data, or other evidence in NextGen, Omanoff, Taylor, or Gardner's possession pending production to CheyTac;

    B. Disclosing, sharing, selling, conveying, transferring, transmitting, reproducing by any means or in any form or medium, concealing, or hiding, removing or moving from their present locations, altering, destroying, disposing of or using in any way, directly or indirectly, any of CheyTac's trade secrets or intellectual property;

    C. Designing, architecting, coding, manufacturing, implementing, or selling or offering to sell any products or services base in any way upon or in which are incorporated or embodies, any of CheyTac's trade secrets and intellectual property;

    D. Undertaking or continuing any development or research or work using for CheyTac employees or consultants in any capacity in which it would be

inevitable or probable for such person to use or disclose any of CheyTac's trade secrets or intellectual property;

   E.  Marketing, selling, or distributing for a reasonable period of time any Infringing Products including any product that competes with CheyTac.

2.  An ORDER from the Court providing that the Defendants, jointly and severally:

   a.  competed unfairly with Plaintiff as defined by § 43(a) of the Federal Trademark Act, 15 U.S.C. § 1125(a), and at common law and have otherwise injured the Plaintiff's business reputation in the manner complained of herein;

   b.  infringed Plaintiff's exclusive rights in the CheyTac Marks; and

   c.  have infringed one or more claims of the '669 Patent.

3.  An ORDER from the Court providing that the Defendants, jointly and severally:

   a.  Be permanently enjoined from (a) continuing to infringe Plaintiff's trademarks in the Infringed Products; (b) making, having made, offering to sell or selling any CheyTac Products or any other reproduction, counterfeit, copy or colorable imitation of their merchandise and products; (c) using the CheyTac trademarks on any product or packaging or invoices or any other reproduction, counterfeit, copy or colorable imitation of said marks; and (d) otherwise unfairly competing with the Plaintiff or its agents or distributors or otherwise injuring Plaintiff's business reputation. Such injunction shall extend to the Defendants and their respective agents, servants, employees, officers, successors, licensees and assigns and all persons acting in concert or participation

with each or any of them;

b.  Be required in equity to account for, within 15 days of the ORDER, account for and pay to Plaintiff the profits Defendants have realized which are attributable to its acts of unfair competition pursuant to Section 43(a) of the Federal Trademark Act, 15 U.S.C. §1125(a) and/or trademark infringement pursuant to § 35(a) of the Federal Trademark Act, 15 U.S.C. § 1117(a), as amended;

c.  Be required to deliver for destruction all counterfeit merchandise and products, as well as any advertisements, labels, signs, packages, boxes, cartons, wrappers, and all other materials in the possession custody or under the control of either Defendants which are, bear or are packaged with the CheyTac trademark infringing reproduction of counterfeit merchandise which bear or are packaged with any infringing reproduction of the marks, and all tooling, molds, patterns or designs and any means for making or duplicating the same pursuant to § 36 of the Federal Trademark Act, 15 U.S.C. § 1118.

d.  Be required to pay the Plaintiff the Defendant's profits and any costs of this action and any damages which the Plaintiff sustained as a result of Defendants' willful acts of trademark infringement and unfair competition and such damages shall be trebled pursuant to § 35(a) of the Federal Trademark Act, 15 U.S.C. § 1117(a), as amended.

e.  Be required to pay any exceptional damages under 35 U.S.C. §285.

f.  Be required to pay to Plaintiff actual and exemplary damages against the

Defendants on the cause of action alleged herein and the recovery of pre-judgment and post-judgement interest as allowed by law.

g. Be required to pay to Plaintiff, as punitive damages, $100,000 or an amount as the Court may deem just and proper.  Be required to pay the plaintiff its reasonable attorney's fees and costs incurred in pursuit of this action.

4. That a constructive trust be imposed against the Defendants and each of the individual defendants for the profits from use of the confidential information, trade secrets and intellectual property belongs to CheyTac.

5. The Court grants such other and further relief, both general and special, at law or in equity, to which Plaintiff CheyTac may be justly entitled.

Respectfully Submitted,

Dated: May 9, 2017

By: /s/ Andrew S. Rapacke
    Andrew S. Rapacke, Esquire
    *Attorney for Plaintiff*
    **THE RAPACKE LAW GROUP, P.A.**
    **Florida Bar No: 0116247**
    618 East South Street
    Suite 500
    Orlando, FL 32801
    Telephone: (954) 727-8268
    Facsimile:   (407) 992-6101
    Email and Court designation:
    andy@arapackelaw.com