# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| CHEYTAC USA, LLC., | § | |
| | § | Civil Action No: |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| NEXTGEN TACTICAL, LLC., | § | |
| DENNIS OMANOFF, | § | |
| individually, and | § | **JURY TRIAL DEMANDED** |
| JOHN TAYLOR, | § | |
| individually, | § | |
| | § | |
| Defendants. | | |

## DECLARATION OF JOSEPH WARREN

I, Joseph Warren, do hereby certify, affirm and state that:

1.    I am over 18 years of age and competent to testify of my own knowledge as to the facts stated herein.

2.    All facts stated by me herein are true, correct and complete to the best of my knowledge and understanding and any facts referred to here which are not of my personal knowledge are believed to be true to me.

3.    I am the Chief Executive Officer of CHEYTAC USA, LLC ("CheyTac"). A Georgia Limited Liability Company with its principal address located at 225 Saint Phillips Street, Charleston, S.C., 29403. Exhibit 2 is true and correct copy of CheyTac's Certificate of Organization filed with Georgia's Secretary of State.

4.    CheyTac is the designer and manufacturer of high caliber rifles and ammunition ("CheyTac Products") which are sold in more than 10 countries world-

wide. CheyTac's high caliber rifles are sold at retail prices between $8,700.00 to 14,800.00.

5.   Exhibit 3 to the Plaintiff's Complaint is a website screen shot that depicts the CheyTac Products that are the foundation of this lawsuit.

6.   CheyTac offers and sells their CheyTac Products globally through its own website www.cheytac.com. CheyTac has spent more than $500,000 on advertising and marketing CheyTac Products. Hundreds of thousands more dollars have been spent on production costs for CheyTac Products.

7.   I am in charge of the company's product production, which includes managing our inventory levels and product supply chain volumes so we can match our production with the anticipated demands. I also work directly with our warehouse, shipping partners, and retail companies to ensure the reliable shipment and delivery of our products to our customers.

8.   CheyTac has produced and sold thousands of units of CheyTac Products world-wide since its inception. CheyTac has spent countless hours designing, manufacturing, and marketing its products around the world. Hundreds more man-hours were spent designing the production tooling and arranging the manufacturing processes.

9.   CheyTac's M200 Intervention rifle and its .408CT and .375CT ammunition have received world-wide recognition including the Military Channel's coveted "Top Sniper Rifle."

10.  Exhibit 4 to the Complaint is a true and correct copy of a series of images that depict CheyTac Products on video games, movies, and television

programs: Call of Duty, "Shooter" starring Mark Walberg, and the Military Channel, respectively.

11. On information and belief, CheyTac was founded under the name "CHEY TAC" USA LLC in Nashville, Georgia in July 2011, by Corey Kupersmith and David McCutcheon ("McCutcheon") to design, develop, manufacture, and market high caliber rifles and ammunition for military and law enforcement agencies. This is also shown on the Certificate of Organization in Exhibit 2.

12. In May 2012, a Certificate of Amendment was filed with Georgia's Secretary of State Corporations Department amending the name to CHEYTAC USA, LLC. Exhibit 5 is true and correct copy of CheyTac's May 21, 2012, Certificate of Amendment filed with Georgia's Secretary of State.

13. In July 2015, a Certificate of Amendment was filed with Georgia's Secretary of State Corporations Department amending the name to CHEYTAC USA-DBM, LLC. Exhibit 6 is true and correct copy of CheyTac's July 29, 2015, Certificate of Amendment filed with Georgia's Secretary of State.

14. In August 2015, a Certificate of Amendment was filed with Georgia's Secretary of State amending the name to CHEYTAC USA, LLC. Exhibit 7 is true and correct copy of the Certificate of Amendment filed with Georgia's Secretary of State.

15. Dennis Omanoff, acting as a Trustee of the Omanoff Family Trust, owned and controlled at least a 30% interest in CheyTac prior to September 28, 2015, Exhibit 8 is a true and correct copy of CheyTac's September 28, 2015, Operating Agreement.

16. On September 28, 2015, Omanoff executed a "Proprietary Rights Agreement" with CheyTac containing both non-compete and non-solicitation clauses (clauses 7 & 8). Exhibit 9 is a true and correct copy of the Proprietary Rights Agreement between Omanoff and CheyTac.

17. On October 20, 2015, John Taylor ("Taylor") executed a "Proprietary Rights Agreement" with CheyTac containing both non-compete and non-solicitation clauses (clauses 7 & 8). Exhibit 10 is a true and correct copy of the Proprietary Rights Agreement between Taylor and CheyTac.

18. Both Proprietary Rights Agreements also contained an Equitable Relief clause (clause 15) stating: "*I acknowledge and agree that the Company would be irreparably damaged if any of the provisions of this Agreement are not performed by me in accordance with their specific terms or are otherwise breached. Accordingly, I agree that the Company is entitled to an injunction or injunctions to prevent breaches of this Agreement and has the right to specific enforcement of this Agreement and the terms and provisions hereof in addition to any other remedy to which the Company may be entitled hereunder, at law or in equity.*"

19. Moreover, the Proprietary Rights Agreements contained a provision requiring that Omanoff and Taylor maintain the confidentiality and refrain from use of CheyTac's proprietary information (clause 2) stating: "*At all times, both during my association with the Company and after its termination, I will keep in confidence and trust and will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of a Company officer.*"

20. On September 28, 2015, CheyTac offered and Omanoff accepted a

position as Chief Executive Officer of CheyTac. Exhibit 11 is a true and correct copy of the Offer Letter to Omanoff.

21.  On September 28, 2015, CheyTac offered and McCutcheon accepted the position of President of ChetyTac. Exhibit 12 is a true and correct copy of the Offer Letter to McCutcheon.

22.  In February 2016, it was discovered during a routine audit that McCutcheon had failed to account for over 60 CheyTac rifles. CheyTac's immediately terminated McCutcheon as President and removed him as a Board Member.

23.  CheyTac executed a Repurcahse Agreement with DBM Technology, LLC, on February 11, 2016 to purchase all of McCutcheon's 6,000,000. The following day 3,000,000 shares were issued to Omanoff.

24.  Consequently, CheyTac executed an Amendment to its Operating Agreement on February 12, 2016 to reflect the DBM Repurchase Agreement and McCutcheon's removal. Exhibit 13 is a true and correct copy of the First Amendment to the Operating Agreement dated February 12, 2016.

25.  On November 1, 2016, Omanoff resigned as CheyTac's Chief Executive Offer and executed a Membership Interest Purchase Agreement and Settlement Agreement ("Omanoff Purchase Agreement") concurrently selling all shares and interest of Omanoff and the Omanoff Family to CheyTac for over $850,000. Exhibit 14 is a true and correct copy of the Omanoff Purchase Agreement.

26.  In January 2017, Taylor resigned as Chief Technical Advisor at CheyTac and executed a Membership Interest Purchase Agreement and Settlement

Agreement ("Taylor Purchase Agreement") to sell his remining 600,000 shares back to CheyTac.

27.   Clause 12 of both the Omanoff and Taylor Purchase Agreements includes the language: *"each party hereto covenants and agrees not to make to any third party at any time any derogatory or negative statements about or otherwise disparage, defame, impugn, or damage the reputation for integrity of the other parties. Each party hereto shall have the right to pursue all remedies available at law or equity to enforce the obligations …"*

28.   CheyTac has filed numerous trademark applications with the United States Patent and Trademark Office to protect its name, products, and goodwill and has continuously enforced its trademark rights. Exhibit 15 are true and correct copies of the trademark applications, registrations, and prosecution histories.

29.   On April 2, 2013, CheyTac federally registered the word mark "SEIZE THE DISTANCE" in standard characters (Reg. No. 4,312,281) with the United States Patent and Trademark Office. Exhibit 16 is a true and correct copy of the trademark's prosecution history.

30.   On April 29, 2003, CheyTac federally registered the word mark "CHEYTAC" (Reg. No. 2,711,809) with the United States Patent and Trademark Office. Exhibit 17 is a true and correct copy of the trademark's prosecution history.

31.   On February 20, 2017, CheyTac filed to federally register the word mark "CHEYTAC USA" in standard characters (Serial No. 87,342,181) with the United States Patent and Trademark Office. Exhibit 18 is a true and correct copy of the

trademark's prosecution history.

32.  CheyTac acquired the entire interest to U.S. Patent No. 6,629,669 titled "Controlled Spin Projectile" to protect the proprietary methods for firing ammunition from a rifle barrel. The claims of the patent are directed toward the grooved pattern of the projectile surface which impart a pre-determined spin on the projectile which enable the ammunition to travel up to 2.6 miles. Exhibit 19 is true and correct copy of U.S. Patent No. 6,629,669 and its assignment information.

33.  On April 17, 2017 Omanoff registered NextGen Tactical, LLC ("NextGen"), with the Florida Division of Corporations, to directly compete against CheyTac. Exhibit 20 is true and correct screen shot from the Florida Division of Corporations website.

34.  Omanoff's registration and operation of NextGen is a violation of the non-compete clause (clause 7) of the Proprietary Rights Agreement with CheyTac.

35.  Dennis Omanoff is listed as the Managing Member and Registered Agent of NextGen Tactical, LLC with its principal address in Cocoa Beach, FL.

36.  On information and belief, Omanoff has solicited and recruited John Taylor and Brock Gardner, former CheyTac contractor, to work at NextGen in violation of the Non-solicitation clause (clause 8) of the Proprietary Rights Agreement.

37.  Taylor's employment with NextGen is a violation of the non-compete clause (clause 7) of his Proprietary Rights Agreement.

38.  On or before March 2017, NextGen created a Products Flyer ("Flyer") and circulated the Flyer to CheyTac customers. Exhibit 21 is a true and correct

copy of NextGen's Flyer.

39. Exhibit 22 is a true and correct copy of an email Omanoff sent one of CheyTac's current clients attempting to solicit business away from CheyTac with the NextGen Flyer attached.

40. The NextGen Flyer offers for sale its ammunition as ".375ct" and ".408ct" in violation of CheyTac's trademark rights.

41. NextGen's website (www.nextgentactical.net) offers for sale a "NEXTGEN .375" rifle. Upon information and belief, the "NEXTGEN .375" rifle was deliberately created to look identical to the CheyTac M300 Intervention. Exhibit 24 is screen shot depicting a detailed view of the M300 Intervention.

42. Upon information belief, the "NEXTGEN .375" is inferior to the M300 Intervention and displays CheyTac's trademarks "CHEYTAC USA" and "SEIZE THE DISTANCE" engraved into the body and bipod leg of the "NEXTGEN .375."

43. Exhibit 25 to the Complaint is a true and correct copy showing the "CHEYTAC USA" trademark engraved onto the body of the "NEXTGEN .375." I took and produced the images of Exhibit 25.

44. Exhibit 26 is a true and correct copy of a CheyTac bipod with the mark "SEIZE THE DISTANCE" engraved along the front side of its leg.

45. NextGen is advertising, offering for sale, and selling these infringing and counterfeit goods through NextGen's website.

46. On information and belief, Omanoff and Taylor are personally participating in the infringement and counterfeit of CheyTac Products.

47. On information and belief, Omanoff has contacted CheyTac customers in

an attempt to solicit business away from CheyTac. Upon information and belief, Omanoff and Taylor have disparaged CheyTac, and CheyTac employees.

48.   On information and belief, Omanoff and Taylor have disclosed, and are continuing to disclose and use CheyTac proprietary and confidential information, trade secrets, and intellectual property rights which they acquired as a result of their employment and involvement at CheyTac.

49.   On information and belief, NextGen ".375ct" and ".408ct" ammunition infringes CheyTac's U.S. Patent No. 6,629,669.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: _____          By: _____
                                             Joseph Warren

# EXHIBIT 2

Control No. **11054406**

# STATE OF GEORGIA

## Secretary of State
### Corporations Division
### 315 West Tower
### #2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

# CERTIFICATE
# OF
# ORGANIZATION

I, **Brian P. Kemp**, the Secretary of State and the Corporations Commissioner of the State of Georgia, hereby certify under the seal of my office that

## "CHEY TAC" USA LLC
### a Domestic Limited Liability Company

has been duly organized under the laws of the State of Georgia on **07/19/2011** by the filing of articles of organization in the Office of the Secretary of State and by the paying of fees as provided by Title 14 of the Official Code of Georgia Annotated.

WITNESS my hand and official seal in the City of Atlanta and the State of Georgia on July 19, 2011



Brian P. Kemp
Secretary of State

Control No: 11054406
Date Filed: 07/19/2011 09:02 AM
Brian P. Kemp
Secretary of State

11 JUL 19 AM 8: 18

RECEIVED
SECRETARY OF STATE
SOUTH GA OFFICE

# ARTICLES OF ORGANIZATION OF "CHEY TAC" USA LLC

I.

## NAME

The name of the Limited Liability Company is **"CHEY TAC" USA LLC** (hereinafter the "Company").

II.

## MANAGEMENT

The management of the Company is vested in the Manager.

III.

## ORGANIZER

The organizer of the Company is: Corey Kupersmith of Fairfield County, Connecticut.

IV.

## REGISTERED AGENT

The registered agent of the Company is David McCutcheon whose address is 541 Hazel Avenue, Nashville, Georgia 31639.

State of Georgia
Creation - Domestic Entity 3 Page(s)

T1120016001

F:\Wpfiles\Lori\LLC-Incorporation\cheytec\articles-organization.doc

IN WITNESS WHEREOF, the undersigned has executed these Articles of Organization, this __18__ day of **July, 2011.**

11 JUL 19 AM 8: 18

RECEIVED
SECRETARY OF STATE
CORPORATE OFFICE

_____
Mitchell O. Moore, Attorney for Organizer

THESE DOCUMENTS PREPARED BY:
Mitchell O. Moore, Esquire
MITCHELL O. MOORE, PC
P. O. Box 647
Nashville, GA 31639-0647
Phone: (229) 686-5591

F:\Wpfiles\Leo\LLC-Incorporation\choyte\articles-organization.doc



**OFFICE OF SECRETARY OF STATE**
**CORPORATIONS DIVISION**
315 West Tower, #2 Martin Luther King, Jr. Drive
Atlanta, Georgia 30334-1530
(404) 656-2817
Registered agent, officer, entity status information via the Internet
http://www.georgiacorporations.org

**TRANSMITTAL INFORMATION**
**GEORGIA LIMITED LIABILITY COMPANY**

Brian P. Kemp
Secretary of State

---

<u>IMPORTANT</u>
**Remember to include your e-mail address when completing this transmittal form.**

Providing your e-mail address allows us to notify you via e-mail when we receive your filing and when we take action on your filing.   Please enter your e-mail address on the line below. Thank you.

E-Mail: mitchell@mitchellomoorelaw.com

---

NOTICE TO APPLICANT:  PRINT PLAINLY OR TYPE REMAINDER OF THIS FORM

1. 2011228184
   LLC Name Reservation Number (if one has been obtained; if articles are being filed without prior reservation, leave this line blank)
   "CHEY TAC" USA LLC
   LLC Name (List *exactly* as it appears in articles)

2. Mitchell O. Moore, P.C.
   Name of person filing articles (certificate will be mailed to this person, at address below)        (229) 686-5591
                                                                                                          Telephone Number
   PO Box 647
   Address
   Nashville                        GA                       31639
   City                             State                    Zip Code

3. 541 Hazel AVenue
   Principal Office Mailing Address of LLC  (Unlike registered office address, this may be a post office box)
   Nashville                        GA                       31639
   City                             State                    Zip Code

4. David McCutcheon
   Name of LLC's Registered Agent in Georgia
   541 Hazel Avenue
   Registered Office Street Address of LLC in Georgia  (Post office box or mail drop not acceptable for registered office address)
   Nashville              Berrien                    GA              31639
   City                   County                     State           Zip Code

5. Name and Address of each organizer    (Attach additional sheets if necessary)
   Corey Kupersmith      2 Cowdray Park Dr.        Greenwich          CT       06831
   Organizer             Address                   City               State    Zip Code

   Organizer             Address                   City               State    Zip Code

6. Mail or deliver the following items to the Secretary of State, at the above address:
   1)   This transmittal form
   2)   Original and one copy of the Articles of Organization
   3)   Filing fee of $100.00 payable to Secretary of State.  Filing fees are NON-refundable.

   _____                    7/18/11
   Authorized Signature                                  Date
   Member, Manager, Organizer or Attorney-in-fact (Circle one)

**Request certificates and obtain entity information via the Internet: http://www.georgiacorporations.org**

FORM 231

# EXHIBIT 3

# CHEYTAC USA
MAKE EVERY SHOT COUNT

HOME · FIREARMS ▾ · AMMUNITION · RELOADING · OPTICS · FIREARM COMPONENTS
MEDIA · THE CHEYTAC ADVANTAGE · GS CUSTOM BULLETS

## Firearms

Showing all 4 results

Default sorting >



**M200 Intervention®**
~~$11,700.00–$12,460.00~~ $11,700.00
–$12,460.00

Select and Buy



**M300 Carbon Fiber**
$10,500.00–$10,960.00

Select and Buy



**M300 Intervention®**
Composite
$10,000.00–$10,460.00

Select and Buy





**M300 Lightweight**
**Aluminum**
$8,700.00–$9,160.00

Select and Buy

### Search CheyTac

Search

### Recent Posts

- Expanding Safeguards, Service, and Accuracy
- Greater Accuracy and Reliability
- Find a New Scope for Your Rifle
- The M200 Intervention® Infographic
- Get Fully Equipped With New Sniper Gear



## CHEYTAC USA
MAKE EVERY SHOT COUNT

HOME     FIREARMS |     AMMUNITION     RELOADING

MEDIA     THE CHEYTAC ADVANTAGE     GS CUSTOM


Sale!



Manufactured by CheyTac USA, LLC

CheyTac® Loaded Match Gr

~~$140.00–$1,386.00~~ $140.00–$1,188.0

| Ammo Type | |
|---|---|
| Caliber/Grain | |
| Ammo Quantity | |

[ 1 ]   Add to cart

SKU: N/A
Category: Ammunition

Description     Additional Information



(http://www.cheytac.com/)

HOME (HTTP://WWW.CHEYTAC.COM/)

FIREARMS (HTTP://WWW.CHEYTAC.COM/PRODUCT-CATEGORY/FIREARMS/)

AMMUNITION (HTTP://WWW.CHEYTAC.COM/SHOP/AMMO/20-ROUND-AMMO-BOX/)

RELOADING (HTTP://WWW.CHEYTAC.COM/RELOADING/)

OPTICS (HTTP://WWW.CHEYTAC.COM/PRODUCT-CATEGORY/STORE-OPTICS/)

FIREARM COMPONENTS (HTTP://WWW.CHEYTAC.COM/FIREARM-COMPONENTS/)

MEDIA (HTTP://WWW.CHEYTAC.COM/ABOUT-US/MEDIA/)

THE CHEYTAC ADVANTAGE (HTTP://WWW.CHEYTAC.COM/THE-CHEYTAC-ADVANTAGE/)

GS CUSTOM BULLETS (HTTP://WWW.CHEYTAC.COM/GS-CUSTOM/)

Sale!

### CheyTac® Loaded Match Grade Ammunition

~~$140.00–$1,386.00~~ $140.00–$1,188.00





| Ammo Type | Choose an option |
| Caliber/Grain | Choose an option |
| Ammo Quantity | Choose an option |

[ 1 ]   Add to cart

SKU: N/A

Category: Ammunition (http://www.cheytac.com/product-category/ammo/)

Manufactured by CheyTac USA, LLC
(http://www.cheytac.com/wp-content/uploads/2013/06/20RoundAmmoBox2.jpg)

| Description | Additional Information |

## Additional Information

| | |
|---|---|
| **Weight** | 3 lbs |
| **Dimensions** | 7 x 7 x 5 in |
| **Ammo Type** | CheyTac Balanced Flight Bullet |
| **Caliber/Grain** | .375/350 gr, .408/ 370 gr, .408/305 gr, .408/387 gr, .408/419 gr |
| **Ammo Quantity** | 20 Round Box, 100 Round Box, 198 Round Ammo Can |

# EXHIBIT 4





# vention (weapon)

Talk [105]   Share

er uses, see Intervention.

milar weapon, see Widowmaker (weapon).

ac M200 **Intervention** is a bolt-action sniper rifle featured in *Call of Duty: Modern Warfare 2, Call of Duty*

*Call of Duty: Infinite Warfare*

Add New Page   **9,333** PAGES ON THIS WIKI

⟡ Trending Fandom Article



| Intervention | |
|---|---|
| Damage | 70 (MP) .50 (Silenced) |
| Damage Multipliers | Head: 1.5, Neck: 1.5 Chest: 1.5, Stomach: 1.1, Limbs: 1 |
| Magazine Size | 5 rounds (10 with Extended Mags) |
| Unlocked | Level 4 |

## Duty: Modern Warfare 2 🖉 Edit

gn 🖉 Edit

paign, it is only found in the missions "Wolverines," "The Only Easy
esterday," and "Just Like Old Times."

Ops 🖉 Edit

ntion is a starting weapon in "Hidden" and "Snatch and Grab." It is
mate weapon in "Body Count," "Homeland Security." Ammo
nd "Wetwork." It is a good weapon to counter Juggernauts with should
ack the Barrett but it requires six shots to kill these behemoths
her enemies will fall with one round

yer 🖉 Edit

ntion is available at level 4 when Create-A-Class is unlocked. The
ow fire rate and high sway, but has high damage multipliers with



TRENDING        Can a gun trust protect your firearms during a divorce?                    Search...

HOME    TGW COLUMN    NEWS ⌄    TGW TV    EVENTS ⌄    REVIEWS    WHO WE ARE ⌄    ADVERTISE WITH TGW

YOU ARE AT:    Home  »  Florida Gun News  »  Column: An interview with CheyTac USA's new CEO

## Column: An interview with CheyTac USA's new CEO

BY LEE WILLIAMS ON OCTOBER 1, 2014        FLORIDA GUN NEWS, GUNS, HOME, NEW FIREARMS, NEWS - NATIONAL



*CheyTac USA's M200 has been featured in blockbuster films and several video games. Mark Walberg uses the M200 in "Shooter." Photo Courtesy CheyTac USA*

By Lee Williams

**Published: Wednesday, October 1, 2014 at 8:31 a.m.**

**Last Modified: Wednesday, October 1, 2014 at 8:31 a.m.**

CheyTac USA rifles have become the movie industry's darling.

It's not without good reason.

With their skeletonized adjustable stocks and massive magazines that hold their proprietary rounds, CheyTac's rifles look good, like a precision rifle should. Their .408 M200 "Intervention" was used by Mark Wahlberg in the movie "Shooter," and by the Italian-born actress Violante Placido in "Ghost Rider 2: Spirit of Vengeance."

The rifle will be seen in the upcoming film "Batman v. Superman: Dawn of Justice," scheduled to be released in 2016.

The M200 is also a staple among some of the most popular video games. It's featured in "Call of Duty — Modern Warfare 2," "Call of Duty Online" and "Homefront."

David McCutcheon, a decorated Air Force veteran who recently became

CheyTac's new CEO, says there's much more to the firm's high-end precision rifles than Hollywood notoriety.

PODCAST

Search ...        Search

TGW YOUTUBE VIDEOS





A SOF-level Med kit and med plan for the range

At the range with Special Ops legend Bob Keller of Gamut Resolutions





Q&A: At the range with Special Operations legend Bob Keller

Rom Outdoors 3-in-1 backpack, which converts to a poncho, shooting mat

View more

TWITTER FEED

I disagree, Bob, respectfully. I think it's a kill-shot.



Cheytac wins the day on the Military Channels Ultimate Weapons - Sniper Rifles

# EXHIBIT 5

Control No. **11054406**

# STATE OF GEORGIA

## Secretary of State

### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Drive
### Atlanta, Georgia 30334-1530

# CERTIFICATE
# OF
# AMENDMENT
## NAME CHANGE

I, **Brian P. Kemp**, the Secretary of State and the Corporations Commissioner of the State of Georgia, hereby certify under the seal of my office that

## "CHEY TAC" USA LLC
### a Domestic Limited Liability Company

has filed articles/certificate of amendment in the Office of the Secretary of State on **05/22/2012** changing its name to

## CHEYTAC USA, LLC

and has paid the required fees as provided by Title 14 of the Official Code of Georgia Annotated. Attached hereto is a true and correct copy of said articles/ certificate of amendment.

WITNESS my hand and official seal in the City of Atlanta and the State of Georgia on May 22, 2012



Brian P. Kemp
Secretary of State



Control No: 11054406
Date Filed: 05/22/2012 04:29 PM
Brian P. Kemp
Secretary of State



**Office Of The Secretary Of State**
**Corporations Division**

**Articles Of Amendment** 22  PM 3:45

**To Articles of Organization** OF STATE
SOUTH GA OFFICE

Brian P. Kemp
Secretary Of State

### Article One

The Name Of The Limited Liability Company Is:

"CHEY TAC" USA LLC

### Article Two

The Date The Articles Of Organization Were Filed Was:

July 19, 2011

### Article Three

The Limited Liability Company Hereby Adopts The Following Amendment To Change The Name Of The Organization.  The New Name Of The Organization Is:

CheyTac USA, LLC

**IN WITNESS WHEREOF, the undersigned has executed these Articles Of Amendment**

On  May 21, 2012
    (Date)



_____, Manager
(Signature And Capacity in which signing)

Form CD 110

State of Georgia
Name Change 1 Page(s)

T1214418001

# EXHIBIT 6

Control Number : 11054406

# STATE OF GEORGIA

### Secretary of State
#### Corporations Division
#### 313 West Tower
#### 2 Martin Luther King, Jr. Dr.
#### Atlanta, Georgia 30334-1530

### CERTIFICATE OF AMENDMENT

I, Brian P. Kemp, the Secretary of State and the Corporation Commissioner of the State of Georgia, hereby certify under the seal of my office that

### CHEYTAC USA, LLC

#### a Domestic Limited Liability Company

has filed articles/certificate of amendment in the Office of the Secretary of State on **07/19/2011** and has paid the required fees as provided by Title 14 of the Official Code of Georgia Annotated.  Attached hereto is a true and correct copy of said articles/certificate of amendment.

WITNESS my hand and official seal in the City of Atlanta

and the State of Georgia on 8/19/2015



Brian P. Kemp
Secretary of State



Brian P. Kemp
Secretary of State

OFFICE OF SECRETARY OF STATE
CORPORATIONS DIVISION
2 Martin Luther King Jr. Dr. SE
Suite 313 West Tower
Atlanta, Georgia 30334
(404) 656-2817
sos.georgia.gov/corporations

# Articles of Amendment
# to Articles of Organization

### Article One

The name of the limited liability company ("company") is:

CheyTac USA, LLC

### Article Two

The date the articles of organization were filed was   July 19, 2011

### Article Three

The company hereby adopts the following amendment to change the name of the company. The new name of the company is:

CheyTac USA-DBM, LLC

### Article Four
*(Check, and if applicable complete, one of the following)*

✓  The articles of amendment shall be effective upon the filing with the Secretary of State.

The articles of amendment shall be effective on: ........................... at ...........................
                                                                            (Date)                              (Time)

**IN WITNESS WHEREOF, the undersigned has executed these Articles of Amendment on**

July 14, 2015
_____
(Date)

Signature  _____

David McCutcheon
Print Name

Capacity (choose one option only)
- Organizer
- Member
- ✓ Manager
- Court-Appointed Fiduciary
- Attorney-in fact

Email Address: ...........................

Form CD 115
(Rev. 4/2015)

# EXHIBIT 7

Control Number : 11054406

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

### CERTIFICATE OF AMENDMENT NAME CHANGE

I, Brian P. Kemp, the Secretary of State and the Corporation Commissioner of the State of Georgia, hereby certify under the seal of my office that

### CHEYTAC USA-DBM, LLC
#### a Domestic Limited Liability Company

has filed articles/certificate of amendment in the Office of the Secretary of State on **07/19/2011** changing its name to

### CHEYTAC USA, LLC

and has paid the required fees as provided by Title 14 of the Official Code of Georgia Annotated. Attached hereto is a true and correct copy of said articles/ certificate of amendment.

WITNESS my hand and official seal in the City of Atlanta

and the State of Georgia on 8/11/2015



Brian P. Kemp
Secretary of State



**Brian P. Kemp**
Secretary of State

**OFFICE OF SECRETARY OF STATE**
**CORPORATIONS DIVISION**
2 Martin Luther King Jr. Dr. SE
Suite 313 West Tower
Atlanta, Georgia 30334
(404) 656-2817
sos.georgia.gov/corporations

2015 AUG 10  PM 5: 15

SECRETARY OF STATE
CORPORATIONS DIVISION

## Articles of Amendment
## to Articles of Organization

### Article One

The name of the limited liability company ("company") is:

CheyTac USA-DBM, LLC

### Article Two

The date the articles of organization were filed was: July 19, 2011

### Article Three

The company hereby adopts the following amendment to change the name of the company. The new name of the company is:

CheyTac USA, LLC

### Article Four
*(Check, and if applicable complete, one of the following)*

[✓] The articles of amendment shall be effective upon the filing with the Secretary of State.

[ ] The articles of amendment shall be effective on: _____ at _____
                                                        (Date)              (Time)

**IN WITNESS WHEREOF, the undersigned has executed these Articles of Amendment on**

August 10, 2015
_____
(Date)

Signature _____

David McCutcheon
Print Name _____

Capacity (choose one option only): [ ] Organizer
                                   [ ] Member
                                   [✓] Manager
                                   [ ] Court-Appointed Fiduciary
                                   [ ] Attorney-in-fact

Email Address: _____

Form CD 115
(Rev. 4/2015)

# EXHIBIT 8

**EXECUTION COPY**

# CHEYTAC USA, LLC

# OPERATING AGREEMENT

### (A Georgia Limited Liability Company)

### Dated as of September 28, 2015

---

THE SHARES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH SHARES MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND SECURITIES LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH OR REFERRED TO HEREIN.

---

**EXECUTION COPY**

# CheyTac USA, LLC
# OPERATING AGREEMENT

This Agreement is made as of September 28, 2015, among CheyTac USA, LLC, a Georgia limited liability company (the **"Company"**), and the Persons signatory hereto (such Persons, together with their respective heirs, personal representatives, successors and permitted assigns and such other Persons as may become parties hereto from time to time, hereinafter referred to individually as a **"Member"** and collectively as **"Members"**).

## PREAMBLES

A.     The Company is a limited liability company originally formed in accordance with the Georgia Limited Liability Company Act (as amended from time to time, the **"Act"**) by the filing on July 19, 2011 with the Georgia Secretary of State of a Certificate of Organization.

B.     The undersigned desire to adopt this Agreement to govern the establishment and regulation of the affairs of the Company, the conduct of its business and the relations among all present and future Members of the Company.

## AGREEMENT

## ARTICLE I
## DEFINITIONS

Capitalized terms used herein or in any Annex, schedule or exhibit attached hereto and not otherwise defined shall have the following meanings:

**"Act"** has the meaning given it in the Preambles.

**"Affiliate"** means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, the Person in question.  As used in the definition of **"Affiliate"**, the term **"control"** means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

**"Agreement"** means this Agreement as the same may be amended and supplemented from time to time, and all Exhibits and attachments hereto.

**"Award Agreement"** has the meaning given it in Section 3.01(c)(i).

**"Authorization Summary"** has the meaning given it in Section 2.02.

**"Board"** has the meaning given it in Section 5.02(a).

**"Capital Account"** means the capital account of each Member determined and maintained in accordance with Section 3.02 and <u>Annex A</u> to this Agreement.

**"Capital Contribution"** means, with respect to any Member, the amount of cash and the initial Gross Asset Value of property (other than cash) contributed to the Company by such Member.

**"Certificate"** means the Certificate of Organization of the Company, and all amendments thereto, executed and filed pursuant to the Act and the terms of this Agreement.

**"Class A Member"** means a Member who holds Class A Shares.

**"Class A Share"** means a Share representing a fractional part of the ownership of the Company and having the rights and obligations specified in this Agreement with respect to Class A Shares.

**"Class B Member"** means a Member who holds Class B Shares.

**"Class B Share"** means a Share representing a fractional part of the ownership of the Company and having the rights and obligations specified in this Agreement with respect to Class B Shares. Class B Shares which are issued on or about the same date and having the same Class B Share Threshold Amount shall also bear a numeric designation (e.g., B1, B2, B3, etc.).

**"Class B Share Threshold Amount"** means, with respect to any Class B Share, an amount equal to or, in the sole discretion of the Board, greater than the aggregate Fair Market Value of all the Shares issued and outstanding immediately before such Class B Share is issued; provided, that the Class B Share Threshold Amount shall not be less than zero. The Class B Share Threshold Amount of all or any Class B Share may be adjusted by the Board at any time, if the Board determines in good faith that such adjustment is necessary to maintain the characterization of such Class B Shares or Class B Share as a profits interest within the meaning of Rev. Proc. 93-27.

**"Code"** means the Internal Revenue Code of 1986, as amended from time to time. All references herein to specific sections of the Code shall be deemed to refer also to the corresponding provisions of succeeding law.

**"Company"** means the limited liability company operated pursuant to this Agreement.

**"Depreciation"** means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis, provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

**"Fair Market Value"** of the Company means the fair market value of the Company and its subsidiaries on a going concern basis. The Fair Market Value of a Share means the amount which the holder of such Share would receive for such security if the Company sold all its assets for their Fair Market Value and the proceeds of such sale were distributed to the Company's Members (on a fully diluted, as converted basis) in accordance with Section 4.1 of Annex A after satisfaction of all funded indebtedness and other liabilities (including transaction costs) that would typically be satisfied in connection with a sale of the Company. The Fair Market Value of any other asset means

the fair market value of the asset in question as determined by the Board, taking into account all relevant factors determinative of value, without any discount or premium for control or illiquidity.

"**Gross Asset Value**" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross Fair Market Value of such asset, as determined by the Board in good faith;

(ii)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross Fair Market Values (taking Code Section 7701(g) into account), as determined by the Board in good faith, as of the following times: (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (B) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and (D) in connection with the grant of an interest in the Company (other than a de minimis interest) to a Service Provider as consideration for the provision of services, including any issuance of Class B Shares pursuant to an Award Agreement; provided that an adjustment pursuant to subsections (A), (B), and (D) of this definition shall be made only if the Board reasonably determines that such adjustment is necessary to reflect the relative economic interests of the Members in the Company;

(iii)   The Gross Asset Value of any item of Company assets distributed to any Member shall be adjusted to equal the gross Fair Market Value (taking Code Section 7701(g) into account) of such asset on the date of distribution as determined by the Board; and

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to (A) Regulations Section 1.704-1(b)(2)(iv)(m) and (B) subsection (vi) of the definition of "Net Profits" and "Net Losses" or Section 3.2(g) of Annex A hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subsection (iv) to the extent that an adjustment pursuant to subsection (ii) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subsection (i), (ii), or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset, for purposes of computing Net Profits and Net Losses.

"**Manager**" has the meaning given it in Section 5.02(a).

"**Member Repurchase Agreement**" means, as to each Member, that certain Member Repurchase Agreement entered into between said Member and the Company.

"**Net Profits**" and "**Net Losses**" mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately

pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition of "Net Profits" and "Net Losses" shall be added to such taxable income or loss;

(ii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses hereunder shall be subtracted from such taxable income or loss;

(iii)     In the event the Gross Asset Value of any Company asset is adjusted pursuant to subsections (ii) or (iii) of the definition of "Gross Asset Value," the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Gross Asset Value of the asset) or an item of loss (if the adjustment decreases the Gross Asset Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing Net Profits or Net Losses hereunder;

(iv)     Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with the definition of Depreciation;

(vi)     To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Net Profits or Net Losses; and

(vii)     Notwithstanding any other provision of this definition, any items that are specially allocated pursuant to Section 3.2 or Section 3.3 of Annex A hereof shall not be taken into account in computing Net Profits or Net Losses.

The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to Sections 3.2 and 3.3 of Annex A hereof shall be determined by applying rules analogous to those set forth in subsections (i) through (vi) above.

"Offer Letter" has the meaning given it in Section 5.05(c).

**"Organizational Expenses"** means the fees, costs and expenses of, and incidental to, the organization of the Company. Such expenses shall include any and all amounts categorized as "organizational expenses" under the Code.

**"Person"** means any individual, partnership, Company, estate, trust, limited liability company or other entity.

**"Pre-Operating Expenses"** means the investigative fees, costs and expenses incidental to the creation of the Company and the fees, costs and expenses incurred in connection with the commencement of operations of the Company. Such expenses shall include any and all amounts categorized as "start-up expenditures" under the Code.

**"Pro Rata Share"** means the Class A Member's proportionate share of all Class A Shares held by all Class A Members (or by all Class A Members in a subgroup of the Class A Members, if the context requires).

**"Protections and Rights"** has the meaning given it in Section 5.01(b).

**"Required Members"** means Class A Members holding Class A Shares representing more than 50% of the total number of Class A Shares held by all Class A Members (or by all Class A Members in a subgroup of the Class A Members, if the context requires).

**"Securities Act"** means the Securities Act of 1933, as amended.

**"Service Provider"** means any Manager, officer, employee, consultant or other service provider of the Company or any direct or indirect subsidiary of the Company.

**"Share"**, or any fraction thereof, means an ownership interest in the Company, which represents such Member's share of Net Profits and Net Losses, such Member's right to receive distributions hereunder, such Member's right to vote (if any) and any and all other rights and interests to which such Member may be entitled as provided in this Agreement, including the Capital Account of such Member, and includes the Class A Shares and Class B Shares and any other class of Shares created by the Board as contemplated under Section 6.04(a).

**"Tax Matters Partner"** means the Member of the Company so designated pursuant to Section 5.08.

**"Transfer"** means, when used as a noun, any sale, gift, hypothecation, pledge, assignment, encumbrance, disposal or other transfer, whether voluntary or by operation of law, and, when used as a verb, means to sell, give, hypothecate, pledge, assign, encumber, dispose of or otherwise transfer, whether voluntarily or by operation of law. Without limiting the generality of the foregoing, the term Transfer shall include the transfer of a controlling interest in any Member to any Person who, before such transfer, owned no interest in such Member. The term Transfer does not include a change in the board of directors or similar governing body of any Member.

**"Treas. Reg."** and **"Regulations"** mean the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

**"Unvested Shares"** means any Class B Shares which are not fully vested in accordance with the terms of the applicable Award Agreement.

## ARTICLE II
## ORGANIZATIONAL MATTERS

**2.01    Formation.** The Company was organized as a Georgia limited liability company on July 11, 2011 by the execution and filing of the Certificate under and pursuant to the Act and shall be continued in accordance with the terms of this Agreement. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of the Members are different by any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control. Each party hereto represents and warrants that he or she is duly authorized to join in this Agreement. The Members hereby agree to execute, file and record all such other certificates and documents, including amendments to the Certificate and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property, and the conduct of business under the laws of the State of Georgia and any other jurisdiction in which the Company may own property or conduct business.

**2.02    Name.**  The name of the Company is CheyTac USA, LLC. The Board in its sole discretion, and in compliance with the Board of Directors Authorization Summary attached hereto as <u>Exhibit A</u> and made a part hereof, as the same may be amended from time to time (the **"Authorization Summary"**) may change the name of the Company at any time and from time to time. Notification of any such change shall be given to all Members. The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Board.

**2.03    Principal Office; Registered Office.** The registered office of the Company is 110 Eagle Avenue, Nashville, GA 31639, and the principal office of the Company shall be at 110 Eagle Avenue, Nashville, GA 31639, or at such other place or places as the Board may from time to time designate in compliance with the Authorization Summary. The Company may maintain offices at such other place or places as the Board deems advisable.  Notification of any change in the Company's principal place of business shall be given to all of the Members.

**2.04    Purposes.**  The Company is organized to conduct all lawful purposes for which a limited liability company may be organized under the Act.

**2.05    No State Law Partnership.** The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Member shall be an agent, partner or joint venturer of any other Member, for any purposes other than as set forth in the next sentence. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

## ARTICLE III
## SHARES; CAPITAL ACCOUNTS; ADDITIONAL CAPITAL CONTRIBUTIONS

### 3.01    Schedule of Members and Shares.

(a) The Members and the number of Shares they hold as of the date of this Agreement are set forth on Schedule 3.01. Schedule 3.01 shall be amended from time to time without the further vote, act or consent of the Board or any Member to reflect any changes in the Members or their Shares held as a result of any act or occurrence permitted or required under this Agreement.

(b) The Company shall initially have the authority to issue two classes of Shares: Class A Shares and Class B Shares. As of the date of this Agreement, 18,600,000 Class A Shares have been issued. The Board shall have the authority to issue up to an additional 1,400,000 Class B Shares.

(c) The following additional provisions apply to the Class B Shares:

(i)    The Board shall have the authority to issue Class B Shares to one or more Service Providers. The Board shall have the authority to issue up to 1,400,000 Class B Shares (as such number may be adjusted to reflect any Share split or consolidation) in the aggregate. All such Class B Shares shall be issued pursuant to Award Agreements or similar written grant notice agreements with such Service Providers and may include such terms, conditions, rights and obligations as may be determined by the Board, in its sole discretion, consistent with the terms herein (each, as the same may be amended from time to time by the Board, an **"Award Agreement"**). Each Award Agreement shall include the Class B Share Threshold Amount applicable to such Class B Shares, as determined by the Board in good faith. Class B Shares which are issued on or about the same date and having the same Class B Share Threshold Amount shall also bear a numeric designation (e.g., B1, B2, B3, etc.). This Agreement and the provisions relating to the Class B Shares are intended to constitute a written plan for purposes of the Code, Rule 701 of the Securities Act and any other applicable exemption from securities registration requirements. In connection with any issuance of Class B Shares to a Service Provider, such Service Provider (if not already a Member hereunder) shall execute and deliver to the Company a joinder to this Agreement, accepting and agreeing to be bound by all terms and conditions hereof, a joinder to the Member Repurchase Agreement, accepting and agreeing to be bound by all terms and conditions thereof, and shall execute and deliver such other documents and instruments with respect thereto as are required by the Board.

(ii)    The Company and each Member hereby acknowledge and agree that, with respect to any Service Provider, such Service Provider's Class B Shares constitute a "profits interest" in the Company within the meaning of Rev. Proc. 93-27, 1993-2 C.B. 343, and that any and all Class B Shares received by a Service Provider are received in exchange for the provision of services by the Service Provider to or for the benefit of the Company or its subsidiaries in a Service Provider capacity or in anticipation of becoming a Service Provider. The Company and each Service Provider who receives Class B Shares hereby agree to comply with the provisions of Rev. Proc. 2001-43, I.R.B. 2001-34, and neither the Company nor any Service Provider who receives Class B Shares shall perform any act or take any position inconsistent with the application of Rev. Proc. 2001-43.

- 7 -

(iii)     To the extent that the Company has the option to make an election pursuant to Proposed Treasury Regulation Section 1.83-3(l), Section 3.03 of the Proposed Revenue Procedure in Notice 2005-43, or any similar provision of applicable law or regulation, the Company is hereby authorized and directed to file such election and to treat the Fair Market Value of the applicable Class B Shares, or of any other interest in the Company transferred in connection with the performance of services, as being equal to the liquidation value of that interest upon its receipt. The Company and each Member (including any Person to whom an interest in the Company is transferred in connection with the performance of services) agrees to comply with all requirements of such election and the Regulations governing such election.

(iv)     Each Service Provider who receives Class B Shares that are subject to a substantial risk of forfeiture within the meaning of Code Section 83 shall make a timely and effective election under Code Section 83(b) with respect to such Class B Shares and shall promptly provide a copy to the Company.  Except as otherwise determined by the Board, both the Company and all Members shall (A) treat such Class B Shares as outstanding for tax purposes, (B) treat such Service Provider as a partner for tax purposes with respect to such Class B Shares and (C) file all tax returns and reports consistently with the foregoing.  Neither the Company nor any of its Members shall deduct any amount (as wages, compensation or otherwise) with respect to the receipt of such Class B Shares for federal income tax purposes.

(d) Notwithstanding any contrary provision of this Agreement, the following additional provisions apply to the Unvested Shares:

(i)     No holder of Unvested Shares shall be entitled to receive any distribution (other than Tax Distributions pursuant to Section 4.2 of Annex A) made by the Company with respect to any such Unvested Shares unless and until such Unvested Shares become vested.

(ii)     Any amount that would otherwise be distributed to a holder of Unvested Shares but for the application of subsection (i) above shall instead be retained by the Company in a segregated Company account and paid to such holder if, as and when the Unvested Shares become (or would have become) vested.  If any Unvested Shares have been redeemed by the Company pursuant to an Award Agreement or other repurchase right or have been (or would have been) forfeited or otherwise become incapable of vesting, any amounts retained by the Company pursuant to this subsection on account of such Unvested Shares (A) first, shall be credited against and reduce the amount otherwise payable, if any, by the Company in connection with the exercise of the Company's repurchase option or other repurchase right or obligation of the Company with respect to any vested Shares owned by the Member holding such repurchased or forfeited Unvested Shares and (B) second, shall be permanently retained by the Company or distributed by the Company in accordance with Section 4.1 of Annex A.

**3.02    Capital Contributions; Capital Accounts.**  The initial Capital Contributions of the Members are as set forth on Schedule 3.01.  There shall be established for each Member on the books of the Company a Capital Account reflecting the initial Capital Contribution of the Member, and which shall be maintained for each Member in the manner set forth in Section 2 of Annex A.

**3.03    Additional Funds.**

(a) No Member shall be paid interest on any Capital Contribution to the Company or on such Member's Capital Account, and no Member shall have any right to (i) demand or receive the return of such Member's Capital Contribution or any other distribution from the Company (whether upon resignation, withdrawal or otherwise) except as otherwise specifically provided in this Agreement or (ii) cause a partition of the Company's assets.

(b) No Member shall be required to make any additional Capital Contributions to the Company. Any future Capital Contributions made by any Member shall only be made with the consent of the Board.

(c) No Member shall be required to lend any funds to the Company and no Member shall have any personal liability for the payment or repayment of any Capital Contribution by or to any other Member.

(d) Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent such loans relate to any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member.

**3.04    Nature of Members' Interests.** The interests of the Members in the Company shall constitute personal property for all purposes. Legal title to all Company assets shall be held in the name of the Company. No Member nor a successor, representative or assign of such Member shall have any right, title or interest in or to any Company property or the right to partition any real property owned by the Company.

**3.05    Certificated Shares.** The Shares of the Company shall be certificated. It is intended that the Shares shall be securities for purposes of Article 8 of the Uniform Commercial Code.

**3.06    Assets and Liabilities; Equipment and Inventory.** The Members acknowledge and agree that, as of the Effective Date, the assets and liabilities of the Company are as reflected on Exhibit G attached hereto and said Exhibit G contains a complete and accurate accounting of all inventory, fixtures, equipment and accounts receivables owned by the Company and all accounts payable owed by the Company.

### ARTICLE IV
### ALLOCATIONS AND DISTRIBUTIONS

Allocations of Net Profits and Net Losses, special allocations, tax allocations and distributions shall be made in accordance with the provisions of Sections 3 and 4 of Annex A to this Agreement.

### ARTICLE V
### MANAGEMENT

**5.01    Management by Managers.**

(a)    The management, operation and control of the Company and its business and affairs shall rest exclusively with the Board (as set forth in Section 5.02).

(b)     Anything herein to the contrary notwithstanding, the Board shall act in compliance with the Authorization Summary and the Protections and Rights for Members and Board of Managers attached hereto as <u>Exhibit B</u> and made a part hereof, as the same may be amended from time to time (the **"Protections and Rights"**).  The Authorization Summary and the Protections and Rights may only be amended by the unanimous approval of the Board.

(c)     Notwithstanding the provisions of this Section 5.01 and except as otherwise specifically provided in this Agreement, no Member, as such, may bind or otherwise obligate the Company independent of the Board which is established pursuant to Section 5.02 of this Agreement.

**5.02    Board.**

(a) The management of the Company by and on behalf of the Members shall be effectuated by a board of Managers (the **"Board"**).  The Board shall be comprised of three (3) individuals/entities (each, a **"Manager"**), or such other number of individuals/entities as may be approved by the Members in accordance with the Authorization Summary.  The Board as of the date of this Agreement consists of David McCutcheon, Dennis Omanoff and Joseph Warren.  No member of the Board individually shall have the authority to bind the Company (unless the Board at a given time consists of a single Manager, in which case such Manager shall have the authority to bind the Company unilaterally); instead, such Managers shall act only as a group, through the Board.  The Board shall continue to have and may exercise all of the powers and shall have all the authority conferred hereby at all times, including during any period in which one or more vacancies on the Board may exist.  Except as otherwise set forth in the Authorization Summary, all actions taken and all determinations and decisions made by consent of the majority of members of the Board shall be deemed for all purposes to be the actions taken by the Members.

(b) At any time when there is more than one Manager, any one Manager may take any action permitted to be taken by the Managers, unless the approval of more than one Manager is expressly required pursuant to this Agreement, the Authorization Summary or by law.  The act of a Manager for the purpose of apparently carrying on in the usual way the business or affairs of the Company, including without limitation, (a) executing any and all documents necessary to the Company's business, (b) entering into, (c) modifying, and (d) concluding or terminating contracts.

(c) Each Manager shall be reimbursed all reasonable expenses incurred on behalf of the Company.  A Manager's entitlement to compensation, if any, shall be determined from time to time in the manner set forth in the Authorization Summary.

(d) The Board may, upon written consent of a majority of members of the Board, unless a greater number is required by the Authorization Summary, establish, modify or dissolve one or more committees thereof and adopt, amend and revoke such bylaws, rules, regulations, policies and procedures as it may determine to be in the best interest of the Company (but not inconsistent with this Agreement) for the conduct of the business of the Board and the business and affairs of the Company.

(e) Each member of the Board shall hold office until his, her or its death, dissolution, resignation or removal.

(f)  Each of David McCutcheon, Dennis Omanoff and Joseph Warren shall serve on the Board unless/until either of the following events occurs:

(1)    The Company exercises its call rights set forth in the Member Repurchase Agreement; or

(2)    The Manager, in its capacity as a Member, exercises his/its put rights as set forth in said Member's Member Repurchase Agreement; or

(3)    He/It is removed as provided in the Authorization Summary.

(g)  The vacancy or vacancies caused in the Board by such removal may be filled as set forth in the Authorization Summary.  As set forth in Section GG of the Authorization Summary, if at any time, due to any change in circumstances, the Board is composed of an even number of individuals, the remaining members of the Board shall, within ninety (90) days of the event resulting in such even number, submit to all Class A Members a list of viable candidates to fill an additional Board seat.  The Required Members shall select from said list to fill such Board seat.

(h)  Any vacancy that occurs in the Board by reason of death, resignation, removal increase in the number of members thereof or any other cause whatsoever may only be filled as set forth in the Authorization Summary.

(i)  Meetings of the Board may be called at any time by any one or more members of the Board or by the CEO of the Company, and shall be held on such date and at such time and place as shall be specified by the person or persons calling the meeting.  However, the Board shall meet at least once a year at a place to be determined by the Board.  Meetings may be held by telephone or other remote conferencing device.

(j)  Notice of every meeting of the Board specifying the place, date and time thereof shall be given to each member of the Board at least 48 hours prior to the time of the meeting. Notices shall be given orally, in person or by mail (including email), a reliable express delivery service or telefacsimile to the address or number of a member of the Board appearing in the Company's records.  The right to notice may be waived, before or after the date fixed for the meeting, by delivery to the Company of a written waiver of notice signed by the person entitled to such notice.  Attendance of a member of the Board at a meeting shall constitute a waiver by such member of notice of such meeting, except when a member attends the meeting for the express purpose of objecting, when he or she enters the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

(k)  Subject to the terms of the Authorization Summary, any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting if a consent in writing, setting forth the actions so taken, shall be signed by a majority of the members of the Board or such committee, as applicable, and such written consent is filed with the minutes of the Board or such committee, as applicable.  Within a reasonable time after obtaining such authorization by written consent, the Company shall provide notice to those Managers who have not consented in writing or who are not entitled to vote on the action.

- 11 -

(l) Except as otherwise expressly provided in this Agreement, members of the Board, or any committee thereof, may participate in a meeting of the Board or such committee by means of conference telephone or other electronic technology by which all persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

**5.03   Duties.**  The Board shall manage and control the Company, its business and affairs under the same duty of care as is applicable to a board of directors of a corporation organized under the Georgia Business Corporation Code except to the extent (if any) otherwise provided in this Agreement.  The Board shall further comply with the Protections and Rights and the Authorization Summary in the execution of its duties.  Except as set forth in the applicable Manager's Offer Letter and/or Proprietary Rights Agreement, the Board shall devote only such time as it deems necessary for the proper conduct of the Company's business and affairs.  Subject to the duties of the Managers pursuant to this Agreement, and subject to the terms of a Manager's Offer Letter and/or Proprietary Rights Agreement, Members of the Board may engage in, or possess interests in, other business ventures of any nature and description, independently or with others, and neither the Company nor the Members shall have any rights in or to any such other ventures or the income or profits derived therefrom.

**5.04   Powers.**

Except as otherwise set forth in this Agreement, the Authorization Summary, or the Protections and Rights, the entire management, operation and control of the Company and its business and affairs shall be under the direction of the Board.  Without limiting the generality of the foregoing, the Board shall have the following rights and powers which it may exercise at the cost, expense and risk of the Company:

(a)   to carry out and implement any and all of the purposes of the Company set forth in Section 2.04;

(b)   to select, hire, supervise and dismiss employees, contractors, and other Service Providers of the Company;

(c)   to negotiate, execute and deliver such agreements, contracts, documents and instruments on behalf of the Company, and to give such receipts, releases and discharges with respect to all of the foregoing and any matters incident thereto, as the Board deems necessary, advisable, appropriate or convenient to carry out and implement any and all of the purposes of the Company set forth in Section 2.04; provided, that the economic and other terms of any agreement entered into with an Affiliate of any of the Members or the Company shall be reasonably comparable to the economic and other terms generally available to the Company for similar services or materials from an unrelated Person;

(d)   to prepare operating and capital budgets;

(e)   to delegate any or all of its duties hereunder and in furtherance of such delegation, to appoint, employ or contract with such persons on behalf of the Company as the Board deems necessary or desirable for the transaction of the business of the Company, all of which persons shall be under the ultimate supervision of the Board; and

- 12 -

(f)     to execute any document granting to any Person the right to confess judgment against the Company in the event of the Company's default in the performance of its obligations thereunder.

### 5.05     Designation of Officers.

(a) Officers.  The Board shall have the power to appoint officers and agents to act for the Company with such titles, if any, as the Board deems appropriate and to delegate to such officers or agents such of the powers as are granted to the Board hereunder, including the power to execute documents on behalf of the Company, as the Board may in its sole discretion determine; provided, that no such delegation by the Board shall cause any Manager or cease to be a "manager" of the Company within the meaning of the Act.  The officers so appointed may include persons holding titles such as Chief Executive Officer, President, Secretary, Treasurer or the like.  Unless the authority of the officer in question is limited in the document appointing such officer or is otherwise specified by the Board, any officer so appointed shall have the applicable duties and authority set forth below, subject to the terms of the Authorization Summary, and in the absence of a specific delegation of authority shall have the same authority to act for the Company as a corresponding officer of a Georgia limited liability company would have to act for a Georgia limited liability company; provided, that unless such power is specifically delegated to the officer in question either for a specific transaction or generally, no such officer shall have the power to lease or acquire real property, to borrow money, to issue notes, debentures, securities, equity or other interests of or in the Company, to make investments in (other than the investment of surplus cash in the ordinary course of business) or to acquire securities of any Person, to give guarantees or indemnities (other than in the ordinary course of business with respect to sales of the Company's products and services), to merge, liquidate or dissolve the Company or to sell or lease all or any substantial portion of the assets of the Company.

(i)     The Chief Executive Officer.  The Chief Executive Officer, if one has been elected, shall perform functions and duties as may be assigned to him or her from time to time by the Board.  The Chief Executive Officer shall, if present, preside at all meetings of Members and of the Board.

(ii)    The President.  The President shall perform functions and duties as may be assigned to him or her from time to time by the Board.

(iii)   The Secretary and Assistant Secretaries.  It shall be the duty of the Secretary (a) to keep or cause to be kept an original or duplicate record of the proceedings of the Members and the Board, and a copy of the Certificate; (b) to attend to the giving of notices of the Company as may be required by law or this Agreement; (c) to be custodian of the corporate records and of the seal of the Company and see that the seal is affixed to such documents as may be necessary or advisable; (d) to have charge of the share register of the Company; and (e) to exercise such further powers and duties as may be prescribed by the Board from time to time.  The Secretary by virtue of his or her office shall be an Assistant Treasurer.  The Assistant Secretaries shall assist the Secretary in the performance of his or her duties and shall also exercise such further powers and duties as from time to time may be assigned to them by the Board or the Secretary.  At the direction of the Secretary or in his or her absence or disability, an Assistant Secretary shall perform the duties of the Secretary.

- 13 -

(iv)    The Treasurer and Assistant Treasurers.  It shall be the duty of the Treasurer (a) to have custody of all the funds and securities of the Company; (b) to collect all moneys due the Company and deposit such moneys to the credit of the Company in such banks, trust companies, or other depositories as may have been duly designated by the Board of Directors; (c) to endorse for collection on behalf of the Company checks, notes, drafts and other documents, and to sign and deliver receipts, vouchers and releases of liens evidencing payments made to the Company; (d) to cause to be disbursed the funds of the Company by payment in cash or by checks or drafts upon the authorized depositories of the Company; (e) to have charge of the books and accounts of the Company; and (f) to exercise such further powers and duties as may be prescribed by the Board from time to time.  The Treasurer by virtue of his or her office shall be an Assistant Secretary.  The Assistant Treasurers shall assist the Treasurer in the performance of his or her duties and shall also exercise such further powers and duties as from time to time may be assigned to them by the Board or the Treasurer.  At the direction of the Treasurer or in his or her absence or disability, an Assistant Treasurer shall perform the duties of the Treasurer.

(b) Current Officers.  As of the date of this Agreement, Dennis Omanoff is the Chief Executive Officer, David McCutcheon is the President, Joseph Warren is the Secretary, and the Treasurer will be selected by the Board.

(c) Compensation.  The initial compensation of the officers shall be as set forth in the Offer Letters dated September 28, 2015 , true and correct copies of which are attached hereto as Exhibit C (each an "Offer Letter", collectively the "Offer Letters").

(d) Power to Remove.  As it pertains to any officers that are not Members, except as may be limited by contract, and subject in all instances to the Authorization Summary, each officer shall serve at the pleasure of the Board or otherwise in accordance with the terms and provisions of any agreement approved by the Board in accordance herewith, and any such designation (and the accompanying powers, authorities and responsibilities) may be modified or terminated at any time in the sole discretion of the Board.  It shall not be a requirement for any individual to serve in any employee or officer capacity that he or she be a member of the Board or a Member.

**5.06    Certain Limitations Upon the Powers of the Board.**  Notwithstanding the provisions of this Agreement, and except as otherwise set forth in the Authorization Summary, neither the Board nor the officers shall do any act in contravention of this Agreement.

**5.07    Liability and Indemnification.**

(a) No Member, no Manager, and no officer shall be liable to the Company or to any other Member for any debts owed by the Company to any such Person, nor for any actions taken or omissions made in good faith and reasonably believed by such Person to be in the best interests of the Company, or for errors of judgment, except to the extent such acts or omissions constitute gross negligence, recklessness or willful misconduct.

(b) To the fullest extent permitted by law, the Company shall indemnify each Manager and each officer and their respective heirs, successors, personal representatives and assigns (any of the foregoing Persons being hereinafter an "**Indemnified Person**") and save and hold them and each of them harmless from and in respect of (i) all fees, costs and expenses, including attorneys' fees, incurred in connection with, or resulting from, any claim, action or

- 14 -

demand against any such Indemnified Person or the Company which arise out of, or in any way relate to, the Company, its properties, business or affairs, and (ii) all such claims, actions and demands and any losses, liabilities or damages resulting therefrom, including amounts paid by such Indemnified Person with the prior written consent of the Company in settlement or compromise of any such claim, action or demand; provided, that this indemnity shall not extend to any such Indemnified Person to the extent that his or her acts and omissions shall have been adjudged to constitute a breach of this Agreement or recklessness or willful misconduct.

(c) The Company, at the discretion of the Board, may advance monies of the Company to any Indemnified Person who is or may be subject to a claim for which indemnification may be required under this Section to cover attorneys' and accountants' fees and disbursements and other similar defense costs or expenses. Such advances may be conditioned by the Board upon satisfaction of such conditions as the Board in its discretion determines are appropriate including, but not limited to, either or both of (i) an undertaking by the Indemnified Person to return monies so advanced if it is ultimately determined that indemnification is not required under this Section and (ii) a determination by independent counsel that such Indemnified Person is more likely than not to be entitled to indemnification under this Section. Furthermore, no monies shall be advanced under this Section if the making of such advance would, in the reasonable judgment of the Board, render the Company insolvent or impair its ability to discharge its other obligations, whether or not accrued, absolute, fixed or contingent, or would interfere with its ability to carry out the purposes of the Company.

**5.08    Tax Matters Partner.** The Board shall designate a "tax matters partner" (as defined in Section 6231(a)(7) of the Code) to act on behalf of the Company in connection with Company income tax matters, and in the absence of such designation, Praecisa Tenuras, LLC shall be the tax matters partner.

## ARTICLE VI
## MEMBERS

**6.01    Voting Rights.** The Members acknowledge and agree that in all instances in which a vote on an action is required hereunder, the vote of the members of the Board shall control, and the Members shall not be entitled to a vote, except as required by the Act and except in those instances in which the Board, due to an extenuating circumstance, is unable to act. In the event the Board is unable to act, or as required to elect an additional member of the Board in an instance in which there is an even number of Board members, as more particularly set forth in Section 5.02(g), the Class A Members shall be entitled to one vote per Class A Share on all matters presented to or requiring a vote of Members. All Members' acts are subject to Section II of the Authorization Summary. Except as expressly provided in the Act or in this Agreement, the Class B Members (in their capacities as such) are not entitled to vote, and the consent, approval or agreement of the Class B Members (in their capacities as such) is not required, on any matter presented to the Members. Except as otherwise provided or permitted in this Agreement or the Act, any decision, determination or other action to be made or taken by the Members shall be by the Required Members. Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the actions so taken, shall be signed by the Required Members and such written consent is filed with the minutes of the Company. Within a reasonable time after obtaining such authorization by written consent, the Company shall provide notice to those Members who have not consented in writing or who are not entitled to vote on the action.

- 15 -

**6.02     Limited Liability of the Members.** No Member will be bound by, or be personally liable for, the debts, liabilities or obligations of the Company beyond Capital Contributions made and not yet returned pursuant to this Agreement; provided, that if any Member has received distributions in violation of the Act, such Member will remain liable to the extent of such wrongful distributions as provided in the Act. Any such returns of distributions will be repaid to the Company by such Member in cash upon demand by the Board. This Section will not create any rights in, or inure to the benefit of, any Person other than the Company.

**6.03     Certain Covenants of the Members.**

(a) The Members shall be subject to the Protections and Rights and the covenants set forth therein to the extent applicable to the Members.

(b) No Member will either directly or indirectly take any action to require partition or appraisal of the Company or of any of its assets or to cause the sale of any assets of the Company, and each Member hereby irrevocably waives any and all rights to maintain any action for partition or to compel any sale with respect to his or her Shares or any assets of the Company.

(c) Each Member hereby covenants and agrees that the Members have entered into this Agreement based on their mutual expectation that all Members will continue as Members and carry out the duties and obligations undertaken by them hereunder and that, except as otherwise provided herein or in a Member Repurchase Agreement, no Member will withdraw or retire from the Company, be entitled to demand or receive a return of such Member's contributions or profits (or a bond or other security for the return of such contributions or profits) or exercise any power under the Act to dissolve the Company.

(d) If the Company is obligated to pay any amount to the Internal Revenue Service or any other tax or governmental agency, body, authority or other instrumentality (or otherwise makes a payment) because of a Member's status or otherwise specifically attributable to (and/or any Company income and/or gain allocable to) a Member (including United States federal, state or local withholding taxes imposed with respect to any issuance of Shares or other interests to a Service Provider or any payments to a Service Provider hereunder, United States federal withholding taxes with respect to foreign Persons, state personal property taxes, state unincorporated business taxes, etc.), then such Member (the **"Indemnifying Member"**) shall indemnify the Company in full for the entire amount paid (including any interest, penalties and expenses associated with such payments) together with the accrued interest thereon at the rate of 5% per annum. At the option of the Board (which, for this purpose, shall not include the Indemnifying Member or any Manager designated by the Indemnifying Member), either:

(i)     promptly upon notification of an obligation to indemnify the Company, the Indemnifying Member shall make a cash payment to the Company equal to the full amount to be indemnified (provided that the amount paid shall not be treated as a Capital Contribution); or

(ii)     the Company shall reduce distributions that would otherwise be made to the Indemnifying Member, until the Company has recovered the amount to be indemnified (provided that the amount of such reduction shall be deemed to have been distributed for all purposes of this Agreement).

An Indemnifying Member's obligation to make contributions to the Company under this Section shall survive the termination, dissolution, liquidation and winding up of the Company and, for purposes of this Section, the Company shall be treated as continuing in existence. The Company may pursue and enforce all rights and remedies it may have against each Indemnifying Member under this Section, including instituting a lawsuit to collect such contribution with interest.

**6.04    Issuance of Additional Shares and Admission of Additional Members.**

(a) The Board may at any time, subject to the Authorization Summary: (i) issue additional Shares to existing Members; (ii) create such additional class or classes of Shares having such relative rights, powers and duties as the Board may establish; and (iii) whether or not in connection with subsection (ii) above, designate one or more Persons for admission as a Member and, in connection therewith, determine the amount and nature of such Person's Capital Contribution and the times at which such Person's Capital Contributions are to be made, the number of Shares such Person will be entitled to receive and all other terms and conditions of the issuance of additional Shares to such Person or such Person's admission as a Member.

(b) No Person may be admitted as an additional Member unless such prospective Member executes and delivers to the Company (i) a counterpart of, or joinder to, this Agreement, (ii) a Member Repurchase Agreement between said additional Member and the Company, and (iii) such other documents as requested by the Board.

**6.05    Preemptive Rights**

(a)    If the Company authorizes the issuance and sale of any additional Shares (collectively, **"Additional Interests"**), the Company shall first offer to sell to each Class A Member his, her or its Pro Rata Share of such Additional Interests. If two or more types of Additional Interests are to be issued, or if Additional Interests are to be issued together with other types of securities (including debt securities) in a single transaction or related transactions, the rights of the Class A Members under this Section must be exercised to purchase all types of Additional Interests and such other securities in the same proportion as such Additional Interests and other securities are to be issued by the Company.

(b)    To implement the foregoing, prior to the date of any issuance by the Company of any Additional Interests, the Company shall deliver a written notice (a **"Preemptive Notice"**) to each Class A Member specifying in reasonable detail the number and type of Additional Interests proposed to be issued, the percentage of the Company's outstanding Shares such issuance would represent and the proposed terms and conditions of the issuance, including the proposed purchase price per Additional Interest and the identity of any third party transferees who wish to acquire such Additional Interests, if any. Each Class A Member may elect to participate in the contemplated issuance at the same price per Additional Interest and on the same terms and conditions by delivering written notice to the Company within 15 days after his, her or its receipt of the Preemptive Notice specifying the maximum amount of Additional Interests such Class A Member desires to purchase. Additional Interests shall be allocated among the Class A Members so electing in an amount equal to the lesser of the maximum amount specified by each such Class A Member in such Class A Member's notice to the Company and such Class A Member's Pro Rata Share of the Additional Interests being issued. If the Class A Members do not elect to purchase all of such Additional Interests, any remaining Additional Interests shall be allocated on a pro rata basis among the Class

A Members electing to participate in the contemplated issuance, in each case up to the maximum amount that each such Class A Member indicated it would purchase in its response to the Preemptive Notice. Failure of a Class A Member to deliver such notice within such 15-day period shall constitute a waiver by such Class A Member of his, her or its rights under this Section with respect to such issuance of Additional Interests.

(c)     If any Class A Members elect to purchase any Additional Interests, the Company shall sell, and each Class A Member electing to participate in such issuance pursuant to this Section shall purchase, the amount of Additional Interests determined pursuant to subsection (b) above within 15 days after the end of such 15-day period, and the Company may issue to the third party transferee(s) identified in the Preemptive Notice, within 90 days after the expiration of such 15-day period, any Additional Interests which the Class A Members have not elected to purchase for the consideration and upon other terms not more favorable to the purchaser than those specified in the Preemptive Notice. Any issuance of Additional Interests made other than in accordance with the foregoing sentence will be subject to all of the provisions of this Section. At the closing of any sale of Additional Interests to the Class A Members, the Company shall deliver to each electing Class A Member the certificates or other instruments representing the issued securities (if certificated), free and clear of all liens, and each such Class A Member shall make customary investment representations to the Company and shall deliver to the Company the purchase price therefor in immediately available funds.

**6.06    Termination of Agreement with Respect to a Member**.  This Agreement shall terminate with respect to a Member upon such Member's Transfer of all of his or her Shares in accordance with the terms and conditions applicable to such Transfer under this Agreement; provided that the Agreement shall terminate only as to such Member and shall continue among the remaining parties hereto.

**6.07    Representations and Warranties of the Members**.  Each Member hereby severally, but not jointly, represents and warrants to the Company as follows:

(a)     Such Member is acquiring the Shares for such Member's own account with the present intention of holding such Shares for investment purposes and with no intention of selling such Shares in violation of applicable securities laws;

(b)     Such Member has received information regarding the Company and the risks associated with an investment in the Company, has had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of the Shares and the transactions contemplated by this Agreement, and has had full access to such other information concerning the Company and its business and assets as such Member may have requested;

(c)     Such Member (i) is an "accredited investor" as defined in Rule 501(a) under the Securities Act or (ii) is a founder of the Company or (iii) is a Service Provider holding Class B Shares or by reason of such Member's business and financial experience and the business and financial experience of those retained by such Member to advise such Member with respect to such Member's investment in the Shares, such Member, together with such advisors, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of such Member's investment in such Shares;

(d)     Such Member is able to bear the economic risk of such Member's investment in the Shares for an indefinite period of time and, at the present time, is able to afford a complete loss of such investment;

(e)     Such Member, if an entity, is duly organized, validly existing and in good standing in its jurisdiction of organization;

(f)     Such Member, if an entity, has the power and authority to own its assets, to conduct its business as presently conducted and to execute, deliver and perform this Agreement;

(g)     This Agreement has been duly and validly executed and delivered by such Member and constitutes a legal, valid and binding obligation of such Member enforceable against such Member in accordance with its terms, subject to the laws of bankruptcy and other laws affecting creditors' rights generally and to the availability of equitable remedies;

(h)     The execution, delivery and performance by such Member of this Agreement do not:  (i) violate such Member's organizational documents (in the case of Members who are entities); (ii) breach or result in a default (or an event which, with the giving of notice or the passage of time, or both, would constitute a default) under, require any consent under or give to others any rights of termination, acceleration, suspension, revocation, cancellation or amendment of any contract, agreement, instrument or document to which such Member is a party or by which such Member or any of such Member's properties or assets is bound; (iii) breach or otherwise violate any order, writ, injunction or decree issued by any governmental entity which names such Member or is directed to such Member or any of such Member's assets; (iv) violate any governmental law or regulation; or (v) require any consent, authorization, approval, exemption or other action by, or any filing, registration or qualification with, any person or entity; and

(i)     Such Member has not employed or retained, and has no liability to, any broker, agent or finder on account of this Agreement or the transactions contemplated hereby.

## ARTICLE VII
## BOOKS, RECORDS, ACCOUNTING, REPORTS AND EXPENSES

**7.01    Books of Account; Accounting.**  The Company's books of account and financial records shall be maintained at the principal office of the Company or at any other location designated by the Board, and each Member shall have access thereto at all reasonable times for any proper purpose reasonably related to the interest of such Person as a Member.  The Board shall cause the Company's books of account and financial records to be kept in reasonable detail and in accordance with the basis of accounting used for federal income tax purposes, and otherwise in a manner which accurately and fairly reflects the financial position and operations of the Company.

**7.02    Reports.**

(a) Within ninety (90) days after the end of each Fiscal Year, the Company shall prepare and submit to each Member an annual report of the Company for such Fiscal Year.  The annual report shall include the balance sheet of the Company as of the last day of such Fiscal Year and a statement of profit or loss of the Company for such Fiscal Year, prepared using reasonable accounting standards.  The report shall be accompanied by a supplementary schedule showing the

entries to the Members' Capital Accounts (separately and in the aggregate) in respect of such Fiscal Year, together with the appropriate Internal Revenue Service forms showing entries required to be made on each such Member's federal income tax return with respect to the Company's Net Profits or Net Losses.

(b) In connection with the liquidation and dissolution of the Company, the Board shall cause to be prepared and submitted to the Members a termination report containing the financial statements of the Company as of and for the period ended upon the substantial completion of liquidation.

**7.03    Expenses and Fees.**

(a) Pre-Operating Expenses and Organizational Expenses will be amortized as permitted by the Code.

(b) The Company shall be obligated to pay or reimburse the expenses of operating and maintaining the Company, which expenses shall include, without limitation, legal, accounting and auditing fees and expenses of the Company and the costs of the acquisition, maintenance, repair and disposition of the Company's properties and taxes and assessments with respect thereto.

(c)    Except as otherwise provided in this Agreement, no Member, as such, shall receive any salary, fee or draw for services rendered to or on behalf of the Company.  Members shall be entitled to receive such salaries, draws and bonuses for services rendered to or on behalf of the Company as the Board may determine.  To the extent as may be determined by the Board upon setting such salaries, draws and bonuses, payments made to Members pursuant to this subsection (c) shall, to the greatest extent permitted by the Regulations, be treated as "guaranteed payments" as described in Section 707(c) of the Code.  To the extent that any portion of such payments may not be properly treated as such guaranteed payments, such portion shall be treated as special allocations of items of Net Profits or Net Losses, as the case may be, prior to the making of the allocations of the remaining items of Net Profits or Net Losses pursuant to this Agreement.

**7.04    Banking.**  All funds of the Company shall be deposited in such bank account or accounts of federally insured banks as shall be determined by the Board.  Such funds shall not be commingled with any of the funds of any Member.  All withdrawals therefrom shall be made upon written authorization signed by any Person authorized to do so by the Board.

## ARTICLE VIII
## RESTRICTIONS ON TRANSFERS

**8.01    Restrictions on Transfers.**  No Member may Transfer any of his/her/its Shares, or any rights or interest appertaining thereto, whether now owned or hereafter acquired, except as permitted under such Member's Member Repurchase Agreement.  Except as otherwise agreed in a separate written agreement, no Class B Member may directly or indirectly Transfer all or any part of such Class B Member's Class B Shares without the prior consent of the Board, which consent may be withheld for any or no reason.  Any purported Transfer of Shares by a Member that is not in accordance with the provisions of this Agreement shall be null and void and shall not operate to Transfer any right, title or interest in such Shares to the purported transferee.  The Company shall

- 20 -

not cause or permit the Transfer of any Shares to be made on its books unless the Transfer is permitted by this Agreement and has been made in accordance with its terms.

**8.02    Essence of Agreement.**  The provisions of this Article VIII shall be deemed to be of the essence with respect to the Shares and upon application to any court of equity having jurisdiction, each of the parties hereto shall be entitled to a decree against any Person violating or about to violate the provisions hereof seeking specific performance of the provisions hereof or any injunction to restrain any violation thereof.  The remedy provided for herein shall be in addition and without prejudice to any other legal, equitable or contractual remedies which the parties may have.

## ARTICLE IX
## DISSOLUTION AND WINDING UP

**9.01    Dissolution.**

(a) The Company shall dissolve upon the occurrence of any of the following events:

(i)    the written agreement of the Board pursuant to the Authorization Summary;

(ii)    the sale of all or substantially all the assets of the Company;

(iii)    the entry of an order of judicial dissolution under the Act; or

(iv)    the entry of a final judgment, order or decree of a court with competent jurisdiction adjudicating the Company to be bankrupt, and the expiration of the period, if any, allowed by applicable law in which appeal therefrom is taken.

(b) The death, bankruptcy, incompetency, insanity, dissolution, termination, liquidation, reorganization, merger or other changes in the ownership or nature of a Member will not dissolve the Company.

**9.02    Termination of Business.**  Upon dissolution, the Company shall cease to conduct its activities, and its business and affairs shall be wound up as promptly as practicable in conformity with the procedures set forth herein and the requirements of the Act.  The Company itself shall not terminate, however, until its debts, liabilities and obligations have been paid or provided for and its assets have been distributed.

**9.03    Liquidation of Assets.**  Upon dissolution of the Company, the Board or, if there is no Board, the liquidation trustee selected by the Required Members (the **"Liquidation Trustee"**), will arrange for liquidation of the Company's assets and cause such liquidation to be carried out as promptly as is consistent with realization of maximum value.  The Board or the Liquidation Trustee, as the case may be, will have full power and authority to:

(a) sell, at such prices and upon such terms as it in its sole discretion may deem appropriate, any or all of the Company's assets, provided that such sales will be made for cash to the fullest extent practicable;

- 21 -

(b) incur such fees, costs and expenses for the account of the Company as may be reasonable and necessary or advisable to accomplish such liquidation;

(c) defer and withhold from liquidation Company assets if, in its best judgment, such action is in the best interests of Company's creditors and the Members; and

(d) take any and all other actions as may be permitted under the Act.

Pending the liquidation provided for herein, the Board or the Liquidation Trustee, as the case may be, will have the power and authority to manage and otherwise deal with the Company's assets and to pay or provide for payment and discharge of the Company's debts, obligations and liabilities.

**9.04    Distribution of Assets.**

(a) Distributions of the Company's assets upon liquidation may be made in cash or other property (or a combination thereof).

(b) Distribution of the Company's assets upon liquidation will be made in the following order:

(i)    to the payment and discharge of all debts, liabilities and obligations of the Company to Company creditors (including Members and former Members in their capacities as creditors, if any) in the order of priority as provided by law;

(ii)    to the establishment of any reserves for any contingent or unforeseen liabilities or obligations of the Company; provided, that upon the determination that it is no longer necessary to maintain any particular portion of such reserves, such portion will be immediately distributed in accordance with subsection (iii) below; and

(iii)    to the Members in accordance with Section 4.1 of Annex A by the end of such taxable year (or, if later, within 90 days after the date of the Company's liquidation).

(c) No Member will have any obligation to restore any negative balance in its Capital Account upon liquidation or dissolution of the Company or otherwise. Upon completion of the winding up of the affairs of the Company and the distribution of its assets as provided herein and in the Act, the Board will cause the Certificate to be canceled in accordance with the Act.

(d) Notwithstanding any contrary provision of this Agreement, the Company's income, gain, losses, deductions and credits for the Fiscal Year in which the Company dissolves and winds up shall be allocated to and among the Members in a manner such that the Capital Account balance of each Member, immediately after giving effect to such allocations, shall, as nearly as possible, equal (proportionately) the amount to be distributed to each Member upon such dissolution and winding up pursuant to subsection (b)(iii) above (and, as applicable, Section 4.1 of Annex A). For purposes of this subsection, the allocation provisions contained in this Agreement are intended to produce a final Capital Account balance for each Member (such Member's **"Target Final Balance"**) that is equal to the amount to be so distributed to such Member upon the Company's dissolution and winding up and that to the extent that the allocation provisions of this Agreement would not produce the Target Final Balance for any Member, then this Agreement shall be automatically amended, and allocations of items of Company income (including gross income),

gain, deductions and/or losses shall be allocated in such manner so as to produce such Target Final Balance for each Member (and, if and to the extent necessary, for any prior taxable year if the United States federal income tax return of the Company for such prior taxable year has not yet been filed or is still open and can be amended, shall be specially allocated to the extent the Managers determine to be necessary to cause the respective positive Capital Account balance of each Member to be equal to such Member's Target Final Balance).  This subsection shall apply without regard to any allocation or re-allocation that may be required and/or imposed by the Internal Revenue Service or any other tax authority in any audit, proceeding or otherwise.

(e)  All payments made in liquidation of the interest of a Member in the Company shall be made in exchange for the interest of such Member in Company property pursuant to Code Section 736(b)(1), including the interest of such Member in Company goodwill.

## ARTICLE X
## GENERAL PROVISIONS

### 10.01   Amendment of Agreement.

(a)  Except as otherwise specifically provided herein or in the Authorization Summary, this Agreement may be amended in whole or in part, or provisions waived, only with the written consent of the Board; provided, that without the express written consent of each Member adversely affected thereby: (i) no new monetary obligation shall be imposed upon any Member, and no existing monetary obligation of a Member shall be increased, without the consent of such Member; and (ii) no amendment that adversely affects a Member in a manner different from any other Member holding Shares of the same class or type or that amends, waives or limits any unique right or obligation of a particular Member shall be made without the consent of such Member.  This Section 10.01 may not be amended or waived without the unanimous consent of all Members, and no provisions of this Agreement requiring the consent or action of greater than the Board or the Required Members may be amended or waived without the same consent as is required in the provision to be amended or waived.  The Board shall give prior written notice of any proposed amendment or waiver to all of the Members, which notice shall set forth the text of the proposed amendment or waiver.

(b)  Notwithstanding subsection (a) above, this Agreement may be amended by the Company without the approval of the Members if such amendment is: (i) for the purpose of substituting or adding a Member or class of Members which have been admitted to the Company in accordance with the provisions of this Agreement; or (ii) in the opinion of counsel for the Company, to the extent necessary or appropriate to satisfy requirements of the Code with respect to partnerships, including without limitation the requirements under sections 7701, 704 and 752 of the Code, or of any federal or state securities laws or regulations promulgated thereunder.

(c)  No amendment or waiver of this Agreement shall be effective to the extent it deprives any party to this Agreement of any rights that have already accrued hereunder.

### 10.02   Arbitration.  Any claim, controversy or dispute arising between the Members and the Company, between a Member and the Company or between one or more Members  with respect to this Agreement (a "Dispute"), to the maximum extent allowed by applicable law, shall be submitted to and finally resolved by, binding arbitration.  Any party may file a written Demand for

Arbitration with the American Arbitration Association's Atlanta, Georgia Regional Office (and if no such Regional Office exists, the nearest Regional Office), and shall send a copy of the Demand for Arbitration to the Company and all other Members. The arbitration shall be conducted pursuant to the terms of the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association, except that discovery may be had in accordance with the Federal Rules of Civil Procedure. The venue for the arbitration shall be Atlanta, Georgia. The arbitration shall be conducted before one arbitrator selected through the American Arbitration Association's arbitrator selection procedures. The arbitrator shall promptly fix the time, date and place of the hearing and notify the parties. The parties shall stipulate that the arbitration hearing shall last no longer than five business days. The arbitrator shall render a decision within 10 days of the completion of the hearing, which decision may include an award of legal fees, costs of arbitration and interest. The arbitrator shall promptly transmit an executed copy of its decision to the parties. The decision of the arbitrator shall be final, binding and conclusive upon the parties. Each party shall have the right to have the decision enforced by any court of competent jurisdiction. Notwithstanding any other provision of this Section 10.02, any Dispute in which a party seeks equitable relief may be brought in any court having jurisdiction.

    **10.03   Counterparts; Electronic Execution.** This Agreement may be executed in several counterparts, including by signature in Adobe PDF or other electronic facsimile format, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

    **10.04   Entire Agreement.** This Agreement, together with the Exhibits attached hereto and the Member Repurchase Agreements entered into by each of the Members and the Company concurrently herewith, contain the entire agreement of the parties with respect to the transactions contemplated hereby and supersede all prior written and oral agreements, and all contemporaneous oral agreements, relating to such transactions.

    **10.05   Governing Law.** This Agreement shall be governed by and interpreted and enforced in accordance with the substantive laws of the State of Georgia, without reference to the principles governing the conflict of laws applicable in that or any other jurisdiction.

    **10.06   Notices.** Unless otherwise specifically provided herein, all notices, consents, requests, demands and other communications required or permitted hereunder: (a) shall be in writing, (b) shall be sent by messenger, certified or registered U.S. mail, a reliable express delivery service, telefacsimile or email (and if by telefacsimile or e-mail, a copy also must be sent by one of the foregoing means), charges prepaid as applicable, to the appropriate address(es) or number(s) set forth in Schedule 3.01; and (c) shall be deemed to have been given on the date of receipt by the addressee (or, if the date of receipt is not a business day, on the first business day after the date of receipt), as evidenced by (A) a receipt executed by the addressee (or a responsible person in his or her office) or a notice to the effect that such addressee refused to claim or accept such communication, if sent by messenger, U.S. mail or express delivery service, or (B) a receipt generated by the sender's telecopier or email showing that such communication was sent to the appropriate number or email address on a specified date, if sent by telecopier or email. All such communications shall be sent to the addresses set forth on Schedule 3.01, or to such other addresses as any party may inform the others by giving five business days' prior notice.

    **10.07   Severability.** Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or

unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

 **10.08**  **Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns.

 **10.09**  **Number and Gender.** Whenever used in this Agreement the singular shall include the plural, the plural shall include the singular, and the use of any gender shall be applicable to any other gender or to all genders.

 **10.10**  **Waivers.** The waiver by any party of any default or breach of this Agreement or of any right or benefit hereunder shall not be effective unless made in writing by the waiving party and will not constitute a waiver of any other or subsequent default or breach. No act, delay or omission on the part of either party will be deemed a waiver unless expressly made in writing.

 **10.11**  **Equitable Relief.** Each party: (a) acknowledges that the other parties would be irreparably damaged if any of the provisions of this Agreement are not performed by such party in accordance with their specific terms; and (b) agrees that the other parties are entitled to injunctive relief to prevent breaches of this Agreement, and have the right to specifically enforce this Agreement and the terms and provisions hereof, in addition to any other remedies available at law or in equity.

**[Signature Page Follows]**

[SIGNATURE PAGE TO OPERATING AGREEMENT]

**COMPANY:**

CheyTac USA, LLC

By: _____

Name: _____

Title: _____ CEO _____

**MEMBERS:**

_____

Dennis Omanoff, Co-Trustee
of the Omanoff Family Trust

_____

Elaine Omanoff, Co-Trustee
of the Omanoff Family Trust

DBM TECHNOLOGY, LLC

By: _____

Name: _____

Title: _____

PRAECISA TENURAS, LLC

By: _____

Name: _____

Title: _____

_____

John Taylor

EXECUTION COPY

[SIGNATURE PAGE TO OPERATING AGREEMENT]

**COMPANY:**

CheyTac USA, LLC

By:_____
Name:_____
Title:_____

**MEMBERS:**

_____

Dennis Omanoff, Co-Trustee
of the Omanoff Family Trust

_____

Elaine Omanoff, Co-Trustee
of the Omanoff Family Trust

DBM TECHNOLOGY, LLC

By:_____
Name:_____
Title:_____

PRAECISA TENURAS, LLC

By: _____
Name: _____
Title: _____

_____

John Taylor

CASE 11 11925 CMA

[SIGNATURE PAGE TO OPERATING AGREEMENT]

COMPANY:

Cling Tan USA, LLC

By: _____
Name: _____
Title: _____

MEMBERS:

_____
Dennis Dimanoff, Co-Trustee
of the Dimanoff Family Trust

_____
Elaine Dimanoff, Co-Trustee
of the Dimanoff Family Trust

DIME TECHNOLOGY, LLC

By: _____
Name: _____
Title: _____

PRALI USA GENERAL, LLC

By: _____
Name: _____
Title: _____

_____
John Taylor

2

# EXHIBIT 9

## PROPRIETARY RIGHTS AGREEMENT

This PROPRIETARY RIGHTS AGREEMENT (this "Agreement"), confirms certain terms of my association with the Company, whether as an employee, independent contractor or consultant, a member of the Company's Board of Managers, or as an owner of Shares in the Company (as such term is defined in the Operating Agreement of the Company dated September 28, 2015, as amended from time to time (the "Operating Agreement")), which is a material part of the consideration for my association with the Company and the compensation or, as to Members, distributions received by me from the Company from time to time. The headings contained in this Agreement are for convenience only, have no legal significance, and are not intended to change or limit this Agreement in any matter whatsoever.

1.     Definitions.

A.     "Affiliate" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, the Person in question. As used in the definition of "Affiliate", the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise. As used in this definition, the term "Person" means any individual, partnership, company, estate, trust, limited liability company or other entity.

B.     "Business" means the invention, production and sale of ammunition, guns and shooting systems for specific calibers. Some elements in the system include (but are not limited to), ammunition, guns and gun accessories, optics, ballistic software and methods of calculation. The caliber range includes all calibers starting with the .338 up to and including the .50 caliber. The performance range is from very, very long distance to rapid fire automatic. Notwithstanding the foregoing, the term "Business" as used herein shall not include those activities described in Exhibit A hereto.

C.     "Company" means CheyTac USA, LLC, a Georgia limited liability company and its subsidiaries or affiliated companies. I understand and agree that the terms of this Agreement will continue to apply to me even if I transfer at some time from one subsidiary or affiliate of the Company to another.

D.     "Company Documents and Materials" means documents or other media or tangible items that contain or embody Proprietary Information or any other information concerning the Business, operations or plans of the Company, whether such documents, media or items have been prepared by me or by others. Company Documents and Materials include, but are not limited to, blueprints, drawings, photographs, charts, graphs, notebooks, customer lists, computer disks, tapes or printouts, sound recordings and other printed, typewritten or handwritten documents, sample products, prototypes and models.

E.     "Inventions" means all creative acts or ideas that are relevant to, and within the scope of, the Business including, but not limited to, all software programs or subroutines, source or object code, algorithms, improvements, inventions, works of authorship, trade secrets, technology, designs, formulas, ideas, processes, techniques, know-how and data, whether or not

patentable, made or discovered or conceived or reduced to practice or developed by me, either alone or jointly with others, during my employment with or engagement by the Company.

       F.     "Proprietary Information" means information that was or will be developed, created, or discovered by or on behalf of the Company, or that became or will become known by, or was or is conveyed to, the Company that has research or commercial value in the Business and is not known outside of the Company.  Proprietary Information includes, but is not limited to, information about research, patents (both pending and issued), software programs and subroutines, source and object code, algorithms, trade secrets, designs, technology, know-how, processes, data, ideas, techniques, inventions (whether patentable or not), works of authorship, formulas, business and product development plans, customer lists, terms of compensation and performance levels of Company employees, Company customers and other information concerning the Company's actual or anticipated business, research or development, or that is received in confidence by or for the Company from any other person.  For the avoidance of doubt, Proprietary Information shall not include information developed, created, or discovered in connection with the activities described in Exhibit A hereto as an exception to the definition of "Business".

    2.     Assignment of Rights.  All Proprietary Information and all patents, patent rights, copyrights, trade secret rights, trademark rights and other rights (including, but not limited to, intellectual property rights) anywhere in the world in connection therewith is and shall be the Company's sole property.  I hereby assign to the Company any and all rights, title and interest I may currently have or acquire in such Proprietary Information.  At all times, both during my association with the Company and after its termination, I will keep in confidence and trust and will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of a Company officer, except as may be necessary in the ordinary course of performing my duties to the Company.

    3.     Maintenance and Return of Company Documents and Materials.  I agree to make and maintain adequate and current written records, in a form specified by the Company, of all inventions, trade secrets and works of authorship assigned or to be assigned to the Company under this Agreement.  All Company Documents and Materials are and shall be the Company's sole property.

    4.     Disclosure of Inventions to the Company.  I will promptly disclose in writing to my immediate supervisor or to such other person designated by the Company all Inventions.  I will also disclose to the Company all Inventions made, discovered, conceived, reduced to practice or developed by me within six months after the termination of my employment with or engagement by the Company that resulted, in whole or in part, from my prior employment with or engagement by the Company.  Such disclosures shall be received by the Company in confidence (to the extent such Inventions are not assigned to the Company under Section 5) and do not extend the assignment made in Section 5.

    5.     Right to New Ideas.

       A.     *Assignment of Inventions to the Company.*  I agree that all Inventions shall be the Company's sole property to the maximum extent permitted by applicable law.

B.      *Works Made for Hire.*  The Company shall be the sole owner of all patents, patent rights, copyrights, trade secret rights, trademark rights and all other intellectual property or other rights in connection with any Inventions.  I further acknowledge and agree that such Inventions, including, but not limited to, any research results, research documentation, and other works of authorship, are "works made for hire" for purposes of the Company's rights under copyright laws. I hereby assign to the Company any and all rights, title and interest I may have or acquire in such Inventions. If, in the course of my association with the Company, I incorporate into a Company product a process or a prior invention owned by me or in which I have interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, sublicensable, worldwide license to make, have made, modify, use, market, sell and distribute such prior invention as part of or in connection with such product, process or machine; provided, however, that this section shall not apply to the activities described in Exhibit A as an exception to the definition of the term "Business".

C.      *Cooperation.*  I agree to perform, during and after my association with the Company, all acts deemed necessary or reasonably desirable by the Company to permit and assist it, at the Company's expense, in further evidencing and perfecting the assignments made to the Company under this Agreement and in obtaining, maintaining, defending and enforcing patents, patent rights, copyrights, trademark rights, trade secret rights or any other rights in connection with such Inventions and improvements thereto in any and all countries.  Such acts may include, but are not limited to, execution of documents and assistance or cooperation in legal proceedings.  I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents, as my agents and attorneys-in-fact to act for and on my behalf and instead of me, to execute and file any documents, applications or related findings and to do all other lawfully permitted acts to further the purposes set forth in this Section 5(C), including, but not limited to, the perfection of assignment and the prosecution and issuance of patents, patent applications, copyright applications and registrations, trademark applications and registrations or other rights in connection with such Inventions and improvements thereto with the same legal force and effect as if executed by me.

D.      *Assignment or Waiver of Moral Rights.*  Any assignment of copyright hereunder (and any ownership of a copyright as a work made for hire) includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights" (collectively "Moral Rights").  To the extent such Moral Rights cannot be assigned under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, I hereby waive such Moral Rights and consent to any action of the Company that would violate such Moral Rights in the absence of such consent.

E.      *List of Prior Inventions.*  I have attached as Exhibit A a complete list of all prior inventions or improvements to which I claim ownership and that I desire to remove from the operation of this Agreement, and I acknowledge and agree that such list is complete.  If no such list is attached to this Agreement, I represent that I have no such prior inventions or improvements at the time of signing this Agreement.

6.      Company Authorization for Publication.

A.      I agree that during my association with the Company, I will not remove any Company Documents and Materials from the Company's premises or deliver any Company

Documents and Materials to any person or entity outside the Company except as I am required to do in connection with performing the duties of my employment or engagement, or my duties as a Member. I further agree that, upon the termination of my association with the Company for any reason, or during my association with the Company if so requested by the Company, I will return all Company Documents and Materials, apparatus, equipment and other physical property, or any reproduction of such property to the Company on a timely basis, excepting only: (i) my personal copies of records relating to my compensation, (ii) my personal copies of any materials previously distributed generally to members of the Company and (iii) my copy of this Agreement.

B.    Prior to my submitting or disclosing for possible publication or dissemination outside the Company any Company Documents and Materials, including any such items prepared by me that incorporate information that concerns the Business or any Inventions, I agree to deliver a copy of such material to a Company officer for his or her review at least 30 days prior to such submission or disclosure. Within 20 days following such delivery to the Company, the Company agrees to notify me in writing whether the Company believes such material contains any Proprietary Information or Inventions, or whether the Company intends to file patent application(s) with respect to any Inventions described therein, and I agree to defer submission or disclosure and/or to make such deletions and revisions as are reasonably requested by the Company to protect its Proprietary Information and Inventions. I further agree to obtain the Company's written consent prior to any review of such material by persons outside the Company.

7.    <u>Noncompetition</u>.

A.    During my association with the Company and for a period of two (2) years following the termination of said association for any reason whatsoever, voluntarily or involuntarily, I shall not engage directly or indirectly, either personally or as an employee, associate, shareholder, partner, manager, salesperson, agent or in any other individual or representative capacity whatsoever, or by means of any corporate or legal device, in any "Competing Business". For purposes of this Agreement, "Competing Business" shall mean any person, corporation, or other entity that sells products or services within any Company market area, which as of the date hereof is international, as of the date of termination that are similar to the products and/or services sold by the Company at any time during the last two years prior to the termination of my association with the Company; <u>provided</u>, <u>however</u>, that the term "Competing Business" shall not include any of the activities of employee/consultant/Member or his/its Affiliates that are excluded from the definition of "Business" as set forth in <u>Exhibit A</u> hereto.

B.    I understand that I will not be in violation of the foregoing by reason of my ownership of not more than 2% of the outstanding shares of the stock of any entity that is listed on a national securities exchange or NASDAQ. I understand that if I breach either of the provisions set forth in subparagraphs (A)(i) or (A)(ii) above, then the time periods set forth in such clauses will be extended by the length of time during which I am in breach of any of such provisions. I represent and warrant to the Company that my experience and capabilities are such that the provisions of this <u>Section 7</u> will not prevent me from earning an adequate livelihood for me and my family.

8.    <u>Non-Solicitation</u>. Additionally, during my association with the Company and for a period of two (2) years following the termination of said association for any reason whatsoever,

voluntarily or involuntarily, I shall not, directly or indirectly, attempt to dislodge, divert, prejudice or interfere with current or future employees or current or future customers of the Company. In connection with the foregoing, during my association with the Company and for the above-referenced two (2) year period:

(a). **Employees.** I shall not, directly or indirectly, solicit, hire or engage or attempt to hire or engage any individual who is an employee or a consultant of the Company whether for or on my behalf or for any entity in which I shall have a direct or indirect interest (or any subsidiary or affiliate of any such entity).

(b). **Customers.** I shall not, directly or indirectly, solicit or contact any person or entity which is a present or former client, or potential client of the Business, for the purpose of introducing, offering or selling to such person or entity any services that compete with the services offered or sold by the Company.

**[Notwithstanding the foregoing, (A) this obligation shall not affect any responsibility I may have as a Company employee with respect to the bona fide hiring and firing of Company personnel and (B) a general advertisement or notice of a job listing or opening or other similar general publication of a job search or availability to fill employment positions, including on the internet, shall not be construed as a solicitation or inducement, and the hiring of any such employees or independent contractor who freely responds thereto shall not be a breach of this <u>Section 8</u>.]**

9.      <u>Former Employer Information</u>. I represent that my performance of all the terms of this Agreement and as a Company employee, consultant or Member does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my association with the Company, and I will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employers or others. I have not entered into, and I agree I will not enter into any agreement, either written or oral, in conflict herewith or in conflict with my association with the Company. I further agree to conform to the rules and regulations of the Company.

10.      <u>Severability</u>. I agree that if one or more provisions of this Agreement are held to be unenforceable under applicable law, such provisions shall be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

11.      <u>Authorization to Notify New Employer</u>. I hereby authorize the Company to notify my new employer about my rights and obligations under this Agreement following the termination of my employment with or engagement by the Company.

12.      <u>Entire Agreement</u>.   This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us, including, but not limited to, any and all statements made by any Company officer, employee or representative regarding the Company's financial condition or future prospects. I understand and acknowledge that, except as set forth in this Agreement, the

Operating Agreement, and any agreement for employment or engagement between the Company and me, (A) no other representation or inducement has been made to me, (B) I have relied on my own judgment and investigation in accepting my employment with or engagement by the Company or my ownership of Shares in the Company and (C) I have not relied on any representation or inducement made by any Company officer, employee or representative. No modification of or amendment to this Agreement nor any waiver of any rights under this Agreement will be effective unless in a writing signed by the Company and me. I understand and agree that any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

13.     <u>Effective Date</u>. This Agreement shall be effective as of the date on which it is executed by me and shall be binding upon me, my heirs, executor, assigns and administrators and shall inure to the benefit of the Company, its subsidiaries, successors and assigns.

14.     <u>Governing Law; Jurisdiction</u>. Although I may work for the Company outside of the State of Georgia or the United States, I understand and agree that this Agreement shall be interpreted and enforced in accordance with the laws of the State of Georgia. I agree that any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled, except as may otherwise be provided herein, by arbitration held in Atlanta, Georgia, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The award of such arbitrators shall be binding and conclusive upon the parties, and the arbitration award may be entered as a final judgment in any court having jurisdiction. Any dispute as to whether a controversy or claim is subject to arbitration shall be submitted as part of the arbitration proceeding. Legal costs, attorneys' fees and any other expenses associated with the arbitration shall be assessed against the non-prevailing party. All arbitration proceedings shall be conducted by a panel of three (3) arbitrators. Notwithstanding the foregoing, I understand that I and the Company may agree on any other arbitration system for purposes of resolving any claims or controversies hereunder, and any such award under such alternative arbitration system shall be binding and conclusive.

15.     <u>Equitable Relief</u>. I acknowledge and agree that the Company would be irreparably damaged if any of the provisions of this Agreement are not performed by me in accordance with their specific terms or are otherwise breached. Accordingly, I agree that the Company is entitled to an injunction or injunctions to prevent breaches of this Agreement and has the right to specific enforcement of this Agreement and the terms and provisions hereof in addition to any other remedy to which the Company may be entitled hereunder, at law or in equity.

16.     <u>Assignment</u>. I acknowledge that the Company may assign, pledge or otherwise transfer this Agreement to any third party, without my prior consent, including by way of merger, consolidation or the sale or transfer of all or substantially all of the Company's assets. For purposes of this <u>Section 16</u>, an assignment is deemed to have occurred if 50% or more of the voting securities of the Company are transferred to any person or entity who is not an equity holder of the Company on the date hereof.

[Signature Page Follows]

## SIGNATURE PAGE TO PROPRIETARY RIGHTS AGREEMENT

I HAVE READ THIS PROPRIETARY RIGHTS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS THAT IT IMPOSES UPON ME WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT.  I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY.

Date: _____

_____
Employee/Consultant/Member Signature

_____
Employee/Consultant/Member Name
(Please Print)

Acknowledged and Agreed:

CHEYTAC USA, LLC

By:_____

Name:_____
Title:_____

## EXHIBIT A

The following is a list of my activities or the activities of my Affiliates which are specifically excluded from the definition of "Business" under the Proprietary Rights Agreement:

*Investments in pre-IPO, Private and Public companies, Service on Public or Non-Public Boards*   P.o

The following is a complete list of all prior inventions or improvements relevant to the subject matter of my association with the Company that have been made or discovered or conceived or first reduced to practice by me or jointly with others prior to my association with the Company that I desire to remove from the operation of the Company's Proprietary Rights Agreement:

_____     No inventions or improvements.

_____     See below: Any and all inventions regarding:

_____     Additional sheets attached.

I propose to bring to my association with the Company the following materials and documents of a former employer:

_____     No materials or documents

\_\_\_\_\_X_____     See below:

*Supply Chain Management Practices and Methods*
*Product Life Cycle Management Practices and Methods*
*Total Quality Management Practices and Methods*
*Lean Six Sigma Practices and Methods*
*Supply, Customer and Partner Programs, Practices and Methods*
*Contract Playbooks and Negotiating Best Practices*

Date: \_\_\_\_7/28/15\_\_\_\_

_____
Employee/Consultant/Member Signature

_____
Employee/Consultant/Member Name (Please Print)

Macintosh HD:Users:DennisOmanoff:Desktop:Bruce Wobeck Final:9 28 15 Proprietary Rights Agreement (DO Final).docx

# EXHIBIT 10

## PROPRIETARY RIGHTS AGREEMENT

This PROPRIETARY RIGHTS AGREEMENT (this "Agreement"), confirms certain terms of my association with the Company, whether as an employee, independent contractor or consultant, a member of the Company's Board of Managers, or as an owner of Shares in the Company (as such term is defined in the Operating Agreement of the Company dated September 28, 2015, as amended from time to time (the "Operating Agreement")), which is a material part of the consideration for my association with the Company and the compensation or, as to Members, distributions received by me from the Company from time to time.  The headings contained in this Agreement are for convenience only, have no legal significance, and are not intended to change or limit this Agreement in any matter whatsoever.

1.    Definitions.

A.    "Affiliate" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, the Person in question. As used in the definition of "Affiliate", the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.  As used in this definition, the term "Person" means any individual, partnership, company, estate, trust, limited liability company or other entity.

B.    "Business" means the invention, production and sale of ammunition, guns and shooting systems for specific calibers. Some elements in the system include (but are not limited to), ammunition, guns and gun accessories, optics, ballistic software and methods of calculation. The caliber range includes all calibers starting with the .338 up to and including the .50 caliber. The performance range is from very, very long distance to rapid fire automatic.  Notwithstanding the foregoing, the term "Business" as used herein shall not include those activities described in Exhibit A hereto.

C.    "Company" means CheyTac USA, LLC, a Georgia limited liability company and its subsidiaries or affiliated companies.  I understand and agree that the terms of this Agreement will continue to apply to me even if I transfer at some time from one subsidiary or affiliate of the Company to another.

D.    "Company Documents and Materials" means documents or other media or tangible items that contain or embody Proprietary Information or any other information concerning the Business, operations or plans of the Company, whether such documents, media or items have been prepared by me or by others.  Company Documents and Materials include, but are not limited to, blueprints, drawings, photographs, charts, graphs, notebooks, customer lists, computer disks, tapes or printouts, sound recordings and other printed, typewritten or handwritten documents, sample products, prototypes and models.

E.    "Inventions" means all creative acts or ideas that are relevant to, and within the scope of, the Business including, but not limited to, all software programs or subroutines, source or object code, algorithms, improvements, inventions, works of authorship, trade secrets, technology, designs, formulas, ideas, processes, techniques, know-how and data, whether or not

1

patentable, made or discovered or conceived or reduced to practice or developed by me, either alone or jointly with others, during my employment with or engagement by the Company.

F. "Proprietary Information" means information that was or will be developed, created, or discovered by or on behalf of the Company, or that became or will become known by, or was or is conveyed to, the Company that has research or commercial value in the Business and is not known outside of the Company. Proprietary Information includes, but is not limited to, information about research, patents (both pending and issued), software programs and subroutines, source and object code, algorithms, trade secrets, designs, technology, know-how, processes, data, ideas, techniques, inventions (whether patentable or not), works of authorship, formulas, business and product development plans, customer lists, terms of compensation and performance levels of Company employees, Company customers and other information concerning the Company's actual or anticipated business, research or development, or that is received in confidence by or for the Company from any other person. For the avoidance of doubt, Proprietary Information shall not include information developed, created, or discovered in connection with the activities described in Exhibit A hereto as an exception to the definition of "Business".

2. Assignment of Rights. All Proprietary Information and all patents, patent rights, copyrights, trade secret rights, trademark rights and other rights (including, but not limited to, intellectual property rights) anywhere in the world in connection therewith is and shall be the Company's sole property. I hereby assign to the Company any and all rights, title and interest I may currently have or acquire in such Proprietary Information. At all times, both during my association with the Company and after its termination, I will keep in confidence and trust and will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of a Company officer, except as may be necessary in the ordinary course of performing my duties to the Company.

3. Maintenance and Return of Company Documents and Materials. I agree to make and maintain adequate and current written records, in a form specified by the Company, of all inventions, trade secrets and works of authorship assigned or to be assigned to the Company under this Agreement. All Company Documents and Materials are and shall be the Company's sole property.

4. Disclosure of Inventions to the Company. I will promptly disclose in writing to my immediate supervisor or to such other person designated by the Company all Inventions. I will also disclose to the Company all Inventions made, discovered, conceived, reduced to practice or developed by me within six months after the termination of my employment with or engagement by the Company that resulted, in whole or in part, from my prior employment with or engagement by the Company. Such disclosures shall be received by the Company in confidence (to the extent such Inventions are not assigned to the Company under Section 5) and do not extend the assignment made in Section 5.

5. Right to New Ideas.

A. *Assignment of Inventions to the Company.* I agree that all Inventions shall be the Company's sole property to the maximum extent permitted by applicable law.

B.     *Works Made for Hire*.  The Company shall be the sole owner of all patents, patent rights, copyrights, trade secret rights, trademark rights and all other intellectual property or other rights in connection with any Inventions.  I further acknowledge and agree that such Inventions, including, but not limited to, any research results, research documentation, and other works of authorship, are "works made for hire" for purposes of the Company's rights under copyright laws.  I hereby assign to the Company any and all rights, title and interest I may have or acquire in such Inventions.  If, in the course of my association with the Company, I incorporate into a Company product a process or a prior invention owned by me or in which I have interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, sublicensable, worldwide license to make, have made, modify, use, market, sell and distribute such prior invention as part of or in connection with such product, process or machine; provided, however, that this section shall not apply to the activities described in Exhibit A as an exception to the definition of the term "Business".

C.     *Cooperation*.  I agree to perform, during and after my association with the Company, all acts deemed necessary or reasonably desirable by the Company to permit and assist it, at the Company's expense, in further evidencing and perfecting the assignments made to the Company under this Agreement and in obtaining, maintaining, defending and enforcing patents, patent rights, copyrights, trademark rights, trade secret rights or any other rights in connection with such Inventions and improvements thereto in any and all countries.  Such acts may include, but are not limited to, execution of documents and assistance or cooperation in legal proceedings.  I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents, as my agents and attorneys-in-fact to act for and on my behalf and instead of me, to execute and file any documents, applications or related findings and to do all other lawfully permitted acts to further the purposes set forth in this Section 5(C), including, but not limited to, the perfection of assignment and the prosecution and issuance of patents, patent applications, copyright applications and registrations, trademark applications and registrations or other rights in connection with such Inventions and improvements thereto with the same legal force and effect as if executed by me.

D.     *Assignment or Waiver of Moral Rights*.  Any assignment of copyright hereunder (and any ownership of a copyright as a work made for hire) includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights" (collectively "Moral Rights").  To the extent such Moral Rights cannot be assigned under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, I hereby waive such Moral Rights and consent to any action of the Company that would violate such Moral Rights in the absence of such consent.

E.     *List of Prior Inventions*.  I have attached as Exhibit A a complete list of all prior inventions or improvements to which I claim ownership and that I desire to remove from the operation of this Agreement, and I acknowledge and agree that such list is complete.  If no such list is attached to this Agreement, I represent that I have no such prior inventions or improvements at the time of signing this Agreement.

6.     Company Authorization for Publication.

A.     I agree that during my association with the Company, I will not remove any Company Documents and Materials from the Company's premises or deliver any Company

3

Documents and Materials to any person or entity outside the Company except as I am required to do in connection with performing the duties of my employment or engagement, or my duties as a Member. I further agree that, upon the termination of my association with the Company for any reason, or during my association with the Company if so requested by the Company, I will return all Company Documents and Materials, apparatus, equipment and other physical property, or any reproduction of such property to the Company on a timely basis, excepting only: (i) my personal copies of records relating to my compensation, (ii) my personal copies of any materials previously distributed generally to members of the Company and (iii) my copy of this Agreement.

B.      Prior to my submitting or disclosing for possible publication or dissemination outside the Company any Company Documents and Materials, including any such items prepared by me that incorporate information that concerns the Business or any Inventions, I agree to deliver a copy of such material to a Company officer for his or her review at least 30 days prior to such submission or disclosure. Within 20 days following such delivery to the Company, the Company agrees to notify me in writing whether the Company believes such material contains any Proprietary Information or Inventions, or whether the Company intends to file patent application(s) with respect to any Inventions described therein, and I agree to defer submission or disclosure and/or to make such deletions and revisions as are reasonably requested by the Company to protect its Proprietary Information and Inventions. I further agree to obtain the Company's written consent prior to any review of such material by persons outside the Company.

    7.      Noncompetition.

A.      During my association with the Company and for a period of two (2) years following the termination of said association for any reason whatsoever, voluntarily or involuntarily, I shall not engage directly or indirectly, either personally or as an employee, associate, shareholder, partner, manager, salesperson, agent or in any other individual or representative capacity whatsoever, or by means of any corporate or legal device, in any "Competing Business". For purposes of this Agreement, "Competing Business" shall mean any person, corporation, or other entity that sells products or services within any Company market area, which as of the date hereof is international, as of the date of termination that are similar to the products and/or services sold by the Company at any time during the last two years prior to the termination of my association with the Company; provided, however, that the term "Competing Business" shall not include any of the activities of employee/consultant/Member or his/its Affiliates that are excluded from the definition of "Business" as set forth in Exhibit A hereto.

B.      I understand that I will not be in violation of the foregoing by reason of my ownership of not more than 2% of the outstanding shares of the stock of any entity that is listed on a national securities exchange or NASDAQ. I understand that if I breach either of the provisions set forth in subparagraphs (A)(i) or (A)(ii) above, then the time periods set forth in such clauses will be extended by the length of time during which I am in breach of any of such provisions. I represent and warrant to the Company that my experience and capabilities are such that the provisions of this Section 7 will not prevent me from earning an adequate livelihood for me and my family.

    8.      Non-Solicitation. Additionally, during my association with the Company and for a period of two (2) years following the termination of said association for any reason whatsoever,

voluntarily or involuntarily, I shall not, directly or indirectly, attempt to dislodge, divert, prejudice or interfere with current or future employees or current or future customers of the Company. In connection with the foregoing, during my association with the Company and for the above-referenced two (2) year period:

    (a). **Employees.** I shall not, directly or indirectly, solicit, hire or engage or attempt to hire or engage any individual who is an employee or a consultant of the Company whether for or on my behalf or for any entity in which I shall have a direct or indirect interest (or any subsidiary or affiliate of any such entity).

    (b). **Customers.** I shall not, directly or indirectly, solicit or contact any person or entity which is a present or former client, or potential client of the Business, for the purpose of introducing, offering or selling to such person or entity any services that compete with the services offered or sold by the Company.

**[Notwithstanding the foregoing, (A) this obligation shall not affect any responsibility I may have as a Company employee with respect to the bona fide hiring and firing of Company personnel and (B) a general advertisement or notice of a job listing or opening or other similar general publication of a job search or availability to fill employment positions, including on the internet, shall not be construed as a solicitation or inducement, and the hiring of any such employees or independent contractor who freely responds thereto shall not be a breach of this <u>Section 8</u>.]**

    9.    <u>Former Employer Information</u>. I represent that my performance of all the terms of this Agreement and as a Company employee, consultant or Member does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my association with the Company, and I will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employers or others. I have not entered into, and I agree I will not enter into any agreement, either written or oral, in conflict herewith or in conflict with my association with the Company. I further agree to conform to the rules and regulations of the Company.

    10.    <u>Severability</u>. I agree that if one or more provisions of this Agreement are held to be unenforceable under applicable law, such provisions shall be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

    11.    <u>Authorization to Notify New Employer</u>. I hereby authorize the Company to notify my new employer about my rights and obligations under this Agreement following the termination of my employment with or engagement by the Company.

    12.    <u>Entire Agreement</u>. This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us, including, but not limited to, any and all statements made by any Company officer, employee or representative regarding the Company's financial condition or future prospects. I understand and acknowledge that, except as set forth in this Agreement, the

Operating Agreement, and any agreement for employment or engagement between the Company and me, (A) no other representation or inducement has been made to me, (B) I have relied on my own judgment and investigation in accepting my employment with or engagement by the Company or my ownership of Shares in the Company and (C) I have not relied on any representation or inducement made by any Company officer, employee or representative. No modification of or amendment to this Agreement nor any waiver of any rights under this Agreement will be effective unless in a writing signed by the Company and me. I understand and agree that any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

13.    <u>Effective Date</u>.  This Agreement shall be effective as of the date on which it is executed by me and shall be binding upon me, my heirs, executor, assigns and administrators and shall inure to the benefit of the Company, its subsidiaries, successors and assigns.

14.    <u>Governing Law; Jurisdiction</u>.  Although I may work for the Company outside of the State of Georgia or the United States, I understand and agree that this Agreement shall be interpreted and enforced in accordance with the laws of the State of Georgia. I agree that any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled, except as may otherwise be provided herein, by arbitration held in Atlanta, Georgia, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The award of such arbitrators shall be binding and conclusive upon the parties, and the arbitration award may be entered as a final judgment in any court having jurisdiction. Any dispute as to whether a controversy or claim is subject to arbitration shall be submitted as part of the arbitration proceeding. Legal costs, attorneys' fees and any other expenses associated with the arbitration shall be assessed against the non-prevailing party. All arbitration proceedings shall be conducted by a panel of three (3) arbitrators. Notwithstanding the foregoing, I understand that I and the Company may agree on any other arbitration system for purposes of resolving any claims or controversies hereunder, and any such award under such alternative arbitration system shall be binding and conclusive.

15.    <u>Equitable Relief</u>.  I acknowledge and agree that the Company would be irreparably damaged if any of the provisions of this Agreement are not performed by me in accordance with their specific terms or are otherwise breached. Accordingly, I agree that the Company is entitled to an injunction or injunctions to prevent breaches of this Agreement and has the right to specific enforcement of this Agreement and the terms and provisions hereof in addition to any other remedy to which the Company may be entitled hereunder, at law or in equity.

16.    <u>Assignment</u>.  I acknowledge that the Company may assign, pledge or otherwise transfer this Agreement to any third party, without my prior consent, including by way of merger, consolidation or the sale or transfer of all or substantially all of the Company's assets. For purposes of this <u>Section 16</u>, an assignment is deemed to have occurred if 50% or more of the voting securities of the Company are transferred to any person or entity who is not an equity holder of the Company on the date hereof.

[Signature Page Follows]

SIGNATURE PAGE TO PROPRIETARY RIGHTS AGREEMENT

I HAVE READ THIS PROPRIETARY RIGHTS AGREEMENT CAREFULLY AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS THAT IT IMPOSES UPON ME WITHOUT RESERVATION.   NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT.   I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY.

Date: 10/20/2015

Employee/Consultant/Member Signature

Employee/Consultant/Member Name (Please Print)

Acknowledged and Agreed:

CHEYTAC USA, LLC

By: _____
Name: _____
Title: _____

## EXHIBIT A

The following is a list of my activities or the activities of my Affiliates which are specifically excluded from the definition of "Business" under the Proprietary Rights Agreement:


The following is a complete list of all prior inventions or improvements relevant to the subject matter of my association with the Company that have been made or discovered or conceived or first reduced to practice by me or jointly with others prior to my association with the Company that I desire to remove from the operation of the Company's Proprietary Rights Agreement:

_____        No inventions or improvements.

_____        See below: Any and all inventions regarding:


_____        Additional sheets attached.

I propose to bring to my association with the Company the following materials and documents of a former employer:

_____        No materials or documents

_____        See below:




Date: _____



_____

Employee/Consultant/Member Signature



_____

Employee/Consultant/Member Name (Please Print)

1

# EXHIBIT 11

**CHEYTAC USA, LLC LETTERHEAD**

September 28, 2015

Dennis Omanoff
367 Santana Heights
#3070
San Jose, CA 95128

Dear Dennis:

On behalf of CheyTac USA, LLC, a Georgia limited liability company (the "Company"), I am pleased to offer you the position of Chief Executive Officer, beginning on September 28, 2015 (the "Effective Date").  You will serve as Chief Executive Officer reporting to the Board of Managers of the Company (the "Board"), from the Effective Date until the earliest of your death, resignation, or removal by the Board in accordance with the Company's Operating Agreement dated September 28, 2015.

In consideration for your service as Chief Executive Officer and subject to approval by the Board, you will be paid $200,000 in cash per year, paid monthly in arrears, subject to customary payroll deductions for applicable taxes and the like.  Your compensation will be deferred until After Brass (defined below) and following After Brass your compensation will be paid current on a monthly basis.  Any deferred compensation and deferred out of pocket expenses which are not paid when due shall be paid and bear interest at the then applicable one year Treasury bill rate plus five percent (5%) per annum until paid in full.  The Company expects to execute a Supplier Agreement with a qualified supplier or suppliers to provide brass casings to the Company. It is expected that casings from this new source will begin to arrive in March of 2016.  Once the Company has access to this higher volume of casings it anticipates a substantial increase in its sales and profits from ammunition. This increased profitability is expected to show up about 60 days after the new source of casings, approximately May 2016.  The beginning of this period of increased profitability is referred to as "After Brass."

During this period of deferred compensation, all Internal Revenue Service allowable expenses incurred by you for the benefit of the Company will be paid for by the Company when incurred. Examples include but are not limited to travel-related expenses or the purchase of items for the benefit of the Company.

Once the Company arrives at the "After Brass" period it will quantify the amount of your deferred compensation, along with the deferred expenses listed above that are owed to you, and submit a spreadsheet showing these amounts at the next-scheduled Board meeting. The amount will then be divided by twelve, and paid out to you over the next twelve months together with interest at the then applicable one year Treasury bill rate plus 5% per annum until paid in full. If at any time during this twelve-month reimbursement period the profitability of the Company is high enough or the Company has raised sufficient capital that the Board unanimously agrees to accelerate the reimbursement payments, it may do so, but it is not required to do so.

In addition to the above compensation, you shall be given one of each model of firearms sold by the Company for your use and for use in the sale and demonstration of such firearms in connection with the Company's business. Initially this will include an M200, One Ashbury in both

Page 2
September 28, 2015

.408 and .375 Caliber, and an XLD in .408 and .375. This may expand as necessary when the composite stock lite weight, semi-automatic battlefield dominator and recoil management are introduced. Intention is to enable successful execution of the business while not creating undue strain on the company financials. Upon your death, resignation or removal as CEO of the Company, you shall be entitled to retain ownership of all such firearms at no charge. In addition, at any time during your employment by the Company, you shall have the right to purchase any firearms, accessories or ammunition sold by the Company for your personal use at a price equal to the lower of the Company's cost of goods sold or the then current market price.

In accepting this offer, you are representing to us that (i) you do not know of any conflict that would restrict your service as Chief Executive Officer and (ii) you will not provide the Company with any documents, records or other confidential information belonging to other parties.

During the term of your employment, you will devote your full professional abilities to the performance of your duties. Additionally, you will be expected to comply with all Company policies, rules, regulations, and standards.

This offer of employment is contingent upon the following:

- Your signing of the Company's Proprietary Rights Agreement, which will not be any less or more stringent than any other class A shareholder, in the form attached hereto as Exhibit A;

- Your acceptance of this offer by signing this letter below;

- Your signing of the enclosed W-4 form;

- Your beginning work on the agreed commencement date; and

- In order to comply with federal regulations, we must require that on your first day of employment you provide proof of your legal right to work in the United States and complete the Immigration Form I-9 as required by the U.S. Immigration and Naturalization Service. These include either:

1. a U.S. passport, a U.S. certificate of citizenship, a U.S. certificate of naturalization, and unexpired foreign passport with attached employment authorization, or an alien registration card with photograph; or

2. a state driver's license, a state I.D. card, or a U.S. military card and a Social Security card or a U.S. birth certificate.

You will not be placed on the Company payroll until a Company representative completes the I-9 form after examining your documents. **If for any reason you are unable to provide proof of your identity as well as your legal right to work in the United States within the first three (3) days of your employment, the Company may rescind this offer of employment.**

Page 3
September 28, 2015

     This offer of employment together with the Operating Agreement and other agreements related thereto contain all of the terms and conditions of your employment with the Company and supersedes any and all prior, oral and/or written representations or agreements made by anyone employed by, or associated with, the Company. The terms of this offer, if accepted, will become your terms of employment and can only be added to or modified by written documents signed by the Board.

# EXHIBIT 12

## CHEYTAC USA, LLC LETTERHEAD

September 28, 2015

David McCutcheon
110 Eagle Avenue
Nashville, GA 13639

Dear David:

On behalf of CheyTac USA, LLC, a Georgia limited liability company (the "Company"), I am pleased to offer you the position of President, beginning on September 28, 2015 (the "Effective Date"). You will serve as President reporting to the Board of Managers of the Company (the "Board"), from the Effective Date until the earliest of your death, resignation, or removal by the Board in accordance with the Company's Operating Agreement dated September 28, 2015.

In consideration for your service as President and subject to approval by the Board, you will be paid $104,000 in cash per year, paid in arrears, subject to customary payroll deductions for applicable taxes and the like. $26,000 of your compensation will be deferred until After Brass (defined below). Concurrently herewith, the Company has executed a Supplier Agreement with Peterson Cartridge, LLC to provide brass casings to the Company, which Supplier Agreement shall be effective on the date on which the Bureau of Alcohol, Tobacco, Firearms, and Explosives approves the Company's Federal Firearms License. It is expected that casings from this new source will begin to arrive in March of 2016. Once the Company has access to this higher volume of casings it anticipates a substantial increase in its sales and profits from ammunition. This increased profitability is expected to show up about 60 days after the new source of casings, approximately May 2016. The beginning of this period of increased profitability is referred to as "After Brass."

During this period of deferred compensation, all Internal Revenue Service allowable expenses incurred by you for the benefit of the Company will be paid for by the Company when incurred. Examples include but are not limited to travel-related expenses or the purchase of items for the benefit of the Company.

Once the Company arrives at the "After Brass" period it will quantify the amount of your deferred compensation, along with the deferred expenses listed above that are owed to you, and submit a spreadsheet showing these amounts at the next-scheduled Board meeting. The amount will then be divided by twelve, and paid out to you over the next twelve months. If at any time during this twelve-month reimbursement period the profitability of the Company is high enough that the Board unanimously agrees to accelerate the reimbursement payments, it may do so, but it is not required to do so.

In accepting this offer, you are representing to us that (i) you do not know of any conflict that would restrict your service as President and (ii) you will not provide the Company with any documents, records or other confidential information belonging to other parties.

During the term of your employment, you will devote your full professional abilities to the performance of your duties. Additionally, you will be expected to comply with all Company policies, rules, regulations, and standards.

Page 7
September 28, 2015

This offer of employment is contingent upon the following:

- Your signing of the Company's Proprietary Rights Agreement, in the form attached hereto as <u>Exhibit A</u>;

- Your acceptance of this offer by signing this letter below;

- Your signing of the enclosed W-4 form;

- Your beginning work on the agreed commencement date; and

- In order to comply with federal regulations, we must require that on your first day of employment you provide proof of your legal right to work in the United States and complete the Immigration Form I-9 as required by the U.S. Immigration and Naturalization Service.  These include either:

3. a U.S. passport, a U.S. certificate of citizenship, a U.S. certificate of naturalization, and unexpired foreign passport with attached employment authorization, or an alien registration card with photograph; or

4. a state driver's license, a state I.D. card, or a U.S. military card and a Social Security card or a U.S. birth certificate.

You will not be placed on the Company payroll until a Company representative completes the I-9 form after examining your documents.  **If for any reason you are unable to provide proof of your identity as well as your legal right to work in the United States within the first three (3) days of your employment, the Company may rescind this offer of employment.**

This offer of employment contains all of the terms and conditions of your employment with the Company and supersedes any and all prior, oral and/or written representations or agreements made by anyone employed by, or associated with, the Company.  The terms of this offer, if accepted, will become your terms of employment and can only be added to or modified by written documents signed by the Board.

Page 8
September 28, 2015

      Please acknowledge your acceptance of this offer by signing and dating this letter and returning it to the undersigned by PDF email or fax.

                                Sincerely,

                                CHEYTAC USA, LLC

                                By: _____
                                Name:
                                Title:

Accepted and agreed:

Signature: _____
Date:

# EXHIBIT 13

FIRST AMENDMENT

To

CHEYTAC USA, LLC
OPERATING AGREEMENT

This First Amendment to CheyTac USA, LLC Operating Agreement (the "Amendment") is made as of February 12, 2016 (the "Effective Date"), among Dennis Omanoff and Joseph Warren (collectively, "Managers"); Dennis Omanoff and Elaine Omanoff, as Trustees of the Omanoff Family Trust ("Omanoff Trust"), Praecisa Tenuras, LLC, a Virginia limited liability company ("Praecisa Tenuras"), and John Taylor (collectively, the "Class A Members"); and Michael Golden and Brandon Hite (collectively, the "Class B Members").

PREAMBLE

A.     WHEREAS, CheyTac USA, LLC (the "Company) is a limited liability company originally formed in accordance with the Georgia Limited Liability Company Act (as amended from time to time, the "Act") by the filing of its Articles of Organization with the Georgia Secretary of State's Office on July 19, 2011;

B.     WHEREAS, the Class A Members and DBM Technology, LLC, a Georgia limited liability company ("DBM"), entered into that certain Operating Agreement of CheyTac USA, LLC dated as of September 28, 2015 (as may hereafter be modified or amended, the "Agreement");

C.     WHEREAS, the Company has repurchased all of DBM's Class A Shares in the Company (the "DBM Share Repurchase") pursuant to the Member Repurchase Agreement dated as of September 28, 2015 made by and between the Company and DBM;

D.     WHEREAS, David B. McCutcheon ("McCutcheon") has been removed as a Manager and Officer of the Company;

E.     WHEREAS, the Managers have approved the issuance of certain Class B Shares in the Company to the Class B Members and the admission of the Class B Members to the Company;

F.     WHEREAS, the parties desire to amend the Agreement to reflect the DBM Share Repurchase, the removal of McCutcheon as a Manager and Officer of the Company, the issuance of the Class B Shares to the Class B Members and admission of the Class B Members to the Company and certain other matters.

1

NOW, THEREFORE, the parties hereto agree to amend the Agreement as set forth herein as of the Effective Date.

1.   Definitions. Defined terms that are not otherwise defined herein shall have the meaning provided to such terms in the Agreement.

2.   DBM Share Repurchase. All Class A Shares held by DBM consisting of 6,000,000 Class A Shares (the "Repurchased Shares") were repurchased by the Company on February 11, 2016, pursuant to the Member Repurchase Agreement dated as of September 28, 2015 made by and between DBM and the Company. As of February 11, 2016, DBM ceased to be a Member of the Company. As of the Effective Date, 3,000,000 of the Repurchased Shares shall be reissued to Omanoff Trust and 3,000,000 of the Repurchased Shares shall be reissued to Praecisa Tenuras. The Managers hereby approve such reissuance of the Repurchased Shares. Schedule 3.01 of the Agreement is hereby amended to substitute the updated Schedule 3.01 attached hereto and made a part hereof, which reflects the foregoing transfers and the issuance of certain Class B Shares to the Class B Members as provided in Paragraph 4 below.

3.   Removal of McCutcheon as Manager and Officer. Section 5.02 of the Agreement is hereby amended to reflect that David McCutcheon is no longer a Manager of the Company or a member of the Board. Section 5.05(b) of the Agreement is hereby amended to reflect that David McCutcheon is no longer President of the Company.

4.   Issuance of Class B Shares. Effective as of January 2, 2016, the Company hereby issues to the Class B Members the following amounts of Class B Shares in accordance with and subject to the terms of the Agreement: (i) Michael Golden – 186,000 Class B Shares; and (ii) Brandon Hite – 18,600 Class B Shares. The foregoing Class B Shares are non-voting, fully vested and shall hereafter be identified as the "Class B1 Shares". The Class B Share Threshold Amount for the Class B1 Shares shall be deemed to be $1,000.00, subject to adjustment if and to the extent deemed necessary by the Board pursuant to the Agreement. Each of the Class B Members hereby agrees to execute such other documents as may be required by the Agreement or as otherwise required by the Company as a condition to the issuance of the Class B1 Shares. The Managers hereby approve the issuance of the Class B1 Shares to the Class B Members in accordance with the foregoing terms.

5.   Admission of Class B Members. Each of the Class B Members is hereby admitted as a Class B Member of the Company. Each of the Class B Members hereby acknowledges that he has reviewed the Agreement, the Authorization Summary and the Protections and Rights and each of the Class B Members agrees to be bound by all terms

2

and provisions of the Agreement, the Authorization Summary and Protections and Rights, as may be amended from time to time.

6.    Power of Attorney.  Each Member hereby appoints the Managers, jointly, as such Member's attorney-in-fact to execute all documents and amendments required to be executed by such Member pursuant to the Agreement, the Member Repurchase Agreement between the Company and such Member, as may be amended or modified, or any other agreement between the Company and such Member or which is reasonably necessary to effect the provisions thereof.  This power of attorney, being coupled with an interest, shall be irrevocable.

7.    Further Assurances.  Each Member shall as often as and whenever requested to do so by the Managers execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all instruments and documents as the Company may reasonably determine to be necessary to carry out the provisions of this Amendment.

8.    Representations of the Members.  Each Member hereby represents and warrants to the Company as follows: (a) Member has the full power and legal capacity to execute, deliver, and carry out the terms and provisions of this Amendment and to consummate the transactions contemplated hereby; (b) this Amendment constitutes a legal, valid, and binding obligation of Member enforceable against Member in accordance with its terms; and (c) the execution, delivery and performance of this Amendment by Member will not result in a breach or violation by Member of, or constitute a default by the Member under, any statute, ordinance, rule, regulation, franchise, permit, agreement or instrument to which Member is or may be a party or by which Member is otherwise bound.

9.    Miscellaneous.  Except as expressly set forth herein, the Agreement remains unmodified and unchanged and the parties hereto ratify and confirm the Agreement, as amended hereby.  This Amendment: (a) may be amended only by a writing signed by each of the parties; (b) may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument; (c) together with the other agreements referenced herein contains the entire agreement of the parties with respect to the transactions contemplated hereby and supersedes all prior written and oral agreements, and all contemporaneous oral agreements, relating to such transactions; (d) is governed by, and will be construed and enforced in accordance with, the laws of the State of Georgia, without giving effect to any conflict of law rules; and (e) is binding upon, and will inure to the benefit of, the parties and their respective successors and permitted assigns.

[SIGNATURE PAGES FOLLOW]

3

## SIGNATURE PAGE TO FIRST AMENDMENT

MANAGERS:

Dennis Omanoff

Joseph Warren

CLASS A MEMBERS:

Dennis Omanoff, Co-Trustee
of the Omanoff Family Trust

Elaine Omanoff, Co-Trustee
of the Omanoff Family Trust

PRAECISA TENURAS, LLC

By: _____
Name: _____
Title: _____

John Taylor

[SIGNATURES CONTINUED ON NEXT PAGE]

4

SIGNATURE PAGE TO FIRST AMENDMENT

CLASS B MEMBERS:

_____
Michael Golden

*Brandon Hite*
_____
Brandon Hite

5

<u>**SIGNATURE PAGE TO FIRST AMENDMENT**</u>

CLASS B MEMBERS:

_____
Michael Golden

_____
Brandon Hite

5

<u>Schedule 3.01</u>

**SCHEDULE OF MEMBERS**
**As of February 12, 2016**
**CheyTac USA, LLC**

| Member | Address for Notices | Class A Shares | Capital Contribution | Class A Share Percentage | Class B Shares | Class B Share Percentage | Total Share Percentage |
|---|---|---|---|---|---|---|---|
| Dennis Omanoff and Elaine Omanoff, as Trustees of the Omanoff Family Trust | 367 Santana Heights #3070, San Jose, CA 95128 | 9,000,000 | $100 | 48.387% | 0 | 0 | 45.00% |
| Praecisa Tenuras, LLC | 255 St. Philip St. Charleston, SC 29403 | 9,000,000 | $700,000 (previously contributed) See Exhibit E | 48.387% | 0 | 0 | 45.00% |
| John Taylor | 15440 Pompeii Square Colorado Springs, CO 80921 | 600,000 | $100 and See Exhibit F | 3.226% | 0 | 0 | 3.00% |
| Michael Golden | 99 Iron Bottom Lane Charleston, SC 29492 | 0 | | 0 | 186,000 B1 | 13.286% | 0.930% |
| Brandon Hite | 7716 Pinewood Drive, NW Albuquerque, NM 87120 | 0 | | 0 | 18,600 B1 | 1.3286% | 0.093% |
| Class B Shares Reserved by Company | | 0 | N/A | 0 | 1,195,400 | 85.3854% | 5.977% |
| **Totals:** | | **18,600,000** | | **100%** | **1,400,000** | **100.00%** | **100%** |

6

# EXHIBIT 14

## <u>MEMBERSHIP INTEREST PURCHASE AGREEMENT</u>
## <u>AND SETTLEMENT AGREEMENT</u>

THIS MEMBERSHIP INTEREST PURCHASE AND SETTLEMENT AGREEMENT (this "Agreement") is made effective as of the 1st day of November, 2016 by and among (i) CHEYTAC USA, LLC, a Georgia limited liability company (the "Corporation"), (ii) DENNIS OMANOFF, CO-TRUSTEE OF THE OMANOFF FAMILY TRUST and ELAINE OMANOFF, CO-TRUSTEE OF THE OMANOFF FAMILY TRUST, Class A member of the Corporation (collectively, "The Omanoff Trust"), (iii) PRAECISA TENURAS, LLC, a Delaware limited liability company, Class A member of the Corporation ("PT"), (iv) DENNIS OMANOFF, Manager of the Corporation ("Dennis Omanoff") and (v) JOSEPH R. WARREN, Manager of the Corporation ("Joe Warren").

### RECITALS

A.      The Corporation is governed by that certain CheyTac USA, LLC Operating Agreement dated September 28, 2015, as amended by a First Amendment to CheyTac USA, LLC Operating Agreement dated February 12, 2016 (as amended, the "Operating Agreement"). A certain Proprietary Rights Agreement (the "Proprietary Rights Agreement") and Offer Letter for Dennis Omanoff's employment with and management of the Corporation (the "Offer Letter") were executed on or about September 28, 2015. This Agreement, the Operating Agreement, the Offer Letter and the Proprietary Right Agreement are hereinafter referred to collectively as the "CheyTac Agreements".

B.      Effective as of the date hereof, it is the intent of the parties that this Agreement accomplish the following: (1) to effect a purchase by the Corporation of the entire interest held by DENNIS OMANOFF, ELAINE OMANOFF, and/or the Omanoff Trust; (2) DENNIS OMANOFF is to resign from all positions held with the Corporation including as employee, officer, director, member and executive and shall have no further official capacity with the Corporation; (3) that the Corporation shall pay to DENNIS OMANOFF the amounts owed to him as reimbursable business expenses (in the amount hereinafter shown) and deferred salary/compensation for his services to the Corporation as Chief Executive Officer; (4) that DENNIS OMANOFF shall be personally indemnified and released from any and all liabilities of the Corporation, whether such liabilities arose or accrued before, during or after DENNIS OMANOFF's association and employment with the Corporation.

C.      Each of the parties desires to accomplish the transactions described herein above, and shall do all things reasonably necessary, and shall complete certain other transactions associated therewith, as more fully described below.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

*E.O.*

*T.O.*

## AGREEMENT

1.     The above Recitals are incorporated herein by reference,

2.     Concurrently with the full execution and performance of this Agreement, the Corporation has purchased all of the Class A membership interests owned by The Omanoff Trust, consisting of 9,000,000 Class A shares (the "Omanoff Shares").   To complete this transaction, The Omanoff Trust has delivered to the Corporation the original certificate evidencing the Omanoff Shares, duly endorsed, and the Corporation shall pay The Omanoff Trust the sum of $850,000 in consideration therefor.

a. In the event that the funds required to be paid by the Corporation for the Omanoff Shares, are not delivered to the account designated by Dennis Omanoff by the end of business on Tuesday, November 1, 2016, Dennis Omanoff shall have the option to cancel the sale of the Omanoff Shares and gain the option to purchase the entire interest in the Corporation held by JOSEPH R. WARREN, by tendering the sum of $850,000 to WARREN at any time on or prior to December 31, 2016.

b. If the Omanoff shares are purchased by the Corporation, and the Corporation engages in a transaction within one year of the date of execution hereof, whereby the Corporation either transfers all or virtually all of its assets to a third person; or JOSEPH R. WARREN transfers all or virtually all of the stock in the Corporation held by him or any of his related entities; or the Corporation engages in a financing transaction with any single third party investor or group of investors, where the value of the sale or financing exceeds the sum of $1.7 million, then WARREN shall be responsible to pay to Omanoff, within thirty (30) days of the close of any such transaction, a sum equal to one of the following:

(i) 50% of the value of the transaction which is in excess of $1.7 million if the transaction occurs within ninety (90) days of the execution of this Agreement.

(ii) 25% of the value of the transaction which is in excess of $1.7 million if the transaction occurs more than ninety (90) days after but within one hundred eighty (180) days of the execution of this Agreement.

(iii) 10% of the value of the transaction which is in excess of $1.7 million if the transaction occurs more than one hundred eighty (180) days after but within one year of the execution of this Agreement.

3.     Concurrently with the full execution and performance of this Agreement, the Corporation shall pay to Dennis Omanoff the sum of $150,000, less any applicable withholding, FICA and Medicare taxes, as accrued but unpaid compensation for his duties as the CEO and Manager of the Corporation, and shall further remit to Dennis Omanoff as reimbursement of expenses submitted to the Corporation, the sum of $11,973.73

4.     In addition to the cash payments referenced in Sections 2 and 3 above, Dennis Omanoff shall be entitled to keep without obligation to pay any money or return any products (a) all of the CheyTac firearms and firearm components that he currently has in his possession, specifically including, but not limited to, five (5) AR lowers presently being held at MCM

- 2 -

F.O.

D.O.

Firearms; (Dennis Omanoff shall be responsible for any costs related to said five AR lowers, which is being performed by MCM Firearms); and (b) the Dodge Ram Red Truck. The Corporation has delivered the original certificate of title for the Dodge Ram Truck to Dennis Omanoff to complete this transaction.

5.    Concurrently with the full execution of this Agreement, Dennis Omanoff and The Omanoff Trust shall destroy all confidential material relating to the Corporation, including the permanent deletion of all emails and electronic copies of the same – but specifically excluding any Federal Firearms License ("FFL") logs and original contracts or business documents relating to the Corporation. By executing this Agreement, Dennis Omanoff hereby certifies to the other parties hereto that this has been completed.

6.    Concurrently with the full execution of this Agreement, Dennis Omanoff shall deliver the original FFL logs to the Corporation, the Corporation shall file all necessary paperwork to have Dennis Omanoff removed from the FFLs' related to the Corporation and the Corporation shall deliver copies of such filings to Dennis Omanoff. The Corporation shall retain the responsibility and obligation for all reporting requirements by and to the Bureau of Alcohol, Tobacco and Firearms, as it relates to the transfer or transportation of any firearms, regardless of whether any such items came into the possession of Dennis Omanoff during his employment with the Corporation.

7.    The transactions specified in paragraphs 2, 3, 4, 5 and 6 above are hereinafter referred to as the "Settlement Obligations" and they represent the full and final "net" obligations and payment of all liabilities due to or owing from, on the one hand, Dennis Omanoff and The Omanoff Trust, and on the other hand, the Corporation, under the CheyTac Agreements; it being understood, however, the Proprietary Rights Agreement shall expressly survive this Agreement and shall remain legal, valid and binding.

   a.  Joseph R. Warren hereby represents and warrants that he has disclosed to Dennis Omanoff any and all facts which reasonably relate to the determination of the value of the Corporation as of the close of the transaction, including but not limited to, all relevant Corporation financial data such as pending orders, pending sales, actual revenues, expenses, profits, liabilities, obligations, and any interest expressed by any third party in a potential acquisition or merger opportunity.

8.    Subject to the full execution and performance of this Agreement, Dennis Omanoff and The Omanoff Trust hereby releases PT and any person or party related to or affiliated with PT (collectively, the PT Group") and the Corporation and its members, agents, employees and other representatives, collectively or individually in any capacity, from any and all manner of claims, demands, actions and causes of action, liabilities, and duties, of any kind or nature whatsoever, whether known or unknown, whether in law, equity or otherwise, and whether or not presently accrued, against the PT Group or the Corporation or its members, agents, employees or other representatives, or any of them, Dennis Omanoff or The Omanoff Trust ever had, or has, or hereafter can or may have arising out of or related to their involvement with the Corporation

- 3 -

through the date of this Agreement; provided, however, the enforcement of this Agreement shall not be subject to the release contained in this Section 8.

9.    Subject to the full execution and performance of this Agreement, the PT Group and the Corporation, on behalf of themselves and their members, agents, employees and other representatives, hereby release Dennis Omanoff and The Omanoff Trust from any and all manner of claims, demands, actions and causes of action, liabilities, and duties, of any kind or nature whatsoever, whether known or unknown, whether in law, equity or otherwise, and whether or not presently accrued, against Dennis Omanoff and The Omanoff Trust that any of them, ever had, or has, or hereafter can or may have arising out of or related to Dennis Omanoff's and The Omanoff Trust's involvement with the Corporation through the date of this Agreement; provided, however, the enforcement of this Agreement shall not be subject to the release contained in this Section 9.

10.    Additionally, the Corporation hereby agrees to indemnify, defend and hold Dennis Omanoff and The Omanoff Trust harmless from any and all manner of claims, demands, actions and causes of action, liabilities, and duties, of any kind or nature whatsoever, whether known or unknown, whether in law, equity or otherwise, and whether or not presently accrued, made by third parties against Dennis Omanoff or The Omanoff Trust arising out of or related to their involvement with the Corporation through the date of this Agreement.

11.    From and after the date of this Agreement, each party hereto covenants and agrees to keep confidential the terms of this Agreement, it being understood and agreed that such confidentiality is a material inducement for all parties to enter into this Agreement. Each party hereto shall have the right to pursue all remedies available at law or equity to enforce the obligations contained in this Section 11.

12.    From and after the date of this Agreement, each party hereto covenants and agrees not to make to any third party at any time any derogatory or negative statements about or otherwise disparage, defame, impugn or damage the reputation or integrity of the other parties. Each party hereto shall have the right to pursue all remedies available at law or equity to enforce the obligations contained in this Section 12.

13.    The press release announcing these transactions, if any, shall be made only by the Corporation – not any other party to this Agreement – and shall be subject to the prior review and approval of all parties to this Agreement, such approval not to be unreasonably withheld, conditioned or delayed.

14.    This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs, successors, assigns, and representatives.

15.    This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia.

- 4 -

E.O.

16.     In the event of any dispute or controversy arising out of or relating to the interpretation of this Agreement, such dispute or controversy shall be governed by Section 10.02 of the Operating Agreement and Section 14 of the Proprietary Rights Agreement, each of which is hereby incorporated herein by this reference.

17.     The parties agree that this Agreement represents a compromise and settlement of disputed and undetermined claims, the existence of any liability for which is expressly denied, and that this Agreement, the consideration therefor, and all negotiations relating thereto, are for settlement purposes only.

18.     By executing and delivering this Agreement: (a) The Omanoff Trust and PT, as Class A Members, and Dennis Omanoff and Joseph R. Warren, as Managers, hereby consent to and approve the purchase of The Omanoff Trust Class A Shares and the transactions contained in this Agreement, such consent being effective for all purposes under the Operating Agreement, (b) and upon receipt of the payment specified in Section 3 above, Dennis Omanoff hereby resigns as CEO and as Manager of the Corporation and (c) upon receipt of the payment specified in Section 2 above, The Omanoff Trust hereby withdraws as a member of the Corporation.

19.     The agreements referenced herein, together with this Agreement, constitute the complete expression of the terms of the agreement between the parties.    All prior or contemporaneous agreements, representations, or negotiations not referenced herein, if any, are superseded hereby and shall have no binding effect.

20.     Each party represents and warrants that he or she has the legal authority to execute this Agreement in the capacity stated, and that such Agreement, once executed, shall be the legal, valid and binding obligation of such party.

21.     Each party hereto shall pay their own legal fees related to the preparation of this Agreement.  No modification of, or amendment to, this Agreement shall be valid unless it is in writing and signed by the party or parties to be charged.

22.     This Agreement may be executed in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  This Agreement may be executed by PDF copies or facsimile copies and any PDF or facsimile signatures shall be deemed original counterparts.

*[SIGNATURE PAGES TO FOLLOW]*

- 5 -

IN WITNESS WHEREOF, the undersigned parties have executed this Agreement effective for all purposes as of the date first set forth above.

THE COMPANY:

CHEYTAC USA, LLC

By: _____
Name: Joseph R. Warren, Manager

_____
Witness

THE OMANOFF TRUST:

_____
DENNIS OMANOFF, CO-TRUSTEE OF
THE OMANOFF FAMILY TRUST

_____
Witness

_____
ELAINE OMANOFF, CO-TRUSTEE OF
THE OMANOFF FAMILY TRUST

_____
Witness

PT:

PRAECISA TENURAS, LLC

By: _____
Joseph R. Warren, Managing Member

_____
Witness

DENNIS OMANOFF:

_____
DENNIS OMANOFF

_____
Witness

JOSEPH R. WARREN:

_____
JOSEPH R. WARREN

_____
Witness

- 6 -



№ 5

Shares 3,000,000

CHEYTAC USA, LLC

*This Certifies that* _Dennis Omanoff and Elaine Omanoff, as Trustees of the Omanoff Family Trust,_ is the registered holder of _3,000,000 Class A Shares_ of CheyTac USA, LLC, a Georgia limited liability company, no par value, transferable as follows: (x) in the case of a transfer by the registered holder to the Company (by operation of law, agreement or otherwise) such transfer may be effected by the Secretary of the Company by annotation on the books and records of the Company upon surrender of this Certificate (with or without endorsement) and (y) in the case of a transfer to a third party, such transfer will be effective upon endorsement by the registered holder or his Attorney and surrender of this Certificate. *Contains additional restrictions regarding the transfer of these Shares as set forth on the back of this Certificate*

*In Witness Whereof,* the said Company has caused this Certificate to be signed by its duly authorized officer and its Company Seal to be hereunto affixed as of the _12th_ day of February 2016.

By: _Dennis Omanoff_

*Dennis Omanoff, Chief Executive Officer*

**RESTRICTIONS ON TRANSFER:** THE SECURITIES REPRESENTED BY THIS CERTIFICATE (COLLECTIVELY THE "SHARES") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE PROVISIONS OF ANY STATE SECURITIES LAWS, BUT HAVE BEEN ACQUIRED BY THE REGISTERED HOLDER HEREOF FOR PURPOSES OF INVESTMENT AND IN RELIANCE ON STATUTORY EXEMPTIONS UNDER THE SECURITIES ACT, AND UNDER ALL APPLICABLE STATE SECURITIES LAWS. THE SHARES MAY NOT BE SOLD, PLEDGED, TRANSFERRED OR ASSIGNED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS, OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE PROVISIONS OF THE SECURITIES ACT AND UNDER PROVISIONS OF APPLICABLE STATE SECURITIES LAWS; AND IN THE CASE OF AN EXEMPTION, ONLY IF THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL THAT SUCH TRANSACTION DOES NOT REQUIRE REGISTRATION OF THE SHARES, WHICH OPINION AND WHICH COUNSEL SHALL BE SATISFACTORY TO THE COMPANY IN ITS SOLE DISCRETION.

ANY SALE, ASSIGNMENT, TRANSFER, PLEDGE OR OTHER DISPOSITION OR ENCUMBRANCE OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY AND SUBJECT TO THE TERMS AND PROVISIONS OF A MEMBER REPURCHASE AGREEMENT BETWEEN THE COMPANY AND THE REGISTERED HOLDER, AS A MEMBER OF THE COMPANY. A COPY OF SUCH MEMBER REPURCHASE AGREEMENT IS ON FILE WITH THE SECRETARY OF THE COMPANY.

*For Value Received,* W.E. *hereby sell, assign and transfer unto*

CHRYTAC USA LLC

3 000 000 *Shares represented by the within Certificate, and do hereby irrevocably constitute and appoint*

_____ *Attorney to transfer the said Shares on the books of the within named Company with full power of substitution in the premises.*

*Dated* 10 31 2016

Dennis Omanoff

Elaine Omanoff

NOTICE: THE SIGNATURE OF THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT, OR ANY CHANGE WHATSOEVER.



**CHEYTAC USA, LLC**

No. 3

Shares  6,000,000

*This Certifies that*  *Dennis Omanoff and Elaine Omanoff, as Trustees of the Omanoff Family Trust,*  is the registered holder of 6,000,000  Class A Shares of CheyTac USA, LLC, a Georgia limited liability company, no par value, transferable as follows: (x) in the case of a transfer by the registered holder to the Company (by operation of law, agreement or otherwise), such transfer may be effected by the Secretary of the Company by annotation on the books and records of the Company upon surrender of this Certificate (with or without endorsement) and (y) in the case of a transfer to a third party, such transfer will be effective upon endorsement by the registered holder or its Attorney and surrender of this Certificate. Certain additional restrictions regarding the transfer of these Shares are set forth on the back of this Certificate.

*In Witness Whereof,* the said Company has caused this Certificate to be signed by its duly authorized officer and its Company Seal to be hereunto affixed as of the 28th day of September 2015.

By: Dennis Omanoff

*Dennis Omanoff, Chief Executive Officer*

**RESTRICTIONS ON TRANSFER:** THE SECURITIES REPRESENTED BY THIS CERTIFICATE (COLLECTIVELY THE "SHARES") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE PROVISIONS OF ANY STATE SECURITIES LAWS, BUT HAVE BEEN ACQUIRED BY THE REGISTERED HOLDER HEREOF FOR PURPOSES OF INVESTMENT AND IN RELIANCE ON STATUTORY EXEMPTIONS UNDER THE SECURITIES ACT, AND UNDER ALL APPLICABLE STATE SECURITIES LAWS. THE SHARES MAY NOT BE SOLD, PLEDGED, TRANSFERRED OR ASSIGNED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS, OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE PROVISIONS OF THE SECURITIES ACT AND UNDER PROVISIONS OF APPLICABLE STATE SECURITIES LAWS; AND IN THE CASE OF AN EXEMPTION, ONLY IF THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL THAT SUCH TRANSACTION DOES NOT REQUIRE REGISTRATION OF THE SHARES, WHICH OPINION AND WHICH COUNSEL SHALL BE SATISFACTORY TO THE COMPANY IN ITS SOLE DISCRETION.

ANY SALE, ASSIGNMENT, TRANSFER, PLEDGE OR OTHER DISPOSITION OR ENCUMBRANCE OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY AND SUBJECT TO THE TERMS AND PROVISIONS OF A MEMBER REPURCHASE AGREEMENT BETWEEN THE COMPANY AND THE REGISTERED HOLDER, AS A MEMBER OF THE COMPANY. A COPY OF SUCH MEMBER REPURCHASE AGREEMENT IS ON FILE WITH THE SECRETARY OF THE COMPANY.

---

**For Value Received,** WE _hereby sell, assign and transfer unto_

CHRYDAC USA LLC

6 000 000 _Shares represented by the within Certificate, and do hereby irrevocably constitute and appoint_

_____ _Attorney to transfer the said Shares on the books of the within named Company with full power of substitution in the premises._

Dated 10 31 2016

Pervris Omaroff

Elaine Omaroff

NOTICE: THE SIGNATURE OF THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE, IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT, OR ANY CHANGE WHATSOEVER.

# EXHIBIT 15



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Thu Apr 27 03:21:03 EDT 2017*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | PREV LIST | NEXT LIST | IMAGE LIST | BOTTOM |

| HELP |
| Logout | *Please logout when you are done to release system resources allocated for you.*

| Start List At: [        ]  OR  Jump to record: [        ] | **18 Records(s) found (This page: 1 ~ 18)** |

Refine Search (CHEYTAC)[ON]      Submit

**Current Search: S1: (CHEYTAC)[ON] docs: 18 occ: 18**

| | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead |
|---|---|---|---|---|---|
| 1 | 87080078 | 5133099 | THINK OUTSIDE IN | TSDR | LIVE |
| 2 | 87342181 | | CHEYTAC USA | TSDR | LIVE |
| 3 | 85839213 | 4509171 | SAFESIDE | TSDR | LIVE |
| 4 | 85942719 | 4430295 | BALANCED FLIGHT PROJECTILES | TSDR | LIVE |
| 5 | 85933639 | | XM408 SIZING AND SEATING DIES | TSDR | DEAD |
| 6 | 85933508 | | XM375 SIZING AND SEATING DIES | TSDR | DEAD |
| 7 | 85933182 | | M408 SIZING AND SEATING DIES | TSDR | DEAD |
| 8 | 85933107 | | M375 SIZING AND SEATING DIES. | TSDR | DEAD |
| 9 | 85881208 | 4442891 | MODEL 300 INTERVENTION | TSDR | LIVE |
| 10 | 85839216 | 4421029 | PERSES | TSDR | LIVE |
| 11 | 85839203 | 4406310 | VIDAR | TSDR | LIVE |
| 12 | 85775334 | | CHEYTAC MODEL 300 INTERVENTION | TSDR | DEAD |
| 13 | 85679594 | 4308441 | M200 INTERVENTION | TSDR | LIVE |
| 14 | 85679512 | 4308440 | TECHNOLOGY OVER TRADITION | TSDR | LIVE |
| 15 | 85679388 | 4312281 | SEIZE THE DISTANCE | TSDR | LIVE |
| 16 | 76132837 | 2711809 | CHEYTAC | TSDR | LIVE |
| 17 | 76573385 | | CHEYENNE TACTICAL | TSDR | DEAD |
| 18 | 76568822 | | CHEYTAC | TSDR | DEAD |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | PREV LIST | NEXT LIST | IMAGE LIST | TOP |

| HELP |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# EXHIBIT 16



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed May 3 03:47:02 EDT 2017*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | | HELP | | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At: [          ]   OR   Jump   to record: [          ]   **Record 15 out of 18**

| TSDR | ASSIGN Status | TTAB Status |   *( Use the "Back" button of the Internet Browser to return to TESS)*

# SEIZE THE DISTANCE

| | |
|---|---|
| **Word Mark** | SEIZE THE DISTANCE |
| **Goods and Services** | IC 013. US 002 009. G & S: ALL TYPES OF FIREARMS AND AMMUNITION INCLUDING LONG RANGE SNIPER RIFLES AND PATENTED AMMUNITION. FIRST USE: 20040905. FIRST USE IN COMMERCE: 20040905 |
| **Mark Drawing Code** | (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM |
| **Serial Number** | 85679388 |
| **Filing Date** | July 17, 2012 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | January 15, 2013 |
| **Registration Number** | 4312281 |
| **Registration** | |

| | |
|---|---|
| **Date** | April 2, 2013 |
| **Owner** | (REGISTRANT) **CheyTac** USA, LLC LIMITED LIABILITY COMPANY GEORGIA 541 HAZEL AVENUE NASHVILLE GEORGIA 31639 |
| **Attorney of Record** | JERRY ROMANOFF |
| **Description of Mark** | Color is not claimed as a feature of the mark. The mark consists of the words, "SEIZE THE DISTANCE". |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

| HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# EXHIBIT 17

 **United States Patent and Trademark Office**

Home|Site Index|Search|FAQ|Glossary|Guides|Contacts|eBusiness|eBiz alerts|News|Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Tue May 2 03:47:02 EDT 2017*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST

NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: [        ]  OR  Jump  to record: [        ]  **Record 3 out of 4**

TSDR | ASSIGN Status | TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*

# Typed Drawing

| | |
|---|---|
| **Word Mark** | CHEYTAC |
| **Goods and Services** | IC 013. US 002 009. G & S: ammunition. FIRST USE: 20010910. FIRST USE IN COMMERCE: 20010910 |
| **Mark Drawing Code** | (1) TYPED DRAWING |
| **Serial Number** | 76132837 |
| **Filing Date** | September 5, 2000 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | March 26, 2002 |
| **Registration Number** | 2711809 |
| **Registration Date** | April 29, 2003 |
| **Owner** | (REGISTRANT) THEIS, L.L.C. LIMITED LIABILITY COMPANY MICHIGAN 1147 Hawthorn Grosse Pointe Woods MICHIGAN 48236 |
| | (LAST LISTED OWNER) CHEYTAC USA, LLC LIMITED LIABILITY COMPANY GEORGIA 110 EAGLE AVE. NASHVILLE GEORGIA 31639 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Jeremy D. Bisdorf |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20130524. |
| **Renewal** | 1ST RENEWAL 20130524 |
| **Live/Dead Indicator** | LIVE |

# EXHIBIT 18



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed May 3 03:47:02 EDT 2017*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST |

| FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At: [        ] OR Jump | to record: [    ] **Record 2 out of 18**

TSDR | ASSIGN Status | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

# CHEYTAC USA

**Word Mark**  CHEYTAC USA

**Goods and Services**  IC 013. US 002 009. G & S: Firearms; and ammunition for firearms. FIRST USE: 20010910. FIRST USE IN COMMERCE: 20010910

IC 035. US 100 101 102. G & S: On-line retail store services featuring firearms, ammunition for firearms, monopods and bipods for firearms, sighting scopes for firearms, weapon cases for firearms, implements for firearms, namely, chamber reamers. FIRST USE: 20010910. FIRST USE IN COMMERCE: 20010910

**Standard Characters Claimed**

**Mark Drawing Code**  (4) STANDARD CHARACTER MARK

**Serial Number**  87342181

**Filing Date**  February 20, 2017

**Current Basis**  1A

**Original Filing Basis**  1A

http://tess2.uspto.gov/bin/showfield?f=doc&state=4802:r66474.3.2

Page 1 of 2

| | |
|---|---|
| **Owner** | (APPLICANT) **CheyTac** USA, LLC LIMITED LIABILITY COMPANY GEORGIA Bldg 4 9801 Highway 78 Ladson SOUTH CAROLINA 29456 |
| **Attorney of Record** | Rachel H. Huffstetler |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST
FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

| HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY