# EXHIBIT 19

US006629669B2

(12) **United States Patent**   (10) Patent No.:   **US 6,629,669 B2**
Jensen                           (45) Date of Patent:   **Oct. 7, 2003**

(54) **CONTROLLED SPIN PROJECTILE**

(76) Inventor: **Warren S. Jensen**, Rte. 1, Box 187,
Arco, ID (US) 83213

(*) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/881,790**

(22) Filed: **Jun. 14, 2001**

(65) **Prior Publication Data**

US 2002/0190156 A1 Dec. 19, 2002

(51) Int. Cl.⁷ ............................................... **F42B 10/48**
(52) U.S. Cl. ...................................... **244/3.23**; 102/529
(58) Field of Search ................................ 244/130, 200,
244/3.1, 3.24, 3.23; 102/501, 517, 526,
529, 430, 439, 444, 519, 524, 490

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,531,624 A | * | 3/1925 | Richardson ................. 102/517 |
| 3,343,488 A | * | 9/1967 | Sherwood |
| 4,016,817 A | * | 4/1977 | Blanco ........................ 12/519 |
| 4,109,582 A | | 8/1978 | Haep et al. ................... 102/93 |
| 4,718,348 A | | 1/1988 | Ferrigno .................... 102/439 |
| 4,754,707 A | | 7/1988 | Ahlers ........................ 102/527 |

| | | | |
|---|---|---|---|
| 4,813,635 A | * | 3/1989 | Paterson et al. |
| 5,164,538 A | | 11/1992 | McClain III, Harry T. . 102/517 |
| 5,932,836 A | * | 8/1999 | White |
| 6,085,662 A | | 7/2000 | Nilsson ...................... 102/526 |

* cited by examiner

*Primary Examiner*—Galen L. Barefoot
(74) *Attorney, Agent, or Firm*—Joseph W. Holland

(57) **ABSTRACT**

A projectile and a method of launching a projectile from a
barrel. The projectile of the present invention may be
matched to a pre-selected barrel rifling to produce a con-
trolled spin rate. Controlled spin rate is characterized by
substantially balanced forward and axial deceleration. Sub-
stantially balanced forward and axial deceleration is char-
acterized by an axial speed that decreases in relationship to
the decrease in forward speed. Substantially balanced for-
ward and axial deceleration produces a trajectory that is
characterized by a gyroscopic stability factor that remains
highly stable over a given distance of a trajectory. Gyro-
scopic stability is controlled during the projectile's flight by
controlling the spin damping moment as a design element.
Control of the spin damping moment may be achieved by
incorporating physical features in the projectile's design and
manufacture and/or may result from the incorporation of
physical features imparted upon the projectile during launch.

**19 Claims, 13 Drawing Sheets**





*Figure 1*



*Figure 2*



*Figure 3*



*Figure 4*

U.S. Patent          Oct. 7, 2003          Sheet 3 of 13          US 6,629,669 B2



Figure 5



*Figure 6*



*Figure 7*



*Figure 8*



*Figure 9*



*Figure 10*



*Figure 11*
*Prior Art*



7.62 mm

*Figure 12A*
*Prior Art*



*Figure 12B*
*Prior Art*



*Figure 13*
*Prior Art*

**U.S. Patent**        Oct. 7, 2003        Sheet 13 of 13        US 6,629,669 B2



Figure 14
Prior Art

US 6,629,669 B2

| 1 | 2 |

# CONTROLLED SPIN PROJECTILE

## BACKGROUND OF THE INVENTION

### 1. Technical Field

This invention relates generally to projectiles and more specifically to a projectile and a method of launching a projectile from a barrel to produce a controlled spin rate.

### 2. Background Art

Where the gyroscopic stability factor, $S_g$, of a projectile in flight exceeds one, a gyroscopic stability condition is present. The gyroscopic stability factor may be defined as follows:

$$S_g=(I_x/I_y)\times(pd/V_w)(2I_x/\rho\pi d^2)$$

where:

$I_x$=axial moment of inertia of the projectile
$I_y$=forward moment of inertia of the projectile
$V_w$=velocity
d=projectile diameter
p=spin rate of the projectile
ρ=air density

Alternately, the gyroscopic stability factor may be defined as follows:

$$S_g=I^2/4M=I_x^2p^2/2\rho I_y SdV^2 C_{M\alpha}$$

where,

P=the sum of epicyclic turning rates
M=mach number
$I_x$=axial moment of inertia of the projectile
p=projectile axial spin in radians/second
$I_y$=forward moment of inertia of the projectile
S=projectile reference area S=$d^2$/4
d=projectile diameter
V=velocity
$C_{M\alpha}$=pitching moment coefficient

The relationship between the axial moment of inertia $I_x$ and the forward moment of inertia of the projectile $I_y$ is readily observed. Additionally the above expressions attempt to characterize the relationship between a projectile's forward velocity, spin rate and geometry and the effect that these variables may have on gyroscopic stability.

It is generally believed that a projectile may be made gyroscopically stable by increasing the spin rate of the projectile. It is also widely believed that if a projectile is gyroscopically stable at the muzzle, it will be gyroscopically stable throughout its flight.

Practically speaking, however, the spin rate p decreases more slowly than the forward velocity, and therefore, the gyroscopic stability factor $S_g$, continues to increase throughout the flight of the projectile. Designers usually prefer a gyroscopic stability factor $S_g$>1.2 to 1.5 at departure from the muzzle, but because spin rate decreases more slowly than the forward velocity it is also possible to introduce too much spin to a projectile. This condition is commonly characterized as "over-stabilization". It has been observed that a projectile may become unstable by being "over-stabilized", however, most designers and commentators have not been terribly concerned with this aspect of flight as it is also commonly held that small arm fire is ineffective past the range where instability due to "over-stabilization" may occur, for instance, in the range of 2000 to 4000 yards.

"Over-stabilization" is a popular mischaracterization used to describe a phenomenon wherein the axial speed of the projectile continues to increase in proportion to the forward speed. As a result, the projectile becomes incapable of following the bending trajectory and the longitudinal axis of the projectile continues to nose up in relation to the bending trajectory. This effect may be referred to as a decrease in tractability. The relationship between excess gyroscopic stability and lack of stability in flight has been previously observed. FIG. 11 is a schematic representation depicting the relationship between gyroscopic stability GS and distance D in two projectiles manufactured and launched according to the prior art, a 7.62 mm and a 50 caliber. As can be readily seen, in each case the value for gyroscopic stability GS effectively continues to increase from the muzzle until termination of flight at T in the range of 2300 to 2500 yards. As will be seen, the relationship between a maximum GS value and a starting GS value produces the following ratios: 7.62 mm—approximately 9.50:2.20 or 4.32:1 and 50 caliber—approximately 5.60:1.60 or 3.50:1.

Skin friction at the surface of the projectile has a direct effect on the axial velocity of a projectile. A spin damping coefficient $M_S$ may be defined as follows:

$$M_S=-(\rho/2)\times A\times C_{spin}(B\times Ma\times Re)\times V_w^2\times d(pd/V_w)\times e_c$$

where:

ρ=air density
A=projectile cross section area
$C_{spin}$=the spin damping moment coefficient
B=projectile geometry
Ma=mach number
Re=Reynolds number
$V_w$=velocity
d=projectile diameter
p=spin rate of the projectile
$e_c$=unit vector in the direction of the projectile's longitudinal axis

A spin damping moment may be defined as follows:

$$\frac{1}{2}\rho V^2 Sd(pd/V)C_{spin}$$

where:

ρ=air density
V=projectile velocity
S=projectile reference area
d=projectile diameter
p=spin rate of the projectile
$C_{spin}$=the spin damping moment coefficient

The relationship between the spin damping moment coefficient and the spin damping moment may be observed in the above formulas. Particularly, the greater the spin damping moment coefficient for any given atmospheric condition, projectile geometry, projectile velocity, both axial and forward and the ratio of axial spin to forward velocity, the greater the spin damping moment. The relationship between spin damping moment coefficient and forward velocity has likewise been observed.

FIGS. 12A and 12B are schematic representations depicting generally the relationship between axial deceleration, forward deceleration and distance in two projectiles of the prior art, a 7.62 mm and a 50 caliber. As can be seen in either case, the rate of decrease in forward deceleration exceeds the rate of decrease in axial deceleration in both cases and as a result, there is an increased probability of the occurrence of "over-stabilization" and as a result, instability in flight.

US 6,629,669 B2

3

FIG. 13 is a schematic representation depicting the relationship between spin damping moment coefficient, SDMC, and forward velocity, MACH, in two projectiles manufactured and launched according to the prior art, a 7.62 mm and a 50 caliber. As can be seen, in each case the spin damping moment coefficient in either case remains in the range of approximately −0.018 to −0.027 regardless of forward velocity.

The relationship characterized by the expression pd/V, projectile diameter times the spin rate of the projectile divided by the velocity, expressed in spin per caliber of travel, has also been previously observed. FIG. 14 is a schematic representation depicting the relationship between projectile diameter times the spin rate of the projectile divided by the velocity, pd/V, and distance D in two projectiles manufactured and launched according to the prior art, a 7.62 mm and a 50 caliber. As can be readily seen, in each case the spin per caliber of travel effectively continues to increase from the muzzle until termination of flight at T in the range of 1300 to 2500 yards. Additionally, the relationship between a maximum pd/V value and a starting pd/V value produces the following ratios: 7.62 mm—approximately 4.22:1.94 or 2.17 and 50 caliber—approximately 5.07:2.35 or 2.15. In each instance, it should be noted that the value for pd/V, at termination of flight, may be characterized as increasing.

It may be advantageous to the efficiency of a projectile's flight to control the spin damping moment coefficient of the projectile by controlling various parameters of projectile design including projectile aerodynamics, projectile surface area and projectile surface features and finish. By controlling the spin damping moment coefficient the gyroscopic stability factor may be maintained within a predetermined desirable range and overall ballistic efficiency maybe improved.

## SUMMARY OF THE INVENTION

The present invention is directed to a projectile and a method of launching a projectile from a barrel, the projectile having an axial velocity upon launching. The projectile of the present invention may be matched to a pre-selected barrel rifling to produce a controlled spin rate. "Controlled spin rate", as used herein, is characterized by substantially balanced forward and axial deceleration. "Substantially balanced forward and axial deceleration", as used herein, is characterized by an axial speed that decreases in relationship to the decrease in forward speed. Substantially balanced forward and axial deceleration produces a trajectory that may be depicted by a curve exhibiting a relatively narrow band of values for the gyroscopic stability factor over a given distance of a trajectory.

Gyroscopic stability is controlled during the projectile's flight by controlling the spin damping moment as a design element. More particularly, control of the spin damping moment may result from a projectile design that incorporates a relatively low aerodynamic drag value with physical features incorporated in the projectile's design and manufacture, or produced during launch, that increase the skin friction at the surface of the projectile. Alternately, the projectile may include both physical features incorporated in the projectile's during manufacture and physical features which are imparted upon the projectile during launch.

In one preferred embodiment of the invention, a projectile is provided having a relatively low density and a relatively low drag coefficient. A projectile manufactured and launched according to the present invention exhibits a drag coefficient in the range of 0.100 to 0.250. A physical feature is then identified and selected that will produce a pre-

4

selected projectile surface area and/or surface relief that produces a calculated spin damping moment. For instance a projectile may be matched to a barrel including riflings that produce physical scoring on the exterior surface of the projectile which cover a predetermined percentage of the exterior surface of the projectile to produced a controlled effect on the spin damping moment resulting in a controlled deceleration of axial velocity of the projectile during flight.

In one preferred embodiment of the invention, the spin stabilized projectile is manufactured having sufficiently low aerodynamic drag so that upon launching, the ensuing axial drag, as increased by designed physical features, will cause the projectile to exhibit a controlled spin rate and controlled axial deceleration. The trajectory of such a projectile is characterized by substantially balanced forward and axial deceleration. The result is a projectile which is aerodynamically stable while not being overspun to the point of induced instability. The lower aerodynamic drag and the increased axial drag are substantially balanced throughout the projectile's flight to produce a controlled spin and increase in the spin damping moment. During flight, the gyroscopic stability of the projectile is not increasing or decreasing dramatically.

The gyroscopic stability factor of a projectile of the present invention, a projectile exhibiting substantially balanced forward and axial deceleration, should remain in the range of greater than or equal to 1.0 to less than or equal 3.0. Alternately, the gyroscopic stability factor of a projectile of the present invention, a projectile exhibiting substantially balanced forward and axial deceleration, should remain in the range of greater than or equal to 1.0 through and including three times the initial value at the muzzle. A projectile manufactured and launched according to the present invention, should exhibit increased tractability and stability particularly down range. Balancing forward and axial deceleration should produce a trajectory that is characterized by a nose that maintains a near direct into oncoming air orientation throughout its trajectory. The gyroscopic stability factor of the projectile increases or decreases only within a relatively narrow range.

Physical features which may contribute to a calculated control of a projectile's spin damping moment include but are not limited to the total surface area of the projectile, the length of the projectile, the length, depth and number of lands and grooves engraved by barrel riflings on launch, surface roughness and material density of the projectile. Controlled axial drag imparts a controlled axial deceleration. Physical features which may be calculated to affect the spin damping moment include but are not limited to the following:

a. control of projectile total surface area and total axial surface friction;

b. decrease in the density of constituent materials;

c. control of the number of lands and grooves in the rifle bore from which the projectile is shot and engraved, thereby controlling the number of engraved grooves on the projectile;

d. control of the length of engraving to control axial deceleration;

e. control of the depth of engraving to control axial deceleration;

f. control of the forms of engraving using trigonal, polygonal, and multi-cornered shapes to increase axial drag to control axial deceleration;

g. incorporation of fins, canards, wings, deflectors, and protrusions to control axial deceleration;

US 6,629,669 B2

5                                                              6

h. control of the surface roughness of the projectile to control axial deceleration;

i. any other feature manufactured into the projectile or caused by the engraving process which by effect controls the spin dampening moment and causes a gyroscopic balance the projectile's trajectory.

It is believed that the control of spin damping moment by the control and specification of physical features provides a projectile which in flight maintains gyroscopic stability within a specified range preventing increased yaw, increased precession, increased inaccuracy and projectile instability.

Historically, designers of projectiles for small arms have not been concerned with ballistic efficiency or the effects of "over-stabilization", primarily instability, at ranges beyond 2000 yards as it is commonly held that small arm fire is ineffective past this range. A projectile engraved and launched according to the teachings of the present invention, however, is designed to decelerate from supersonic flight through transonic to subsonic in a stable and predictable manner effective in a range beyond 3000 yards.

The present invention consists of the combination and arrangement of parts hereinafter more fully described, illustrated in the accompanying drawings and more particularly pointed out in the appended claims, it being understood that changes may be made in the form, size, proportions and minor details of construction without departing from the spirit or sacrificing any of the advantages of the invention.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a representative side view of a projectile according to the invention;

FIG. 2 is a representative side view of a projectile according to the invention;

FIG. 3 is a representative side view of a projectile according to the invention;

FIG. 4 is a representative side view of a projectile according to the invention;

FIG. 5 is a representative side view of a projectile according to the invention;

FIG. 6 a cross-sectional cutaway of a projectile according to the invention;

FIG. 7 is a schematic representation depicting the relationship between distance and gyroscopic stability in a projectile of the present invention;

FIG. 8 is a schematic representation depicting generally the relationship between axial deceleration, forward deceleration and distance in a projectile of the present invention;

FIG. 9 is a schematic representation depicting generally the relationship between the spin damping moment coefficient and forward velocity in a projectile of the present invention;

FIG. 10 is a schematic representation depicting generally the relationship between the spin rate of the projectile divided by the velocity, pd/V, and distance in a projectile of the present invention;

FIG. 11 is a schematic representation depicting generally the relationship between gyroscopic stability and distance in two projectiles manufactured and launched according to the prior art;

FIG. 12A is a schematic representation depicting generally the relationship between axial deceleration, forward deceleration and distance in a projectile of the prior art;

FIG. 12B is a schematic representation depicting generally the relationship between axial deceleration, forward deceleration and distance in a projectile of the prior art;

FIG. 13 is a schematic representation depicting generally the relationship between spin damping moment coefficient and forward velocity in two projectiles manufactured and launched according to the prior art; and

FIG. 14 is a schematic representation depicting generally the relationship between projectile diameter times the spin rate of the projectile divided by the velocity and distance in two projectiles manufactured and launched according to the prior art.

DETAILED DESCRIPTION OF THE INVENTION

Referring to FIGS. 1 through 5, projectile 10 is shown including body 11 having bearing surface 12 and ogive 15 which is continuous to and extends forward from bearing surface 12. Projectile 10 includes boattail 14 continuous to and extending rearward from bearing surface 12. Boattail 14 terminates at tail end 16. Ogive 15 is formed including relatively long radius R converging at méplate 17. Alternately, as shown in FIG. 2, ogive 15 may be formed including pointed tip 18. FIG. 1 is a representative side view of projectile 10 according to the invention having a low aerodynamic drag factor. FIG. 1 is a representative side view of projectile 10 prior to launching and engraving of physical features.

FIG. 2 is a representative side view of one embodiment of projectile 10 according to the invention including a pattern of alternating lands 20 and grooves 21 forming a physical feature which is imparted on the surface of bearing surface 12 of projectile 10 upon launching.

FIG. 3 is a representative side view of projectile 10 according to the invention including a pattern of alternating lands 22 and grooves 23 forming a physical feature which is imparted on the surface of bearing surface 12 of projectile 10 during a manufacturing process.

FIG. 4 is a representative side view of projectile 10 according to the invention including a pattern of dimples 24 forming a physical feature which is imparted on the surface of bearing surface 12 of projectile 10 during a manufacturing process. Additional physical features may be added to the pattern of alternating lands 22 and grooves 23 shown in FIG. 3 or the pattern of dimples 24 shown in FIG. 4 during launch to achieve a desired ratio of surface area of projectile 10 including physical features to the total surface area of projectile 10 such that a substantially balanced forward and axial deceleration is achieved.

FIG. 5 is a representative side view of projectile 10 according to the invention including a pattern of alternating lands 20 and grooves 21 forming a physical feature which is imparted on the surface of bearing surface 12 of projectile 10 upon launching. In the embodiment of the invention shown at FIG. 5, alternating lands 20 and grooves 21 include angle of attack 19 substantially equal to 5°±1°.

In the embodiment of the invention shown at FIG. 5, projectile 10 includes overall length L. Bearing surface 12 includes length L1 and diameter D1. Ogive 15 includes effective length L2 and is formed having a radius R. Tip 17 is configured as a flat having a diameter D3. Boattail 14 includes length L3 and diameter D2 at tail end 16. Grooves 21 include length L4 and, as shown in FIG. 6, width W and depth E.

According to one aspect of the invention, length L of projectile 10 equals 5.25 to 5.50 times diameter D1, length L1 of bearing surface 12 equals 1.25 to 1.50 times diameter D1 and length L2 of ogive 15 equals 3.10 to 3.25 times diameter D1. The length L3 of boattail 14 may equal 0.10 to 1.1 times diameter D1.

US 6,629,669 B2

7

In the embodiment of the invention shown at FIG. 5, projectile 10 is shown in a .408 caliber. In this embodiment of the invention, projectile 10 is formed by machining a solid copper nickel alloy, for instance C-145, a Tellurium copper-alloy containing less than 1% Tellurium. C-145 has a density on the order of 0.322 lb./in.³. Projectile 10, as shown in FIG. 5 will have a mass in the range of 400 grains to 430, depending upon nose configuration and length of boattail 14. Projectile 10, as shown at FIG. 5 includes an overall length L substantially equal to 2.217 inches. Bearing surface 12 has a length L1 substantially equal to 0.580 inches and diameter D1 substantially equal to 0.408 inches. Ogive 15 has length L2 substantially equal to 1.300 inches and is formed on a 7.00 inch radius. Tip 17 is configured as a flat having a diameter D3 equal to 0.020 inches. Boattail 14 includes length L3 substantially equal to 0.337 inches and diameter D2 at tail end 16 substantially equal to 0.340 inches resulting in a taper from bearing surface 12 to tail segment 14 substantially equal to 6.00 degrees. A projectile manufactured and launched according to the present invention exhibits a drag coefficient in the range of 0.100 to 0.250. Projectile 10 shown at FIG. 5 exhibits an drag coefficient substantially equal to 0.211.

The configuration shown in FIG. 5 results in projectile 10 having a ratio of length L1 over L substantially equal to 0.262, a ratio of length L2 over L substantially equal to 0.586 and a ratio of length L3 over L substantially equal to 0.158. Length L4 of grooves 21 is substantially equal to 0.686 in. As shown in FIG. 6, width W of grooves 21 is substantially equal to 0.100 in. and depth E is substantially equal to 0.004 in. The configuration shown in FIG. 5 results in projectile 10 having a ratio of depth E of groove 21 to diameter D1 approximately equal to 0.001. Otherwise stated, grooves 21 may be of virtually any depth, however, a depth E substantially equal to 1% of the projectile body diameter D1 is preferred.

The total surface area of projectile 10 as shown at FIG. 5 is substantially equal to 1.923 in.². The total surface area of bearing surface 12 as shown at FIG. 5 is substantially equal to 0.744 in.². The total aggregate area of grooves 20 as shown at FIG. 5 is substantially equal to 0.550 in.². The ratio of the aggregate areas of all groves 21 to total surface area of bearing surface 12 is substantially equal to 0.739. The ratio of the aggregate areas of all groves 21 to total surface area of projectile 10 is substantially equal to 0.285. The ratio of the total surface area of projectile 10 to the total surface of the physical feature as shown at FIG. 5 is substantially equal to 3.40:1. A projectile manufactured and launched according to the present invention includes a ratio of the total surface area of projectile 10 to the total surface of the physical feature as shown at FIG. 5 in the range of to 3.00:1 to 4.00:1.

FIG. 6 a cross-sectional cutaway taken through bearing surface 12 of projectile 10. Projectile 10 includes a plurality of alternating lands 20 and grooves 21. In this case, there are a total of eight lands 20 and 8 alternating grooves 21. Each groove 21 includes a depth E and a width W.

FIG. 7 is a schematic representation depicting the relationship between gyroscopic stability GS and distance D in a projectile manufactured and launched according to the present invention. As can be readily seen, the value for gyroscopic stability GS remains in the range of 1.0 to 2.0 from the muzzle until termination of flight at T in the range of 3500 yards. As will be seen, the relationship between a maximum GS value and a starting GS value produces the following ratio: approximately 1.88:1.42 or 1.32:1. It should also be noted that the value for GS, at termination of flight,

8

may be characterized as decreasing. Projectile 10, as shown at FIG. 5, exhibits a gyroscopic stability in the range of greater than or equal to 1.0 to less than or equal 3.0 for any given distance from the muzzle. In an alternate embodiment of the invention, the trajectory of projectile 10 is characterized by a gyroscopic stability greater than or equal to 1.0 through to three times the gyroscopic stability at the muzzle for any given distance from the muzzle.

FIG. 8 is a schematic representation depicting the relationship between axial deceleration, forward deceleration and distance in a projectile of the present invention. As can be seen, the slope of both curves remains substantially equal from the muzzle until termination of flight at T in the range of 3500 yards. A projectile manufactured and launched according to the present invention includes a trajectory characterized by a rate of axial deceleration that is continuously decreasing throughout flight.

FIG. 9 is a schematic representation depicting the relationship between the spin damping moment coefficient and forward velocity in a projectile of the present invention. Projectile 10, as shown at FIG. 5, exhibits a spin damping moment coefficient in the range of −0.035 to −0.045. It will be noted that the spin damping moment coefficient remains effectively in the range of approximately −0.035 to −0.045 throughout flight regardless of the forward velocity of the projectile. This represents a substantial increase in the spin damping moment coefficient over the prior art. As previously noted, the spin damping moment coefficient for projectiles representative of the prior art, remains effectively in the range of approximately −0.018 to −0.027 regardless of forward velocity. In one preferred embodiment of the invention, projectile 10 exhibits a ratio of a high spin damping moment coefficient to a low spin damping moment coefficient in the range of 1.25:1 to 1.45:1.

Projectile 10 exhibits a ratio of total projectile surface area to spin damping moment coefficient in the range of 45 to 50 during flight. Projectile 10 exhibits a ratio of density of the projectile to spin damping moment coefficient of the projectile in the range of 7.0 to 9.0

FIG. 10 is a schematic representation depicting the relationship between the spin rate of the projectile divided by the velocity as expressed in spin per caliber of travel, pd/V, and distance in a projectile of the present invention. As will be seen, the relationship between a maximum pd/V value and a starting pd/V value produces the following ratio: approximately 3.11:2.35 or 1.32:1. It should also be noted that the value for pd/V, at termination of flight, may be characterized as decreasing.

Without limiting the invention, it is believed that the negative increase in the spin damping moment coefficient, over projectile design for spin stabilized projectile of the prior art may be due the spin/forward movement stabilizing effect of the air flow passing through grooves 21, (shown in FIG. 5). The value for spin per caliber of travel, pd/V, for projectile 10 remains fairly constant and the spin damping moment coefficient decreases from the point of exit from the muzzle. Grooves 21 may act effectively as fins to control spin per caliber of travel, pd/V, to match the speed of oncoming air. It is believed that projectiles of the prior art are not capable of acting in this manner for the reasons previously discussed. Without limiting the invention, it is believed that because the value for spin per caliber of travel, pd/V, remains fairly constant, a more laminar flow of air about projectile 10 results preventing heat transfer that is associated with a more turbulent air flow that results from the effects of "over-stabilization". The heat transfer that is

US 6,629,669 B2

9

associated with a more turbulent air flow results in a decrease in the friction coefficient allowing an associated increase in the spin per caliber of travel, pd/V. As the spin rate, pd/V, increases the engravings of a projectile of the prior art spin past the flow of oncoming air and, rather than channeling the air through the grooves, the air about the projectile increases in temperature and becomes more turbulent.

While this invention has been described with reference to the detailed embodiments, this is not meant to be construed in a limiting sense. Various modifications to the described embodiments, as well as additional embodiments of the invention, will be apparent to persons skilled in the art upon reference to this description. It is therefore contemplated that the appended claims will cover any such modifications or embodiments as fall within the true scope of the invention.

What is claimed is:

1. A projectile comprising:

a body including a bearing surface and an ogive continuous to and extending forward from the bearing surface;

a plurality of grooves and a plurality of lands formed on the bearing surface of the projectile in an alternating pattern for imparting a predetermined spin damping moment to the projectile in flight; and

a ratio of a total surface the projectile to a total surface area of the physical feature in the range of to 3.00:1 to 4.00:1.

2. The projectile of claim 1 further comprising a drag coefficient in the range of 0.100 to 0.250.

3. The projectile of claim 1 further comprising a trajectory characterized by a forward rate of deceleration and an axial rate of deceleration that are substantially balanced.

4. The projectile of claim 1 further comprising a trajectory characterized by a controlled spin rate.

5. The projectile of claim 1 wherein the physical feature is imparted to the projectile during manufacture of the projectile.

6. The projectile of claim 1 wherein the physical feature is imparted to the projectile during launch of the projectile.

7. The projectile of claim 1 further comprising a ratio of total projectile surface area to spin damping moment coefficient in the range of 45 to 50.

8. The projectile of claim 1 further comprising a ratio of density of the projectile to spin damping moment coefficient of the projectile in the range of 7.0 to 9.0.

9. The projectile of claim 1 further comprising a trajectory characterized by a continuously decreasing rate of axial deceleration.

10. The projectile of claim 1 further comprising a trajectory characterized by a gyroscopic stability during flight in the range of greater than or equal to 1.0 to less than or equal 3.0.

11. The projectile of claim 1 further comprising a trajectory characterized by a gyroscopic stability during flight in the range of greater than or equal to 1.0 to three times the gyroscopic stability at the muzzle.

10

12. The projectile of claim 1 further comprising a trajectory characterized by a spin damping moment spin damping moment coefficient during flight in the range of −0.035 to −0.045.

13. The projectile of claim 1 further comprising a trajectory characterized by a ratio of a spin rate of the projectile to a forward velocity of the projectile during flight in the range of 1.25:1 to 1.40:1.

14. A method for launching a projectile along a trajectory characterized by a controlled spin rate and a substantially balanced forward and axial deceleration including the steps of:

forming the projectile having a body including a bearing surface and an ogive continuous to and extending forward from the bearing surface and an aerodynamic drag factor upon launching and during flight in the range of 0.100 to 0.250;

forming the projectile having ratio of a spin rate of the projectile to a forward velocity of the projectile upon launching and during flight in the range of 1.25:1 to 1.40:1; and

imparting a physical feature to a bearing surface of the projectile, the physical feature having a depth substantially equal to 1% the caliber of the projectile and a ratio of a total surface area of projectile to the total surface of the physical feature in the range of to 3.00:1 to 4.00:1 for imparting an axial surface friction upon launching and during flight required to produce a trajectory characterized by a continuously decreasing rate of axial deceleration.

15. A projectile comprising:

a body including a bearing surface and an ogive continuous to and extending forward from the bearing surface;

the projectile including a pre-selected physical feature having a depth substantially equal to 1% the caliber of the projectile;

the projectile including a relatively low drag coefficient in the range of 0.100 to 0.250; and

the projectile including a ratio of a total surface area of projectile to a total surface of the physical feature in the range of to 3.00:1 to 4.00:1.

16. The projectile of claim 15 further comprising a trajectory characterized by a forward rate of deceleration and an axial rate of deceleration that are substantially balanced.

17. The projectile of claim 15 wherein the spin stabilized trajectory further comprises a controlled spin rate.

18. The projectile of claim 15 wherein the spin stabilized trajectory further comprises a gyroscopic stability during flight in the range of greater than or equal to 1.0 to three times the gyroscopic stability at the muzzle.

19. The projectile of claim 15 wherein the spin stabilized trajectory further comprises a ratio of a high spin damping moment coefficient to a low spin damping moment coefficient during flight in the range of 1.25:1 to 1.45:1.

* * * * *

# EXHIBIT 20

Florida Department of State

DIVISION OF CORPORATIONS



Department of State  /  Division of Corporations  /  Search Records  /  Detail By Document Number  /

## Detail by Entity Name

Florida Limited Liability Company
NEXTGEN TACTICAL, LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L17000084931 |
| **FEI/EIN Number** | NONE |
| **Date Filed** | 04/17/2017 |
| **Effective Date** | 04/17/2017 |
| **State** | FL |
| **Status** | ACTIVE |

**Principal Address**

801 S ATLANTIC AVE
COCOA BEACH, FL 32931 UN

**Mailing Address**

801 S ATLANTIC AVE
COCOA BEACH, FL 32931 UN

**Registered Agent Name & Address**

OMANOFF, DENNIS
801 S ATLANTIC AVE
COCOA BEACH, FL 32931

**Authorized Person(s) Detail**

**Name & Address**

Title MGR

OMANOFF, DENNIS
801 S ATLANTIC AVE
COCOA BEACH, FL 32931 UN

**Annual Reports**

**No Annual Reports Filed**

**Document Images**

04/17/2017 -- Florida Limited Liability | View image in PDF format |

# EXHIBIT 21





# EXHIBIT 22

**De :** Dennis Omanoff [mailto:dennis@nextgentactical.net]
**Envoyé :** vendredi 3 mars 2017 ██████████
**À :** ██████████████████████████████████████
**Cc :** Dennis Omanoff <dennis@nextgentactical.net>
**Objet :** NextGen Catalogue



NextGenFlyv4.pdf



Piece jointe sans titre
00436.htm

Great seeing you today █████████

Latest Catalogue - Shhhh stil a secret

Dennis Omanoff
NextGen Tactical
Dennis@nextgentactical.net
Mobile (408) 206-2665
Fax: (408) 516-9690

# EXHIBIT 23

# NextGen Tactical (http://www.nextgentactical.net/)

## PRODUCTS

and services



### NEXTGEN .375     

NextGen offers a variety of smaller calibers, with great accuracy yet more mobile and way superior to similar calibers.

(http://www.nextgentactical.net/wp-content/uploads/2017/04/Image-134.png)





NextGen Tactical

NextGen Tactical

NEXTGEN .375







# EXHIBIT 24

# M300 Intervention®

## A Modern Rendition of a Legend.

Opening a new chapter to long range accuracy, we present the M300 Intervention®, a truly capable modern rendition of the legendary M200 Intervention®. CheyTac® USA achieved this goal by utilizing lightweight materials such as aluminum and carbon fiber to bring you a lightweight portable rifle that doesn't compromise strength, accuracy, or agility.

The M300 Intervention® is equipped with all the standard features of the M200 Intervention®, and much more, such as as full-length Picatinny rails at 3, 6, 9 and 12 o'clock positions for mounting accuracy enhancements, fully adjustable folding buttstock, adjustable pistol grip to meet individual shooter needs, and flush cups for conveniently mounting and removing your favorite sling.

Available in .408 CheyTac or .375 CheyTac, the M300 Intervention is a truly versatile rifle is a sure fit to all your long range shooting applications.

## SPECIFICATIONS

- **Effective Range:** 2500 Yd Plus
- **Caliber:** .408 CheyTac®, .375 CheyTac®
- **Barrel Length:**
  29-inch fluted barrel standard
  (custom length available)
  .408 cal twist 1:13.25
  .375 Cal Twist 1:11.25
- **Magazine:** Seven (7) round detachable box mag
- **Weight:** 21 Pounds
- **Stock:** Fully adjustable folding stock
- **Custom case included with one (1) magazine**
- **Adjustable match trigger**
- **Detachable muzzle brake**







# EXHIBIT 25



# EXHIBIT 26

CheyTac USA, LLC



CHEYTAC USA, LLC

NOW AVAILABLE

ONLY $289.00

**BIPOD**



SHOP NOW





# EXHIBIT 27

<u>Exhibit E</u>

Principles or Leadership Descriptions

## *Principles for Growing Value*

This week, as I make decisions, I will choose the options that align us more closely with these Principles, and aid the Company's **Prime Directive to:** **"Create more cash dividends this year than last, year after year, decade after decade."**

A.       To achieve the Prime Directive, you travel through each week hunting for and exploiting opportunities to 1) Increase Customer Value, 2) Increase Sales, 3) Increase Gross Margin, and 4) Reduce Expenses -- The Business Tetrad.

**Customer Value – Focus our business on superior customer value.**
   A.   Know our customers' goals and problems well enough to build a business model that provides products and services of high value to them.
   B.   Aggressively invest in those things that allow us to deliver higher value to our customers than our competitors do.
   C.   Ensure everyone continually obsesses over customer satisfaction. Exceed customer expectations.
   D.   Measure the quality of our product and service:
      1.   Customer complaints.
      2.   Quality failures.
      3.   Late deliveries.
      4.   Customer retention (and know why your customers leave you).
      5.   Presentation competence at customer touch points (wince factor).

**Sales – Develop a formula for perpetually increasing sales.  Aim for Double-Digit Growth.**
   A.   Typical "Organic Growth" formulas include one or more of the following:
      1.   Ramping up an outbound sales force.
      2.   Adding new products or services.
      3.   Entering new markets.
      4.   Outspending your competition on: advertising / marketing / PR.
   B.   Ride a burgeon.
      1.   Position the business to operate in "markets with great disparity." *— Drucker circa 1970*
      2.   Keep maneuvering the business into growing, non-cyclical markets.
      3.   "Surveying the whole field of business, I fixed on the most developing force and the largest field of the day, and determined to attach myself to it." *— Charles Francis Adams circa 1840*
   C.   Work our formula as aggressively as we are able without hurting our goals of:
      1.   privately held.
      2.   cash profitable.
      3.   internally financed, except for large capital expenditures.
      4.   competent supervisors at all levels and in all pockets of the business.

**Margin – Keep our mark-up among the highest in the industry.**
   A.   Some businesses produce a "Gross Margin" – sales minus cost-of-goods-sold.
      1.   With these businesses, issue a Gross Margin Report and continually push for increased margin.
   B.   Other businesses produce a "Contribution Margin" – profit after reaching Initial-Break-Even (IBE).
      1.   These businesses require minimal increased cost for each additional sale – like at a radio station.
   C.   There are three ways to produce high margin:
      1.   Have the courage to charge more.
         a.   Many examples in luxury and service industries.
      2.   Pursue sales opportunities that tolerate higher margin.
         a.   Certain industries, products or buyers will more readily absorb higher costs.
      3.   Lower the cost of producing what you sell, without reducing quality.

      a.   Henry Ford sold cars for less than his competitors yet maintained a higher Gross Margin by producing them more efficiently.

D.   Before creating a new Initial Break/Even by entering a new market or business, ensure that:

    1.   we have the entrepreneurial capacity to cover the new activity without harming our existing activities,

    2.   sales at existing operations are growing as fast as the market will allow; unless:

       a.   We've crossed the point of diminishing returns in our existing markets.

       b.   The margins in the new market are far superior to our current margins.

       c.   Customer demand in the new market is far superior to our current demand.

E.   Have the wisdom to "No Quote" or reject customers and projects that harm our margin, cash flow or other principles.

# ...For Growing Value...

**Drive down costs.**

A.   Force our operating-cost-per-dollar-of-sales lower than our competitors; and lower this year than last year.

    1.   Management must model behavior that teaches parsimony and frugality.

    2.   Outwork our competition -- do more work, and better work, with fewer employees.

       a.   High employee efficiency and effectiveness.

       b.   High employee work quality and accuracy.

       c.   Lowest possible employee head count.

    3.   Lock down cash outflow.

       a.   Approach each invoice payable with an "Auditor's Skepticism."

       b.   Follow written "Contracting Guidelines" and "Employee Authorizations" for spending money.

       c.   Teach and follow written "Purchasing Rules" like "Confirm price before authorizing work."

       d.   Ensure error-free payroll processing; resulting in no employees being overpaid or under withheld.

       e.   Adhere to Travel Expense Policies that spend company money conservatively, like: When reasonable, bunk two to a room and drive if it costs less than flying. With clients, angle for average-priced restaurants vs. "elite" dining.

    4.   Have it be true that, "Nobody pays less than us (for the quality we require)."

    5.   Plug all leaks in the revenue cycle that cause a variance between "True gross sales" and "Realized sales."

    6.   Don't get burned by early-stage, unstable technology. Only upgrade our technology when dysfunctional; or the R.O.I. is massive.

    7.   Minimize activities or expenses that customers or shareholders would not be willing to pay for.

       a.   Don't spend your time doing what others want, if there isn't a strong, near-term benefit to our goals. E.g. sitting on outside boards, to public speaking, to as little as filling out surveys.

       b.   No political activity. Take no side in public controversy. -- *Giovanni de' Medici d.1429*

       c.   Limit charitable donations of time or money.

       d.   Shun management comforts – and take pride in it.

B.   Meet deadlines, "On time, every time."

C.   Collect receivables faster.

    1.   Strive for prepayment.

D.   Minimize or eliminate the costs of growth.

**Our aim is to be one of the most profitable companies in our industry, for our size. This will require constant attention and adjustment. Our target is a 30% Return On Sales (pre-tax profit).**

**A 30% return is easiest to achieve when sales are rising; margins are high; operating costs are low; and customer retention is high. (Below a 10% ROS, it is difficult to produce any free-cash-flow.)**

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

*(Above this line are the four aspects of the business you strive to improve each week – The Business Tetrad. Below this line are the main principles that will help you achieve I, II, III & IV above.)*

**Scrutinize Results – Develop reports that give us insight into our success at achieving the above-mentioned goals; then scrutinize these <u>financial</u> statements; <u>productivity</u> reports; and <u>quality-assurance</u> reports monthly.**

    A.  Act on what they tell you to change – in order to achieve the Prime Directive.

    B.  Clamor for more 1) dividends; 2) productivity; 3) product quality and customer service.

    C.  Face our uncomfortable truths. Security comes from confronting the uncomfortable.

    D.  Develop a set of Key Performance Indicators (KPI's) that will give you a weekly feel for company performance and profitability.

**Establish a "world-class" organization.**

    A.  Employ only the best.

        1.  Attract, hire, and retain top quality employees who can build the business better than our current best.

        2.  Recruit new-hires by using a best-practice hiring system. Don't just "trust your gut."

        3.  "Install managers who are among the ablest, most earnest, and reliable in the field of business." — *J.D. Rockefeller circa 1880*

        4.  Promote those who demonstrate the *Observable Traits of Management Excellence*, and *LEADERSHIP*.

        5.  "The unable or unwilling must be removed from the enterprise." – *Henri Fayol circa 1900*

    B.  Affiliate with the best suppliers and outside service providers.

        1.  Examples: accountant, legal counsel, product vendors, subcontractors.

        2.  "Engage those with the best reputation; the most prominent; at the top of their field." – *Armand Hammer circa 1950*

        3.  Reject vendors that are less than "Grade A"— as fast as possible.

# ...Of An Investment-Grade...

    C.  Provide tools, equipment, and technology that are good quality, and the most efficient.

    D.  Establish Policies and Procedures (P&P) that are considered "Best Practice."

    E.  Occupy facilities that inspire confidence in our customers, and enable us to recruit world-class employees.

        1.  i.e. buildings and furnishings, in neighborhoods that our target job applicants will be proud to show their parents or spouse.

**Bench Strength – Build a reserve of capable employees who can move up to fill positions created by growth.**

    A.  Have at all times at least one subordinate with the ambition, people skills, technical competence and values who could take over my position today.

    B.  Cause managers to hire "bench strength" even for their star performers and for themselves.

        1.  Only offer jobs to applicants you believe can grow beyond their starting position with us. To do otherwise runs the risk of not having enough capable employees to fuel our growth.

        2.  Offer jobs to applicants capable of solving all the problems they'll encounter. We're flunking if it requires the department head to solve the department's problems.

    C.  Make room for capable employees who could grow into a larger role at our company, so we don't lose them.

**Delegate: effectively; and as necessary.**

    A.  Delegate so you can do timely and well all the things that only you can do.

    B.  A top manager delegating too slowly harms company growth and profit.

        1.  If for several months you've been unable to get to important responsibilities,

        2.  and you've determined it is not because of a temporary spike in work,

        3.  and company goals are being harmed because you can't get to everything:

        4.  Perform a Work Study by recording your activities during the next several weeks, in half-hour increments.

        5.  Individual tasks will present that can be eliminated or parceled out to others.

        6.  Sometimes groups of tasks can be batched and assigned to a new position you create.

    C.  Steps to delegate effectively.

        1.  Do the job well yourself.

      2.   Let the other person watch you do it well.
      3.   Watch them do it until they do it well.
   D.   "The growth of small companies is capped if they don't install Systems & Controls. These allow you to delegate yet keep work-quality high." — *Jon Slabaugh 1998*

## Management must set a good example.
   A.   Strive for honesty and high integrity, especially from myself.
      1.   This relates to my treatment of employees, customers, suppliers and laws.
      2.   Comply with all software licenses, plus health and safety regulations eagerly.
      3.   Decide in favor of paying less tax this year; but pay happily the tax we do owe.
      4.   Don't take product, office supplies, or equipment home; or use company-paid services for personal benefit.
      5.   Promote making high-character choices, as they arise, throughout the company.
      6.   Lying or deceiving should result in termination.

## Company Culture – Establish the correct "Working Climate." – *Henri Fayol circa 1900*
   A.   The first requirement of organizational health is a high demand on performance – managers must set high standards for themselves and their teams. – *Drucker circa 1970*
   B.   "Build a force of enthusiastic, loyal, harmonious co-workers." – *Harvey Firestone circa 1920*
   C.   Incentivize to make employees feel the way the company feels.
   D.   Transmit to employees an active, unrelenting drive to affect process improvements promptly, at all levels and in all parts of the business – what the Japanese call KAIZEN.
   E.   Create a culture that celebrates cost saving in every corner of the business.
      1.   A good way to achieve this is with a monthly "cost-side-down" meeting and database.
   F.   Involve all employees in keeping our facility organized, orderly and clean – what efficiency experts call "5-S".

# ...Privately Held Business

   G.   Treat each other with respect.
      1.   Decide in favor of the employee or subordinate when the written policy is unclear.
      2.   Thank, praise, and compliment daily; to comply with the 4-to-1 rule (Four compliments per criticism).
      3.   Model friendly, fair, courteous, compassionate behavior.
      4.   We promise our incoming employees a work environment where they will not be subject to:
         a.   yelling; loss of emotional control
         b.   sarcasm
         c.   humor at the expense of others
         d.   profanity or vulgarity
         e.   group reprimands
         f.   moodiness or rudeness

## Failure Analysis – "Analyze and profit from our failures." – *Jim Rand circa 1920*
   A.   Whenever we find ourselves frustrated, in pain, failing at our goals, confronted with a problem, or having made a mistake, we stop the flow of our day.
      1.   We recognize this as an opportunity to improve the business, and ask:
         a.   What changes can we make to our process, or
         b.   What form, policy, checklist, system or control can we install, or
         c.   What training can we institute, so we don't repeat this problem in the future?
      2.   Before the next opportunity to encounter this problem again, we install the permanent solution.
      3.   The cost of the solution must be less than the cost of the problem.
      4.   For a company to suffer from the same mistakes, year after year, is the opposite of "Best Practice."

## Innovation and Entrepreneurship – Innovate to expand our Competitive Advantages.
   A.   Innovate new and better ways to:
      1.   Provide value to our customers

    2.   Increase sales

    3.   Raise margin

    4.   Lower expenses

B.  You'll know you are succeeding at this if you can truthfully quote Rockefeller when he said, "We have ways of making money our competition knows nothing about."

C.  Competitive advantages can last years, but seldom decades. The company that fails to innovate is on the path to obsolescence.

D.  Innovations can be as little or as big as:

    1.   Streamlining a process

    2.   Developing a new form to solve a recurring problem

    3.   Changing how we deliver value to our customers.

E.  "When the rate of change inside an institution becomes slower than the rate of change outside, the end is in sight. *-- Jack Welch*

F.  Keep a running list of our Innovations and Competitive Advantages and how we compare to these Principles For Growing Value.

    1.   Have the management team review this annually for additions and subtractions.

**Avoid debt.**

A.  "Debt, grinding debt, which consumes so much time, which cripples and disheartens. – If you are wise, you will avoid a prosperity which loads you with more debt." *– Emerson circa 1850*

**Save – stockpile cash – stuff the war chest.**

A.  Feel angry, determined, redoubled resolve any month we don't create free-cash-flow.

    1.   It's the free-cash-flow that allows you to accelerate debt payments, add to safety capital, fund growth, pay dividends, and finance next year's employee pay raises.

B.  There will always be a next recession; at these times Cash is King.

C.  Grow our "Safety Capital" accounts until we reach our targets of:

    1.   Internally financed Credit Line = 1 payroll minimum.

    2.   Recessionary Savings = 2 month's operating expense.

    3.   Safety Reserve at the Holding Company = 1 month's operating expense.

    4.   Sinking Funds and Revolving Funds = as needed.

# EXHIBIT 28

06-25-2001                                    Docket No.: **LOST105**

FORM PTO-1595 (Modified)
(Rev. 6-93)
OMB No. 0651-0011 (exp.4/94)
Copyright 1994-97 LegalStar
P08/REV02

**101759343**

R SHEET
**LY**

U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

Tab settings ➤ ➤ ➤ ▼          ▼          ▼          ▼          ▼          ▼

To the Honorable Commissioner of Patents and Trademarks: Please record the attached original documents or copy thereof.

| 1. Name of conveying party(ies): | 2. Name and address of receiving party(ies): |
|---|---|
| Warren S. Jensen    *06/14/01* | Name: **Lost River Ballistic Technologies** |
| | Internal Address: **P. O. Box 801, Arco, ID  83213** |
| Additional names(s) of conveying party(ies)  ☐ Yes ☒ No | |

3. Nature of conveyance:

☒ Assignment          ☐ Merger

☐ Security Agreement  ☐ Change of Name

Street Address: **P. O. Box 801**

☐ Other _____

Execution Date: _____

City: **Arco**    State: **ID**   ZIP: **83213**

Additional name(s) & address(es) attached?  ☐ Yes ☒ No

4. Application number(s) or registration numbers(s):

If this document is being filed together with a new application, the execution date of the application is: _____

A. Patent Application No.(s)                          B. Patent No.(s)

06/20/2001 DTESSEM1 00000007 09881790

02 FC:581                        40.00 OP

*09/881790*

Additional numbers attached?  ☐ Yes ☒ No

| 5. Name and address of party to whom correspondence concerning document should be mailed: | 6. Total number of applications and patents involved: | 1 |
|---|---|---|
| Name: **Joseph W. Holland** | 7. Total fee (37 CFR 3.41):.................$  **40.00** | |
| Internal Address: **P. O. Box 1840, Boise, ID  83701** | ☒ Enclosed - Any excess or insufficiency should be credited or debited to deposit account | |
| | ☐ Authorized to be charged to deposit account | |
| Street Address: **P. O. Box 1840** | 8. Deposit account number: | |
| City: **Boise**    State: **ID**   ZIP: **83701** | | |

DO NOT USE THIS SPACE

9. Statement and signature.

*To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.*

**Joseph W. Holland**                    _____           _6/14/01_
Name of Person Signing                   Signature                Date

Total number of pages including cover sheet, attachments, and document: | 3 |

**PATENT**

**REEL: 011910 FRAME: 0805**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:
Warren S. Jensen

Serial No.:  N/A

Filed:  Filed concurrently herewith

For: CONTROLLED SPIN PROJECTILE

Attorney Docket No.:  LOST105

Group Art Unit:  N/A

Examiner:  N/A

### ASSIGNMENT:

_X_  Enclosed for recording
___ Previously recorded
Date:_____
Reel:_____

## A S S I G N M E N T

FOR GOOD AND VALUABLE CONSIDERATION, the receipt, sufficiency and adequacy of which are hereby acknowledged, the undersigned, do hereby:

SELL, ASSIGN AND TRANSFER to LOST RIVER BALLISTIC TECHNOLOGIES (the "Assignee"), an Idaho corporation, having a place of business at P. O. Box 801, Boise, ID 83213, the entire right, title and interest for the United States and all foreign countries, in and to any and all inventions and improvements which are disclosed in the application for United States Letters Patent, which has been executed by the undersigned concurrently herewith and is entitled: **CONTROLLED SPIN PROJECTILE**; such application and all divisional, continuing, substitute, renewal, reissue and all other applications for patent which have been or shall be filed in the United States and all foreign countries on any of such improvements; all original and reissued patents which have been or shall be issued in the United States and all foreign countries on such improvements; and specifically including the right to file foreign applications under the provisions of any convention or treaty and claim priority based on such application in the United States;

AUTHORIZE AND REQUEST the issuing authority to issue any and all United States and foreign patents granted on such improvements to the Assignee;

WARRANT AND COVENANT that no assignment, grant, mortgage, license or other agreement affecting the rights and property herein conveyed has been or will be made to others by the undersigned, and that the full right to convey the same as herein expressed is possessed by the undersigned;

ASSIGNMENT - 1

COVENANT that, when requested and at the expense of the Assignee, to carry out in good faith the intent and purpose of this assignment, the undersigned will execute all divisional, continuing, substitute, renewal, reissue, and all other patent applications on any and all such improvements; execute all rightful oaths, declarations, assignments, powers of attorney and other papers; communicate to the Assignee all facts known to the undersigned relating to such improvements and the history thereof; and generally do everything possible which the Assignee shall consider desirable for securing, maintaining and enforcing proper patent protection for such improvements and for vesting title to such improvements in the Assignee;

TO BE BINDING on the heirs, assigns, representatives and successors of the undersigned and extend to the successors, assigns and nominees of the Assignee.

(Signature) _Warren S. Jensen_  Date: _6/12/01_
Warren S. Jensen

STATE OF IDAHO )
) ss.
County of _Butte_ )

BEFORE ME, this ___12___ day of ___June___, 2001 personally appeared the above-named individual, to me known to be the person who is described in and who executed the foregoing assignment instrument and acknowledged to me that he executed the same of his own free will for the purpose therein expressed.

_Crystal Carpenter_
Notary or Consular Officer
My Commission Expires: _2/22/07_

CRYSTAL CARPENTER
NOTARY
PUBLIC
STATE OF IDAHO

ASSIGNMENT - 2

Form PTO-1595 (Rev. 03-11)
OMB No. 0651-0027 (exp. 04/30/2015)

U.S. DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

## RECORDATION FORM COVER SHEET
# PATENTS ONLY

To the Director of the U.S. Patent and Trademark Office: Please record the attached documents or the new address(es) below.

**1. Name of conveying party(ies)**
LYNETTE LAMB/LYNETTE MOSDELL
LOST RIVER BALLISTIC TECHNOLOGIES
LOST RIVER BALLISTIC TECHNOLOGIES INC
LOST RIVER BALLISTICS, INC

Additional name(s) of conveying party(ies) attached? ☐ Yes ☒ No

**2. Name and address of receiving party(ies)**
Name: GREENWICH BALLISTICS, LLC
Internal Address:

Street Address: 2 COW DRAY PARK DR

City: GREENWICH
State: CT
Country: USA          Zip: 06831

Additional name(s) & address(es) attached? ☐ Yes ☒ No

**3. Nature of conveyance/Execution Date(s)**
Execution Date(s) APRIL 28, 2011
☒ Assignment          ☐ Merger
☐ Security Agreement   ☐ Change of Name
☐ Joint Research Agreement
☐ Government Interest Assignment
☐ Executive Order 9424, Confirmatory License
☐ Other

**4. Application or patent number(s):**  ☐ This document is being filed together with a new application.

A. Patent Application No.(s)

B. Patent No.(s)
6,629,669

Additional numbers attached? ☐ Yes ☒ No

**5. Name and address to whom correspondence concerning document should be mailed:**
Name: JERRY ROMANOFF, ESQ

Internal Address:

Street Address: 4 OCEANVIEW CT

City: LONG BEACH
State: NEW YORK     Zip: 11561
Phone Number: 923-715-8615
Docket Number:
Email Address: JerryRomanoff@aol.com

**6. Total number of applications and patents involved:** ONE

**7. Total fee (37 CFR 1.21(h) & 3.41)** $40

☐ Authorized to be charged to deposit account
☒ Enclosed  Credit Card PTO 2038
☐ None required (government interest not affecting title)

**8. Payment Information**
CREDIT CARD ATTACHED

Deposit Account Number
Authorized User Name

**9. Signature:**   Jerry Romanoff
Signature

Jerry ROMANOFF ATTORNEY OF RECORD, New York Bar Member
Name of Person Signing

JUNE 7, 2012
Date

Total number of pages including cover sheet, attachments, and documents: 6

Documents to be recorded (including cover sheet) should be faxed to (571) 273-0140, or mailed to:
Mail Stop Assignment Recordation Services, Director of the USPTO, P.O.Box 1450, Alexandria, V.A. 22313-1450

OP $40.00 662966



## ASSIGNMENT OF INTELLECTUAL PROPERTY

THIS ASSIGNMENT OF INTELLECTUAL PROPERTY ("Agreement") is made and entered into this 28 day of April _____, 2011, (the "Effective Date"), by and between Lynette Lamb/Lynette Mosdell (who is one and the same person having used different names), Lost River Ballistic Technologies, Lost River Ballistic Technologies, Inc., Lost River Ballistics, Inc. and all other successors and/or affiliated entities for which Lynette Mosdell/Lynette Lamb has the authority to act (collectively, "Assignor") and Greenwich Ballistics, LLC ("Assignee").

### RECITALS

A.    Assignor is the successor in interest to Warren S. Jensen with respect to U.S. Patent No. 6,629,669 (the "Patent").

B.    Pursuant to a certain License Agreement, a copy of which is attached hereto as Exhibit A, by and between Assignor as Licensor and Assignee as Licensee (the "License Agreement"), Assignor licensed to Assignee certain intellectual property, including, without limitation, the Patent, and related rights as set forth therein.

C.    Assignor and Assignee wish to confirm the historic effectiveness of and terminate the License Agreement.

D.    Assignor wishes to transfer outright Assignor's ownership of the intellectual property and related rights described herein to Assignee and Assignee wishes to accept such transfer.

### AGREEMENT

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned parties hereby agree as follows:

1.    **Recitals.**  The parties agree that the above recitals are true and correct and are incorporated as part of the agreements among the parties by this reference.

2.    **Confirmation of License.**  Assignor hereby confirms that the License Agreement has been in full force and effect since the beginning of September 2005 until terminated by this Agreement as set forth below and that Assignee has fully performed all obligations under the License Agreement.

3.    **Termination of License Agreement.**  Assignor and Assignee hereby agree that the License Agreement and all rights and obligations of both parties under the License Agreement are terminated as of the Effective Date.  Assignor waives all claims it has or may have against Assignee, CheyTac, LLC, Jamison International V, LLC or Corey Kupersmith with

AGREEMENT FOR ASSIGNMENT AND OWNERSHIP OF INTELLECTUAL PROPERTY – 1
[A\1752.001\Mosdell IPMP Assignment (4.29 2011).doc

**PATENT
REEL: 028364 FRAME: 0291**

respect to the License Agreement and any other business relationship Assignor may have had with the aforementioned.

**4.    Assignment.** Assignor hereby assigns, delivers, transfers and sets over unto the Assignee all of Assignor's right, title, and interest, now or hereafter acquired in all patents, trademarks, copyrights, trade secrets, original ideas, miscellaneous intellectual property, technique and know-how, business plans, manufacturing methods, plans and specifications and other intangible rights derived from or related to in any manner to: (i) the Patent; (ii) the name or mark "Lost River Ballistic Technologies", "Lost River Ballistics" and all other similar names and marks; and (iii) all bullets and ammunition regardless of the style, caliber or anticipated use (collectively, the "Intellectual Property"). This assignment includes, without limitation, all of the following personal property:

*4.1 Technology and Copyrights.* Any and all copyrights of the related to the Intellectual Property, any registration and application relating thereto and any renewal and extension thereof, all precursors, works of authorship, drawings, plans, mask works, technology, information, technique and know-how, computer software, and tools relating to the development, support, or maintenance of the Intellectual Property;

*4.2 Intellectual Property Rights.* (a) Any and all (i) patents, patent applications continuations, continuations-in-part, divisionals, reexaminations, reissues, extensions, and foreign counterparts related to the Intellectual Property, as well as all patents or patent applications claiming priority from any of the foregoing, and the right to claim priority to any of the foregoing, (ii) patentable subject matter contained in the Intellectual Property, and (iii) other patent or similar rights related to the Intellectual Property; (b) any and all trade secrets, technique and know-how related to the Intellectual Property and all rights thereunder, including the right to sue for past or future misappropriation thereof; (c) any and all (i) registered and unregistered trademarks, service marks, trade dress, brands, logos, symbols, emblems and slogans related to or arising from the Intellectual Property or used in connection with the Services (collectively, the "Trademarks"), together with the goodwill symbolized by the Trademarks, (ii) other rights, privileges and priorities of the Assignor provided under United States, state or foreign law with respect to the Trademarks including, without limitation, common law rights, trade dress rights and rights under the laws of unfair competition and dilution (collectively, the "Related Rights"), (iii) rights to sue at law or in equity for any infringement, imitation, impairment, distortion, dilution or other unauthorized use or conduct in derogation of the Trademarks and Related Rights occurring prior to or after the Effective Date, including the right to receive all proceeds and damages therefrom, and (iv) rights in, and to, obtain registrations, renewals or registration or other legal protections pertaining to the Trademarks and Related Rights; and (d) any and all other intellectual or industrial property rights in the Intellectual Property;

*4.3 Contract Rights.* All contract rights, causes of action, and goodwill in, incorporated or embodied in, used to develop, or related to the Intellectual Property; and

*4.4 Moral Rights.* All rights of integrity, disclosure, and withdrawal and any other rights known as "moral rights," "artist's rights," or "droit moral" that are retained by the

AGREEMENT FOR ASSIGNMENT AND OWNERSHIP OF INTELLECTUAL PROPERTY ~ 2
I:\1752.001\Masdell IP\IP Assignment (4.29.2011).doc



developer of intellectual property under applicable law notwithstanding an assignment of the developer's rights to the Intellectual Property; and

*4.5 Royalties and Other Rights.*  Any and all income, royalties, damages, claims and payments now or hereafter due or payable with respect to the Intellectual Property, and in and to all causes of action, either in law or in equity for past, present, or future infringement of or any other claims related to any of the Intellectual Property.

5.    **Assignment Price.**  Assignee agrees to pay Assignee in consideration of the terms hereof, Twenty Five Thousand Dollars ($25,000.00) (the "Purchase Price").  Assignor acknowledges that Assignor has already received Ten Thousand Dollars ($10,000.00) from Assignee as payment towards the Purchase Price.  Assignee shall pay the remaining Fifteen Thousand Dollars ($15,000.00) promptly upon receipt of Assignor's original signature on this Agreement.

6.    **Assumption.**  Assignee hereby accepts the assignment of the Intellectual Property being made hereunder.

7.    **Further Actions and Covenants.**  Assignor hereby agrees that if, in the future, Assignor obtains any additional rights and/or ownership interests related in any way to the Intellectual Property, such rights are part of the Intellectual Property and are assigned pursuant to the terms of this Agreement.  Assignor further agrees to take such further actions, including, without limitation, the execution of documents, reasonably requested by Assignee to transfer and/or prove the transfer of the Intellectual Property pursuant to the terms hereof.

8.    **Non-Disclosure/Non-Competition.**    Assignor shall never disclose any proprietary information related to the Intellectual Property or license, sell, lease, transfer or otherwise allow any third party to copy, use or possess any such proprietary information.  Assignor hereby covenants and agrees that for a period of five (5) years following the date hereof, Assignor shall not, on her own behalf or on behalf of any other person or any governmental or business entity of any kind (a) solicit, divert, take away or attempt to take away any of Assignee's clients or customers; or (b) solicit, entice, hire, employ or endeavor to employ any of Assignee's other employees; or (c) work for, consult with or provide any services to an individual or entity that is involved in the ammunition or firearms business in any manner.  Further, Assignor shall not have an ownership interest in any entity involved in such a business.

9.    **Representations.**

9.1.    Licensor hereby represents and warrants that it is the owner of the Intellectual Property and the Patent and that Lynette Lamb/Lynette Mosdell has the authority to bind Assignor to the terms of this Agreement.

9.2.    Licensor represents and warrants that the Intellectual Property is not the subject of a license agreement, other than the License Agreement, or otherwise encumbered by any interest belonging to any individual or entity.

AGREEMENT FOR ASSIGNMENT AND OWNERSHIP OF INTELLECTUAL PROPERTY – 3
151752.001\Mosdell IP\IP Assignment (4.26.2011).doc

**PATENT**
**REEL: 028364 FRAME: 0293**

05/04/2011  16:02    435--6??-7188          FEDEX OFFICE    5593              PAGE  05

10.   **Entire Agreement.**   This Agreement shall constitute the entire agreement between the parties hereto and shall supersede and replace all prior negotiations, agreements or understandings, written or oral, with respect to the subject matter hereof.

11.   **Joint and Several.**  If any party to this Agreement is comprised of more than one individual or entity, all obligations of such party are joint and several and all representations of such party are made jointly and severally.

12.   **Successors.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns.

13.   **Attorney Fees and Representation.**  This Agreement was drafted by counsel to Assignee.  Assignor has had the opportunity to review and comment on this Agreement and to retain legal counsel.  If any court action at law of equity that is brought by a party to this Agreement to enforce or interpret the provisions of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, including those on any appeal, in addition to any other relief to which that party may be entitled.

EXECUTED the day and year first above written.

Assignor:
Lynette Lamb/Lynette Mosdell,
individually
Lost River Ballistic Technologies
Lost River Ballistic Technologies, Inc.
Lost River Ballistics, Inc.
all other affiliated entities for which
Lynette Mosdell has the authority to act

By:  Lynette Lamb/Lynette Mosdell
Its:  Authorized Agent

Assignee:
Greenwich Ballistics, LLC

By:  Corey Kupersmith
Its:  Authorized Agent

AGREEMENT FOR ASSIGNMENT AND OWNERSHIP OF INTELLECTUAL PROPERTY – 4
F:\1752.001\Mosdell IP\IP Assignment (4.29.2011).doc

**PATENT**
**REEL: 028364 FRAME: 0294**

Form PTO-1595 (Rev. 03-11)
OMB No. 0651-0027 (exp. 04/30/2015)

06/19/2012

U.S. DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

||||||||||||||||||| 103645936

To the Director of the U.S. Patent and Trademark Office: Please record the attached documents or the new address(es) below.

**1. Name of conveying party(ies)**

GREENWICH Ballistics, LLC

Additional name(s) of conveying party(ies) attached? ☐ Yes ☒ No

**2. Name and address of receiving party(ies)**

Name: DBM TECHNOLOGIES, LLC

Internal Address: _____

Street Address: 1421 FOREST WAY

City: NASHVILLE

State: GA

Country: USA    Zip: 31639

Additional name(s) & address(es) attached? ☐ Yes ☒ No

**3. Nature of conveyance/Execution Date(s)**

Execution Date(s) APRIL 3, 2012

☒ Assignment          ☐ Merger
☐ Security Agreement  ☐ Change of Name
☐ Joint Research Agreement
☐ Government Interest Assignment
☐ Executive Order 9424, Confirmatory License
☐ Other _____

**4. Application or patent number(s):** ☐ This document is being filed together with a new application.

A. Patent Application No.(s)          B. Patent No.(s)

6,629,669

Additional numbers attached? ☐ Yes ☒ No

*Assignment Recordation Branch Public Records Division*
*Received*
*JUN 19 2012*
*5th Floor*

**5. Name and address to whom correspondence concerning document should be mailed:**

Name: JERRY ROMANOFF, ESQ.

Internal Address: _____

Street Address: 4 OCEANVIEW COURT

City: LONG BEACH

State: NY    Zip: 11561

Phone Number: 973-715-8615

Docket Number: _____

Email Address: JerryRomanoff@AOL.com

**6. Total number of applications and patents involved:** ONE

**7. Total fee (37 CFR 1.21(h) & 3.41)** $40.00

☐ Authorized to be charged to deposit account
☒ Enclosed  CREDIT CARD PAYMENT
☐ None required (government interest not affecting title)

**8. Payment Information**

Deposit Account Number _____
Authorized User Name _____

06/19/2012 60000020 6629669
01 FC:8021          40.00 OP

**9. Signature:**

*Jerry Romanoff*                    6/15/201—
_____          _____
Signature                          Date

Jerry Romanoff, Attorney of Record
Name of Person Signing NY STATE BAR MEMBER

Total number of pages including cover sheet, attachments, and documents: 6

Documents to be recorded (including cover sheet) should be faxed to (571) 273-0140, or mailed to:
Mail Stop Assignment Recordation Services, Director of the USPTO, P.O.Box 1450, Alexandria, V.A. 22313-1450

PATENT
REEL: 028417 FRAME: 0487

04/04/2012 11:21 FAX  12032291690

04.04.2012  10:58 AM  CheyTac, USA                2296861941              PAGE.  2

## ASSIGNMENT OF INTELLECTUAL PROPERTY

This Assignment of Intellectual Property ("Agreement") is made and entered into this 3rd day of April, 2012 (the "Effective date"), by and between Greenwich Ballistics, LLC, a Delaware limited liability company with an address of 2 Cowdray Park Drive, Greenwich, CT 06831 ("Assignor"), and DBM Technologies, LLC, a Georgia limited liability company with an address of 1421 Forest Way, Nashville, Ga. 31639 ("Assignee").  (The Assignor and the Assignee shall be referred to collectively as the "Parties.")

### RECITALS

A.      Assignor is the successor in interest to Los River Ballistic Technologies, Inc., which is itself the successor in interest inventor Warren S. Jensen, with respect to U.S. Patent No. 6,629,669 (the "Patent").

B.      Assignor wishes to transfer outright Assignor's ownership of the Patent and related rights described herein to Assignee, and Assignee wishes to accept such transfer.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.      Recitals.  The Parties agree that the above recitals are true and correct, and are incorporated as part of the agreements among the parties by this reference.

2.      Assignment Payment.  In consideration of the terms herein, Assignee shall pay Assignor $50,000 (the "Purchase Price").  Assignor acknowledges that it has already received from Assignee the full Purchase Price, and that no further payment is due from Assignee in consideration of the terms herein.

3.      Assignment.  Assignor hereby assigns, delivers, transfers and sets over until the Assignee all of Assignor's right, title, and interest now or hereafter acquired in all patents, trademarks, copyrights, trade secrets, original ideas, miscellaneous intellectual property, technique and know-how, business plans, manufacturing methods, plans and specifications and other intangible rights derived from or related in any manner to the Patent, and all bullets and ammunition, regardless of the style, caliber or anticipated use (collectively, the "Intellectual Property").  This assignment includes, without limitation, all of the following personal property.

04.04.2012  10:59 AM  CheyTac, USA          2296861941          PAGE.  3
☑ 003/005

3.1  *Technology and Copyrights.*  Any and all copyrights of, or the related to, the Intellectual Property, any registration and application relating thereto and any renewal and extension thereof, all precursors, works of authorship, drawings, plans, mask works, technology, information, technique and know-how, computer software, and tools relating to the development, support, or maintenance of the Intellectual Property;

3.2  *Intellectual Property Rights.*  (a) Any and all (i) patents, patent applications, continuations, continuations-in-part, divisionals, reexaminations, reissues, extensions and foreign counterparts related to the Intellectual Property, as well as all patents or patent applications claiming priority from any of the foregoing, and the right to claim priority to any of the foregoing, (ii) patentable subject matter contained in the Intellectual Property, and (iii) other patent or similar rights related to the Intellectual Property; (b) any and all trade secrets, technique and know-how related to the Intellectual Property and all rights thereunder, including the right to sue for past and future misappropriation thereof; (c) any and all (i) registered and unregistered trademarks, service marks, trade dress, brands, logos, symbols, emblems and slogans related to or arising from the Intellectual Property or used in connection with the Services (collectively, the "Trademarks"), together with the goodwill symbolized by the Trademarks, (ii) other rights, privileges and priorities of the Assignor provided under the United States, state or foreign law with respect to the Trademarks including, without limitations, common law rights, trade dress rights and rights under the laws of unfair competition and dilution (collectively, the "Related Rights"), (iii) rights to sue at law or in equity for any infringement, imitation, impairment, distortion, dilution or other unauthorized use or conduct in derogation of the Trademarks and Related Rights occurring prior to or after the Effective Date, including the right to receive all proceeds and damages therefrom, and (iv) rights in, and to obtain, registrations, renewals or registration or other legal protections pertaining to the Trademarks and Related Rights; and (d) any and all other intellectual or industrial property rights in the Intellectual Property;

3.3  *Contract Rights.*  All contract rights, causes of action and goodwill in, incorporated or embodied in, used to develop, or related to the Intellectual Property; and

3.4  *Moral Rights.*  All rights of integrity, disclosure, and withdrawal and any other rights known as "moral rights," "artist's rights," or "droit moral" that are retained by the developer of intellectual property under applicable law notwithstanding an assignment of the developer's rights to the Intellectual Property; and

2

3.5  *Royalties and Other Rights.* Any and all income, royalties, damages, claims and payments now or hereafter due or payable with respect to the Intellectual Property, and in and to all causes of action, either in law or in equity for the past, present, or future infringement of or other claims related to the Intellectual Property.

4.  <u>Assumption</u>.  Assignee hereby accepts the assignment of the Intellectual Property being made hereunder.

5.  <u>Further Actions and Covenants</u>.  Assignor hereby agrees that if, in the future, Assignor obtains any additional rights and/or ownership interests related in any way to the Intellectual Property, such rights are part of the Intellectual Property and are assigned pursuant to the terms of this Agreement.  Assignor further agrees to take such further actions, including, without limitation, the execution of documents, reasonably requested by Assignee to transfer and/or prove the transfer of the Intellectual Property pursuant to the terms thereof.

6.  <u>Non-Disclosure</u>.  Assignor shall never disclose any proprietary information related to the Intellectual Property or license, sell, lease, transfer or otherwise allow any third party to copy, use or possess any such proprietary information.

7.  <u>Representations</u>.  Assignor represents and warrants that it is the owner of the Intellectual Property and the Patent and that Corey A. Kupersmith has the authority to bind the Assignor to the terms of this Agreement.  Assignor represents and warrants that the Intellectual Property and the Patent is not subject of any license agreement to any third party.

8.  <u>Entire Agreement</u>.  This Agreement shall constitute the entire agreement between the Parties and shall supersede and replace all prior negotiations, agreements or understandings, written or oral, with respect to the subject matter hereof.

9.  <u>Joint and Several</u>.  If any party to this Agreement is comprised of more than one individual or entity, all obligations of such party are joint and several and all representations of such party are made jointly and severally.

10.  <u>Successors</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns.

11.  <u>Attorneys Fees</u>.  If any court action at law or equity is brought by the Assignee to this Agreement to enforce or interpret the provisions of this Agreement, the Assignee shall be entitled to reasonable attorneys' fees,

3

04.04.2012  11:00 AM  CheyTac, USA                2296861941                PAGE.  5

including those on any appeal, in addition to any other relief to which that
party may be entitled.

12.   Choice of Law and Jurisdiction.  This Agreement shall be governed by the
laws of the State of Georgia.  The parties agree that the state and federal
courts of the State of Georgia shall have exclusive jurisdiction over all
claims arising under, or related to, this Agreement.

In witness whereof,

Greenwich Ballistics, LLC                    DBM Technologies, LLC

By: _____              By: _____
    Corey A. Kupersmith                         David B. McCutcheon
Its: Managing Member, duly authorized      Its: President, duly authorized

Dated: ____4/2/12____                      Dated: ____4/2/12____

4

PATENT
REEL: 028417 FRAME: 0491

RECORDED: 06/19/2012

503601132    12/08/2015

# PATENT ASSIGNMENT COVER SHEET

Electronic Version v1.1                                                      EPAS ID: PAT3647762
Stylesheet Version v1.2

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT |

### CONVEYING PARTY DATA

| Name | Execution Date |
|---|---|
| DBM TECHNOLOGIES, LLC | 12/07/2015 |

### RECEIVING PARTY DATA

| | |
|---|---|
| Name: | CHEYTAC USA, LLC |
| Street Address: | 110 EAGLE AVENUE |
| City: | NASHVILLE |
| State/Country: | GEORGIA |
| Postal Code: | 31639 |

### PROPERTY NUMBERS Total: 1

| Property Type | Number |
|---|---|
| Patent Number: | 6629669 |

### CORRESPONDENCE DATA

**Fax Number:**   (404)393-7058
*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*
**Phone:**              404-435-3665
**Email:**              rachel.huffstetler@fisherbroyles.com
**Correspondent Name:**   RACHEL HUFFSTETLER
**Address Line 1:**     4279 ROSWELL ROAD
**Address Line 2:**     STE. 102, #260
**Address Line 4:**     ATLANTA, GEORGIA 30327

| ATTORNEY DOCKET NUMBER: | 04518.P001U1 |
|---|---|
| NAME OF SUBMITTER: | RACHEL H. HUFFSTETLER |
| SIGNATURE: | /Rachel H. Huffstetler/ |
| DATE SIGNED: | 12/08/2015 |

**Total Attachments: 3**
source=Assignment to Cheytac#page1.tif
source=Assignment to Cheytac#page2.tif
source=Assignment to Cheytac#page3.tif

## ASSIGNMENT

WHEREAS, DBM TECHNOLOGIES, LLC, a Georgia corporation located at 1421 Forest Way, Nashville, Georgia 31639, is owner of the entire right, title, and interest in the new and useful improvements in "CONTROLLED SPIN PROJECTILE" for which United States Patent No. 6,629,669B2 was issued on Oct. 7, 2003; and

WHEREAS, CHEYTAC USA, LLC, a Georgia corporation located at 110 Eagle Avenue, Nashville, GA 31639, desires to acquire the entire interest in the same;

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, DBM TECHNOLOGIES, LLC hereby does sell, assign, and transfer unto said CHEYTAC USA, LLC, the entire right, title, and interest in and to said invention and Patent throughout the world, including, without limitation, any Letters Patent which may issue thereon, and any subsequent application claiming priority to the above-identified application, reissue, reexamination, divisional, continuation-in-part, extension, or continuation thereof and all rights of priority under the Paris Convention arising from said application; the same for CHEYTAC USA, LLC'S legal representatives and assigns, as fully and entirely as the same would have been held by us had this assignment and sale not been made;

AND, we hereby bind ourselves, our heirs, legal representatives, administrators, and assigns properly to execute without further consideration any and all applications, petitions, oaths, and assignments or other papers and instruments which may be necessary in order to carry into full force and effect the sale, assignment, transfer, and conveyance hereby made or intended to be made and generally do everything possible to aid CHEYTAC USA, LLC, and its legal representatives and assigns, to obtain and enforce proper protection for said invention and Patent in all countries throughout the world.

PAGE 2 of 3

**IN WITNESS WHEREOF,** I have executed this Assignment on this, the _____ day of _____, 2015.

DBM TECHNOLOGIES, LLC

By: ~~David B. McC~~ (L.S.)

Name: David B. McCutcheon

Title: President

State of _Georgia_

County of _Berrien_

On this, the _7th_ day of _December_, 2009, before me, a Notary Public, personally appeared _David McCutcheon_, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person or entity upon whose behalf he acted, executed the instrument.

_Debbie S. Lindsey_ (Seal)
Notary Public

My Commission Expires: _12/18/15_

PAGE 3 of 3

IN WITNESS WHEREOF, I have executed this Assignment on this, the _____ day of _____, 2015.

CHEYTAC USA, LLC

By: _____ (L.S.)

Name: Dennis Omanoff

Title:   Chief Executive Officer

State of _____
County of _____

On this, the _____ day of _____ 2015, before me, a Notary Public, personally appeared _____ who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person or entity upon whose behalf he acted, executed the instrument.

_____ (Seal)
Notary Public

My Commission Expires: _12/18/15_

**PATENT**
**REEL: 037238 FRAME: 0148**

# EXHIBIT 29

**SECOND AMENDMENT**

**To**

**CHEYTAC USA, LLC
OPERATING AGREEMENT**

This Second Amendment to CheyTac USA, LLC Operating Agreement (the "**Amendment**") is made as of November 2, 2016 (the "**Effective Date**"), among Joseph Warren ("**Manager**"); Praecisa Tenuras, LLC, a Virginia limited liability company ("**Praecisa Tenuras**"), and Live Oak Endeavors, LLC, a South Carolina limited liability company ("**Live Oak**"; together with Praecisa Tenuras, the "**Class A Members**").

**PREAMBLE**

A.     WHEREAS, CheyTac USA, LLC (the "Company) is a limited liability company originally formed in accordance with the Georgia Limited Liability Company Act (as amended from time to time, the "Act") by the filing of its Articles of Organization with the Georgia Secretary of State's Office on July 19, 2011;

B.     WHEREAS, Praecisa Tenuras, Dennis Omanoff and Elaine Omanoff, as Trustees of The Omanoff Family Trust ("**Omanoff Trust**"), DBM Technology, LLC, a Georgia limited liability company ("**DBM**"), and John Taylor (collectively, the "**Original Class A Members**") entered into that certain Operating Agreement of CheyTac USA, LLC dated as of September 28, 2015 (as may hereafter be modified or amended, the "**Agreement**");

C.     WHEREAS, the Original Class A Members, except for DBM, and certain "Class B Members" entered into that certain First Amendment to Operating Agreement as of February 12, 2016, to reflect, among other things, the repurchase by the Company of all of DBM's Class A Shares in the Company and the reissuance of such Class A Shares to Praecisa Tenuras and Omanoff Trust and the removal of David B. McCutcheon as a Manager and Officer of the Company;

D.     WHEREAS, the Company has now repurchased all of the Class A Shares held by Omanoff Trust (the "**Omanoff Share Repurchase**") and Dennis Omanoff has resigned as a Manager and Chief Executive Officer of the Company;

E.     WHEREAS, the parties desire to amend the Agreement further to reflect the Omanoff Share Repurchase, the resignation of Dennis Omanoff as a Manager and Chief Executive Officer of the Company, the reissuance of the Class A Shares repurchased from Omanoff Trust to Praecisa Tenuras and Live Oak and admission of Live Oak to the Company and certain other matters.

NOW, THEREFORE, the parties hereto agree to amend the Agreement as set forth herein as of the Effective Date.

1.     <u>Definitions</u>.  Defined terms that are not otherwise defined herein shall have the meaning provided to such terms in the Agreement.

1

2.   Omanoff Share Repurchase and Reissuance of Shares.

(a)   All Class A Shares held by Omanoff Trust consisting of 9,000,000 Class A Shares (the "**Repurchased Shares**") were repurchased by the Company on November 1, 2016, pursuant to the Membership Interest Purchase Agreement and Settlement Agreement (the "**Settlement Agreement**") dated as of November 1, 2016 made by and among the Company, Omanoff Trust, Praecisa Tenuras, Dennis Omanoff and Joe Warren. As of November 1, 2016, Omanoff Trust ceased to be a Member of the Company.

(b)   As of the Effective Date, 5,625,000 of the Repurchased Shares shall be reissued to Praecisa Tenuras and 3,375,000 of the Repurchased Shares shall be reissued to Live Oak. The Manager and Praecisa Tenuras, as Class A Member holding greater than 60% of the outstanding Class A Shares, hereby approve such reissuance of the Repurchased Shares and agree that the Repurchased Shares shall not be deemed "Additional Interests" under the Agreement. As a condition to the reissuance of the Repurchased Shares to Live Oak, Live Oak shall enter into a Member Repurchase Agreement (the "**Member Repurchase Agreement**") in the form attached hereto as Exhibit "H".

(c)   Schedule 3.01 of the Agreement is hereby amended to substitute the updated Schedule 3.01 attached hereto and made a part hereof, which reflects the foregoing transactions. Praecisa Tenuras and Live Oak have contributed additional capital to the Company in consideration for the Repurchased Shares as set forth in Schedule 3.01.

3.   Resignation of Dennis Omanoff as Manager and Officer. Section 5.02 of the Agreement is hereby amended to reflect that Dennis Omanoff is no longer a Manager of the Company or a member of the Board. Section 5.05(b) of the Agreement is hereby amended to reflect that Dennis Omanoff is no longer Chief Executive Officer of the Company.

4.   Appointment of New Officers. Joseph Warren is hereby appointed as the new Chief Executive Officer of the Company. Parker Allen is hereby appointed as the new Chief Financial Officer of the Company. Joseph Warren and Parker Allen shall each be required to execute and deliver a Proprietary Rights Agreement in favor of the Company.

5.   Elimination of Board of Managers and Authorization Summary. Section 5.02 of the Agreement is hereby further amended to provide that, unless and until Class A Members holding at least a majority of the Class A Shares then outstanding shall elect to reinstate the Board of Managers: (i) the Company shall be governed by one Manager instead of a Board of Managers; (ii) all rights and responsibilities granted to or reserved for the Board shall be held by the Manager; (iii) the Authorization Summary shall be of no further force and effect except for the rights reserved to the Members in Section II; and (iv) all references elsewhere in the Agreement, the Protections and Rights or any ancillary documents of the Company to the "Board" or "Board of Managers" shall mean the Manager. As of the date of this Amendment, Joseph Warren is the sole Manager and he shall remain as Manager until his death, resignation or removal by the Class A Members holding greater than a majority of the then outstanding Class A Shares.

6.   Admission of Live Oak. Live Oak is hereby admitted as a Class A Member of the Company. Live Oak hereby acknowledges that Live Oak has reviewed the Agreement, as amended hereby, the Member

2

Repurchase Agreement and the Protections and Rights and Live Oak agrees to be bound by all terms and provisions of the Agreement, the Member Repurchase Agreement and Protections and Rights, as may be amended from time to time. Live Oak hereby makes each of the representations and warranties set forth in Section 6.07 of the Agreement as of the Effective Date.

7.    Principal Office; Registered Office.  Section 2.03 of the Agreement is hereby amended to change the following: (i) the registered office of the Company is 255 St. Phillip St., Charleston, SC 29403; and (ii) the principal office of the Company is 9801 Highway 78, Building 4, Ladson, SC 29456.

8.    Power of Attorney.  Live Oak hereby appoints the Manager as such Member's attorney-in-fact to execute all documents and amendments required to be executed by such Member pursuant to the Agreement, the Member Repurchase Agreement or any other agreement between the Company and such Member or which is reasonably necessary to effect the provisions thereof.  This power of attorney, being coupled with an interest, shall be irrevocable.

9.    Further Assurances.  Live Oak shall as often as and whenever requested to do so by the Manager execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all instruments and documents as the Company may reasonably determine to be necessary to carry out the provisions of this Amendment.

10.    Representations of the Members.  Each Member hereby represents and warrants to the Company as follows: (a) Member has the full power and legal capacity to execute, deliver, and carry out the terms and provisions of this Amendment and to consummate the transactions contemplated hereby; (b) this Amendment constitutes a legal, valid, and binding obligation of Member enforceable against Member in accordance with its terms; and (c) the execution, delivery and performance of this Amendment by Member will not result in a breach or violation by Member of, or constitute a default by the Member under, any statute, ordinance, rule, regulation, franchise, permit, agreement or instrument to which Member is or may be a party or by which Member is otherwise bound.

11.    Miscellaneous.  Except as expressly set forth herein, the Agreement remains unmodified and unchanged and the parties hereto ratify and confirm the Agreement, as amended hereby. This Amendment: (a) may be amended only by a writing signed by each of the parties; (b) may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument; (c) together with the other agreements referenced herein contains the entire agreement of the parties with respect to the transactions contemplated hereby and supersedes all prior written and oral agreements, and all contemporaneous oral agreements, relating to such transactions; (d) is governed by, and will be construed and enforced in accordance with, the laws of the State of Georgia, without giving effect to any conflict of law rules; and (e) is binding upon, and will inure to the benefit of, the parties and their respective successors and permitted assigns.

**[SIGNATURE PAGES FOLLOW]**

3

## SIGNATURE PAGE TO SECOND AMENDMENT

**MANAGER:**

_____
Joseph Warren

PRAECISA TENURAS, LLC

By: _____
Name: _____
Title: _____

LIVE OAK ENDEAVORS, LLC

By: _____
Name: _____
Title: _____

5

Schedule 3.01

**SCHEDULE OF MEMBERS**
**As of November 2, 2016**
**CheyTac USA, LLC**

| Member | Address for Notices | Class A Shares | Capital Contribution | Class A Share Percentage | Class B Shares | Class B Share Percentage | Total Share Percentage |
|---|---|---|---|---|---|---|---|
| Praecisa Tenuras, LLC | 255 St. Philip St. Charleston, SC 29403 | 14,625,000 | $700,000 (previously contributed) See Exhibit E + $625,000 | 78.629% | 0 | 0 | 73.125% |
| Live Oak Endeavors, LLC | 255 St. Philip St. Charleston, SC 29403 | 3,375,000 | 375,000 | 18.145% | 0 | 0 | 16.875% |
| John Taylor | 15440 Pompeii Square Colorado Springs, CO 80921 | 600,000 | $100 and See Exhibit F | 3.226% | 0 | 0 | 3.00% |
| Michael Golden | 99 Iron Bottom Lane Charleston, SC 29492 | 0 | | 0 | 186,000 B1 | 13.286% | 0.930% |
| Brandon Hite | 7716 Pinewood Drive, NW Albuquerque, NM 87120 | 0 | | 0 | 18,600 B1 | 1.3286% | 0.093% |
| Class B Shares Reserved by Company | | 0 | N/A | 0 | 1,195,400 | 85.3854% | 5.977% |
| **Totals:** | | **18,600,000** | | **100%** | **1,400,000** | **100.00%** | **100%** |

1

**EXHIBIT H**

**CHEYTAC USA, LLC**
**MEMBER REPURCHASE AGREEMENT**
(Live Oak Endeavors, LLC)

THIS MEMBER REPURCHASE AGREEMENT is made effective as of the 2nd day of November, 2016, between LIVE OAK ENDEAVORS, LLC, a South Carolina limited liability company (the "**Member**") and CHEYTAC USA, LLC, a Georgia limited liability company (hereinafter referred to as the "**Company**").

**Background Information**

A.    As of the date hereof, the Member owns the below interests (collectively referred to as the "**Shares**"):

| Member | Class A Shares | Class A Share Percentage | Class B Shares | Class B Share Percentage | Total Share Percentage |
|---|---|---|---|---|---|
| Live Oak Endeavors, LLC | 3,375,000 | 18.145% | 0 | 0 | 16.875% |

B.    The Member is a limited liability company and Joseph Warren serves as the Managing Member.  All members of the Member have voted affirmatively for this transaction.

C.    The Member and the Company desire to enter into this Member Repurchase Agreement to provide, among other items, for the disposition of the Shares upon the occurrence of certain events and to restrict the transferability of the Shares for the purpose of assuring the continuous and harmonious management of the affairs of the Company in the future.

NOW, THEREFORE, in consideration of the mutual promises contained herein, and intending to be legally bound hereby, the parties hereto acknowledge the accuracy of the foregoing background information and hereby agree as follows:

**1.    Restrictions on Transfers**.  Except as otherwise provided in this Agreement, the Member shall not, voluntarily or involuntarily, by operation of law or otherwise, transfer, sell, assign, pledge or encumber (hereinafter referred to collectively as a "**Transfer**") any of its Shares in the Company to or in favor of any person, firm or corporation without the written consent of the Manager of the Company.  Any Transfer of all or any portion of the Shares held by the Member, except in the manner specified or permitted in this Agreement, shall be null and void, and the Company and its Secretary shall not recognize or give effect to such Transfer on its books and records, or recognize the person or persons to whom such Transfer has been made as the legal or beneficial holder thereof.

**2.**    **Permitted Transfers**.  Notwithstanding the restrictions set forth in Paragraph 1, the Member shall be permitted at any time and from time to time to transfer all or any part of its Shares to any Permitted Transferee, although such transferred Shares shall remain subject to this Agreement and the Permitted Transferee shall agree to be bound by the terms and conditions of this Agreement as if the Permitted Transferee were the Member for all purposes hereunder, including without limitation any obligation to sell the Shares pursuant to Paragraph 3 hereof.  A Permitted Transferee shall include the transfer of an interest in the Shares of the Company:

      (i)     to the Company pursuant to Paragraph 3.1;

      (ii)    to the members of the Member individually or to their estates or trusts for their benefit, as applicable, upon the dissolution of the Member, subject, however, to the provisions of Paragraph 3.2; or

      (iii)   to a trustee or receiver as the result of the bankruptcy, insolvency, or similar proceeding brought by or against the Member, subject, however, to the provisions of Paragraph 3.3.

In the event of any conflict under this Agreement, the terms of this section 2 shall have priority over and shall govern any disposition of Shares hereunder.

**3.**    **Events Triggering Purchases and Sales.**

   **3.1**    **Member Put**.  The Member may at any time following November 2, 2019 offer to sell all or any part of the Shares as owned by the Member to the Company by written notice.  The Company shall purchase all of such Shares as offered.  Any purchase by the Company under this Paragraph 3.1 shall be upon the terms and conditions set forth in this Agreement, including the price and payment terms as set forth in Paragraphs 4 and 5 of this Agreement.

   **3.2**    **Company's Call Rights**.  If (i) the Member's legal existence is terminated, (ii) Joseph Warren voluntarily retires and does not remain a Manager of the Company, or (iii) Members owning at least sixty percent (60%) of the total outstanding Class A Shares in the Company decide to call the Member's Shares for any reason at any time (this is measured by the percentage of Class A Shares owned versus the total issued and outstanding Class A Shares, and not by the number of persons or entities owning such Class A Shares), then for a period of six (6) months following any of the foregoing events, the Company shall have the option to purchase from the Member, and the Member thereafter shall be obligated to sell to the Company, all of the Shares of the Company then owned by the Member, in accordance with the procedures and pursuant to the terms set forth in Paragraph 3.4.

   **3.3**    **Transfers by Operation of Law**.  In the event the Member (i) files a voluntary petition under any bankruptcy or insolvency law or a petition for the appointment of a receiver or makes an assignment for the benefit of creditors, (ii) is subjected involuntarily to such a petition or assignment or to an attachment or other legal or equitable interests with respect to the Shares in

the Company and such involuntary petition, assignment or attachment is not discharged within sixty (60) days after its effective date, or (iii) is subjected to any other involuntary transfer of the Shares by legal process, including an assignment or transfer incident to a divorce of Joe, the Company shall have the option to purchase all of the Shares that are subject to the involuntary transfer, and the Member shall be obligated to sell  to the Company all of the Shares of the Company then owned by the Member, in accordance with the procedures and pursuant to the terms and conditions set forth in Paragraph 3.4.

    **3.4**    **Procedural Requirements for Purchase**.  Upon the occurrence of an event triggering a purchase and sale under Paragraph 3.2 or 3.3, the Company shall have the option to purchase all of such Shares. Any purchase by the Company shall be upon the terms and conditions set forth in this Agreement, including the price and payment terms as set forth in Paragraphs 4 and 5 of this Agreement.

    **3.5**    **Bring-Along Rights**.

        **3.5.1**    **Sale of the Company**.  If the Manager, at any time or from time to time, in one transaction or a series of transactions, desires to enter into an agreement (whether oral or written) to transfer all of the outstanding shares of the Company in an arms-length sale to one or more unrelated third parties  (for purposes of this Paragraph, a "**Bring-Along Sale**"), and such sale has been approved by the requisite vote of the members of the Company pursuant to the Company's Operating Agreement dated as of September 28, 2015, as it may be amended from time to time (the "**Operating Agreement**"), then the Manager shall have the right, but not the obligation, to cause the Member to tender for purchase all of the Shares held by the Member. Any such sale by the Member shall be on the same terms and conditions as the proposed sale by the Manager.  In any such sale, the Company shall be required to bear all of the expenses of the transaction, including, without limitation, legal, accounting and investment banking fees and expenses.

        **3.5.2**    **Bring-Along Notice**.  Upon advice of the Manager, the Company shall promptly provide the Member with notice of the Bring-Along Sale, which shall contain the following information:

            (i)    the name and address of the proposed purchaser of the Shares;

            (ii)    the proposed amount and form of consideration to be paid for the Shares; and

            (iii)    that the proposed transferee or purchaser has been informed of the Bring-Along Rights as provided in this Paragraph.

**4.**    **Purchase Price Determination**.  The purchase price of each Share to be purchased and sold pursuant to Sections 3.1-3.4 of this Agreement shall be determined as follows:

    **4.1**    The value of the Company shall be determined in accordance with the Purchase Price Determination attached hereto as Exhibit A.

**4.2**    The value as established under Paragraph 4.1 shall be divided by the number of issued and outstanding Shares to determine a per Share purchase price.

**4.3**    The number of Shares to be purchased by the Company from the Member shall be multiplied times the per Share purchase price calculated pursuant to Paragraphs 4.1 and 4.2 to determine the purchase price payable to the Member.

5. **Purchase Terms and Conditions.**

**5.1    Payment of Purchase Price.**   Except as may otherwise be provided in this Agreement, the purchase price of any Shares purchased shall be paid by certified or cashier's check at the closing specified herein, or, at the option of the Company, as follows:

(i)    By a down payment of at least ten percent (10%) of the total purchase price by certified or cashier's check at the closing specified in Paragraph 5.3.

(ii)    The balance of the total purchase price shall be paid in up to one hundred twenty (120) equal monthly installments of principal and interest. This installment obligation will be evidenced by an installment note (the "**Note**") containing the terms specified in Paragraph 5.4. The first installment payment will be due as of the first day of the month after the closing date set forth in Paragraph 5.2.   In addition, if the Member or Joseph Warren is owed any deferred salary, benefits or expense reimbursements at the time an election to sell or purchase the Shares is exercised, all of such amounts owed shall be paid in cash at the closing specified in Paragraph 5.3.

**5.2    Closing Date.**  The closing date shall be on or before ninety (90) days following the date on which the notice of an election to sell or purchase the applicable Shares is delivered pursuant to the applicable triggering event outlined above, at a time, place and date specified in a written notice from the Company to the Member.  If this date is a Saturday, Sunday or holiday, then the closing shall be held on the first business day thereafter.

**5.3    Closing.**  At the closing held pursuant to Paragraph 5.2:

(i)    The Company shall deliver to the Member (or its successor-in-interest):

(a)  the payments specified in Paragraph 5.1; and/or

(b)  a duly executed Note and Pledge Agreement containing the provisions required by Paragraph 5.4 and Paragraph 5.6, together with duly executed stock powers for attachment to the certificates for the Shares.

(ii)    The Member (or its successor in interest) shall deliver to the Company:

(a)  Share certificates for all of the Shares that are to be purchased and which are in Member's possession or control and, if requested by Company, either duly endorsed in blank for transfer or with duly

- 4 -

executed stock powers attached. In the event a Note has been delivered for payment of a portion of the Purchase Price, the Share certificates shall be held by a third party escrow agent mutually acceptable to the Company and Member until payment in full and satisfaction of the Note;

(b) Joe's written resignation from all positions held in the Company as an officer, director, employee or consultant except to the extent the Member or principal of Member is a Manager and elects to continue serving as a Manager following a voluntary retirement pursuant to Section 3.2(iv) above; and

(c) Any other documents or agreements required by this Agreement.

**5.4** **Terms of the Note**. The Note specified in Paragraph 5.1 shall be in the amount of the difference between the total purchase price and any down payment required to be made at the closing. Interest shall be added to each installment, computed against the outstanding balance at the due date of the installment at the 10 Year Treasury Rate plus 2%, with a maximum of 6%, to be reset on January 2 of every year during the term of the Note. The Note shall provide that the Company shall have the privilege at any time to prepay without penalty all or any part of the balance due on the Note with interest to the date of prepayment. Partial prepayment shall be applied to the last maturing installments in inverse order. The Note shall be immediately due and payable in the event of a Company Sale, as defined in **Exhibit A** attached hereto.

**5.5** **Default**. Failure to make any payment required by any Note, when due or the breach of any warranty or covenant in the Pledge Agreement, which is not covered within any applicable grace or notice and cure period, shall constitute a default on the Note and shall cause the remaining unpaid balance to become immediately due and payable, and the Member shall have all the rights and remedies to enforce payment of the unpaid balance authorized by law and to exercise his or its remedies under the Pledge Agreement; provided, however, that before taking any remedial action to enforce payment, the Member (or its successor in interest) shall deliver written notice of the default to the Company and if the payment in default is paid in full within thirty (30) days from the date of receipt of the notice, the default will be deemed cured. Following the second such written notice, the Member shall not be required to provide any additional notice to the Company before taking remedial action to enforce payment.

**5.6** **Security for Unpaid Balance**. Any Note issued by the Company under Paragraph 5.4 shall be secured by the Company's pledge a first-priority security interest in the Shares purchased pursuant to a pledge and security agreement (the **Pledge** Agreement" and by the filing of a Financing Statement naming the Company as debtor in the appropriate filing office in the State of Georgia. The Pledge Agreement shall contain representations, warranties, covenants and remedies customarily included in a securities pledge agreement that would be provided to a commercially reasonable institutional lender in similar circumstances.

**6.** **Further Acts**. The Member shall execute and deliver all papers and do all other things as may be necessary to consummate any purchase and sale hereunder.

7.      **Effect of Other Laws**.  The obligations under this Agreement of any purchaser of Shares shall be subject to the effect of all laws, regulations and agreements by which the purchaser is bound including, without limitation, (i) loan agreements, the Georgia Limited Liability Company Act, and the Company's Articles of Organization, any or all of which may restrict or prohibit a purchase of Shares in certain circumstances; (ii) federal or state antitrust laws; and (iii) federal or state securities laws, which may require that legal counsel of the Company's choosing, at the Company's expense, determine an exemption from compliance with applicable registration requirements; provided, however, that the Company shall exert its best efforts to overcome any restrictive effect.

8.      **Shares Covered by this Agreement**.  This Agreement, as applicable, shall apply to all Shares that are now or hereafter registered in the Company's records in the name of the Member and to all Shares now or hereafter beneficially owned by the Member.

9.      **Endorsement on Certificates**.  A legend in substantially the following form shall be endorsed conspicuously on each of the certificates representing the Shares of the Member.

> THE SHARES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, OR ANY APPLICABLE STATE SECURITIES LAWS, AND NO TRANSFER OF SUCH SHARES MAY BE MADE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH LAWS OR THE AVAILABILITY OF EXEMPTIONS FROM THE REGISTRATION PROVISIONS THEREOF.

> ANY SALE, ASSIGNMENT, TRANSFER, PLEDGE OR OTHER DISPOSITION OR ENCUMBRANCE OF THE SHARES OF OWNERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY, AND SUBJECT TO, THE TERMS AND PROVISIONS OF AN AGREEMENT AMONG THE COMPANY, THE MEMBER AND OTHERS. A COPY OF SUCH AGREEMENT IS ON FILE WITH THE SECRETARY OF THE COMPANY.

A copy of this Agreement shall be filed with the Secretary of the Company.  During the term of this Agreement, a legend reading substantially as above shall be endorsed on each certificate for Shares issued by the Company to the Member.

10.      **Certificates to be Held by the Secretary of the Company**.  Upon execution of this Agreement, the Member shall deliver certificates representing all of the Shares of the Company owned by it, together with undated stock powers duly executed in blank, to the Secretary of the Company who shall hold such certificate(s) in escrow until such time as it is (they are) required to be delivered pursuant to this Agreement. The Member hereby agrees that the Secretary of the

Company shall deliver such certificates to the Company for cancellation at such time as any redemption provisions of this Agreement become applicable.

**11.**     **No Agreement to Employ**.  Nothing contained in this Agreement shall be construed to constitute or be evidence of an agreement or understanding, express or implied, on the part of the Company to employ or retain the Member for any specific period of time.

**12.**     **Remedies**.

   **12.1     Specific Performance**.  The parties hereto agree that, except as provided herein, the Shares cannot be purchased or sold in the open market, that this Agreement is vitally important to the continuing welfare of the Company and its Members, and that damages are totally inadequate to remedy any default hereunder.  Accordingly, should any dispute arise concerning the Transfer of any of the Shares, the parties consent and agree that an injunction may be issued to restrain any such Transfer pending the dispositive resolution of such controversy.  In the event of any controversy concerning the purchase of any of the Shares in accordance with the terms and conditions of this Agreement, such purchase shall be enforceable in a court by a decree of specific performance.  Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies at law or in equity which the parties hereto may possess.  This Section shall be binding upon all persons whose Shares are subject to any term or condition of this Agreement.

   **12.2     Arbitration**.   Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled, except as may otherwise be provided herein, by arbitration held in Atlanta, Georgia, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Either party may file a written Demand for Arbitration with the American Arbitration Association's Atlanta, Georgia Regional Office (and if no such Regional Office exists, the nearest Regional Office), and shall send a copy of the Demand for Arbitration to the other party. The arbitration shall be conducted pursuant to the terms of the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association, except that discovery may be had in accordance with the Federal Rules of Civil Procedure.  The venue for the arbitration shall be Atlanta, Georgia.  The arbitration shall be conducted before one arbitrator selected through the American Arbitration Association's arbitrator selection procedures.  The arbitrator shall promptly fix the time, date and place of the hearing and notify the parties.  The parties shall stipulate that the arbitration hearing shall last no longer than five business days.  The arbitrator shall render a decision within 10 days of the completion of the hearing, which decision may include an award of legal fees, costs of arbitration and interest.  The arbitrator shall promptly transmit an executed copy of its decision to the parties.  The decision of the arbitrator shall be final, binding and conclusive upon the parties.  Each party shall have the right to have the decision enforced by any court of competent jurisdiction.  Notwithstanding any other provision of this Section 12.02, any dispute in which a party seeks immediate injunctive relief may be brought in any court having jurisdiction.

**13.**     **Termination**.  This Agreement shall terminate and the Shares shall be released from the terms and conditions of this Agreement upon the earlier of:

(i)     The mutual written agreement of the Member and the Company; and

(ii)     The liquidation of the Company following bankruptcy or the dissolution of the Company.

**14.     Notices.**  Any and all notices, designations, consents, offers, acceptances, or any other communication provided for herein shall be given in writing by registered or certified mail addressed to the Company at its principal office and to the Member at the address appearing on the books of the Company or the Member's residence or to such other address as the Member may designate.

**15.     Rule of Construction.**  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions, and the Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

**16.     Binding Effect.**  This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their heirs, legal representatives, executors, successors and assigns.

**17.     Modification.**  No change or modification of this Agreement shall be valid unless made in writing and approved by the Company and the Member.

**18.     Entire Agreement.**  This Agreement, along with the additional documents referenced in this Agreement, contains the complete agreement between the parties regarding the subject matter hereof and shall, as of the effective date hereof, supersede all prior agreements, commitments, representations, writings and discussions between the parties.   The parties stipulate that none of them has made any representation with respect to the subject matter of this agreement or the execution and delivery hereof, except such representations as are specifically set forth herein, and each of the parties hereto acknowledges that he or it has relied on its own judgment in entering into this Agreement.   The parties hereto further acknowledge that any representations that may have heretofore been made by any of them to the others are of no effect and that none of them has relied thereon in connection with his or its dealings with the others.

**19.     Gender.**  As used herein, the singular shall include the plural and the plural shall include the singular and any gender shall include the masculine or the feminine as the case may be.  The terms "herein," "hereto," "hereunder" and the like shall be deemed to refer to this Agreement as a whole and not to any particular Paragraph or other subdivision of this Agreement.

**20.     Governing Law.**  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Georgia.

**21.     Counterparts.**  This Agreement may be executed and delivered in any number of counterparts, all of which when executed and delivered shall have the force and effect of an original.

*[signature page follows]*

- 8 -

IN WITNESS WHEREOF, the Company has caused this Agreement to be signed by its duly authorized officer and the Member has executed this Agreement on the date first above written.

**COMPANY:**

CHEYTAC USA, LLC

By:_____
Name:_____
Title:_____

**MEMBER:**

LIVE OAK ENDEAVORS, LLC

By:_____
Name:
Title:

- 1 -

**Exhibit A to Member Repurchase Agreement**
**of CheyTac USA, LLC dated November 2, 2016 (the "Agreement")**

## Purchase Price Determination

The purchase price of each Share to be purchased and sold pursuant to Paragraphs 3.1 – 3.3 of the Agreement shall be determined under Paragraph 4 of the Agreement as follows:

A. **Value of the Company**. The value of the Company shall be:

   1. **Base Multiple**. Eight (8) times the average of the Company's annual after-tax profits for each of the two fiscal years preceding the fiscal year during which the Share purchase or sale right is exercised, which amount is then reduced by the amount of indebtedness of the Company for borrowed money, excluding any money borrowed in order to satisfy the Company's obligation to purchase the Shares from the applicable Member. The multiplier set forth in the previous sentence is referred to as the "**base multiple**."

      a. If the Company has not been in existence for two full years preceding the fiscal year during which the Share purchase or sale right is exercised, then the average of the Company's annual after-tax profits shall be calculated for the number of full fiscal months in which the Company has been in existence on an annualized basis.

      b. The after-tax profits of the Company for each fiscal year shall be deemed to be the net income of the Company as reflected in the financial statements of the Company for such year or month (if applicable) prepared by the Company's external accountants in accordance with accounting principles consistently applied by the Company in preparing such financial statements and in accordance with generally accepted accounting principles, less the amount of federal and state incomes taxes that would be payable on the amount of such net income by an individual residing in the Highest Tax Bracket Location, if calculated at the maximum rates applicable to individuals for such fiscal year without regard to credits, carryovers or other adjustments from other fiscal years. For purposes of this Agreement, the "**Highest Tax Bracket Location**" shall mean, of the various locations in which the Members reside, the location with the highest state income taxes.

      c. The net income of the Company will be reduced by any "Extraordinary Income" in excess of $10,000 in aggregate, in any applicable fiscal year from a) the sale of assets or capital items, like equipment, a product line or company-owned securities; or b) income from non-cash sources, like a barter arrangement; or c) income from other non-operating or non-recurring sources, like fire insurance proceeds or unusual rental income; or d) other extraordinary income.

B. **Selling Member Price Protection**.

   1. If, within three years after the Company purchases the Shares (a "**Share Purchase**") of a Selling Member pursuant to Paragraphs 3.1-3.3 of the Agreement, the Company or all or substantially all of its assets is sold, whether by way of merger, stock sale (including any public offering), asset sale or otherwise (a "Company Sale"), and as a result the remaining Member(s) receive a per Share value of at least 10% more than the price per Share paid to the Selling Member, as adjusted for the issuance of any additional shares in the Company between the date of the Share Purchase and such Company Sale, then the Selling Member is entitled to an additional payment as follows.

- 2 -

a. If the Company Sale is approved by the Company on or before the first anniversary of the Share Purchase from the Selling Member, then the Selling Member is entitled to receive 100% of the increase in value over the per Share price paid to the Selling Member by the Company.

b. If the Company Sale is approved by the Company after the first anniversary but on or before the second anniversary of the Share Purchase from the Selling Member, then the Selling Member is entitled to receive 66% of the increase in value over the per Share price paid to the Selling Member by the Company.

c. If the Company Sale is approved by the Company after the second anniversary but on or before the third anniversary of the Share Purchase from the Selling Member, then the Selling Member is entitled to receive 33% of the increase in value over the per Share price paid to the Selling Member by the Company.

2. Examples:

   a. Member S sells his Shares to the Company for $30 per Share, and within 12 months the Company is sold for $40 per share. S is then entitled to receive an extra $10 per Share.
   b. Member S sells his Shares to the Company for $30 per share, and within 12 months the Company is sold for $32.50 per share. S is not entitled to receive additional compensation since $2.50 per share is less than 10% more than S's selling price.

3. Time frame to pay. If it is determined that a Selling Member is entitled to an additional payment due to the Selling Member Price Protection component of this Section C, the Company shall make such payment together with the balance of the purchase price owed to the Selling Member under the Note and any accrued interest thereon simultaneously with the closing of the Company Sale.

## C. **Intention of Members Regarding Share Price**.

1. It is not the intention of the Members that a Selling Member be paid a price per Share precisely equivalent to what a Share might be worth if independently valued at the time of the Share Purchase. In no event shall the Share price used in an actual transaction be considered in determining the Share price under this Purchase Price Determination except as provided in Paragraph B above.

2. Subject to Paragraph B above, it is the intention of the shareholders to establish a pricing mechanism that:

   a. focuses on the income produced by the business, as measured by after-tax profits,

   b. allows the Member to calculate the approximate value of his or her Shares every time the Company produces an income statement and a balance sheet,

   c. approximates a Share value that is not subject to fluctuations in the economy over the short term, and

   d. eliminates from consideration factors such as the price that might be paid by a strategic buyer who would bring to the transaction synergistic benefits, strategic advantages,

special financing, a demand for different member rights, or other considerations that could materially distort our standard of value.

3. Because the Members have agreed to all the specifics above, the Company is willing to make the following concessions:

    a. Lack-of-control discount:
    The Selling Member will suffer no additional price per Share reduction because of his or her lack-of-control position.

    b. Lack-of-marketability discount:
    The Selling Member will suffer no additional price per Share reduction because of the lack of marketability of his or her Shares.

# EXHIBIT 30

## MEMBERSHIP INTEREST PURCHASE AGREEMENT
## AND SETTLEMENT AGREEMENT

THIS MEMBERSHIP INTEREST PURCHASE AND SETTLEMENT AGREEMENT (this "Agreement") is made effective as of the 1st day of January, 2017 by and among (i) CHEYTAC USA, LLC, a Georgia limited liability company (the "Corporation"), (ii) PRAECISA TENURAS, LLC, a Virginia limited liability company ("PT"), and LIVE OAK ENDEAVORS, LLC, a South Carolina limited liability company ("LOE"), as Class A members of the Corporation, (iii) JOSEPH R. WARREN, as Manager of the Corporation ("Joe Warren"); (iv) JOHN TAYLOR, individually ("Taylor") and BRANDON HITE, individually ("Hite").

### RECITALS

A.      The Corporation is governed by that certain CheyTac USA, LLC Operating Agreement dated September 28, 2015, as amended by a First Amendment to CheyTac USA, LLC Operating Agreement dated February 12, 2016 and a Second Amendment to CheyTac USA, LLC Operating Agreement dated as of November 2, 2016 (as amended, the "Operating Agreement"). A certain Proprietary Rights Agreement (the "Proprietary Rights Agreements") and a certain Contribution Agreement (the "Contribution Agreements") were executed by each of Taylor and Hite in connection with their admission to the Corporation. This Agreement, the Operating Agreement, the Contribution Agreements and the Proprietary Rights Agreements are hereinafter referred to collectively as the "CheyTac Agreements".

B.      Effective as of the date hereof, it is the intent of the parties that this Agreement accomplish the following: (1) to effect a purchase by the Corporation of the entire interest held by Taylor and Hite in the Corporation; (2) Taylor and Hite are to resign from all positions held with the Corporation and shall have no further official capacity with the Corporation; (3) the Corporation shall transfer and assign to Taylor and Hite all of the Corporation's rights to certain intellectual property previously contributed by them to the Corporation; and (4) Taylor and Hite shall be released from any and all liabilities of the Corporation and Taylor shall be indemnified from any liabilities or damages arising from a pending lawsuit as set forth herein.

C.      Each of the parties desires to accomplish the transactions described herein above, and shall do all things reasonably necessary, and shall complete certain other transactions associated therewith, as more fully described below.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

### AGREEMENT

1.      The above Recitals are incorporated herein by reference.

2.      In consideration of the property being transferred to Taylor pursuant to Paragraphs 4 and 5 below, Taylor hereby transfers and assigns to the Corporation all right, title and interest in and to Taylor's membership interest in the Corporation consisting of 600,000 Class A Shares (the "Taylor Shares") in the Corporation.    Taylor represents and warrants that Taylor is the sole owner of the Taylor Shares and the Taylor Shares are being transferred to the Corporation free and clear of any liens or encumbrances. Concurrently with the execution of this Agreement, Taylor has delivered to the Corporation the original certificate evidencing the Taylor Shares, duly endorsed.

3.      In consideration of the property being transferred to Hite pursuant to Paragraph 5 below, Hite hereby transfers and assigns to the Corporation all right, title and interest in and to Hite's membership interest in the Corporation consisting of 18,600 Class B Shares (the "Hite Shares") in the Corporation. Hite represents and warrants that Hite is the sole owner of the Hite Shares and the Hite Shares are being transferred to the Corporation free and clear of any liens or encumbrances. The parties acknowledge that the Corporation has not issued any certificate evidencing the Hite Shares and, accordingly, the Hite Shares constitute an uncertificated security.

4.      (a)   The Corporation hereby transfers and assigns to Taylor all right, title and interest of the Corporation in and to the property identified in Exhibit A-1 attached hereto and made a part hereof (the "Taylor IP"). Taylor acknowledges that the Taylor IP was conceived and developed solely by Taylor and that the Corporation makes no representations or warranties whatsoever with respect to the value, functionality, freedom to practice or patentability of any of the Taylor IP. For the avoidance of any doubt, Taylor and Hite acknowledge and agree that the Corporation shall retain all right, title and interest in and to all property that was originally included in the Contribution Agreements but is not specifically identified in Exhibit A-1 or Exhibit A-2.  The Corporation shall execute, acknowledge and deliver any and all conveyances, assignments, correction instruments and other instruments and documents as Taylor may reasonably request to further carry out the conveyance of the Taylor IP as contemplated by this Paragraph.

(b)   Taylor hereby grants to the Corporation a perpetual irrevocable royalty-free exclusive license to use, publish and reproduce, both physically and electronically, all articles, white papers, performance reviews, specifications and other written or digital materials (the "Taylor Writings") which have been authored or otherwise created by Taylor and used by the Corporation in connection with the sale, marketing or advertising of the Corporation's products. Taylor shall execute, acknowledge and deliver any other instruments and documents as the Corporation may reasonably request to further carry out the license of the Taylor Writings as contemplated by this Paragraph.

(c)   Upon request by Taylor, the Corporation agrees to sell to Taylor for his personal use reasonable quantities of ammunition then being manufactured by the Corporation at a discount from the full retail price then being offered to its customers, which discount shall be determined by the Corporation in its sole discretion.

- 2 -

(d)  Upon request by the Corporation, Taylor agrees to provide consulting services within his areas of expertise at no charge to the Corporation, provided that Taylor shall have sole discretion to approve the duration and scope of such services.

5.  The Corporation hereby transfers and assigns to Taylor and Hite jointly all right, title and interest of the Corporation in and to the property identified in Exhibit A-2 attached hereto and made a part hereof (the "Joint Taylor-Hite IP").  Taylor and Hite acknowledge that the Joint Taylor-Hite IP was conceived and developed solely by Taylor and Hite and that the Corporation makes no representations or warranties whatsoever with respect to the value, functionality, freedom to practice or patentability of any of the Joint Taylor-Hite IP.  The Corporation shall execute, acknowledge and deliver any and all conveyances, assignments, correction instruments and other instruments and documents as Taylor and Hite may reasonably request to further carry out the conveyance of the Joint Taylor-Hite IP as contemplated by this Paragraph.

6.  Concurrently with the full execution of this Agreement, Taylor and Hite shall return to the Corporation any property of the Corporation in their possession and shall return to the Corporation or destroy all confidential information relating to the Corporation, including the permanent deletion of all emails and electronic copies of the same, but specifically excluding any materials relating to the Taylor IP or Joint Taylor-Hite IP.  By executing this Agreement, Taylor and Hite hereby certify to the Corporation that this has been completed.

7.  The transactions specified in paragraphs 2, 3, 4, 5 and 6 above represent the full and final settlement of any consideration due to or owing from, on the one hand, Taylor and Hite, and on the other hand, the Corporation, under the CheyTac Agreements; it being understood, however, the Proprietary Rights Agreements entered into by each of Taylor and Hite shall expressly survive this Agreement and shall remain legal, valid and binding.  Notwithstanding the foregoing, the Corporation acknowledges and agrees that the development and commercialization by Taylor and/or Hite of: (i) the Taylor IP and Joint Taylor-Hite IP, (ii) any rifles of .300 caliber or less or (iii) any accessories for rifles,  shall not be prohibited or otherwise restricted by the terms of the Proprietary Rights Agreement.

8.  Taylor and Hite hereby release the Corporation and its members, agents, employees and other representatives, collectively or individually in any capacity, from any and all manner of claims, demands, actions and causes of action, liabilities, and duties, of any kind or nature whatsoever, whether known or unknown, whether in law, equity or otherwise, and whether or not presently accrued, against the Corporation or its members, agents, employees or other representatives, or any of them, that Taylor or Hite had, or has, or hereafter can or may have arising out of or related to their involvement with the Corporation through the date of this Agreement.

9.  The Corporation hereby releases Taylor and Hite from any and all manner of claims, demands, actions and causes of action, liabilities, and duties, of any kind or nature whatsoever, whether known or unknown, whether in law, equity or otherwise, and whether or not presently accrued, against Taylor and Hite that the Corporation ever had, or has, or hereafter can

- 3 -

or may have arising out of or related to their involvement with the Corporation through the date of this Agreement.

10.     Additionally, the Corporation hereby agrees to indemnify, defend and hold Taylor harmless from any and all claims, liabilities or damages arising from any lawsuits or other proceedings filed or otherwise initiated by any third party with respect to the ownership, management or business dealings of the Corporation for the period of September 28, 2015 to the Effective Date including without limitation that certain adversary proceeding entitled Ronald I Chorches, Chapter 7 Trustee for the Estate of Corey Kupersmith v. Cheytac USA, LLC; DBM Technology, LLC; David MacCutcheon; Dennis Omanoff and Elaine Omanoff as Trustees of the Omanoff Family Trust; John Taylor; Mark Stern; CT Realty Management, LLC; Praecisa Tenuras, LLC; and Joseph Warren. Upon the request of the Corporation Taylor agrees to enter into any settlement agreement for the dismissal of all claims against Taylor in connection with any such lawsuit or other proceeding, provided that the Corporation shall be responsible for the payment of all amounts required to be paid pursuant to such settlement agreement.

11.     From and after the date of this Agreement, each party hereto covenants and agrees to keep confidential the terms of this Agreement, it being understood and agreed that such confidentiality is a material inducement for all parties to enter into this Agreement. Each party hereto shall have the right to pursue all remedies available at law or equity to enforce the obligations contained in this Section 11.

12.     From and after the date of this Agreement, each party hereto covenants and agrees not to make to any third party at any time any derogatory or negative statements about or otherwise disparage, defame, impugn or damage the reputation or integrity of the other parties. Each party hereto shall have the right to pursue all remedies available at law or equity to enforce the obligations contained in this Section 12.

13.     The press release announcing these transactions, if any, shall be made only by the Corporation -- not any other party to this Agreement -- and shall be subject to the prior review and approval of all parties to this Agreement, such approval not to be unreasonably withheld, conditioned or delayed.

14.     This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs, successors, assigns, and representatives.

15.     This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia.

16.     In the event of any dispute or controversy arising out of or relating to the interpretation of this Agreement, such dispute or controversy shall be governed by Section 10.02 of the Operating Agreement and Section 14 of the Proprietary Rights Agreement, each of which is hereby incorporated herein by this reference.

- 4 -

17.     The parties agree that this Agreement represents a compromise and settlement of disputed and undetermined claims, the existence of any liability for which is expressly denied, and that this Agreement, the consideration therefor, and all negotiations relating thereto, are for settlement purposes only.

18.     By executing and delivering this Agreement: (a) PT and LOE as Class A Members, and Joseph R. Warren, as Manager, hereby consent to and approve the purchase of Taylor Shares and Hite Shares and the transactions contained in this Agreement, such consent being effective for all purposes under the Operating Agreement, and (b) Taylor and Hite hereby resign any positions either of them had with the Corporation and (c) Taylor and Hite hereby withdraw as members of the Corporation.

19.     The agreements referenced herein, together with this Agreement, constitute the complete expression of the terms of the agreement between the parties.  All prior or contemporaneous agreements, representations, or negotiations not referenced herein, if any, are superseded hereby and shall have no binding effect.

20.     Each party represents and warrants that he or she has the legal authority to execute this Agreement in the capacity stated, and that such Agreement, once executed, shall be the legal, valid and binding obligation of such party.

21.     Each party hereto shall pay their own legal fees related to the preparation of this Agreement.  No modification of, or amendment to, this Agreement shall be valid unless it is in writing and signed by the party or parties to be charged.

22.     This Agreement may be executed in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  This Agreement may be executed by PDF copies or facsimile copies and any PDF or facsimile signatures shall be deemed original counterparts.

*[SIGNATURE PAGES TO FOLLOW]*

IN WITNESS WHEREOF, the undersigned parties have executed this Agreement effective for all purposes as of the date first set forth above.

Witness

Witness

CHEYTAC USA, LLC

By: _____
Joseph R. Warren, Manager

_____
JOSEPH R. WARREN, as Manager of CheyTac USA, LLC

Witness

PRAECISA TENURAS, LLC

By: _____
Joseph R. Warren, Managing Member

Witness

LIVE OAK ENDEAVORS, LLC

By: _____
Joseph R. Warren, Managing Member

Witness

_____
JOHN TAYLOR, individually

Witness

_____
BRANDON HITE, individually

- 6 -

IN WITNESS WHEREOF, the undersigned parties have executed this Agreement effective for all purposes as of the date first set forth above.

CHEYTAC USA, LLC

By: _____
Joseph R. Warren, Manager

_____
JOSEPH R. WARREN, as Manager of CheyTac USA, LLC

PRAECISA TENURAS, LLC

By: _____
Joseph R. Warren, Managing Member

LIVE OAK ENDEAVORS, LLC

By: _____
Joseph R. Warren, Managing Member

_____
JOHN TAYLOR, individually

_____
BRANDON HITE, individually

- 6 -

**EXHIBIT A-1**

**TAYLOR IP**

1.　　The following patents and patent applications:

　　　　i.　　Taylor, J. D. 2007. Advanced Armor-Piercing Projectile Construction and Method. U. S. Patent 7,520,224.

　　　　ii.　　Taylor, J. D. 2011. Small Caliber High Energy Sabot Bullet. US Patent Application _____.

2.　　All trade secrets, copyrights and other intellectual property rights relating to the "LaserStryker" Battlefield Optics Device to the extent conceived and developed by John Taylor.

3.　　All patent rights, work product and other intellectual property rights relating to the following inventions to the extent conceived and developed by John Taylor:

　　　　i.　　The projectile and cartridge design that allows projectile to turn in flight so as to hit the target on its side. Application is in patent attorney. Prototype development required.

　　　　ii.　　Polymer machinegun links. Prototype development required.　These will not rust and its lubricity is a major advantage.

　　　　iii.　　Polymer cartridge cases. Injection mold of cases –polymer. These are lighter than brass cases and its lubricity is a major advantage.

　　　　iv.　　Barrel design 1) reduce the OD of the barrel, 2) find the right combination of wrapping piano wire around the barrel – tight. 3) Injection molding polymer to bring back to original OD. Analogy = rebar in concrete.

　　　　v.　　Battlefield Domination Rifle. Prototype rifle developed with titanium receiver

　　　　vi.　　Two part invention. <u>1. Novel Class of Extreme Velocity/Kinetic Energy Projectile Design RiderSabot™</u> A novel design of the sabot projectile, which creates a new class of extremely high velocity projectiles called RiderSabot™ projectiles. In this design, the RiderSabot™ does not leave the core penetrator in flight but instead, accompanies the penetrator to the target. In addition, a base cap holds the penetrator in place inside the sabot, which results in all three components leaving the barrel of the gun and traveling to the target.　Upon target penetration, the sabot and base cap are stripped away from the penetrator.　<u>2. Military small arms projectiles key-holing in flight at</u>

known distances.  The penetrator described in 1 is tilting 1 to 5 degrees depending upon when it turns to key-hole.  A White Paper is available on this topic.  No testing of the theory has been conducted.  Patent pending.

4.      All copyrights of John Taylor in and to the following publications:

1. Taylor, J. D. 1997. The Urban Sniper Rifle... Cartridge Selection & Application. *Shooter's News*, January, pp. 6-11.
2. Taylor, J. D. 1997. Parental Cartridge Cases: The Future. *Shooter's News*, June, pp. 15-27.
3. Taylor, J. D. 1998. Bullet Coating Applications: Today and the Future, *Shooter's News*, January, pp. 6-19.
4. Taylor, J. D. 1999. The .338 Lapua Magnum Cartridge: Origin, Development and Future. Part I. *Tactical Shooter*, Vol. 1, No. 12, pp. 52-66.
5. Taylor, J. D. 1999. The .338 Lapua Magnum Cartridge: Origin, Development and Future. Part II: The Men Behind the Cartridge. *Tactical Shooter*, Vol. 2, No. 1, pp. 22-25.
6. Taylor, J. D. 1999. Nomograph *versus* Analog Mil-Dot Calculators. *Tactical Shooter*, Vol. 2, No. 4, pp. 28-30.
7. Taylor, J. D. 1999. Counterpoise Captures Primary Recoil. *Tactical Shooter*, Vol. 2, No. 5, pp. 21-25.
8. Taylor, J. D. 1999. The Blaser R93 Tactical Rifle and its Novel Bolt - The Ferrari of Sniper Rifles? *Tactical Shooter*, Vol. 2, No. 5, pp. 37-43.
9. Taylor, J. D. 1999. Precision & Tactical Shooting Association - Treasure Island in a Sea of California Freeways. *Tactical Shooter*, Vol. 2, No. 6, pp. 29-33.
10. Taylor, J. D. 1999. A Step in the Evolution of the Portable Shooting Platform: The SharpshootersTM Rifle Rest. *Tactical Shooter*, Vol. 2, No. 9, pp. 53-58.
11. Taylor, J. D. 1999. Sako's TRG-21 Sniper Rifle. *Minute of Angle*, Vol. 1, No. 4, pp.1-4.
12. Taylor, J. D. 1999. Un ensemble pour la ville: Steyr SSG PIIK and .243 Winchester. *Minute d'Angle*, Vol. 1, No. 3, pp 1-3.
13. Taylor, J. D. 2000. The SIG-Sauer SSG 3000 Sniper Rifle -- A Step in the Evolution of Sniper Rifles. *Tactical Shooter*, Vol. 3, No. 1, pp. 20-26.
14. Taylor, J. D. 2000. An Evolutionary Step in Data Gathering, Target Tracking and Acquisition - The Sniper's Data Book, *Tactical Shooter*, Vol. 3, No. 2, pp. 22-29.
15. Taylor, J. D. 2000. High Kinetic Energy from an AR-15 Platform -- MAG-15 Using the .45 Professional Cartridge. *Tactical Shooter*, Vol. 5, No. 9, pp. 7-16.
16. Taylor, J. D. 2000. A Ballistician and Barrel Maker from Scotland -- His Notebook. *Precision Shooting*, Vol. 48, No. 6, pp. 48-57.
17. Taylor, J. D. 2000. Boots Obermeyer on Extreme Rifle Accuracy -- II. 5R Rifling Profile. *The Accurate Rifle*, Vol. 3, No. 12, 15-24.
18. Taylor, J. D. 2001. The Split Second QD Mount and the TS1 Tactical Stock. *The Accurate Rifle*, Vol. 4, No. 4, pp 29-36.
19. Taylor, J. D. 2002. The Voere Sniper/Target Rifle: A Sarkis Design. *The Accurate*

- 8 -

*Rifle*, Vol. 5, No. 10, 33-38.

20. Taylor, J. D. 2006. New CZ 750 Sniper Rifle: CZ Uherský Brod Returns to an Old Design; *i.e.,* the Mauser Action. ***Precision Shooting***, Vol. 58, No. 12, 90-97.

21. Taylor, J. D. 1998. .408 Cheyenne TacticalTM -- A Novel 2,000-Meter Tactical Cartridge. Part I. Tactical Shooter, Vol. 1, No. 2, pp. 70-74.

22. Taylor, J. D. 2000. .408 Cheyenne TacticalTM -- A Novel 2,000-Meter Tactical Cartridge. Part II. Tactical Shooter, Vol. 3, No. 4, pp. 5-20.

23. Taylor, J. D. 2000. .408 Cheyenne TacticalÔ - Une Nouvelle Cartouche Tactique pour le 2000 Métres. Minute d'Angle, Vol. 1, No. 7, pp. 1-3.

24. Taylor, J. D. 2002. .408 Cheyenne TacticalTM -- A Novel 2,000-Meter Tactical Cartridge. Part III. Precision Shooting, Vol. 50, No. 2, pp. 39-64

25. Taylor, J. D. 2015. New Battlefield Tactics: The 419gr/305gr .408

**EXHIBIT A-2**

**JOINT TAYLOR-HITE IP**

1.  The following patents and patent applications:

    i.     Hite, B. and J. D. Taylor.  2011.  Line of Sight Wind Speed Detection.  US Patent 7,982,862 B2.

    ii.    Hite, B. and J. D. Taylor.  2009.  Novel Night Vision Technology: Broad Band Imaging (BBI).  US Patent Application **20090206260 A1**.

2.  All patent rights, work product and other intellectual property rights relating to the following inventions to the extent conceived and developed by John Taylor and/or Brandon Hite:

    i.     New technology which identifies snipers before they take their first shot as well as triggermen before they send radio signal to buried Improvised Explosive Device (IED).  Current US Military technology to identify the location of sniper after he takes his first shot and odor sensing of the buried IED.  With the former, snipers leave their position after taking their shot, and with the latter, odor sensing is not reliable.

    ii.    New technology for night vision with high definition, wide angle of view and in multi-colors.  Placed in handheld unit.  It has been tested to 3000 meters.  US military now has mono-color out to 900 meters.  Patent application was rejected because examiner found part of technology overlapped an existing non-night vision technology.  (Same as 1(ii) above)

    iii.   A novel technology for range finding that has been tested to 5000 meters.  Placed in handheld unit.  This does not use IR – significance, the enemy can identify IR and thus the "ranger."

    iv.    A novel technology to analyze ground heat waves (mirage) and use such information to predict the perfect riflescope settings.  To the shooter, the mirage is eliminated.  No other technology exists to compete with this technology.  This has yet to be submitted for military review and possible funding.

# EXHIBIT 31

# THIRD AMENDMENT

## To

## CHEYTAC USA, LLC
## OPERATING AGREEMENT

This Third Amendment to CheyTac USA, LLC Operating Agreement (the "**Amendment**") is made as of January 2, 2017 (the "**Effective Date**"), among Joseph Warren ("**Manager**"); Praecisa Tenuras, LLC, a Virginia limited liability company ("**Praecisa Tenuras**"), and Live Oak Endeavors, LLC, a South Carolina limited liability company ("**Live Oak**"; together with Praecisa Tenuras, the "**Class A Members**"); Gerard and Elmarie Schultz, jointly with rights of survivorship (collectively, the "**New Class B Members**").

## PREAMBLE

A.     WHEREAS, CheyTac USA, LLC (the "Company) is a limited liability company originally formed in accordance with the Georgia Limited Liability Company Act (as amended from time to time, the "**Act**") by the filing of its Articles of Organization with the Georgia Secretary of State's Office on July 19, 2011;

B.     WHEREAS, Praecisa Tenuras, Dennis Omanoff and Elaine Omanoff, as Trustees of The Omanoff Family Trust ("**Omanoff Trust**"), DBM Technology, LLC, a Georgia limited liability company ("**DBM**"), and John Taylor (collectively, the "**Original Class A Members**") entered into that certain Operating Agreement of CheyTac USA, LLC dated as of September 28, 2015 (as may hereafter be modified or amended, the "**Agreement**");

C.     WHEREAS, the Original Class A Members, except for DBM, and certain "Class B Members" entered into that certain First Amendment to Operating Agreement as of February 12, 2016, to reflect, among other things, the repurchase by the Company of all of DBM's Class A Shares in the Company and the reissuance of such Class A Shares to Praecisa Tenuras and Omanoff Trust and the removal of David B. McCutcheon as a Manager and Officer of the Company;

D.     WHEREAS, the Class A Members entered into that certain Second Amendment to Operating Agreement as of November 2, 2016, to reflect, among other things, the repurchase by the Company of all of the Class A Shares held by Omanoff Trust and the reissuance of such Class A Shares to the Class A Members and the resignation of Dennis Omanoff from his positions as Manager and CEO of the Company;

E.     WHEREAS, the parties desire to amend the Agreement further to reflect the repurchase of certain Class A Shares from John Taylor, the reissuance of such Class A Shares to the Class A Members, the repurchase of certain Class B Shares from Brandon Hite, the issuance of Class B Shares to the New Class B Members and certain other matters.

NOW, THEREFORE, the parties hereto agree to amend the Agreement as set forth herein as of the Effective Date.

1

1.     Definitions.   Defined terms that are not otherwise defined herein shall have the meaning provided to such terms in the Agreement.

2.     John Taylor and Brandon Hite Share Repurchase and Reissuance of Shares.

(a)     All Class A Shares held by John Taylor consisting of 600,000 Class A Shares (the "**Taylor Shares**") and all Class B Shares held by Brandon Hite consisting of 18,600 Class B Shares (the "**Hite Shares**") were repurchased by the Company as of January 1, 2017, pursuant to the Membership Interest Purchase Agreement and Settlement Agreement (the "**Settlement Agreement**") dated as of January 1, 2017 made by and among the Company, the Class A Members, Joe Warren, John Taylor and Brandon Hite.  As of January 1, 2017, John Taylor and Brandon Hite ceased to be Members of the Company.

(b)     As of the Effective Date, 487,500 of the Taylor Shares shall be reissued to Praecisa Tenuras and 112,500 of the Taylor Shares shall be reissued to Live Oak.  The Manager and the Class A Members hereby approve such reissuance of the Taylor Shares and agree that the Taylor Shares shall not be deemed "Additional Interests" under the Agreement.  .

(c)     Schedule 3.01 of the Agreement is hereby amended to substitute the updated Schedule 3.01 attached hereto and made a part hereof, which reflects the foregoing transactions and the issuance of Class B Shares pursuant to Paragraph 3 below.

3.     Issuance of Class B Shares.   As of the Effective Date, the Company hereby issues to the New Class B Members 600,000 Class B Shares in accordance with and subject to the terms of the Agreement.  The foregoing Class B Shares are non-voting, fully vested and shall hereafter be identified as the "Class B2 Shares".  The Class B Share Threshold Amount for the Class B2 Shares shall be deemed to be $100,000.00, subject to adjustment if and to the extent deemed necessary by the Board pursuant to the Agreement.  Each of the New Class B Members hereby agrees to execute such other documents as may be required by the Agreement or as otherwise required by the Company as a condition to the issuance of the Class B2 Shares including without limitation a Member Repurchase Agreement (the "**Member Repurchase Agreement**") in the form attached hereto as Exhibit "H".  The Manager hereby approves the issuance of the Class B2 Shares to the New Class B Members in accordance with the foregoing terms.

4.     Admission of Class B Members.   Each of the New Class B Members is hereby admitted as a Class B Member of the Company.  Each of the New Class B Members hereby makes each of the representations and warranties set forth in Section 6.07 of the Agreement as of the Effective Date and acknowledges that he has reviewed the Agreement, as amended hereby, the Member Repurchase Agreement and the Protections and Rights and each of the New Class B Members agrees to be bound by all terms and provisions of the Agreement, the Member Repurchase Agreement and the Protections and Rights, as may be amended from time to time.

5.     Power of Attorney.   Each of the New Class B Members hereby appoints the Manager as such Member's attorney-in-fact to execute all documents and amendments required to be executed by such Member pursuant to the Agreement, the Member Repurchase Agreement  or any other agreement between the Company

2

and such Member or which is reasonably necessary to effect the provisions thereof. This power of attorney, being coupled with an interest, shall be irrevocable.

6.     <u>Further Assurances</u>. Each of the New Class B Members shall as often as and whenever requested to do so by the Manager execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all instruments and documents as the Company may reasonably determine to be necessary to carry out the provisions of this Amendment.

7.     <u>Representations of the Members</u>. Each Member hereby represents and warrants to the Company as follows: (a) Member has the full power and legal capacity to execute, deliver, and carry out the terms and provisions of this Amendment and to consummate the transactions contemplated hereby; (b) this Amendment constitutes a legal, valid, and binding obligation of Member enforceable against Member in accordance with its terms; and (c) the execution, delivery and performance of this Amendment by Member will not result in a breach or violation by Member of, or constitute a default by the Member under, any statute, ordinance, rule, regulation, franchise, permit, agreement or instrument to which Member is or may be a party or by which Member is otherwise bound.

8.     <u>Miscellaneous</u>. Except as expressly set forth herein, the Agreement remains unmodified and unchanged and the parties hereto ratify and confirm the Agreement, as amended hereby. This Amendment: (a) may be amended only by a writing signed by each of the parties; (b) may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument; (c) together with the other agreements referenced herein contains the entire agreement of the parties with respect to the transactions contemplated hereby and supersedes all prior written and oral agreements, and all contemporaneous oral agreements, relating to such transactions; (d) is governed by, and will be construed and enforced in accordance with, the laws of the State of Georgia, without giving effect to any conflict of law rules; and (e) is binding upon, and will inure to the benefit of, the parties and their respective successors and permitted assigns.

[SIGNATURE PAGES FOLLOW]

## <u>SIGNATURE PAGE TO THIRD AMENDMENT</u>

**MANAGER:**

_____
Joseph Warren

**CLASS A MEMBERS**:

PRAECISA TENURAS, LLC

By: _____
Name: _____
Title: _____

LIVE OAK ENDEAVORS, LLC

By: _____
Name: _____
Title: _____

**NEW CLASS B MEMBERS:**

_____
Gerard Schultz

_____
Elmarie Schultz

**Schedule 3.01**

**SCHEDULE OF MEMBERS**
**As of January 2, 2017**
**CheyTac USA, LLC**

| Member | Address for Notices | Class A Shares | Capital Contribution | Class A Share Percentage | Class B Shares | Class B Share Percentage | Total Share Percentage |
|--------|---------------------|----------------|----------------------|--------------------------|----------------|--------------------------|------------------------|
| Praecisa Tenuras, LLC | 255 St. Philip St. Charleston, SC 29403 | 15,112,500 | $700,000 (previously contributed) See Exhibit E + $625,000 | 81.250% | 0 | 0 | 75.5625% |
| Live Oak Endeavors, LLC | 255 St. Philip St. Charleston, SC 29403 | 3,487,500 | 375,000 | 18.750% | 0 | 0 | 17.4375% |
| Michael Golden | 99 Iron Bottom Lane Charleston, SC 29492 | 0 | | 0 | 186,000 B1 | 13.286% | 0.930% |
| Gerard and Elmarie Schultz | 12A Sheppard St. Charleston, SC 29403 | 0 | | 0 | 186,000 B2 | 13.286% | 0.930% |
| Class B Shares Reserved by Company | | 0 | N/A | 0 | 1,028,000 | 73.428% | 5.14% |
| **Totals:** | | **18,600,000** | | **100%** | **1,400,000** | **100.00%** | **100%** |

1

**EXHIBIT H**

**CHEYTAC USA, LLC**
**MEMBER REPURCHASE AGREEMENT**

THIS MEMBER REPURCHASE AGREEMENT is made effective as of the 2nd day of January, 2017, between Gerard and Elmarie Schultz, jointly with rights of survivorship (collectively, the **"Member"**), and CHEYTAC USA, LLC, a Georgia limited liability company (hereinafter referred to as the **"Company"**).

**Background Information**

A.     As of the date hereof, the Member owns the below interests (collectively referred to as the **"Shares"**):

| Member | Class A Shares | Class A Share Percentage | Class B Shares | Class B Share Percentage | Total Share Percentage |
|---|---|---|---|---|---|
| Gerard and Elmarie Schultz | 0 | 0 | 186,000 | 13.286% | 0.930% |

B.     The Member and the Company desire to enter into this Member Repurchase Agreement to provide, among other items, for the disposition of the Shares upon the occurrence of certain events and to restrict the transferability of the Shares for the purpose of assuring the continuous and harmonious management of the affairs of the Company in the future.

NOW, THEREFORE, in consideration of the mutual promises contained herein, and intending to be legally bound hereby, the parties hereto acknowledge the accuracy of the foregoing background information and hereby agree as follows:

**1.     Restrictions on Transfers**.  Except as otherwise provided in this Agreement, the Member shall not, voluntarily or involuntarily, by operation of law or otherwise, transfer, sell, assign, pledge or encumber (hereinafter referred to collectively as a **"Transfer"**) any of its Shares in the Company to or in favor of any person, firm or corporation without the written consent of the Manager of the Company.  Any Transfer of all or any portion of the Shares held by the Member, except in the manner specified or permitted in this Agreement, shall be null and void, and the Company and its Secretary shall not recognize or give effect to such Transfer on its books and records, or recognize the person or persons to whom such Transfer has been made as the legal or beneficial holder thereof.

**2.     Permitted Transfers**.  Notwithstanding the restrictions set forth in Paragraph 1, the Member shall be permitted at any time and from time to time to transfer all or any part of its Shares to any Permitted Transferee, although such transferred Shares shall remain subject to this

Agreement and the Permitted Transferee shall agree to be bound by the terms and conditions of this Agreement as if the Permitted Transferee were the Member for all purposes hereunder, including without limitation any obligation to sell the Shares pursuant to Paragraph 3 hereof. A Permitted Transferee shall include the transfer of an interest in the Shares of the Company:

      (i)    to the Company pursuant to Paragraph 3.1;

      (ii)    to the members of the Member individually or to their estates or trusts for their benefit, as applicable, upon the dissolution of the Member, subject, however, to the provisions of Paragraph 3.2; or

      (iii)    to a trustee or receiver as the result of the bankruptcy, insolvency, or similar proceeding brought by or against the Member, subject, however, to the provisions of Paragraph 3.3.

In the event of any conflict under this Agreement, the terms of this section 2 shall have priority over and shall govern any disposition of Shares hereunder.

**3.**    **Events Triggering Purchases and Sales.**

    **3.1**    **Member Put**. The Member may at any time following January 2, 2020 offer to sell all or any part of the Shares as owned by the Member to the Company by written notice. The Company shall purchase all of such Shares as offered. Any purchase by the Company under this Paragraph 3.1 shall be upon the terms and conditions set forth in this Agreement, including the price and payment terms as set forth in Paragraphs 4 and 5 of this Agreement.

    **3.2**    **Company's Call Rights**. If (i) the Member's legal existence is terminated, or (ii) the Member's (or its principal's) service with the Company terminates whether due to retirement or voluntary or involuntary termination, or (iii) Members owning at least sixty percent (60%) of the total outstanding Class A Shares in the Company decide to call the Member's Shares for any reason at any time (this is measured by the percentage of Class A Shares owned versus the total issued and outstanding Class A Shares, and not by the number of persons or entities owning such Class A Shares), then for a period of six (6) months following any of the foregoing events, the Company shall have the option to purchase from the Member, and the Member thereafter shall be obligated to sell to the Company, all of the Shares of the Company then owned by the Member, in accordance with the procedures and pursuant to the terms set forth in Paragraph 3.4.

    **3.3**    **Transfers by Operation of Law**. In the event the Member (i) files a voluntary petition under any bankruptcy or insolvency law or a petition for the appointment of a receiver or makes an assignment for the benefit of creditors, (ii) is subjected involuntarily to such a petition or assignment or to an attachment or other legal or equitable interests with respect to the Shares in the Company and such involuntary petition, assignment or attachment is not discharged within sixty (60) days after its effective date, or (iii) is subjected to any other involuntary transfer of the Shares by legal process, including an assignment or transfer incident to a divorce of Joe, the Company shall have the option to purchase all of the Shares that are subject to the involuntary

transfer, and the Member shall be obligated to sell  to the Company all of the Shares of the Company then owned by the Member, in accordance with the procedures and pursuant to the terms and conditions set forth in Paragraph 3.4.

**3.4**  **Procedural Requirements for Purchase**.  Upon the occurrence of an event triggering a purchase and sale under Paragraph 3.2 or 3.3, the Company shall have the option to purchase all of such Shares. Any purchase by the Company shall be upon the terms and conditions set forth in this Agreement, including the price and payment terms as set forth in Paragraphs 4 and 5 of this Agreement.

**3.5**  **Bring-Along Rights**.

**3.5.1**  **Sale of the Company**.  If the Manager, at any time or from time to time, in one transaction or a series of transactions, desires to enter into an agreement (whether oral or written) to transfer all of the outstanding shares of the Company in an arms-length sale to one or more unrelated third parties  (for purposes of this Paragraph, a **"Bring-Along Sale"**), and such sale has been approved by the requisite vote of the members of the Company pursuant to the Company's Operating Agreement dated as of September 28, 2015, as it may be amended from time to time (the **"Operating Agreement"**), then the Manager shall have the right, but not the obligation, to cause the Member to tender for purchase all of the Shares held by the Member. Any such sale by the Member shall be on the same terms and conditions as the proposed sale by the Manager. In any such sale, the Company shall be required to bear all of the expenses of the transaction, including, without limitation, legal, accounting and investment banking fees and expenses.

**3.5.2**  **Bring-Along Notice**.  Upon advice of the Manager, the Company shall promptly provide the Member with notice of the Bring-Along Sale, which shall contain the following information:

(i)  the name and address of the proposed purchaser of the Shares;

(ii)  the proposed amount and form of consideration to be paid for the Shares; and

(iii)  that the proposed transferee or purchaser has been informed of the Bring-Along Rights as provided in this Paragraph.

**4.**  **Purchase Price Determination**.  The purchase price of each Share to be purchased and sold pursuant to Sections 3.1-3.4 of this Agreement shall be determined as follows:

**4.1**  The value of the Company shall be determined in accordance with the Purchase Price Determination attached hereto as Exhibit A.

**4.2**  The value as established under Paragraph 4.1 shall be divided by the number of issued and outstanding Shares to determine a per Share purchase price.

**4.3**     The number of Shares to be purchased by the Company from the Member shall be multiplied times the per Share purchase price calculated pursuant to Paragraphs 4.1 and 4.2 to determine the purchase price payable to the Member.

**5.     Purchase Terms and Conditions.**

**5.1     Payment of Purchase Price.**   Except as may otherwise be provided in this Agreement, the purchase price of any Shares purchased shall be paid by certified or cashier's check  at the closing specified herein, or, at the option of the Company, as follows:

(i)     By a down payment of at least ten percent (10%) of the total purchase price by certified or cashier's check at the closing specified in Paragraph 5.3.

(ii)     The balance of the total purchase price shall be paid in up to one hundred twenty (120) equal monthly installments of principal and interest. This installment obligation will be evidenced by an installment note (the "**Note**") containing the terms specified in Paragraph 5.4. The first installment payment will be due as of the first day of the month after the closing date set forth in Paragraph 5.2.   In addition, if the Member or Joseph Warren is owed any deferred salary, benefits or expense reimbursements at the time an election to sell or purchase the Shares is exercised, all of such amounts owed shall be paid in cash at the closing specified in Paragraph 5.3.

**5.2     Closing Date.**  The closing date shall be on or before ninety (90) days following the date on which the notice of an election to sell or purchase the applicable Shares is delivered pursuant to the applicable triggering event outlined above, at a time, place and date specified in a written notice from the Company to the Member.  If this date is a Saturday, Sunday or holiday, then the closing shall be held on the first business day thereafter.

**5.3     Closing.**  At the closing held pursuant to Paragraph 5.2:

(i)     The Company shall deliver to the Member (or its successor-in-interest):

(a)  the payments specified in Paragraph 5.1; and/or

(b)  a duly executed Note and Pledge Agreement containing the provisions required by Paragraph 5.4 and Paragraph 5.6, together with duly executed stock powers for attachment to the certificates for the Shares.

(ii)     The Member (or its successor in interest) shall deliver to the Company:

(a)  Share certificates for all of the Shares that are to be purchased and which are in Member's possession or control and, if requested by Company, either duly endorsed in blank for transfer or with duly executed stock powers attached.   In the event a Note has been

- 4 -

delivered for payment of a portion of the Purchase Price, the Share certificates shall be held by a third party escrow agent mutually acceptable to the Company and Member until payment in full and satisfaction of the Note;

(b) A written resignation from all positions held by Member (or its principal) in the Company as an officer, director, employee or consultant except to the extent the Member or principal of Member is a Manager and elects to continue serving as a Manager following a voluntary retirement; and

(c) Any other documents or agreements required by this Agreement.

**5.4     Terms of the Note**.  The Note specified in Paragraph 5.1 shall be in the amount of the difference between the total purchase price and any down payment required to be made at the closing.  Interest shall be added to each installment, computed against the outstanding balance at the due date of the installment at the 10 Year Treasury Rate plus 2%, with a maximum of 6%, to be reset on January 2 of every year during the term of the Note.  The Note shall provide that the Company shall have the privilege at any time to prepay without penalty all or any part of the balance due on the Note with interest to the date of prepayment.  Partial prepayment shall be applied to the last maturing installments in inverse order.  The Note shall be immediately due and payable in the event of a Company Sale, as defined in **Exhibit A** attached hereto.

**5.5     Default**.  Failure to make any payment required by any Note, when due or the breach of any warranty or covenant in the Pledge Agreement, which is not covered within any applicable grace or notice and cure period, shall constitute a default on the Note and shall cause the remaining unpaid balance to become immediately due and payable, and the Member shall have all the rights and remedies to enforce payment of the unpaid balance authorized by law and to exercise his or its remedies under the Pledge Agreement; provided, however, that before taking any remedial action to enforce payment, the Member (or  its successor in interest) shall deliver written notice of the default to the Company and if the payment in default is paid in full within thirty (30) days from the date of receipt of the notice, the default will be deemed cured.  Following the second such written notice, the Member shall not be required to provide any additional notice to the Company before taking remedial action to enforce payment.

**5.6     Security for Unpaid Balance**.  Any Note issued by the Company under Paragraph 5.4 shall be secured by the Company's pledge a first-priority security interest in the Shares purchased pursuant to a pledge and security agreement (the **Pledge Agreement**" and  by the filing of a Financing Statement naming the Company as debtor  in the appropriate filing office in the State of Georgia.  The Pledge Agreement shall contain representations, warranties, covenants and remedies customarily included in a securities pledge agreement that would be provided to a commercially reasonable institutional lender in similar circumstances.

**6.     Further Acts**.  The Member shall execute and deliver all papers and do all other things as may be necessary to consummate any purchase and sale hereunder.

7.     **Effect of Other Laws**.  The obligations under this Agreement of any purchaser of Shares shall be subject to the effect of all laws, regulations and agreements by which the purchaser is bound including, without limitation, (i) loan agreements, the Georgia Limited Liability Company Act, and the Company's Articles of Organization, any or all of which may restrict or prohibit a purchase of Shares in certain circumstances; (ii) federal or state antitrust laws; and (iii) federal or state securities laws, which may require that legal counsel of the Company's choosing, at the Company's expense, determine an exemption from compliance with applicable registration requirements; provided, however, that the Company shall exert its best efforts to overcome any restrictive effect.

8.     **Shares Covered by this Agreement**.  This Agreement, as applicable, shall apply to all Shares that are now or hereafter registered in the Company's records in the name of the Member and to all Shares now or hereafter beneficially owned by the Member.

9.     **Endorsement on Certificates**.  A legend in substantially the following form shall be endorsed conspicuously on each of the certificates representing the Shares of the Member.

> THE SHARES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, OR ANY APPLICABLE STATE SECURITIES LAWS, AND NO TRANSFER OF SUCH SHARES MAY BE MADE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH LAWS OR THE AVAILABILITY OF EXEMPTIONS FROM THE REGISTRATION PROVISIONS THEREOF.
>
> ANY SALE, ASSIGNMENT, TRANSFER, PLEDGE OR OTHER DISPOSITION OR ENCUMBRANCE OF THE SHARES OF OWNERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY, AND SUBJECT TO, THE TERMS AND PROVISIONS OF AN AGREEMENT AMONG THE COMPANY, THE MEMBER AND OTHERS. A COPY OF SUCH AGREEMENT IS ON FILE WITH THE SECRETARY OF THE COMPANY.

A copy of this Agreement shall be filed with the Secretary of the Company.  During the term of this Agreement, a legend reading substantially as above shall be endorsed on each certificate for Shares issued by the Company to the Member.

10.    **Certificates to be Held by the Secretary of the Company**.  Upon execution of this Agreement, the Member shall deliver certificates representing all of the Shares of the Company owned by it, together with undated stock powers duly executed in blank, to the Secretary of the Company who shall hold such certificate(s) in escrow until such time as it is (they are) required to be delivered pursuant to this Agreement. The Member hereby agrees that the

- 6 -

Secretary of the Company shall deliver such certificates to the Company for cancellation at such time as any redemption provisions of this Agreement become applicable.

**11.** **No Agreement to Employ**. Nothing contained in this Agreement shall be construed to constitute or be evidence of an agreement or understanding, express or implied, on the part of the Company to employ or retain the Member for any specific period of time.

**12.** **Remedies**.

    **12.1** **Specific Performance**. The parties hereto agree that, except as provided herein, the Shares cannot be purchased or sold in the open market, that this Agreement is vitally important to the continuing welfare of the Company and its Members, and that damages are totally inadequate to remedy any default hereunder. Accordingly, should any dispute arise concerning the Transfer of any of the Shares, the parties consent and agree that an injunction may be issued to restrain any such Transfer pending the dispositive resolution of such controversy. In the event of any controversy concerning the purchase of any of the Shares in accordance with the terms and conditions of this Agreement, such purchase shall be enforceable in a court by a decree of specific performance. Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies at law or in equity which the parties hereto may possess. This Section shall be binding upon all persons whose Shares are subject to any term or condition of this Agreement.

    **12.2** **Arbitration**. Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled, except as may otherwise be provided herein, by arbitration held in Atlanta, Georgia, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Either party may file a written Demand for Arbitration with the American Arbitration Association's Atlanta, Georgia Regional Office (and if no such Regional Office exists, the nearest Regional Office), and shall send a copy of the Demand for Arbitration to the other party. The arbitration shall be conducted pursuant to the terms of the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association, except that discovery may be had in accordance with the Federal Rules of Civil Procedure. The venue for the arbitration shall be Atlanta, Georgia. The arbitration shall be conducted before one arbitrator selected through the American Arbitration Association's arbitrator selection procedures. The arbitrator shall promptly fix the time, date and place of the hearing and notify the parties. The parties shall stipulate that the arbitration hearing shall last no longer than five business days. The arbitrator shall render a decision within 10 days of the completion of the hearing, which decision may include an award of legal fees, costs of arbitration and interest. The arbitrator shall promptly transmit an executed copy of its decision to the parties. The decision of the arbitrator shall be final, binding and conclusive upon the parties. Each party shall have the right to have the decision enforced by any court of competent jurisdiction. Notwithstanding any other provision of this Section 12.02, any dispute in which a party seeks immediate injunctive relief may be brought in any court having jurisdiction.

**13.** **Termination**. This Agreement shall terminate and the Shares shall be released from the terms and conditions of this Agreement upon the earlier of:

(i)     The mutual written agreement of the Member and the Company; and

(ii)    The liquidation of the Company following bankruptcy or the dissolution of the Company.

**14.     Notices**.  Any and all notices, designations, consents, offers, acceptances, or any other communication provided for herein shall be given in writing by registered or certified mail addressed to the Company at its principal office and to the Member at the address appearing on the books of the Company or the Member's residence or to such other address as the Member may designate.

**15.     Rule of Construction**.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions, and the Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

**16.     Binding Effect**.  This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their heirs, legal representatives, executors, successors and assigns.

**17.     Modification**.  No change or modification of this Agreement shall be valid unless made in writing and approved by the Company and the Member.

**18.     Entire Agreement**.  This Agreement, along with the additional documents referenced in this Agreement, contains the complete agreement between the parties regarding the subject matter hereof and shall, as of the effective date hereof, supersede all prior agreements, commitments, representations, writings and discussions between the parties.  The parties stipulate that none of them has made any representation with respect to the subject matter of this agreement or the execution and delivery hereof, except such representations as are specifically set forth herein, and each of the parties hereto acknowledges that he or it has relied on its own judgment in entering into this Agreement.  The parties hereto further acknowledge that any representations that may have heretofore been made by any of them to the others are of no effect and that none of them has relied thereon in connection with his or its dealings with the others.

**19.     Gender**.  As used herein, the singular shall include the plural and the plural shall include the singular and any gender shall include the masculine or the feminine as the case may be.  The terms "herein," "hereto," "hereunder" and the like shall be deemed to refer to this Agreement as a whole and not to any particular Paragraph or other subdivision of this Agreement.

**20.     Governing Law**.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Georgia.

**21.     Counterparts**.  This Agreement may be executed and delivered in any number of counterparts, all of which when executed and delivered shall have the force and effect of an original.

*[signature page follows]*

- 8 -

IN WITNESS WHEREOF, the Company has caused this Agreement to be signed by its duly authorized officers and the Member has executed this Agreement on the date first above written.

**COMPANY:**

CHEYTAC USA, LLC

By: _____

Name: _____

Title: _____


**MEMBER:**

_____
Gerard Schultz

_____
Elmarie Schultz

- 1 -

adjusted for the issuance of any additional shares in the Company between the date of the Share