UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 17-60925-CIV-ALTONAGA

CheyTac USA, LLC,

> *Plaintiff*,

> *v.*                                                    **Oral Argument Requested**

NextGen Tactical, LLC, Dennis Omanoff,
and Dr. John Taylor,

> *Defendants*.

_____/

**DEFENDANTS' RESPONSE TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

## INTRODUCTION

Plaintiff CheyTac USA, LLC is a Georgia company formed on July 19, 2011. Plaintiff purports to be in the firearms industry.[1] Defendant NextGen Tactical LLC (NextGen) is a Florida company with only a sample website and brochure that show various firearms. NextGen has never manufactured or sold any firearms or munitions.[2] It does not have a federal license to sell or manufacture firearms.[3] Despite this, Plaintiff sued to protect alleged intellectual property rights in four products that Plaintiff did not develop itself. Those same products are currently being sold by many other companies, using widely available specifications and parts. The products at issue are:

- "M-200 Intervention" rifle,

- "M-300 Intervention" rifle,

- ".375 CheyTac" or ".375 CT" ammunition, and

- ".408 CheyTac" or ".408 CT" ammunition.

All of those products were developed and manufactured by different companies long before Plaintiff was formed. Plaintiff is nothing more than a company that shares a name with an earlier, more successful gun business, also called "CheyTac," that was operated by different people. Plaintiff is attempting to trade on the success of that earlier company by claiming rights to proprietary secrets it never possessed—and to prevent Defendants' from legitimate competition—using information that has long been available in the public sphere.

---

[1]   *See* Compl. ¶ 1.

[2]   June 23, 2017 **Omanoff Decl. ¶ 4** (being filed concurrently herewith).

[3]   June 23, 2017 **Van Horn Decl. Ex. 16**, Listing of Federal Firearms Licensees, Florida (updatedApril 2017). *See also* "Listing of Federal Firearms Licenses," BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (accessed June 13, 2017), https://www.atf.gov/firearms/listing-federal-firearms-licensees-ffls-2017 (providing lists of licensees for all states and territories). The Van Horn Declaration is being filed concurrently herewith.

Plaintiff's Motion for Preliminary Injunction ("Motion") is its *fourth* pre-answer motion for preliminary relief. The Court has denied the other three, and it should deny this one too. Plaintiff still fails to appreciate the applicable law and relevant facts.

In its ***unverified*** Complaint[4] and motions for injunctive relief, Plaintiff, among other things:

- tries to protect alleged "trade secrets," even though the "secret" information is readily available on the internet and was created by other companies;

- seeks to halt sales by Defendants, even though there have been none; and

- claims a right to recover Defendants' alleged unjust enrichment, even though Defendants have yet to sell any product.

There are numerous other problems with Plaintiff's claims. The causes of action for trade dress infringement and false designation of origin relate to products that have only four major components—none of which originated from or belong to Plaintiff. Those components are freely sold by other companies in a form identical to what Plaintiff claims to sell. Plaintiff asserts that its rifles and ammunition are proprietary, but many other companies build and sell those exact products. Plaintiff's allegations center on a brochure mock-up that depicts only the type of products Defendants *might sell* in the future. Finally, even if Plaintiff's claims were otherwise supportable, it could not bring them in federal court. As Defendants have repeatedly cautioned Plaintiff, each of its causes of action is subject to arbitration. Any dispute as to whether a claim is subject to arbitration, moreover, must also be determined in the arbitration proceeding. Plaintiff's motion for preliminary injunctive relief should be denied.

---

[4]    Plaintiff contends that the Complaint is "verified," but there is no verification on the face of the Complaint. ECF No. 1.

## STATEMENT OF FACTS

A.   **Plaintiff is not the Original "CheyTac" company. Most of the products at issue were developed by the Original CheyTac and manufactured by other companies.**

Plaintiff claims that it is "a pioneer and acknowledged leader in the development and design of its patented balance control flight projectiles (bullets) and high caliber tactical rifles [ ] which enable these projectiles to travel further and with greater accuracy than competitors."[5] There is no factual support for that position, largely because Plaintiff is not actually the company it claims to be. It isn't the first company to trade under the name "CHEYTAC" or to sell products labeled with that mark.[6] Nor was Plaintiff responsible for developing or designing any of the products at issue in this suit. Plaintiff is trying to trade on the success of an earlier company with the name "CheyTac." Any trade secrets that original company may have had were long ago scattered to the wind and are currently available to all. Today, Plaintiff is only one of many companies that sell the products it claims are proprietary.

In 1998, Defendant John Taylor, Ph.D., established Tactical High Energy Impact Systems, LLC ("THEIS"), a company that designed, sold, and distributed ammunition.[7] In 1999, Dr. Taylor met Warren Jensen, who was then co-owner of Lost River Ballistics Technologies, Inc. ("Lost River"). Jensen developed a "balance flight theory" for bullet design.[8] Working together, in January 2002, Dr. Taylor and Jensen released the ".408 CheyTac" cartridge:[9] They jointly announced the release of

---

[5]   Compl. ¶ 1.

[6]   It isn't even the only firearms company currently using the word "CheyTac" in its product names. *See infra* Section D; *see also generally* **Van Horn Decl.**

[7]   June 22, 2017 **Taylor Decl. Ex. 1**, THEIS Articles of Organization (Jan. 28, 1998). The Taylor Declaration is being filed concurrently herewith.

[8]   **Taylor Decl. Ex. 2**, Press Release (Jan. 15, 2002).

[9]   A modern cartridge consists of the (1) bullet, (2) case, (3) propellant, (4) rim, and (5) primer. "Cartridge (firearms)," Wikipedia (accessed June 15, 2017), https://en.wikipedia.org/wiki/Cartridge_(firearms).

the cartridge to market on behalf of THEIS and Lost River on January 15, 2002.[10]

On April 10, 2002, THEIS and Dr. Taylor organized the first and original CheyTac entity, CheyTac Associates, LLC ("Original CheyTac") in Idaho.[11] THEIS (owned by Dr. Taylor) owned 20% of Original CheyTac, Lost River (owned by Jensen) owned 20% of Original CheyTac, and there were three other members.[12] Jensen became Director of Research and Development; Dr. Taylor was Chairman of the Board.[13] On April 29, 2003, THEIS registered the trademark "CHEYTAC."[14] But there is no indication in the Patent and Trademark Office database that THEIS ever transferred the "CHEYTAC" mark to Original CheyTac.[15] On October 7, 2003, Jensen's "balanced flight" projectile design patent was approved.[16] Jensen apparently used that patent as Lost River's payment for its membership in Original CheyTac, although there is no indication in patent records that rights to the patent were ever transferred away from Jensen.[17]

In addition to the .408 CheyTac cartridge, Original CheyTac announced and later began distributing the CheyTac M-200 Intervention rifle.[18] Under an agreement with THEIS, the M-200 Intervention was initially manufactured by a (now-defunct) third party company, E.D.M. Arms, Inc.,

---

[10]   **Taylor Decl. Ex. 2**, Press Release (Jan. 15, 2002) (emphasis in original).

[11]   **Taylor Decl. Ex. 3**, Original CheyTac Operating Agmt. (amended Nov. 14, 2003).

[12]   **Taylor Decl. Ex. 3**, Original CheyTac Operating Agmt. (amended Nov. 14, 2003). The other members were Bradley Development, Inc. (f.k.a. CheyTac LLC), Sniping Operations Executive, and Greenwich Ballistics LLC (in which Corey Kupersmith, discussed more below, was a member).

[13]   **Taylor Decl. Ex. 4**, Original CheyTac Organizational Chart (September 2004).

[14]   **Van Horn Decl. Ex. 14**, U.S. Trademark Application Serial No. 2,711,809 (filed Sept. 5, 2000).

[15]   **Van Horn Decl. Ex. 14**, U.S. Trademark Application Serial No. 2,711,809 (filed Sept. 5, 2000); *See also* **Taylor Decl. ¶ 13**.

[16]   **Van Horn Decl. Ex. 13**, U.S. Patent No. 6,629,669 (filed June 14, 2001).

[17]   **Taylor Decl. ¶ 7**.

[18]   **Taylor Decl. Ex. 5**, Original CheyTac M-200 and M-310 specification Sheets and Original CheyTac Intervention Information Papers. *See also* **Taylor Decl. Ex. 2**, Press Release (Jan. 15, 2002) (announcing the coming "Intervention" rifle).

and sold by Original CheyTac.[19] In July 2006, Original CheyTac also released the .375 CheyTac cartridge to the consumer market for extreme range shooting.[20] Lost River was initially responsible for making the .408 and .375 cartridges sold by Original CheyTac.[21]

Thus, three of the four products on which Plaintiff's claims are based (.408 and .375 munitions; M-200 Intervention) were developed and produced by Lost River or Original CheyTac years before Plaintiff ever existed.[22] But in the Complaint, Plaintiff takes credit for the research and development of those products.[23] It asserts proprietary rights to the alleged trade secrets associated with them, even though Plaintiff never exclusively possessed any such trade secrets.[24] For example, when Plaintiff alleges that the M-200 Intervention rifle was "ranked the #1 Sniper Rifle in the world by the Military Channel," it is referring to the rifle created by Original CheyTac.[25]

The successes of Original CheyTac did not last due to poor management and internal disputes. Corey Kupersmith became CEO. Lost River went out of business. Another company tried to take over the manufacture of ballistics from Lost River, but it too went out of business.[26] Multiple lawsuits ensued, with the members of Original CheyTac all claiming rights to certain intellectual property,

---

[19]  **Taylor Decl. Ex. 6**, THEIS Contract with EDM for Manufacture of Intervention Rifles (June 1, 2001).

[20]  **Taylor Decl. Ex. 7**, .375 CT Press release (July 13, 2006).

[21]  *See* **Taylor Decl. Ex. 2, Ex. 7**, Press Releases (Jan. 15, 2002 and July 13, 2006).

[22]  As discussed below [*see infra* Section D], the M-300 is a composite of widely available major parts. It is simple for any manufacturer to assemble and sell completed rifles identical to the M-300, and indeed other companies do, in fact, sell the identical rifle.

[23]  *See, e.g.*, Compl. ¶ 4 (claiming that "M200 and M300 rifles [ ] and .375CT and .408CT" are *Plaintiff's* most award-winning and proprietary products). *See also id.* ¶ 44 (calling those same products "cornerstone" to *Plaintiff's* research).

[24]  *See, e.g.*, Compl. ¶ 45 (alleging without any supporting factual basis that Plaintiff's "business is highly dependent upon extensive research and development activity."). *See also* Compl. ¶ 41 (falsely asserting that Plaintiff developed the M-200 Intervention rifle).

[25]  *Compare* Compl. ¶ 4 *with* **Taylor Decl. ¶¶ 9, 11**.

[26]  **Van Horn Decl. Ex. 17**, Jamison Int'l V LLC Profile & Filings South Dakota Sec'y of State.

including Jensen's "balanced flight" patent.[27] Original CheyTac stopped active operations, but was

never wound down.[28] THEIS (Dr. Taylor) continued to hold a 20% interest in the company.[29] On

April 17, 2011, Kupersmith offered Dr. Taylor $50,000 for that interest; Dr. Taylor rejected the offer.[30]

**B.   Plaintiff was formed without rights to the "CHEYTAC" trademark or any other intellectual property.**

After Dr. Taylor rejected Kupersmith's buyout offer, Kupersmith incorporated Plaintiff

CheyTac USA, LLC on July 11, 2011 in Georgia ("Plaintiff" or "New CheyTac").[31] Kupersmith and

DBM Technologies LLC ("DBM") (owned by David McCutcheon) were initially Plaintiff's only

members.[32] It had no capital assets on the books except for the two members' respective buy-ins of a

mere $1,000 each.[33] McCutcheon became the company's first Operating Manager. There has never

been any transfer of intellectual property, trade secret or otherwise, from Original CheyTac to New

CheyTac.[34] From 2011 to 2015, New CheyTac didn't have any rights in the trademark "CHEYTAC,"

which was still owned by THEIS.[35] On December 29, 2012, Kupersmith personally filed for Chapter

7 bankruptcy,[36] and Praecisa Tenuras LLC (owned by Joe Warren), saved the fledgling New CheyTac

---

[27]   *See, e.g.*, Compl., *Greenwich Ballistics LLC v. Jamison International V, LLC*, No. 3:11-cv-1566-RNC (Oct. 12, 2011).

[28]   Original CheyTac was administratively dissolved on July 11, 2012. Its last annual report is dated February 11, 2011. **Van Horn Decl. Ex. 18**, Idaho Sec'y of State (accessed June 12, 2017).

[29]   **Taylor Decl. ¶ 6** (Taylor never sold his interest in Original CheyTac).

[30]   **Taylor Decl. ¶ 14, Ex. 8**, Rejecting Kupersmith's Offer (Apr. 17, 2011).

[31]   **Van Horn Decl. Ex. 30**, New CheyTac Articles of Organization (July 19, 2011).

[32]   **Omanoff Decl. Ex. 1**, New CheyTac Operating Agreement (July 19, 2011).

[33]   **Omanoff Decl. Ex. 1**, New CheyTac Operating Agreement (amended Jan. 14, 2013).

[34]   **Taylor Decl. ¶ 20.**

[35]   **Taylor Decl. Ex. 11**, Taylor Transfer Letter (July 3, 2016).

[36]   **Omanoff Decl. Ex. 8**, Settlement Agmt. with Kupersmith (Jan. 17, 2017).

from failure with a $700,000 contribution.[37]

**C.    The Complaint is full of false assertions of fact concerning New CheyTac.**

On September 28, 2015, Defendant Omanoff became CEO and a member of New CheyTac;[38] McCutcheon's title was changed to "President."[39] Under a new operating agreement, Omanoff received 30% ownership in exchange for $100 and his sweat equity; Warren's Praecisa Tenuras received 30% for the $700,000 already contributed; DBM (controlled by McCutcheon) received 30% for the "balanced flight" patent he purported to have; and Dr. Taylor was brought in at 3% in exchange for his contribution of a variety of patents and trademarks, including the trademark for "CHEYTAC." Dr. Taylor became Chief of the Advisory Board, an unpaid, part-time, advisory role.[40]

When Omanoff became CEO of New CheyTac, the design specifications necessary to construct the M-200 Intervention rifle were (and still are) readily available for free online.[41] Other companies were (and are) making the same products originally sold by Original CheyTac.

---

[37]    **Omanoff Decl. Ex. 1**, New CheyTac Operating Agmt. (amended Jan. 14, 2013).

[38]    *See* **Omanoff Decl. Ex. 1**, New CheyTac Operating Agmt. (amended Sept. 28, 2015). Plaintiff attached some, but not all, of this Agreement to the Complaint. ECF Nos. 1-1, 6-1, at 34. Apparently, Plaintiff wants the Court to consider some, but not all, of the relevant contract. The entire agreement, with its incorporated exhibits, is being filed as Exhibit 1 to the Omanoff Declaration. *No part of the Agreement is confidential—including the customer lists and financial information attached thereto as Exhibit G—because no part of that fully integrated Agreement designates any part of it as such.* However, in the abundance of caution, and as a professional courtesy to Plaintiff, Defendants have redacted that information for the time being.

[39]    **Omanoff Decl. Ex. 7**, McCutcheon President Offer Letter (Sept. 28, 2015).

[40]    **Omanoff Decl. Ex. 1**, New CheyTac Operating Agmt. (amended Sept. 28, 2015) (containing Schedule of Members); **Taylor Decl. Ex. 9**, Taylor New CheyTac Contribution Agmt. (Sept. 28, 2015); **Taylor Decl. Ex. 11**, Taylor Letter Transferring CHEYTAC mark (July 3, 2016). The remaining 7% ownership was kept in a pool to fund Class B shares. At the same time, Warren's ownership increased from 14% to 30% (upgrading from Class B to Class A shares) without additional capital contribution. **Omanoff Decl. Ex. 1** (*compare* 2013 ownership *with* 2015 ownership).

[41]    **Van Horn Decl., Ex. 1** (showing CAD file examples via screenshot and reflecting that those CAD files have been publicly available since 2014); **Omanoff Decl. ¶ 11**.

The Complaint alleges that New CheyTac had "achieve[d] global recognition as one of the top firearms and munitions manufacturers in the world"[42] and that Omanoff plotted to let the New CheyTac's revenue steadily decline so that he would accrue interest on the salary owed to him.[43] In addition to defying common sense, those statements are false. Omanoff's offer letter to become CEO made clear that his salary had to be deferred from the start (at 5% interest per annum) because of New CheyTac's inability to pay him.[44] At that point, New CheyTac had abysmal rifle "manufacturing" and sales, per ATF data.[45] It had also been cited by the ATF for six violations of the National Firearms Act.[46] Shortly after Omanoff came on board, he and Warren fired McCutcheon as President.[47] Eventually, Omanoff too left New CheyTac. He had effectively been working for no pay and personally carrying certain company expenses.[48] The Complaint's allegation that the Board of Managers "demand[ed] Omanoff's immediate resignation" is made purely to be harassing: The Board did not even possess the power to demand Omanoff's resignation or to terminate his employment.[49]

**D.      Even a cursory survey of the industry and publicly available information shows that the rifles and ammunition Plaintiff purportedly sells are not proprietary.**

New CheyTac's claims regarding the alleged proprietary nature of the rifles and ammunition it sells are unsupportable. It had no hand in their original production. The overwhelming evidence on this point disproves Plaintiff's claims about proprietary rights and trade secrets.

---

[42]    Compl. ¶ 42.

[43]    Compl. ¶ 69.

[44]    **Omanoff Decl. Ex. 2**, Omanoff CEO Offer Letter (Sept. 28, 2015).

[45]    *See* **Van Horn Decl. Ex. 19**, ATF Annual Firearms Manufacturing and Export Reports.

[46]    **Omanoff Decl. Ex. 4**, ATF Letter to New CheyTac (Apr. 10, 2014), ATF Letter to New CheyTac (Jan. 22, 2014); 26 U.S.C. § 5801, *et seq.*

[47]    **Omanoff Decl. Ex. 6**, McCutcheon Letter of Termination (Jan. 19, 2016).

[48]    **Omanoff Decl. ¶ 14–15**.

[49]    *Contrast* Compl. ¶ 16 *with* **Omanoff Decl. Ex. 1**, New CheyTac Operating Agreement § 5.02 (amended Sept. 28, 2015).

In the Complaint, Plaintiff asserts that the M-200 and M-300 are "award-winning and proprietary products," and that it "substantially improved its ballistic and high caliber rifle barrel designs . . . by ***creating*** the M200 and M300 Intervention rifles and .375CT and .408CT munitions."[50] According to the Complaint, the "M200 incorporates a proprietary lands and groove barrel design and receiver connection which minimize drag forces on munitions."[51] Allegedly, the "rifle barrel design of the M200 and .375CT and, [.]408CT have become CheyTac's most popular products and cornerstone to CheyTac's research and development."[52] Plaintiff says that "the M200 and .375CT and .408CT open new business opportunities for CheyTac because of its [sic] unique and proprietary designs and patterns."[53] Further, Plaintiff claims to have acquired trade dress rights in the design and appearance of the M-300 Intervention rifle and mountable bipod.[54] The Complaint alleges that Omanoff was New CheyTac CEO when both the M-200 and M-300 were ***designed*** and manufactured.[55] Finally, the Complaint asserts that Plaintiff has acquired common law marks in ".375 CT" and ".408 CT." These allegations are simply false. There is nothing at all proprietary about any of the four products that form the heart of Plaintiff's claims.

**First**, neither rifle (M-200, M-300) and neither munition (.375CT, .408CT) were "created" or designed by Plaintiff.[56]

**Second**, the entire design blueprint for the M-200 has been available online since at least 2014. The publicly available computer-aided design (CAD) files permit anyone with the proper machinery

---

[50] Compl. ¶¶ 4, 41 (emphasis added).

[51] Compl. ¶ 4.

[52] Compl. ¶ 44.

[53] Compl. ¶ 43. *See also id.* ¶ 9 (claiming competitive advantage).

[54] Compl. ¶¶ 60, 110–15.

[55] *Contrast* Compl. ¶ 71 *with* Section A, *supra.*

[56] *Contrast* Compl. ¶ 41 *with* Section A, *supra.*

9

and necessary manufacturing skill to produce a working M-200 Intervention rifle. For example, after Plaintiff filed suit, Defendants' counsel located and freely downloaded the comprehensive technical specification and design files necessary to manufacture and assemble every part of the M-200.[57]

**Third**, rifles identical to the M-200 are currently sold by a number of companies. These include the "XDL" by Starmis Arms International LLC[58] or the "M408" by Thor Global Defense Group, to name just a few.[59] Brand new ".408 Chey Tac" replacement barrels are available from Krieger Barrels Inc. via an online form.[60] The wide availability of these products is unsurprising. The M-200 has been in production for more than twice as long as Plaintiff has been in existence.[61]

**Fourth**, all the components that comprise the M-300 rifle—barrel, trigger, stock, scope, tripod, and chassis—are available from a number of suppliers, ready to assemble by any purchaser with appropriate tooling and skill.[62] But, as with the M-200, building one's own M-300 from scratch isn't necessary: the exact rifle Plaintiff calls the "M-300 Intervention Composite" can be purchased from Allen Precision Shooting (the "375 Allen Magnum")[63] or Hill Country Rifles (the "Long Range Extreme Tactical Rifle" "available in 375 CheyTac and 408 CheyTac.").[64] The exact rifle Plaintiff calls the "M300 Aluminum XLD XTreme Long Distance Rifle" is available from at least Mirage ULR.[65]

---

[57] "Chey Tac M200," GRABCAD.COM (accessed May 25, 2017), https://grabcad.com/library/chey-tac-m200-1; *see also* **Van Horn Decl. Ex. 1**, Screenshots from GrabCad.

[58] **Van Horn Decl. Exs. 2–3**.

[59] **Omanoff Decl. Ex. 17**. For many other examples, *see* **Van Horn Decl. Exs. 6–10, 20, 27–29.**

[60] *See* "Start Building Your Custom 408 CheyTac Barrel Now!," KRIEGER BARRELS, INC. (accessed June 7, 2017), https://kriegerbarrels.com/boltorder?se=kbical&cal=49; **Van Horn Decl. Ex. 4**.

[61] **Taylor Decl. Ex. 5**, Original CheyTac M-200 and M-310 Specification Sheets.

[62] *See generally* **Van Horn Decl.; Taylor Decl. ¶ 19**.

[63] *Compare* ECF No. 35, at 15 *with* "APS X.H.S. Rifles," ALLEN PRECISION SHOOTING (accessed June 6, 2017), http://www.apsrifles.com/APS_X.H.S.html *and* **Van Horn Decl. Ex. 5** (same).

[64] *Compare* ECF No. 35, at 15 *with* "Tactical," HILL COUNTRY RIFLES (accessed June 14, 2017), http://hillcountryrifles.com/hcr/tactical *and* **Van Horn Decl. Ex. 11** (same).

[65] *Compare* ECF No. 35, at 16 *with* "Long Rage Rifles," Mirage ULR (accessed June 23, 2017),

At this stage of the litigation, the best knowledge available to Defendants is that the M-200 and M-300 rifles that Plaintiff purports to sell are bedded and chambered by other companies—*not Plaintiff*—and comprised of barrels orderable from at least six different barrel suppliers, triggers from at least two different trigger suppliers, stocks from at least four different stock suppliers, bolt actions from at least four suppliers, chassis orderable from at least six companies, and tooling available from five different firms.[66] Because of the nature of the production channels in the gun industry at least 20 companies produce rifles like those Plaintiff sells.[67]

**Fifth**, with respect to its supposedly patented and trademarked munitions, Plaintiff is responsible for giving away any rights it may have had. .375 and .408 "CT" or "CheyTac" projectiles have become generic, and the current market is flush with third-party companies making ".375 CheyTac" and ".408 CheyTac" rounds.[68] Since 2013, technical specifications for the .408 CheyTac have even been ***published in the public domain***, by at least the Commission Internationale Permanente pour L'Épreuve Des Armes à Feu Portatives ("C.I.P.").[69]

**E.      NextGen isn't selling anything and isn't licensed to sell anything, but, in any event, the unenforceable Proprietary Rights Agreements cannot prevent competition.**

Plaintiff claims that "NextGen [is] almost immediately bringing high caliber rifles and ammunition to market."[70] This is untrue. The brochure about which Plaintiff complains—sent from

---

http://www.mirageulr.com/UltraLongRange.html *and* **Van Horn Decl. Ex. 7** (same).

[66]  *See* **Van Horn Decl. ¶¶ 38–39.**

[67]  *See generally* **Van Horn Decl.**

[68]  *See, e.g.,* **Van Horn Decl. Ex. 22**, The Hunting Shack, Inc. 2015 Products List; **Van Horn Decl. Ex. 23**, Load X Spring 2015 Catalogue; **Omanoff Decl. Ex 10**, Ammunition Box ("408CheyTac"); **Van Horn Decl. Ex. 24**, SAX Munitions GmbH; **Van Horn Decl. Ex. 21**, Ashbury Precision Ordnance Catalogue; **Van Horn Decl. Ex. 32**, Screenshots from Peterson Website.

[69]  ".408 CheyTac," C.I.P (accessed June 16, 2017), http://www.cip-bobp.org /homologation/uploads/tdcc/tab-i/408-chey-tac-en.pdf. *See also* **Van Horn Decl. Ex. 26**.

[70]  Compl. ¶ 78; ECF Nos. 15, 35, Mots. for Prelim Inj. at 3 ("Plaintiff seeks an injunction to prohibit

Omanoff to Jord Carlet of Équipment de Métier de la Défense—was Omanoff's response to Carlet's inquiries about what products NextGen might provide should Omanoff return to the firearms business. In fact, Carlet requested it, and Omanoff had a mock-up hastily made in response to Carlet. NextGen had no intention or plans to produce all (or, necessarily, any) of what the flyer depicts.[71] NextGen doesn't possess the Federal Firearms License ("FFL") to sell firearms.[72] The Proprietary Rights Agreements ("PRAs") Omanoff and Taylor signed don't prohibit nonexistent sales:

> I [Taylor/Omanoff] shall not engage . . . in any "Competing Business." For purposes of this Agreement, "Competing Business" shall mean any person, corporation, or other entity *that sells products or services* within any Company market area . . . .[73]

Further, NextGen possesses no machining, tools, supply contracts, raw materials, payroll, or any determination about which products, if any, it might sell.[74] Yet Plaintiff has rushed into this suit blindly certain that NextGen is already competing. Additionally, the PRAs only protect proprietary information that *is not known outside of the company.* "Proprietary information" is

> *information that was or will be developed, created, or discovered by or on behalf of the Company*, or that became or will become known by, or was or is conveyed to, the Company that has research or commercial value in the Business *and is not known outside of the Company.*[75]

So when Plaintiff alleges that, "as former high-level executives," Omanoff and Dr. Taylor have confidential information and trade secrets, it discounts the important fact that the entire industry

---

the Defendants continued marketing, production, use, offering for sale or sale of products.").

[71] The Flyer doesn't even contain technical specifications. Defendants are unsure how Plaintiff is convinced that those rifles, if produced, would feature *any* of what Plaintiff claims to be its "trade secrets."

[72] **Van Horn Decl. Ex. 16**.

[73] **Taylor Decl. Ex. 10**, **Omanoff Decl. Ex. 3**, PRAs § 7 (emphasis supplied).

[74] **Omanoff Decl. ¶ 4.**

[75] **Taylor Decl. Ex. 10**, **Omanoff Decl. Ex. 3**, PRAs § 1.F.

already knows everything Plaintiff claims is proprietary.[76]

**F.      The PRAs require arbitration of all related claims.**

The relevant contracts are governed by Georgia law and require arbitration arising out of any disputes related to alleged proprietary information.[77] These broad clauses cover all of the causes of action asserted by Plaintiff and require disputes about the scope of what is arbitrable to be decided *in the arbitration*. Plaintiff persists in burdening this Court and Defendants with a case that has nothing to do with this state or district and serial motions for extraordinary injunctive relief instead of acknowledging that it is bound to arbitrate this dispute because of contracts it drafted.

## ARGUMENT

A preliminary injunction is an "extraordinary and drastic remedy."[78] To be entitled to one, Plaintiff must show: (A) a substantial likelihood of success on the merits; (B) irreparable harm that outweighs the harm to the defendant; and (C) that the injunction will not disserve the public interest.[79]

**A.      This case belongs in arbitration. But even if it remained in federal court, Plaintiff is not substantially likely to succeed on the merits of any of its claims.**

"Regardless of the balance of relative hardships threatened to the parties, the granting of a preliminary injunction would be inequitable if the plaintiff has no chance of success on the merits."[80] Here, Plaintiff will not succeed because (1) both PRAs broadly require arbitration of all issues raised by the Complaint, therefore precluding the success of any claim in this Court; (2) there is no evidence that Defendants were made privy to any proprietary information regarding Plaintiff's products, that

---

[76]   Compl. ¶ 83. *See also supra* at § D.

[77]   **Taylor Decl. Ex. 10, Omanoff Decl. Ex. 3**, PRAs § 14 (emphasis supplied).

[78]   *See Exhibitors Poster Exchange, Inc. v. Nat'l Screen Service Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) ("[W]hen a plaintiff applies for a mandatory preliminary injunction, such relief should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.").

[79]   *MacGinnitie v. Hobbs Grp., LLC*, 420 F.3d 1234, 1240 (11th Cir. 2005).

[80]   *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

Defendants used customer lists, or disparaged Plaintiff; (3) the PRAs' covenants are unenforceable under Georgia law; and (4) the Lanham Act and related state law claims will fail because Plaintiff's products have not acquired secondary meaning—similar products that might be created by Defendants in the future are unlikely to cause consumer confusion.

1. **This dispute clearly belongs before an arbitrator, and the question of arbitrability must be decided by the arbitrator.**

When confronted with the question of arbitrability, courts perform a two-step analysis: (a) "determine whether the parties agreed to arbitrate the dispute" based on "federal substantive law of arbitrability" and (b) "consider whether legal constraints external to the parties' agreement foreclose the arbitration of those claims."[81] Where these two elements are satisfied, the parties must arbitrate. In fact, the enforcement of arbitration agreements advances public policy so clearly and strongly that all doubts concerning the scope of an arbitration provision are resolved in favor of arbitration.[82]

Here, the PRAs contain the following comprehensive arbitration provision:

[A]ny controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled, except as may otherwise be provided herein, by arbitration held in Atlanta, Georgia, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. . . . Any dispute as to whether a controversy or claim is subject to arbitration shall be submitted as part of the arbitration proceeding.[83]

The arbitration provision clearly evidences the parties' intent to arbitrate. Not only should any dispute arising out of the PRAs be submitted to arbitration, *even the question of whether the parties agreed to arbitrate certain disputes must itself be decided in arbitration*.[84] Defendants have

---

81  *Mims v. Global Credit and Collection Corp.*, 803 F. Supp. 2d 1349, 1353 (S.D. Fla. 2011) (Altonaga, J.) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985); *Patriot Mfg., Inc. v. Dixon*, 399 F. Supp. 2d 1298, 1301 (S.D. Ala. 2005)).

82  *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 288 (2010).

83  **Taylor Decl. Ex. 10**, **Omanoff Decl. Ex. 3**, PRAs § 14.

84  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 938 (1995) ("[T]he question [of] who has the primary power to decide arbitrability turns upon whether the parties agreed to submit that

previously cautioned the Plaintiff about this fact.[85] In seeking a preliminary injunction, Plaintiff has

brazenly rushed to this Court in plain violation of the PRAs.

> 2. **Plaintiff will not succeed on its misappropriation, tortious interference, breach, or patent claims because Defendants were never made privy to any proprietary information regarding Plaintiff's products and no evidence suggests Defendants used confidential customer lists, disparaged Plaintiff, or are making infringing products.**

Plaintiff's misappropriation claim must fail if it cannot prove that it possesses a "trade secret"

or that its trade secret was "acquired by [Defendants using] improper means."[86] Plaintiff vaguely claims

its trade secrets include customer lists, market research, customer contracts, source code, intellectual

property, testing procedures, product design, competitor analyses, schematics, and component lists.[87]

Dr. Taylor, however, has been in the rifle business far longer than Plaintiff. *His* Original CheyTac

company and other affiliated companies—*but not Plaintiff*—were responsible for the development (*i.e.*,

product design, schematics, component lists, research, and intellectual property) behind the products

at issue here. On that fact alone, those items cannot be "secrets" of Plaintiff.[88] Nor is it possible that

Defendants could have improperly procured something over which Plaintiff does not exclusive

possession or rights. The declarations and exhibits submitted in support of this opposition brief show

that a multitude of other companies make munitions and rifles using the same widely available parts

---

question to arbitration. If so, then the court should defer to the arbitrator's arbitrability decision.").

[85]   ECF. No. 18-2, Letter from Defendants Counsel to Plaintiff (dated May 29, 2017; filed May 31, 2017) ("You have brought suit in federal court for breaches of contracts that could not have been drafted with clearer, more comprehensive and expansive arbitration clauses.").

[86]   18 U.S.C. § 1839 (defining "misappropriation").

[87]   Compl. ¶ 101.

[88]   Ideas or information known to Taylor and others before Plaintiff's formation are not "proprietary rights" within the meaning of the PRAs. **Taylor Decl. Ex. 10**, **Omanoff Decl. Ex. 3**. (defining "proprietary information" as "information that was or will be developed, created, or discovered by or on behalf of the Company . . . *and is not known outside of the Company*.") (emphasis added).

and design specifications that Plaintiff claims are proprietary. These products send the same caliber munitions with the same accuracy and speed as Plaintiff's allegedly proprietary products.

Plaintiff is also unlikely to succeed on its breach of contract, breach of the duty of loyalty, or tortious interference claims,[89] which are founded on alleged misappropriation of customer lists and direct competition by Defendants.[90] The allegations regarding Defendants' alleged use of customer lists are supported by "information and belief" in the Warren Declaration.[91] Plaintiff also alleges, on information and belief, that "Defendants have disparaged the goods and services and business reputation of Plaintiff through false and misleading representations of material fact,"[92] but it has not offered, by affidavit or allegation, any evidence of any disparagement to support that contention. Accordingly, the Court must disregard such claims. Finally, Defendants are not making any products, and are therefore not infringing any patent.[93]

### 3. Plaintiff will not succeed on its breach of contract or breach of duty of loyalty claims because the PRAs' covenants are unenforceable under Georgia law.[94]

Plaintiff will not succeed on any claims for breach of the PRAs because the non-competition clauses are *per se* unreasonable under Georgia law. The non-competition and non-solicitation

---

[89] The Complaint purports to allege a claim for breach of duty of loyalty under Florida law. Compl. at 31–32. Defendants do not concede that Florida law governs this or any of Plaintiff's claims. However, for present purposes, Georgia and Florida law appear to follow similar principles regarding duty of loyalty claims.

[90] Compl. ¶ 147.

[91] ECF No. 1-1, Warren Decl. ¶ 47.

[92] Compl. ¶¶ 85, 136.

[93] Even if NextGen's Flyer could be construed as advertising, "the mere advertising of a patented device is not itself an infringement." *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp.*, 372 F.2d 263, 270 (2d Cir. 1967). *See also Powerlock Floors, Inc. v. Robbins Flooring Co.*, 327 F. Supp. 388, 390 (D. Del. 1971), *aff'd*, 464 F.2d 1022 (3d Cir. 1972) ("However, the fact that defendant was promoting, advertising, and soliciting orders for a structure which copied that claimed by plaintiff's patent did not constitute an act of infringement unless defendant manufactured or sold an infringing product.").

[94] Count VI (alleging Breach of Contract) incorporates all preceding paragraphs by reference and

covenants are unenforceable because they aren't restricted by geography or job function, and don't distinguish between "current" and "potential" customers. The PRAs state that they are to be interpreted and enforced under Georgia law.[95] In Georgia, restrictive covenants that contain no territorial limitation are void.[96] Moreover, provisions that prohibit an employee from working for a competitor in any capacity are also unenforceable.[97] Non-solicitation clauses are treated the same way.[98] Here, the identical non-competition covenants for Taylor and Omanoff offend both rules because they contain no geographic limitations and purport to prevent Defendants from working for a competitor "*in any . . . capacity whatsoever.*"[99] Moreover, the non-solicitation clauses are equally offensive. They are not territorially limited or even limited to present and former clients and customers, but go so far as to proscribe solicitation of "*potential clients* of [New CheyTac]."[100] The clauses on which Plaintiff relies are vastly overbroad. Plaintiff cannot succeed in enforcing them against Defendants.

---

offers only that, "by reason of the foregoing," Defendants have breached their obligations under their respective PRAs and Membership Interest Purchase Agreements and Settlement Agreements (MIPASAs), leaving Defendants to guess at which allegations of fact support this theory. Compl. ¶¶ 129–31.

[95] **Taylor Decl. Ex. 10**, **Omanoff Decl. Ex. 3**, PRAs § 14.

[96] *Coleman v. Retina Consultants, P.C.*, 286 Ga. 317, 320 (2009); *Carson v. Obor Holding Co., LLC*, 318 Ga. App. 645, 652 (2012) ("Here, the non-compete clause is prima facie unreasonable because by restricting activity in the entire country, it contains no legitimate territorial restriction.").

[97] *Howard Schultz & Assocs. of the Se., Inc. v. Broniec*, 239 Ga. 181, 184 (1977).

[98] *Pregler v. C&Z, Inc.*, 259 Ga. App. 149, 150 (2003) ("Noncompetition and nonsolicitation covenants against competition contained in employment agreements are in partial restraint of trade. As such, they may be upheld only when they are strictly limited in both time and geographical effect.").

[99] **Taylor Decl. Ex. 10**, **Omanoff Decl. Ex. 3**, PRAs § 7 ("I shall not engage directly or indirectly, either personally or as an employee, associate, shareholder, partner, manager, salesperson, agent or in any other individual or representative capacity whatsoever").

[100] **Taylor Decl. Ex. 10**, **Omanoff Decl. Ex. 3**, PRAs § 8.

**4. Plaintiff will not succeed on its Lanham Act or deceptive and unfair trade practices claims because its products have not acquired secondary meaning and hypothetical products can't cause consumer confusion.**

Plaintiff alleges it "owns all rights, title and interest in and to the CheyTac's [sic] M300 Intervention's appearance, design, and trade dress rights[, and that its] trade dress has acquired secondary meaning."[101] Plaintiff's Lanham Act and related state law claims require Plaintiff to show that Defendants' purported products are likely to cause confusion, deceive as to the affiliation or origin, or that they misrepresent the nature, characteristics, qualities, or geographic origin of those items.[102] In order to prevail on a claim for trade dress infringement Plaintiff must prove "that the trade dress of the two products is confusingly similar, that the features of the trade dress are primarily non-functional, and that the trade dress has acquired secondary meaning."[103]

Plaintiff has not offered explanation as to how any major part of a long-range, tactical sniper rifle—barrel, chassis, trigger, stock, scope, magazine, bolt action—is non-functional. Even if it had, the M-300 is a composite of readily available parts, and it is sold in identical composition by other manufacturers, including Allen Precision Shooting, Hill Country Rifles, and Mirage ULR.

Plaintiff also claims that "CheyTac's .375CT and .408CT munitions have created a commercial impression amongst sophisticated purchasers who expect the term 'CT' to be trademarked and originate from CheyTac and that the term 'CT' is an abbreviation for 'CHEYTAC' and the two terms have identical connotation."[104] To the extent Plaintiff claims that the designation "CT" has any quasi-trademark influence, such a theory would also fail. A mark or dress is not protectable unless the mark

---

[101]   Compl. ¶¶ 110, 113.

[102]   15 U.S.C. § 1125(a)(1)(A)–(B); Fla. Stat. § 501.204.

[103]   *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983).

[104]   Compl. ¶¶ 7–8. The Complaint **does not** contain a formal claim for trademark infringement. Even though it purports to seek an order "providing that the Defendants . . . infringed Plaintiff's exclusive rights in the CheyTac marks." *Id.* at 35.

is distinctive, that is, unless it serves the purpose of identifying the source of the goods. Generic terms—*i.e.*, ones that do not distinguish the goods of one producer from the goods of others—being least distinctive, receive no trademark protection.[105] Stated differently, a generic term answers the question 'What are you?' while a mark answers the question 'Where do you come from?'" Use of the term by competitors in the industry is relevant to genericness.[106]

In *Colt Def. LLC v. Bushmaster Firearms, Inc.*, Colt Defense LLC, a company that had registered the mark "M4" in relation to its carbine rifle and had used the mark in commerce for years, brought suit against Bushmaster Firearms, Inc., which later began marketing and selling "M4" carbine rifles. In finding "M4" to be generic, the First Circuit found that Bushmaster, along with fifteen other manufacturers, used "M4" to signify a certain type of rifle, rather than the rifle's source.[107] Here, as in *Colt*, the words ".375CT," ".408CT," ".375 CheyTac," and ".408 CheyTac," are currently used by a host of different manufacturers to denominate their long-range, high-caliber munitions and rifles, and do not signify the source of those products for consumers. Moreover, Defendant has not actually produced any product. There can therefore be no consumer confusion.[108]

**B.      Plaintiff cannot show any irreparable harm if the injunction does not issue, and no harm to Plaintiff can outweigh the potential harm to Defendants.**

The facts here do not justify a finding that Plaintiff faces any risk of irreparable harm if an injunction does not issue. Although Plaintiff seeks to halt sales of competing firearms by Defendants, there have been none. NextGen does not have a federal firearms license. There is no claim ripe for

---

[105]   *Colt Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 705 (1st Cir. 2007) (A "generic term" is one that "either by definition *or through common use* has come to be understood as referring to the genus of which the particular product is a species.").

[106]   *Id.*

[107]   *Id.*

[108]   *See, e.g.*, *Vital Pharm., Inc. v. Am. Body Bldg. Prod., LLC*, 510 F. Supp. 2d 1043, 1049 (S.D. Fla. 2007) ("Plaintiff must prove by a preponderance of the evidence that [ ] the trade dress of the two *products* is confusingly similar.") (emphasis supplied).

adjudication.[109] Further, Plaintiff seeks to protect alleged "trade secrets" regarding products it did not develop and whose information is broadly available all over the internet.[110] Plaintiff has not illustrated any ownership over the intellectual property at issue and is not entitled to injunctive relief to protect a nonexistent interest. The countervailing harm to NextGen, Omanoff, and Taylor in their personal and business reputations—facing meritless accusations—outweighs any imagined harm to Plaintiff.

**C.     A preliminary injunction would disserve the public interest.**

The grant of a preliminary injunction is only appropriate where it is not adverse to the public interest.[111] Here, an injunction would compromise the FAA's well-founded public policy interest, which "manifests a liberal federal policy favoring arbitration agreements" and that the State of Georgia, whose law governs under the PRA, shares this policy, and "all doubts concerning the scope of an arbitration provision [must be] resolved in favor of arbitration."[112] Finally, in Georgia, "a covenant not to compete, being in partial restraint of trade, is not favored in the law."[113]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this court deny Plaintiff's Motion for a Preliminary Injunction.

---

[109]  **Omanoff Decl. ¶ 5**. *See also Geathers v. Bank of America, N.A.*, 2015 WL 5092506, *8 (N.D. Ga. August 27, 2015) (ripeness inquiry intersects with injunction inquiry because, if challenges is premature, there can be no immediate or irreparable injury).

[110]  *See generally* **Van Horn Decl.**

[111]  *Lebron Sec'y, Fla. Dep't of Children and Families*, 710 F.3d 1202, 1206 (11th Circ. 2013) (quotation marks and citation omitted).

[112]  *Inetianbor v. Cashcall, Inc.*, 923 F. Supp. 2d 1358, 1362 (S.D. Fla. 2013); *Haynes v. Fincher*, 241 Ga. App. 179, 180 (Ga. App. 1999) (adoption of Georgia Arbitration Code "establishes a clear public policy" in favor of arbitration).

[113]  *Hulcher Services, Inc. v. Corman Railroad Co.*, 247 Ga. App. 486, 490 (2000).

Respectfully submitted this 23rd day of June 2017.

_____/s/_____
Benjamin D. Van Horn
Florida Bar No. 123952
John Da Grosa Smith
(*admitted pro hac vice*)
Kristina M. Jones
(*admitted pro hac vice*)

**SMITH LLC**
1320 Ellsworth Industrial Blvd.
Suite A1000
Atlanta, Georgia 30318
bvanhorn@smithlit.com
jdsmith@smithlit.com
kjones@smithlit.com

*Counsel for Defendants*

## REQUEST FOR ORAL ARGUMENT

In accordance with Local Rule 7.1(b)(2), Defendants hereby respectfully request oral argument on all issues presented by Plaintiff's Motion because this case invokes Georgia law, there are binding arbitration agreements that govern, and there are already a substantial volume of documentary exhibits and technical information that have been presented to the Court. Defendants believe that oral presentation will help to clarify those issues before the Court and that no more than 30 minutes will be necessary for each side.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this **23rd day of June 2017**, I hereby caused to be electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

_____/s/_____
Benjamin D. Van Horn
Florida Bar No. 123952

## **SERVICE LIST**

CASE NO.: 17-60925-CIV-ALTONAGA

Andrew Rapacke, Esq.
Benjamin Bedrava, Esq.
Steve Hyatt, Esq.
THE RAPACKE LAW GROUP, P.A.
Florida Bar No: 0116247
950 S. Pine Island Road
Suite A-150
Plantation, FL 33324
andy@arapackelaw.com

*Counsel for CheyTac USA LLC*

*Via CM/ECF*