UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 17-60925-CIV-ALTONAGA

CheyTac USA, LLC

      *Plaintiff*,

      *v.*

NextGen Tactical, LLC, Dennis Omanoff,
and Dr. John Taylor,

      *Defendants*.

_____/

**DEFENDANTS' MOTION FOR RULE 11 SANCTIONS
AND MEMORANDUM IN SUPPORT**

Defendants NextGen Tactical LLC, Dennis Omanoff, and Dr. John Taylor seek sanctions against Plaintiff CheyTac USA LLC and its attorney Andrew Rapacke, and his law firm Rapacke Law Group, P.A., under Rule 11(b)(1) and (3) of the Federal Rules of Civil Procedure because their repeated submissions to this Court rely on factual contentions utterly lacking in evidentiary support and were made purely to harass Defendants. Parties and their lawyers are not free to deliberately ignore obvious facts in their representations: "Rule 11 stresses the need for some prefiling inquiry."[1]

## INTRODUCTION

Plaintiff CheyTac USA, LLC is a Georgia company formed on July 19, 2011, and is purportedly in the firearms industry.[2] Defendant NextGen Tactical LLC is Florida company with a sample website and brochure that show various firearms, but which has never manufactured or sold any firearms or munitions.[3] It does not have a federal license to sell or manufacture firearms.[4] Despite this, Plaintiff sued to protect alleged intellectual property rights in four products that Plaintiff did not develop. Those same products are currently being sold by many other companies, using widely available specifications and parts. Those products are the

- "M-200 Intervention" rifle,

- "M-300 Intervention" rifle,

---

[1]   *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996) (citing *Mike Ousley Prods., Inc. v. WJBF-TV*, 952 F.2d 380, 382 (11th Cir. 1992)).

[2]   *See* Compl. ¶ 1.

[3]   **Omanoff Decl. ¶ 3** (June 16, 2017, filed concurrently herewith with attachments). In the abundance of caution, Exhibits 2 and 3 of the June 16 Omanoff Declaration are being filed temporarily under seal.

[4]   **Van Horn Decl. Ex. 16**, Listing of Federal Firearms Licensees, Florida (updated April 2017). *See also* "Listing of Federal Firearms Licenses," BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (accessed June 13, 2017), https://www.atf.gov/firearms/listing-federal-firearms-licensees-ffls-2017 (providing lists of licensees for all states and territories). The Van Horn Declaration (June 16, 2017, attached hereto) contains many of the same exhibits as those filed in response to Plaintiff's Mot. for Prelim. Inj. ECF No. 45, 47, and 48.

- ".375 CheyTac" or ".375 CT" ammunition, and

- ".408 CheyTac" or ".408 CT" ammunition.

All of those products were developed and manufactured by different companies long before Plaintiff was formed. Plaintiff is nothing more than a company that shares a name with an earlier, more successful gun business, also called "CheyTac," that was operated by different people. Plaintiff is attempting to trade on the success of that earlier company by claiming rights to proprietary secrets it never possessed—and to prevent Defendants' legitimate competition—using information that has long been available in the public sphere.

Moreover, Plaintiff's conduct in this litigation has been unduly harassing, despite this case's infancy. Plaintiff has filed *four* motions for preliminary relief—three of which have already been denied by the Court. Even brief searches on Google before filing would have revealed a trove of information demonstrating the falsity of many of Plaintiff's claims. Either Plaintiff failed to learn basic information about the industry in which it purports to operate or it knowingly chose to present false information. Plaintiff and its counsel need to be sanctioned to deter such misconduct.

In its Complaint and motions for injunctive relief, Plaintiff, among other things,

- seeks to halt actual sales by Defendants—even though there have been none;

- claims a right to recover Defendants' alleged unjust enrichment—even though Defendants have yet to sell any product; and

- tries to protect alleged "trade secrets"—even though that information is readily available all over the internet and was created by companies other than Plaintiff.

Plaintiff's other causes of action for trade dress infringement and false designation of origin relate to products that have only four major components—none of which originated from or belong to Plaintiff. Those components are freely sold by other companies in a form identical to the ones Plaintiff claims to sell. Plaintiff contends that its rifles and ammunition are proprietary, but many other

2

companies build and sell those exact products. Plaintiff's claims center on a brochure mock-up that depicts only the type of products Defendants *might sell* in the future.

Counsel for Defendants had already informed Plaintiff's counsel about the significant factual inaccuracies in the Complaint before Plaintiff filed motions for preliminary injunctions on May 23 (which the Court summarily denied) and June 9, 2017. Defendants then served Plaintiff and its attorney (Mr. Rapacke) with this Rule 11 motion on June 16, 2017—giving them yet another opportunity to withdraw the troublesome claims. They instead chose to stand on their baseless allegations. By repeatedly signing, filing, submitting, and advocating its positions, Plaintiff and its counsel represented that they had made "an inquiry reasonable under the circumstances," that this litigation is not being presented for any improper purpose, and that their factual contentions have evidentiary support.[5] None of that is true.

## STATEMENT OF FACTS

**A.**     **Plaintiff CheyTac USA LLC is not the Original "CheyTac" company: Most of the products for which the Complaint claims credit were developed by the Original CheyTac and manufactured by other companies.**

Plaintiff claims that it is "a pioneer and acknowledged leader in the development and design of its patented balance control flight projectiles (bullets) and high caliber tactical rifles [ ] which enable these projectiles to travel further and with greater accuracy that competitors."[6] There is no factual support for that position, largely because Plaintiff is not actually the company it claims to be. It isn't the first company to trade under the name "CHEYTAC" or to sell products labeled with that mark.[7] Nor is Plaintiff responsible for developing or designing any of the products at issue in this suit. Plaintiff

---

[5]     Fed. R. Civ. P. 11(b)(1), (3).

[6]     Compl. ¶ 1. *See also Donaldson v. Clark*, 819 F.2d 1551, 1556 (11th Cir. 1987).

[7]     It isn't even the only firearms company currently using the word "CheyTac" in its product names. *See infra* Section D.

3

is trying to trade on the success of an earlier company with the name "CheyTac," one whose trade

secrets (if it ever had them) have long been scattered to the wind and are available to all. Today,

Plaintiff is one of many companies that sell the products Plaintiff claims are proprietary to it.

In 1998, Defendant John Taylor, Ph.D., established Tactical High Energy Impact Systems,

LLC ("THEIS"), a company that designed, sold, and distributed ammunition.[8] In 1999, Dr. Taylor

met Warren Jensen, who was then co-owner of Lost River Ballistics Technologies ("Lost River").

Jensen developed a "balance flight theory" for bullet design.[9] Working together, in January 2002,

Dr. Taylor and Jensen released the ".408 CheyTac" cartridge:[10]

> PRESS RELEASE
> January 15, 2002 – Today, [THEIS and Lost River] announced the release of the long
> awaited 408 Cheyenne Tactical™ (CheyTac) cartridge. The .408 CheyTac™ is the only
> cartridge on the market that is supersonic at ranges over one mile. The concept of the
> .408 CheyTac™ was first developed by THEIS . . . .
>
> Warren Jensen stated, "the partnership with THEIS has given us the opportunity to
> prove what our 'Balanced Flight' technology could deliver in a real word scenario"
> . . . . Dr. John D. Taylor said, "we are very excited by the outstanding performance
> that the Lost River projectiles have provided for the 408 CheyTac™ cartridge" . . . .
>
> Lost River Ballistics Technologies will offer complete .408 CheyTac™ cartridges, as
> well as projectiles, brass and loading dies . . . . THEIS will deliver the ***Intervention***
> advanced weapon systems that utilize this revolutionary new cartridge.[11]

On April 10, 2002, THEIS and Dr. Taylor organized the first and original CheyTac entity,

CheyTac Associates, LLC under the laws of Idaho ("Original CheyTac").[12] The members of Original

---

[8]     **Taylor Decl. Ex. 1**, THEIS Articles of Organization (Jan. 28, 1998). The Taylor Declaration
(June 16, 2017, attached hereto) contains the same exhibits (in the same order) as those filed in
response to Plaintiff's Mot. for Prelim. Inj. ECF No. 49.

[9]     *See* **Taylor Decl. Ex. 2**, Press Release (Jan. 15, 2002).

[10]    A modern cartridge consists of the (1) bullet, (2) case, (3) propellant, (4) rim, and (5) primer. *See*
"Cartridge    (firearms)," Wikipedia (accessed    June    15,    2017),
https://en.wikipedia.org/wiki/Cartridge_(firearms).

[11]    *See* **Taylor Decl. Ex. 2**, Press Release (Jan. 15, 2002) (emphasis in original).

[12]    **Taylor Decl. Ex. 3**, Original CheyTac Operating Agreement (amended Nov. 14, 2003). THEIS
(owned by Dr. Taylor) owned 20% of Original CheyTac, and Lost River (owned by Jensen)

CheyTac were THEIS (owned by Dr. Taylor), Lost River (owned by Jenson), Bradley Development, Inc. (f.k.a. CheyTac LLC), Sniping Operations Executive, and Greenwich Ballistics LLC (in which Corey Kupersmith, discussed more below, was a member).[13] Jensen became Director of Research and Development; Dr. Taylor was Chairman of the Board.[14] On April 29, 2003, THEIS registered the trademark "CHEYTAC."[15] But there is no indication in the Patent and Trademark Office database that THEIS ever transferred the "CHEYTAC" mark to Original CheyTac.[16] On October 7, 2003, Jensen's "balanced flight" bullet design patent was approved.[17] Jensen used that patent as Lost River's payment for its membership in Original CheyTac.[18] However, there is no indication that Jensen ever assigned or transferred his "balanced flight" patent to anyone.[19]

In addition to the .408 CheyTac cartridge discussed above, Original CheyTac announced and later began distributing the CheyTac M-200 Intervention rifle.[20] Under an agreement with THEIS, the M-200 Intervention was initially manufactured by now-defunct EDM Arms, Inc., and sold by Original CheyTac.[21] Thereafter, Original CheyTac released the .375 CheyTac cartridge:

> **Arco ID** – July 13, 2006, CheyTac Associates, LLC makers of the world's record holding 408 CheyTac cartridge and rifle system have developed their first ever

---

owned 20% of Original CheyTac.

[13]   **Taylor Decl. Ex. 3**, Original CheyTac Operating Agreement (amended Nov. 14, 2003).

[14]   **Taylor Decl. Ex. 4**, Original CheyTac Organizational Chart (September 2004).

[15]   **Van Horn Decl. Ex. 14**, U.S. Trademark Application Serial No. 2,711,809 (filed Sept. 5, 2000).

[16]   **Van Horn Decl. Ex. 14**, U.S. Trademark Application Serial No. 2,711,809 (filed Sept. 5, 2000); *See also* **Taylor Decl. ¶ 13**.

[17]   **Van Horn Decl. Ex. 13**, U.S. Patent No. 6,629,669 (filed June 14, 2001).

[18]   **Taylor Decl. ¶ 7**.

[19]   **Van Horn Decl. Ex. 13**, U.S. Patent No. 6,629,669 (filed June 14, 2001).

[20]   *See* **Taylor Decl. Ex. 5**, Original CheyTac M-200 and M-310 specification Sheets and Original CheyTac Intervention Information Papers. *See also* **Taylor Decl. Ex. 2**, Press Release (Jan. 15, 2002) (announcing the coming "Intervention" rifle).

[21]   **Taylor Decl. Ex. 6**, THEIS Contract with EDM for Manufacture of Intervention Rifles (June 1, 2001).

consumer market cartridge for extreme range shooting. . . . CheyTac will initially offer the 375 CheyTac cartridge in its 300 series of bolt-action single shots and repeaters . . . . The company also plans to offer the 375 cartridge in its Model-200 CIV for the civilian market by SHOT show of 2007.[22]

Lost River was initially responsible for making the .408 and .375 munitions sold by Original CheyTac.[23]

Thus, three of the four products on which Plaintiff's claims are based (the .408 and .375 ammunition and the M-200 Intervention) were developed and produced by Lost River or Original CheyTac—not by Plaintiff—years before Plaintiff came into existence.[24] In the Complaint, however, Plaintiff takes credit for the research and development of these products.[25] Moreover, Plaintiff asserts proprietary rights to the alleged trade secrets concerning those products, even though Plaintiff never exclusively possessed them.[26] For example, when Plaintiff alleges that the M-200 Intervention rifle has been "ranked the #1 Sniper Rifle in the world by the Military Channel," it is referring to the rifle created by Original CheyTac.[27]

The successes of Original CheyTac did not last—it suffered from misconduct by its business partners and managers. Kupersmith (of Greenwich Ballistics LLC) became Original CheyTac CEO. Lost River (Jensen) went out of business. Jamison International V LLC tried to take over the

---

[22]   **Taylor Decl. Ex. 7**, .375 CT Press release (July 13, 2006).

[23]   *See* **Taylor Decl. Ex. 2, Ex. 7**, Press Releases (Jan. 15, 2002 and July 13, 2006).

[24]   As discussed below [*see infra* Section D], the M-300 is a composite of widely available major parts. It is simple for any manufacturer to assemble and sell completed rifles identical to the M-300, and indeed other companies do, in fact, sell the identical rifle.

[25]   *See, e.g.,* Compl. ¶ 4 (claiming that "M200 and M300 rifles [ ] and .375CT and .408CT" are *Plaintiff's* most award-winning and proprietary products). *See also id.* ¶ 44 (calling those same products "cornerstone" to *Plaintiff's* research).

[26]   *See, e.g.,* Compl. ¶ 45 (alleging without any supporting factual basis that Plaintiff's "business is highly dependent upon extensive research and development activity."). *See also* Compl. ¶ 41 (falsely asserting that Plaintiff developed the M-200 Intervention rifle).

[27]   Compl. ¶ 4.

manufacture of ballistics from Lost River, but it too went out of business.[28] Multiple lawsuits ensued, with the members of Original CheyTac all claiming rights to certain intellectual property, including the "balanced flight" patent.[29] Original CheyTac stopped active operations, but was never wound down;[30] THEIS (and thus Dr. Taylor) continued to hold a 20% interest in the company.[31] On April 17, 2011, Kupersmith offered Dr. Taylor $50,000 for that ownership interest; Dr. Taylor rejected the offer because Kupersmith still owed $20,000 on a previous debt.[32]

**B.   Plaintiff is formed without having rights to the "CHEYTAC" trademark and without holding any other intellectual property.**

After Dr. Taylor rejected Kupersmith's buyout offer, Kupersmith incorporated CheyTac USA, LLC on July 11, 2011 under the laws of Georgia ("Plaintiff" or "New CheyTac").[33] Kupersmith and DBM Technologies LLC ("DBM") (owned by David McCutcheon) were initially the only members of the New CheyTac.[34] It had no capital assets on the books except for DBM's and Kupersmith's respective buy-ins of a mere $1,000 each.[35] McCutcheon became the company's first Operating Manager.—There has never been any transfer of intellectual property, trade secret or otherwise, from Original CheyTac to New CheyTac. From 2011 to 2015, New CheyTac didn't have any rights to use the trademark "CHEYTAC," which was still owned by THEIS.[36] On December 29, 2012, Kupersmith

---

[28]   **Van Horn Decl. Ex. 17,** Jamison Int'l V LLC Profile & Filings South Dakota Sec'y of State.

[29]   *See, e.g.*, Compl., *Greenwich Ballistics LLC v. Jamison International V, LLC*, No. 3:11-cv-1566-RNC (Oct. 12, 2011).

[30]   Original CheyTac was administratively dissolved on July 11, 2012. Its last annual report is dated February 11, 2011. **Van Horn Decl. Ex. 18,** Idaho Sec'y of State (accessed June 12, 2017).

[31]   **Taylor Decl. ¶ 6**.

[32]   **Taylor Decl. ¶ 14, Ex. 8**, Rejecting Kupersmith's Offer (Apr. 17, 2011).

[33]   **Van Horn Decl. Ex. 30**, New CheyTac Articles of Organization (July 19, 2011).

[34]   **Omanoff Decl. Ex. 1**, New CheyTac Operating Agreement (July 19, 2011).

[35]   **Omanoff Decl. Ex. 1**, New CheyTac Operating Agreement (amended Jan. 14, 2013).

[36]   **Taylor Decl. Ex. 11**, Taylor Transfer Letter (July 3, 2016).

personally filed for Chapter 7 bankruptcy,[37] and Praecisa Tenuras LLC (owned by Joe Warren), saved the fledgling New CheyTac from the brink of failure with a $700,000 contribution.[38]

## C.      The Complaint is full of false assertions of fact concerning the New CheyTac.

On September 28, 2015, Defendant Omanoff became CEO of and a member in the New CheyTac;[39] McCutcheon's title was changed to "President."[40] Under a new operating agreement, Omanoff received 30% ownership in exchange for $100 and his sweat equity; Warren's Praecisa Tenuras received 30% for the $700,000 already contributed; DBM (controlled by McCutcheon) received 30% for the "balanced flight" patent he purported to have; and Dr. Taylor was brought in at 3% in exchange for his contribution of a variety of patents and trademarks, including the trademark for "CHEYTAC." Dr. Taylor became Chief of the Advisory Board.[41]

When Omanoff became CEO of New CheyTac, all of the design blueprints and exact specifications necessary to construct the M-200 Intervention rifle were already available for free on the internet. And they still are.[42] Dozens of companies were (and still are) making the same products that had been sold by Original CheyTac.

The Complaint alleges that the New CheyTac had "achieve[d] global recognition as one of the top firearms and munitions manufacturers in the world"[43] and that Omanoff plotted to let the New

---

[37]   **Omanoff Decl. Ex. 11**, Settlement Agreement with Kupersmith (Jan. 17, 2017).

[38]   **Omanoff Decl. Ex. 1**, New CheyTac Operating Agreement (amended Jan. 14, 2013).

[39]   *See* **Omanoff Decl. Ex. 1**, New CheyTac Operating Agreement (amended Sept. 28, 2015).

[40]   **Omanoff Decl. Ex. 7**, McCutcheon President Offer Letter (Sept. 28, 2015).

[41]   **Omanoff Decl. Ex. 1**, New CheyTac Operating Agmt. (amended Sept. 28, 2015) (containing Schedule of Members); **Taylor Decl. Ex. 9**, Taylor New CheyTac Contribution Agmt. (Sept. 28, 2015); **Taylor Decl. Ex. 11**, Taylor Letter Transferring CHEYTAC mark (July 3, 2016). The remaining 7% ownership was kept in a pool to fund Class B shares.

[42]   **Van Horn Decl., Ex. 1** (showing CAD file examples via screenshot and reflecting that those CAD files have been publicly available since 2014); **Omanoff Decl. ¶ 14**.

[43]   Compl. ¶ 42.

CheyTac's revenue steadily decline so that he would receive interest on his salary.[44] Those statements are false, as should have been clear to Plaintiff and its counsel before initiating this suit. Omanoff's offer letter to become CEO made clear that his salary had to be deferred in the first place (at 5% interest per annum) because of the New CheyTac's inability to pay him.[45] At that point, New CheyTac had seriously abysmal rifle "manufacturing" and sales, according to ATF data.[46] It had also been cited by the ATF for six violations of the National Firearms Act.[47] Shortly after Omanoff had come on board, he and Warren fired McCutcheon from his position as president of the New CheyTac.[48]

Eventually, Omanoff left the New CheyTac. He had effectively been working for no pay and personally carrying certain company expenses.[49] The Complaint's allegation that the Board of Managers "demand[ed] Omanoff's immediate resignation" is made purely to be harassing: The Board did not possess the power to demand Omanoff's resignation or to terminate his employment.[50]

**D. Even a cursory survey of the industry and publicly available information shows that the rifles and ammunition Plaintiff purportedly sells are not proprietary.**

As noted above, the New CheyTac's claims regarding the alleged proprietary nature of the rifles and ammunition it sells is unsupportable, given that it had no hand in their original production. This overwhelming evidence would have been obvious from any prefiling inquiry. Such evidence is all

---

[44]   Compl. ¶ 69.

[45]   **Omanoff Decl. Ex. 4**, Omanoff CEO Offer Letter (Sept. 28, 2015).

[46]   *See* **Van Horn Decl. Ex. 19**, ATF Annual Firearms Manufacturing and Export Reports for 2011–2014 (2011: one manufactured and zero exports; 2012: fourteen manufactured and four exports; 2013: no manufacturing or exports; 2014: 34 manufactured and nine exports).

[47]   **Omanoff Decl. Ex 6**, ATF Letter to New CheyTac (Apr. 10, 2014), ATF Letter to New CheyTac (Jan. 22, 2014); 26 U.S.C. § 5801, *et seq.*

[48]   **Omanoff Decl. Ex. 8**, McCutcheon Letter of Termination (Jan. 19, 2016).

[49]   **Omanoff Decl. ¶ 17**.

[50]   *Contrast* Compl. ¶ 16 *with* **Omanoff Decl. Ex. 1**, New CheyTac Operating Agreement § 5.02 (amended Sept. 28, 2015).

that is necessary to disprove Plaintiff's claims about proprietary rights and trade secrets.

In the Complaint, the New CheyTac asserts that the M-200 and M-300 are "award-winning and proprietary products,"[51] and that it "substantially improved its ballistic and high caliber rifle barrel designs . . . by ***creating*** the M200 and M300 Intervention rifles and .375CT and .408CT munitions."[52] According to the Complaint, the "M200 incorporates a proprietary lands and groove barrel design and receiver connection which minimize drag forces on munitions."[53] Allegedly, the "rifle barrel design of the M200 and .375CT and, [.]408CT have become CheyTac's most popular products and cornerstone to CheyTac's research and development."[54] Plaintiff says that "the M200 and .375CT and .408CT open new business opportunities for CheyTac because of its [sic] unique and proprietary designs and patterns."[55] Further, Plaintiff claims to have acquired trade dress rights in the design and appearance of the M-300 Intervention rifle and mountable bipod.[56] The Complaint also alleges that Omanoff was CEO when both the M-200 and M-300 were designed and manufactured.[57] And finally, the Complaint asserts that the New CheyTac has acquired common law marks in ".375 CT" and ".408 CT." These allegations are simply false. There is nothing at all proprietary about either those rifle or the munitions.

**First**, neither rifle and neither bullet were "created" by the New CheyTac.[58]

**Second**, as Omanoff learned when he became CEO, the entire design blueprint for the M-200 has been available online since at least 2014. These computer-aided design (CAD) files permit

---

[51] Compl. ¶ 4.

[52] Compl. ¶ 41 (emphasis added).

[53] Compl. ¶ 4.

[54] Compl. ¶ 44.

[55] Compl. ¶ 43. *See also id.* ¶ 9 (claiming a competitive advantage).

[56] Compl. ¶¶ 60, 110–15.

[57] Compl. ¶ 71. *Contrast* Section A, *supra*.

[58] *Contrast* Compl. ¶ 41 *with* Section A, *supra*.

anyone with the proper machinery and necessary manufacturing skill to produce a working M-200 Intervention rifle.[59] *After Plaintiff brought suit*, Defendants' counsel located and freely download the comprehensive technical specification and design files—including all angle and length measurements to the millimeter—necessary to manufacture and assemble every part of the M-200.[60]

**Third**, case-in-point, a rifle identical to the M-200 is currently being sold by Starmis Arms International LLC as the "XDL."[61] Thor Global Defense Group has also offered the "M408," also identical to the M-200.[62] The "Cadex Shadow 375CT/408CT," Caracal "CH300," "Mirage ULR LTACCZ RH .408 CheyTac [and] .375 CheyTac," "Noreen Firearms ULR 408 CheyTac," "RND Manufacturing .375 CheyTac," "Victrix Minerva," "BCM Europe Arms Extreme," "Prairie Gun Works Timberwolf," and "G.A.C. Rifles Thunder [and] Big One" are currently for sale in ".375 CheyTac," ".408 CheyTac," or both.[63] Brand new ".408 Chey Tac" replacement barrels are available

---

[59]   Computer-aided design (CAD) is the use of computer systems to aid in the creation, modification, analysis, or optimization of a design of objects, digital and physical, and is used to create a database for manufacturing. *See generally* Lalit K. Narayan, COMPUTER AIDED DESIGN AND MANUFACTURING (New Delhi: Prentice Hall of India., ed. 2008).

[60]   "Chey Tac M200," GRABCAD.COM (accessed May 25, 2017), https://grabcad.com/library/chey-tac-m200-1; *see also* **Van Horn Decl. Ex. 1**, Screenshots from GrabCad.

[61]   "XDL Rifle – {.408}," STARMIS ARMS INTERNATIONAL LLC (accessed June 6, 2017), http://starmisarms.com/xdl-rifle-408/; *see also id.* at "Our Catalogue" (**Van Horn Decl. Ex. 2**) ("The XDL 408 Cheytac is one of our main prides. It presents a highly performed long range sniper rifle that hold [sic] accuracy up to 2500–3000 meters."); **Van Horn Decl. Ex. 2**, Screenshots from Starmis Website; **Van Horn Decl. Ex. 3**, Starmis PDF Catalogue.

[62]   **Omanoff Decl. Ex. 12**, THOR Global Defense Magazine Highlighting M408.

[63]   **Van Horn Decl. Ex. 20**, Cadex Defense Group 2016 and 2017 Catalogues; "Caracal's Long Distance Big Game Rifle: the CH 300," CARACALFORUM (accessed June 14, 2017), http://www.caracalforum.com/Caracal-Big-Game-Long-Distance-Rifle-The-CH300 .html; **Van Horn Decl. Ex. 6**, Screenshots from Caracal Forum (June 14, 2017); "Ultra Long Range Rifles," MIRAGE ULR (accessed June 14, 2017), http://www.mirageulr.com/UltraLongRange.html; **Van Horn Decl. Ex. 7**, Screenshots of Mirage ULR Website Showing .375 CheyTac and .408 CheyTac for Sale; "BN 408 (.408 CheyTac)," NOREEN FIREARMS (accessed June 14, 2017), http://onlylongrange.com/bn408-408-cheytac/; **Van Horn Decl. Ex. 8**, Screenshots of Website Showing Noreen Firearms ULR .408 CheyTac for Sale; "Firearms," RND RIFLES (accessed June 14, 2017), http://www.rndrifles.com/firearms/rnd-2600/, http://www.rndrifles.com/firearms/rnd-2600/ (links to "RND 2500 .408 CheyTac" and "RND

from Krieger Barrels Inc. via an online form.[64] The wide availability of these products is unsurprising. The M-200 has been in production for more than twice as long as Plaintiff has been in existence.[65]

    **Fourth**, concerning the M-300, all the components that comprise that rifle—barrel, trigger, stock, scope, tripod, and chassis—are available from a number of suppliers, ready to assemble by any purchaser with appropriate tooling and skill.[66] But, as with the M-200, building one's own M-300 from scratch isn't necessary: the exact rifle the New CheyTac calls the M-300 can be purchased from Allen Precision Shooting—ask for the "375 Allen Magnum."[67] Hill Country Rifles also makes an identical rifle, called the "Long Range Extreme Tactical Rifle" "available in 375 CheyTac and 408 CheyTac."[68]

    In short, the M-200 and M-300 are comprised of barrels orderable from at least six different

---

2600 .375 CheyTac"); **Van Horn Decl. Ex. 9**, Screenshots of Website Showing RND Rifles in .375 CheyTac and .408 CheyTac; "Minerva Tactical," Victrix Armaments (accessed June 14, 2017), http://www.victrixarmaments.com/portfolio/tormentum/?lang=en#tab-1-3; **Van Horn Decl. Ex. 10**, Screenshots of Victrix Website; "Extreme," BCM Europe Arms (accessed June 16, 2017), http://www.bcmeuropearms.it/armi/EXTREME%20BRO.jpg; **Van Horn Decl. Ex. 27**, Screenshot of BCM Website; "Rifles," Prairie Gun Works (accessed June 16, 2017), http://prairiegunworks.com/id10.htm; **Van Horn Decl. Ex. 28**, Screenshot from Prairie Website; "Tactical Rifles," G.A.C. Rifles (accessed June 16, 2017), http://www.gac-rifles.com/Articles.asp?ID=261; **Van Horn Decl. Ex. 29**, Screenshots from G.A.C.

[64]  *See* "Start Building Your Custom 408 CheyTac Barrel Now!," Krieger Barrels, Inc. (accessed June 7, 2017), https://kriegerbarrels.com/boltorder?se=kbical&cal=49. *See also* **Van Horn Decl. Ex. 4**, Krieger Website Screenshot.

[65]  *See* **Taylor Decl. Ex. 5**, Original CheyTac M-200 and M-310 specification Sheets, M-200 Intervention Information Papers (2004, 2007) (what Original CheyTac called the "M-310," New CheyTac calls the "M-300").

[66]  *See infra* notes 75–80.

[67]  "APS X.H.S. Rifles," Allen Precision Shooting (accessed June 6, 2017), http://www.apsrifles.com/APS_X.H.S.html; *See also* **Van Horn Decl. Ex. 5**, Website Screenshots from APS.

[68]  "Tactical," Hill Country Rifles (accessed June 14, 2017), http://hillcountryrifles.com/hcr/tactical; **Van Horn Decl. Ex. 11**, Screenshots from Hill Country Rifles Website.

barrel suppliers,[69] triggers from at least two different trigger suppliers,[70] stocks from at least four different stock suppliers,[71] bolt actions made commercially available by a further four,[72] chassis orderable from at least six companies,[73] and tooling available from any one of five different firms.[74] Because of the nature of the production channels in the gun industry, each of the following companies produces rifles comparable to (and many comprised of *exactly the same parts* as) those CheyTac sells: Caracal (UAE), Lobaev Arms Corp., Mirage ULR, Northwest Action Works, EDM Arms, RND

---

[69]   Rock Creek Barrels Inc., Krieger Barrels, Inc., Dasan USA Inc., Lothar Walther, Bartlein Barrels, Inc., and Proof Research. *See also* "Cut Rifled Barrels," ROCK CREEK BARRELS INC. (accessed June 7, 2017), http://www.rockcreekbarrels.com/barrel-info/cut-rifled-barrels/ (offering .375 (8 groove) and .408 (8 groove) barrel calibers); "Start Building Your Custom 408 CheyTac Barrel Now!," KRIEGER BARRELS, INC. (accessed June 7, 2017), https://kriegerbarrels.com/boltorder?se=kbical&cal=49; *see also* **Van Horn Decl. Ex. 4**, Krieger Website Screenshot; **Van Horn Decl. Ex. 25**, Lothar Walther Catalogue; "Calibers," BARTLEIN BARRELS INC. (accessed June 7, 2017), https://bartleinbarrels.com/calibers/.

[70]   Jewell Triggers, Inc. (trigger manual available at http://www.ada.ru/guns/remington/jewell/manual_en.htm); Timney Triggers USA (https://www.timneytriggers.com/).

[71]   Ashbury Precision Ordnance, Mfg. (http://www.ashburyprecisionordnance.com/); Manners Composite Stocks (http://mannersstocks.com/), McMillan Fiberglass Stocks (https://mcmillanusa.com/mcmillan-rifle-stocks/mcmillan-tactical-stocks/), "McRee's Big Bore Rifle Stocks," MCREE PRECISION (accessed June 14, 2017), http://shop.mcreesprecision.net/BIG-BORE-RIFLE-STOCKS_c484.htm; **Van Horn Decl. Ex. 12**, Screenshot from McRee Website ("Here is your solution for your 375-408 or your 408 rifle build. These stocks are set up to use the CheyTac style 408 detachable box magazine"); and Cadex Defense (https://www.cadexdefence.com/products/commercial/) (*see also* **Van Horn Decl. Ex. 20**, Cadex 2016 and 2017 Products Catalogues).

[72]   Stiller Precision Firearms, LLC (http://www.viperactions.com/actions/action_index.htm), Ashbury Precision Ordnance (*see* **Van Horn Decl. Ex. 21**, Ashbury Precision Ordnance Products Catalogue ("New! SABER Bolt Action Receivers . . . Available in Action Sizes for .223 to .408/.375CT"), Defiance Machine (http://defiancemachine.com/custom-bolt-actions/), and Fortmeier (Germany).

[73]   Manners Composite Stocks (http://mannersstocks.com/) (see also **Van Horn Decl. Ex. 15**, Screenshots from Manners Website); McMillan Fiberglass Stocks; Cadex Defense (*supra*); Ashbury Precision Ordnance (*supra*); Mirage ULR (http://www.mirageulr.com/customchassis.html); MasterPiece Arms (http://masterpiecearms.com/).

[74]   Pacific Tool and Gauge (http://pacifictoolandgauge.com/), JGS Precision Tool Mfg. LLC (http://www.jgstools.com/mainarea.html), Manson Precision Reamers (https://mansonreamers.com/about/), Whidden Gunworks (http://www.whiddengunworks.com/), Triebel GmbH (http://www.triebel-guntools.de/).

Manufacturing, Knesek Guns, Inc., THOR Global Defense Group, Hill Country Rifles, DSR-precision GmbH, Desert Tech, Allen Precision Shooting, Vigilance Rifles, Ashbury Precision Ordnance, Extreme Machining, Voere GmbH, Black Creek Precision, Vestal's Custom Rifles, Noreen Firearms, and Starmis Arms. [75]

**Fifth**, and turning specifically to supposedly patented and trademarked munitions, the New CheyTac itself is responsible for giving its rights away, if it ever had them.[76] In 2013, it was forced to look to third parties such as Maltenieks (d/b/a American Ballistics) to "fabricate tooling required for custom production of [CheyTac] product."[77] On March 14, 2016, the New CheyTac entered a settlement agreement with Maltenieks, whereby █████████████████████████████



---

[75]   *See*   http://www.caracal.ae/product.php?lang=en&product_id=7;   http://lobaevarms.com/;
http://www.mirageulr.com/longrangerifles.html;   https://www.nwactionworks.com/ramrod-tactical;   http://www.edmarms.com/weaponssystems/408caliber.html;   http://www.rndrifles.com/firearms/rnd-2500/;   http://www.knesekguns.com/;   https://thorgdg.com/shop/thor-xm408/;   http://hillcountryrifles.com/;   http://dsr-nr-1.com/pages/dsr1-rifle/en.php;   https://deserttech.com/product_overview.php?product_id=4&load=product_overview;   http://www.apsrifles.com/;   http://www.vigilancerifles.com/vr1408.html;   http://www.ashburyprecisionordnance.com/;   http://www.xtrememachining.biz/products_barrels.html;   http://www.voere.com/en/rifle-technology.html;   http://blackcreekprecision.com/;   http://vestalscustomrifles.com/#;   http://onlylongrange.com/bn408-408-cheytac/;   http://starmisarms.com/xdl-rifle-408/.

[76]   *See* **Van Horn Decl. Ex. 13**, U.S. Patent No. 6,629,669 (filed June 14, 2001) (showing no transfer of rights from Jensen to anyone). *See also* **Omanoff Decl. Ex. 3**, Non-Disclosure Agreement with Peterson Cartridge Company, LLC (Feb. 5. 2015) ██████████████████████ ███████████████████████

[77]   **Omanoff Decl. Ex. 2**, Tooling Development Agreement (Feb. 20, 2013) and Settlement and Release Agreement (Mar. 14, 2016) Between New CheyTac and Maltenieks.



That is but one example of how the New CheyTac lost hold of its munitions production because of its own manufacturing iniquity, giving away the rights to reproduce "CheyTac" cartridges to third parties. Whatever value the "balanced flight" patent may have had in 2001 when Jensen applied for it, .375 and .408 "CheyTac" projectiles have become generic, *even published in the public domain*, and the current market is flush with third-party companies making ".375 CheyTac" and ".408 CheyTac" rounds.[79] Even the New CheyTac itself, when asked, freely provided all of the necessary reloading data, making reproduction of its rounds a simple process for others.[80] In sum, the New CheyTac has sued to protect alleged patents and trade secrets that are not only ubiquitous, but which it itself has given away.

---

[78] **Omanoff Decl. Ex. 2**, Tooling Development Agreement (Feb. 20, 2013) and Settlement and Release Agreement (Mar. 14, 2016) Between New CheyTac and Maltenieks. (emphasis supplied).

[79] *See, e.g.*, **Van Horn Decl. Ex. 22**, The Hunting Shack, Inc. 2015 Products list (offering ".375 CheyTac" and ".408 CheyTac" rounds); **Van Horn Decl. Ex. 23**, Load X Spring 2015 Catalogue (offering ".408 Cheytac" rounds); Exhibit X, Ammunition Box ("408 CheyTac"); **Van Horn Decl. Ex. 24**, SAX Munitions GmbH (".408 CheyTac"); **Van Horn Decl. Ex. 21**, Ashbury Precision Ordnance Products Catalogue (downloaded from ashburyprecisionordnance.com) (offering ".375CT" cartridges).

Moreover, since 2013 the .408 CheyTac has been in the public domain with its publication by the Commission Internationale Permanente Pour L'Epreuve Des Armes a Feu Portatives ("C.I.P."). *See* ".408 CheyTac," C.I.P (accessed June 16, 2017), http://www.cip-bobp.org /homologation/uploads/tdcc/tab-i/408-chey-tac-en.pdf. *See also* **Van Horn Decl. Ex. 26**, Data Sheet Published by C.I.P (May 5, 2013, revised May 19, 2015).

[80] **Omanoff Decl. Ex. 9**, Email from Andrew McCutcheon giving away the Reloading Data (May 17, 2015).

**E.      Unlike the competitors mentioned above, and contrary to the Complaint's allegations, the facts show that NextGen isn't selling anything and isn't licensed to sell anything.[81]**

Plaintiff and its counsel failed to understand the relevant facts concerning this matter before initiating the litigation and four times insisting that the Court grant them preliminary relief.[82] Plaintiff claims that "NextGen [is] almost immediately bringing high caliber rifles and ammunition to market."[83] This is untrue. NextGen doesn't even possess the Federal Firearms License ("FFL") necessary to sell firearms.[84]

The Proprietary Rights Agreements Omanoff and Taylor signed with the New CheyTac ("PRA") don't prohibit nonexistent sales:

> I [Taylor/Omanoff] shall not engage . . . in any "Competing Business." For purposes of this Agreement, "Competing Business" shall mean any person, corporation, or other entity *that sells products or services* within any Company market area . . . .[85]

This clause requires current, active sales to meet the meaning of a "Competing Business." Moreover, the PRAs only protect proprietary information Omanoff and Dr. Taylor received that *is not known outside of the company.* "Proprietary information" is

> *information that was or will be developed, created, or discovered by or on behalf of the Company*, or that became or will become known by, or was or is conveyed to, the Company that has research or commercial value in the Business *and is not known*

---

[81]      At the time of service of this Motion, NextGen did not possess a Federal Firearms License. It now does have an FFL to import and sell—but not to manufacture—firearms. *See* ECF No. 53.

[82]      ECF Nos. 9 (first Mot. for TRO), 13 (second Mot. for TRO), 15 (first Mot. for Prelim. Inj.), 35 (second Mot. for Prelim. Inj.).

[83]      Compl. ¶ 78; ECF No. 15, first Mot for Prelim Inj. at 3 ("Plaintiff seeks an injunction to prohibit the continued marketing, production, use, offering for sale or sale of products."); ECF No. 35, second Mot for Prelim Inj., at 3 (same).

[84]      **Van Horn Decl. Ex. 16**, Listing of Federal Firearms Licensees, Florida (updated April 2017). *See also* "Listing of Federal Firearms Licenses," BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES (accessed June 13, 2017), https://www.atf.gov/firearms/listing-federal-firearms-licensees-ffls-2017 (providing lists of licensees for all states and territories).

[85]      **Taylor Decl. Ex. 10**, **Omanoff Decl. Ex. 5**, Proprietary Rights Agreements § 7 ("Noncompetition") (emphasis supplied).

*outside of the Company.*[86]

When Plaintiff alleges that, "as former high-level executives," Omanoff and Dr. Taylor have confidential information and trade secrets,[87] it discounts the important fact that the entire industry already knows everything the New CheyTac claims is proprietary.[88]

## F.     Plaintiff's serial filings have been made for no other purpose but to harass Defendants.

Plaintiff has been willing to present unsupportable facts to the Court while Plaintiff's counsel has signed each document without any apparent inquiry concerning those facts. After Plaintiff's two attempts to obtain temporary restraining orders had been denied by the Court,[89] Defendants' counsel (during a phone conversation on May 18, 2017) warned Plaintiff's counsel that there were significant factual inaccuracies in the Complaint. Defendants offered Plaintiff a chance to mediate: an opportunity for the parties to reach a business resolution before Plaintiff caused Defendants to waste money on these frivolous claims. Defendants' counsel also noted that the relevant contracts broadly *require* arbitration arising out of any disputes related to alleged proprietary information:

> I understand and agree that this [Proprietary Rights] Agreement shall be interpreted and enforced in accordance with the laws of the State of Georgia. I agree that any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled, except as may otherwise be provided herein, by arbitration held in Atlanta, Georgia, in accordance with the Commercial Arbitration Rules of the American Arbitration Association.[90]

Right now, the parties should be either in settlement discussions with a mediator or preparing for arbitration. They should not be burdening this Court with a case that has nothing to do with this state or district. Even after its early loses and warning from defense counsel, Plaintiff doubled down

---

[86]   **Taylor Decl. Ex. 10**, **Omanoff Decl. Ex. 5**, Proprietary Rights Agreements § 1.F.

[87]   Compl. ¶ 83.

[88]   *See supra* at § D.

[89]   ECF Nos. 9, 13.

[90]   **Taylor Decl. Ex. 10**, **Omanoff Decl. Ex. 5**, Proprietary Rights Agmts. § 14.

by filing a motion for preliminary injunction—before any Defendant had been served.[91] Plaintiff has now filed a second similar motion.[92] This behavior is entirely improper—particularly given the obvious lack of immediacy in this case: Defendants are *not* licensed to sell firearms, there is no proprietary information or trade secret to protect, and a large segment of the industry sells the same rifles and munitions that Plaintiff does. At every juncture, Defendants have attempted to get Plaintiff and its counsel to stop-and-think. Plaintiff has instead chosen to launch repeated, unjustifiable litigious missiles to purposely increase costs.

## ARGUMENT

An attorney's signature means something. A signing attorney attests that, having made an evaluation of the circumstances, his client's claim is reasonably grounded in fact and law.[93] At one time, Rule 11 only required an attorney to stand behind claims "to the best of his knowledge." Now, however, a "reasonable inquiry" is required. The attorney's conduct is evaluated based on an objective standard; good faith isn't a defense.[94]

Sanctions are appropriate when "the claimant exhibits a deliberate indifference to obvious facts," "should have believed that the pleadings filed were not well-grounded in facts and law,"[95] and has "insist[ed] upon a position after it is no longer tenable."[96] A court tests the signer's conduct by

---

[91]   ECF No. 15 (first Mot. for Prelim. Inj.) (denied as being filed *ex parte*).

[92]   ECF No. 35 (second Mot. for Prelim. Inj.).

[93]   *See, e.g., Donaldson v. Clark*, 819 F.2d 1551, 1556 (11th Cir. 1987).

[94]   Committee on Litigation, *Report on the 1993 Amendments to the Federal Rule of Civil Procedure 11*, CITY BAR OF NEW YORK (May 2010).

[95]   *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998); *see also Aetna Ins. Co. v. Meeker*, 953 F.2d 1328, 1331 (11th Cir. 1992) ("[A] federal district court is required to evaluate whether the motion, pleading or other paper reflected what could reasonably have been believed by the signer at the time of signing.").

[96]   Fed. R. Civ. P. 11 (b), (c) advisory committee's note (1993).

looking at what it was reasonable to believe at the time of the filing.[97] So, a court must understand

what information was available to the signer that is *absent* from the filing. As Rule 11(b) provides:

> By presenting to the court a pleading, written motion, or other paper[,]
> . . . an attorney or unrepresented party certifies that to the best of the
> person's knowledge, information, and belief, formed after an inquiry
> reasonable under the circumstances: (1) it is not being presented for
> any improper purpose, such as to harass, cause unnecessary delay, or
> needlessly increase the costs of litigation; [and] . . . (3) the factual
> contentions have evidentiary support or, if specifically so identified,
> will likely have evidentiary support after a reasonable opportunity for
> further investigation or discovery.[98]

The purpose of Rule 11 sanctions is to "deter repetition of the conduct or comparable conduct by

others similarly situated."[99] So, Plaintiff's counsel was required to "stop-and-think before initially

making legal or factual contentions."[100] Because he failed to do so, Mr. Rapacke, along with Plaintiff,

is subject to sanctions for insisting upon these untenable positions.[101]

Unsupportable contentions "are not measured solely as of the time they are filed with or

submitted to the court, but include reaffirming to the Court and advocating positions contained in

those pleadings and motions after learning that they cease to have any merit."[102] The Court may infer

harassment from a filing when the allegations are diametrically opposite to the actual circumstances.[103]

## CONCLUSION

Here, Plaintiff's representations to the Court are indisputably false. Neither Plaintiff nor its

---

[97] Fed. R. Civ. P. 11, advisory committee's note (1983).

[98] Fed. R. Civ. P. 11(b)(3).

[99] *Id.*

[100] Fed. R. Civ. P. 11, Cmt. to 1993 Am.

[101] *Id.*

[102] *Id.*

[103] *See, e.g.*, *Guidry v. Clare*, 442 F. Supp. 2d 282, 289 (E.D. Va. 2006) ("[I]t is pellucidly clear that five and one half of plaintiff's seven FDCPA claims are meritless, indeed flatly frivolous.").

counsel could have made any reasonable inquiry. Even a quick internet search is enough to reveal that the bulk of the Complaint is substantively wrong. Plaintiff and its counsel have no business availing themselves of the time and resources of this Court and should be sanctioned.

The Complaint (and subsequent filings) seeks injunctive relief to halt sales that haven't happened and to recover alleged unjust enrichment by Defendants that don't have the necessary license to make such sales. It attacks Omanoff's character for no other reason than to harass. It seeks to protect alleged "trade secrets" that are *readily available all over the internet through no fault of any Defendant*, currently used by many manufacturers to make identical goods, and that were originated by companies other than Plaintiff. There are no trade dress infringement and false designation of origin claims based on products with only four major components and are being freely sold by other companies in their identical compositions. Despite all of this, Plaintiff sued Defendants based on a single sample brochure before they manufactured or sold single product.

Plaintiff is trying to trade on the name and accomplishments of an earlier company with a similar name, and to prevent Defendants from competing with it using widely available information that Plaintiff has never been able to claim as proprietary. There is no way that Plaintiff made the reasonable inquiry required under the circumstances before bringing this litigation and its repeated filings for injunctive relief.

The Court should sanction Plaintiff CheyTac USA LLC and its counsel, Andrew Rapacke and the Rapacke Law Group, P.A., for bringing these frivolous claims without making any reasonable inquiry and repeatedly filing false information to harass Defendants.

[signature page follows]

20

Respectfully submitted this 10th day of July, 2017.

_____/s/_____
Benjamin D. Van Horn
Florida Bar No. 123952
John Da Grosa Smith
(*admitted pro hac vice*)
Kristina M. Jones
(*admitted pro hac vice*)

**SMITH LLC**
1320 Ellsworth Industrial Blvd.
Suite A1000
Atlanta, Georgia 30318
bvanhorn@smithlit.com

*Counsel for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on this 10th day of July, 2017, I hereby caused to be electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

_____/s/_____
Benjamin D. Van Horn
Florida Bar No. 123952

22

**<u>SERVICE LIST</u>**
CASE NO.: 17-60925-CIV-ALTONAGA

Andrew Rapacke, Esq.
Benjamin Bedrava, Esq.
Steve Hyatt, Esq.
THE RAPACKE LAW GROUP, P.A.
Florida Bar No: 0116247
950 S. Pine Island Road
Suite A-150
Plantation, FL 33324
andy@arapackelaw.com
ben@arapackelaw.com

*Counsel for CheyTac USA LLC*

*Via ECF*